# IN THE CIRCUIT COURT FOR BALTIMORE CITY

**JEFFREY & RAQUEL LILLY**       *
10 Windemere Court
York, Pennsylvania 17402         *

            Plaintiffs,           *

        v.                        *          Civil Case Number _____

**BALTIMORE POLICE DEPARTMENT**  *          24·C·22·3986
    Serve on:
    Commissioner Michael Harrison *
    601 E. Fayette Street
    Baltimore, Maryland 21202     *

**DEPUTY POLICE COMMISSIONER**    *
**BRIAN NADEAU**
14507 Highbury Lane               *
Laurel, Maryland 20707

                                  *

**CAPTAIN LEKESHIA BLUE**         *
10810 Stansfield Road
Randallstown, Maryland 21133      *

                                  *

**UNKNOWN EMPLOYEES OF THE**
**BALTIMORE POLICE DEPARTMENT**   *
601 E. Fayette Street
Baltimore, Maryland 21202         *

**ROBERT SMITH**                  *
2311 Siena Way
Woodstock, Maryland 21163         *

**DELPHINE SMITH**                *
2311 Siena Way
Woodstock, Maryland 21163         *

            Defendants.           *

---

## COMPLAINT FOR CIVIL RIGHTS VIOLATIONS, TORTIOUS INTERFERENCE WITH A CONTRACT, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiffs, Jeffrey Lilly, and Raquel Lilly, by and through their undersigned attorneys,

Patrick B. Jennings, #412430 and Michael J. Turiello, #845869, complain against the

Baltimore Police Department, Deputy Police Commissioner Brian Nadeau, Captain Lekeshia Blue, unknown employees of the Baltimore Police Department, Robert Smith, and Delphine Smith, and state as follows:

## JURISDICTION AND VENUE

1.      This action is brought pursuant to the Maryland Constitution, Maryland statutes and common law, 42 U.S.C. § 1983, and the Fourteenth Amendment of the United States Constitution. This court has original jurisdiction over Plaintiffs' state law claims and has both concurrent and supplemental jurisdiction over the Plaintiffs' federal claims.

2.      Defendants Brian Nadeau and Lekeshia Blue were acting within the scope of their employment at the times of the incidents giving rise to the causes of action. They have acted and continue to act under the color of law in the State of Maryland at all times relevant to this complaint. Their deprivations of Jeffrey Lilly's constitutional rights are set forth in the following statements of facts and causes of action.

3.      The causes of action in this complaint arising under the laws of the State of Maryland allege damages in excess of $30,000.00 and therefore fall under the original jurisdiction of the Circuit Court.

4.      Venue is proper in this jurisdiction pursuant to Maryland Courts and Judicial Proceedings § 6-201 because one of the Defendants, the Baltimore Police Department, maintains its offices within Baltimore City and because several discrete actions of the ongoing illegal scheme occurred in Baltimore City.

## PARTIES

5.      Plaintiff Jeffrey Lilly is a resident of the State of Pennsylvania. At present, and since 2004, he is employed by the Baltimore Police Department in Baltimore City, Maryland. Since 2015, he has been assigned to a joint task force with the Federal Bureau of Investigation ("FBI"). He is the husband of Raquel Lilly.

6.     Plaintiff Raquel Lilly is a resident of the State of Pennsylvania. She is the wife of Jeffrey Lilly, the niece of Defendant Robert Smith and Defendant Delphine Smith, and the first cousin of Defendant Lekeshia Blue.

7.     Plaintiffs Raquel Lilly and Jeffrey Lilly operate a side business as hobby breeders in the State of Pennsylvania. In that capacity, the Plaintiffs use the name "Twisted Roots Kennels" to breed and sell French bulldogs.

8.     Defendant Baltimore Police Department ("BPD," or "the Department") is or was the employer of each of the Officer Defendants. The BPD is a person within the meaning of 42 U.S.C. § 1983. The BPD is a municipality within the meaning of Maryland law.

9.     Defendant Brian Nadeau (at times referred to herein as "Deputy Commissioner Nadeau") is a resident of Laurel, Maryland. He is a deputy commissioner in the BPD who oversees the Public Integrity Bureau ("PIB"). He reports directly to Commissioner Michael Harrison and oversees all investigations into alleged misconduct by officers in the BPD. At all times relevant hereto he acted in concert with the other Defendants, under color of state law, and within the scope of his employment. The Plaintiffs sue Deputy Commissioner Nadeau in his official and individual capacity.

10.    Defendant Lekeshia Blue (at times referred to herein as "Lieutenant Blue" or "Captain Blue") is a resident of Baltimore County, Maryland. She is the widow of James Blue, III, the daughter of Delphine Smith, the stepdaughter of Robert Smith, the sister of Lamont Pride, and the first cousin of Raquel Lilly. She is a BPD officer assigned to the PIB.   At all times relevant hereto she acted in concert with the other Defendants, under color of state law, and within the scope of her employment. The Plaintiffs sue Lekeshia Blue in her official and individual capacity.

11.    Defendant Robert Smith is a resident of Baltimore County, Maryland. He is the husband of Delphine Smith, the uncle of Raquel Lilly, and the stepfather of Lekeshia Blue. He

is a former BPD officer who attained the rank of colonel. During his career, Colonel Smith served as the Deputy Major of the Western District and worked in Executive Protection, Specialty Drug Enforcement Units, the Warrant Apprehension Task Force ("WATF"), and oversaw the Special Operations Division, which includes the Special Weapons and Tactics Team ("S.W.A.T."). Since his retirement in 2019, Colonel Smith has owned and operated a cigar store in Randallstown, Maryland, where current and former high-ranking members of the BPD and prominent state and local politicians are known to congregate. The Plaintiffs sue Robert Smith in his individual capacity.

12. Defendant Delphine "Dell" Smith is a resident of Baltimore County, Maryland. She is the wife of Robert Smith, the mother of Lekeshia Blue and Lamont Pride, and the aunt of Raquel Lilly. She retired from the BPD with the rank of lieutenant, after working in personnel and hiring, the Internal Affairs Division (now known as the PIB) and in a supervisory role in the Western District. The Plaintiffs sue Delphine Smith in her individual capacity.

13. At times herein, Robert Smith, Delphine Smith, and Lekeshia Blue are referred to as "the Smith family."

14. At times herein, Defendant Deputy Commissioner Brian Nadeau, Defendant Lekeshia Blue, and Defendants Unknown Employees of BPD are referred to as "Officer Defendants."

## PRELIMINARY STATEMENT

15. The City of Baltimore entered into a consent decree on April 7, 2017, after the Department of Justice published findings that the Baltimore Police Department had engaged in a pattern and practice of conduct that violated the First, Fourth, and Fourteenth Amendments to the United States Constitution, and other statutory provisions of state and federal law.

16. The consent decree was agreed to by then-Mayor Catherine E. Pugh and then-Police Commissioner Kevin Davis and promised to ensure that the BPD would protect

individuals' statutory and constitutional rights, treat individuals with dignity and respect, impose discipline for misconduct fairly and efficiently, and enhance support for officers through robust supervision.

17.    Since entering into the consent decree, the City of Baltimore has paid $24,169,772[1] in settlements as a result of lawsuits alleging police misconduct against BPD officers.

18.    Despite the promises contained in the consent decree, and after paying more than twenty-four million dollars in settlements due to police misconduct since making those promises, the BPD continues to be plagued by corruption and misconduct within the ranks of the Department.

19.    The Plaintiffs' allegations stated herein show that corruption and misconduct in the BPD and are perpetuated by its policymakers and leaders.

20.    The Plaintiff will show in the facts below that 1) the BPD was derelict in its duty to protect the public, specifically, James Blue, when it failed to execute a series of warrants in January of 2022; 2) that high-ranking officials in the BPD learned that the family of Mr. Blue had powerful personal and political connections capable of exposing the BPD's incompetence by filing a wrongful death lawsuit following the death of James Blue; 3) that the BPD executed a coordinated pressure campaign against one of its own detectives, the Plaintiff Jeffrey Lilly, through the actions of two current deputy commissioners, a lieutenant colonel, a captain, and other unknown officers, in an attempt to appease the family of James Blue and avoid the wrongful death lawsuit; 4) that the BPD's pressure campaign deprived Jeffrey and Raquel Lilly of rights secured by the United States Constitution, damaged Detective Lilly's

---

[1] Per semi-annual reporting by the Baltimore City Law Department titled, *Reports of Civil Actions involving Alleged Police Misconduct* published on the world wide web at https://law.baltimorecity.gov/transparency.

career, his finances, and his mental and physical health, and finally; 5) that in damaging Det. Lilly's career, the BPD jeopardized an ongoing wiretap investigation in Baltimore City.

## FACTUAL ALLEGATIONS

### Plaintiffs' Contract with James Blue:

21.    In October 2020, James Blue and Twisted Roots Kennels entered into a contract whereby James Blue purchased a dog for $8,500.00 for the purpose of producing a litter of puppies in cooperation with Twisted Roots Kennels.

22.    In exchange for his assistance in producing and caring for that litter, James Blue was to receive sixty percent of the proceeds from the sale of the puppies, after the Lillys selected pick of the litter for future breeding efforts.

23.    James Blue personally signed the agreement on an electronic device in the presence of Jeffrey and Raquel Lilly on October 18, 2020.  The Lillys returned the fully executed version of the agreement to James Blue via email at 6:38 PM that evening.

24.    Since late December 2021, James Blue had been in custody of a litter of five puppies bred in accordance with the contract.  The puppies were kept at the Blue residence in Randallstown, Maryland, as Jeffrey Lilly was teaching Mr. Blue how to care for the puppies and prepare them for sale.

25.    The value of the litter, based on deposits received, was $50,000.00.

26.    The contractual agreement proceeded without incident between James Blue and the Lillys until the day he was murdered.

### The Death of James Blue

27.    On January 25, 2022, James Blue was sitting in his car when a man approached the vehicle and began shooting.  The man continued shooting James Blue after he exited his car, and he was later declared dead at a nearby hospital.  At the time of the murder, the suspect, Sahiou Kargbo, had two outstanding warrants.

28.     The first warrant was issued on December 28, 2021, and the second on January 21, 2022. Both warrants alleged Mr. Kargbo had committed crimes with the use of a handgun.

29.     Baltimore County Police Department ("BCPD") requested the assistance of BPD S.W.A.T in order to serve the warrant.

30.     On the evening of January 25, 2022, the Plaintiffs joined the Defendants at Johns Hopkins Hospital. Also present at the hospital with the family were Shelonda Stokes, President of the Downtown Partnership of Baltimore and James Blue's sister; Nick Mosby, President of the City Council of Baltimore and a close associate of Robert Smith; Major Jason Callaghan of BPD's Public Integrity Bureau; and Deputy Commissioner Brian Nadeau.

31.     Jeffrey Lilly observed a conversation between Major Callaghan and Deputy Commissioner Nadeau at the hospital, in which Major Callaghan explained the relationships of those present to James Blue and Robert Smith. Major Callaghan explained Robert Smith's status as a retired colonel in the BPD. Mr. Lilly specifically recalls Deputy Commissioner Nadeau's concerned expression as he was briefed by Major Callaghan about the political power and influence of those present.

32.     After leaving the hospital, the family gathered at the Smith home. There, Jeffrey Lilly learned that Deputy Commissioner Nadeau had used his professional status to arrange for a private escort for Robert Smith that allowed him to bypass security at BWI airport when picking up James Blue's son, Jadan.

33.     Before they left the Smith residence on January 25th, the Lillys spoke with Lekeshia and Jadan Blue, and requested that Jadan Blue return to the Blue residence and look after the puppies until they could be returned to the Lillys. This arrangement was agreed to verbally by all parties. This information was also shared with Robert Smith and Delphine Smith.

### The Smith Family Refuses to Honor the Contract

34.     On January 27, 2022, Jeffrey Lilly spoke with Jadan Blue on the phone, at which time Jadan Blue informed him that his mother, Lekeshia Blue, and grandparents, Robert and Delphine Smith, had discussed the matter and decided not to allow the Lillys to retrieve their puppies. Jadan further stated that his mother, Lekeshia Blue, had decided to keep the puppies permanently.

35.     The Lillys objected to the Smith family's actions and did not consent to their continued possession of the puppies.

36.     Later that day, the Lillys learned that the puppies had been moved from the Blue residence to the Smith residence. The Lillys did not consent to the puppies being moved.

37.     Believing that the Smith family's actions were an indication that James Blue had not discussed the substance of the contract with his family, Jeff and Raquel Lilly sent a copy of the agreement to Robert Smith, Delphine Smith, Lekeshia Blue, Lamont Pride and Jadan Blue.

38.     On January 28, 2022, Jeffrey Lilly spoke with Robert Smith on the telephone. Robert Smith acknowledged receipt of the contract and had several questions about its terms.

39.     Throughout the afternoon of the 28th, Jeffrey Lilly spoke on the phone several times with members of the Smith family. During each of these calls, members of the Smith family attempted to renegotiate or otherwise retroactively alter the terms of the contract between James Blue and the Lillys. The Lillys rejected the proposed alterations to the terms of the contract.

40.     On January 30, 2022, Raquel Lilly sent a text message to Robert Smith and Lekeshia Blue to arrange for the return of the dogs. Shortly after Raquel Lilly sent the text message, Lekeshia Blue called her and unleashed a stream of expletive-laden verbal abuse that ultimately concluded with the statement, "Fuck you and your dogs."

41.     Later that day, the Lillys arrived at the Woodlawn Precinct of the BCPD in Gwynn Oak, Maryland. The Lillys explained the situation to the desk officer (Officer Wright, Badge #5978), and showed him a picture of the agreement on Raquel Lilly's mobile phone. After consulting with another officer, Officer Wright directed the Lillys to the Baltimore County Court Commissioner's Office in Catonsville, Maryland for further assistance.

42.     At the Court Commissioner's Office, the Lillys spoke with two court commissioners, who provided the Lillys with charging documents. Though they completed the criminal charging documents, they did not submit them, as Raquel Lilly decided that she did not wish to file criminal charges against her relatives, especially during their time of mourning.

43.     Instead, they decided to contact Non-Emergency Police Services. BCPD Officer Murphy (badge #4838) met the Lillys outside the Smith residence. The Lillys showed Officer Murphy a copy of their agreement with James Blue, and the officer replied, "Let's go get your dogs."

44.     Officer Murphy knocked on the door of the Smith residence and spoke to Robert Smith. Officer Murphy asked Robert Smith to step outside, and Robert Smith asked Officer Murphy to enter the home alone and close the door behind him.

45.     Meanwhile, the Lillys remained outside. There, the Lillys heard Lekeshia Blue shouting, "where she at, I'm gonna fuck her up," referencing Raquel Lilly.

46.     After at least fifteen minutes, Officer Murphy came outside. He told the Lillys that the Smiths would not allow either him or the Lillys to retrieve the puppies.

## The BPD Begins its Pressure Campaign Against Jeffrey Lilly

47.     The next day, January 31, 2022, Jeffrey Lilly received a phone call from Lieutenant Colonel ("LTC") John "Jack" Herzog of the Detectives Division of the BPD. LTC

Herzog told Jeffrey Lilly that Deputy Commissioner Sheree Briscoe of the Operations Bureau had asked him to contact Jeffrey Lilly about his recent interactions with Robert Smith.

48.     Deputy Commissioner Sheree Briscoe is Jeffrey Lilly's highest-ranking superior within his chain of command, directly under Commissioner Michael Harrison.

49.     LTC Herzog said that Robert Smith wanted the Lillys to "stop bothering them." LTC Herzog then asked Jeffrey Lilly to "do me this favor, at least until after the funeral." The communication was intimidating to Mr. Lilly, as Mr. Lilly felt his job could be in jeopardy if he were to continue his efforts to retrieve his property from the Smith family.

50.     Two days later, on February 2, 2022, Jeffrey Lilly received a disturbing phone call from a former colleague.  The former colleague told Jeffrey Lilly that someone had informed the FBI that Mr. Lilly was conducting his kennel business on department time and that the FBI was about to initiate an investigation against him.

51.     Later that same morning, Jeffrey Lilly met with Detective Jared Stern on the fourth floor of the FBI's Baltimore Field Office. Jeffrey Lilly told Det. Stern about the call he had received earlier that morning from his former colleague. He explained that he was involved in a civil dispute with a lieutenant in the BPD's Public Integrity Bureau (i.e., Lekeshia Blue) and her father (i.e., retired Colonel Robert Smith).

52.     Jeffrey Lilly expressed to Det. Stern his dismay that a private civil dispute was affecting his professional life. He explained to Det. Stern that the civil dispute was not only creating stress at home but was now also contributing to an uncomfortable work environment.

53.     Later that day, Raquel Lilly filed a formal complaint with the PIB through publicly available channels.  The complaint alleged that Deputy Commissioner of Operations Sheree Briscoe and LTC Jack Herzog had inappropriately interfered in a private family matter and that the manner in which they had interfered was creating a hostile work environment for Mr. Lilly.

54.     The complaint was then submitted in writing via electronic submission at 2:31 PM.   Raquel Lilly received an email receipt of the official complaint from WebNo-Reply@baltimorepolice.org on February 2, 2022, at 2:33 PM.

55.     Raquel Lilly, then followed up her written complaint with a call to the PIB on a recorded hotline at (410) 396-2300.

56.     On February 7, 2022, Mr. Lilly was notified by Deputy Director for the Equal Opportunity and Diversity Section Olufemi Akanni that Deputy Commissioner Brian Nadeau of the PIB wished to speak with him privately.

57.     On February 8, 2022, Jeffrey Lilly met with Deputy Commissioner Brian Nadeau, and the Deputy Director for the Equal Opportunity and Diversity Section, Olufemi Akanni, at BPD Headquarters. The meeting took place behind closed doors.

58.     During the meeting, Deputy Commissioner Nadeau repeatedly attempted to intimidate Mr. Lilly into abandoning the pursuit of his property and ending his efforts to enforce his contract.   On three distinct occasions within the meeting, Deputy Commissioner Nadeau repeated that he "didn't want anything bad to happen" to Mr. Lilly should the Lillys continue to pursue the return of their property.  Deputy Commissioner Nadeau said that Jeff Lilly could get into a lot of trouble if Raquel Lilly continued to have the Baltimore County Police Department make welfare checks on the dogs, and stated that Jeffrey Lilly was "responsible for the actions of (his) wife."

59.     Deputy Commissioner Nadeau admitted to taking a back-channel complaint from Robert Smith and continuously told him to stop bothering the Smith family, that he was ruining the BPD's relationship with the Baltimore County Police Department, and that he'd be "laughed out of court" if he continued to pursue the matter.

60.     Immediately following the meeting with Deputy Commissioner Nadeau, and due to the threatening tone of the meeting, Jeffrey and Raquel Lilly stopped all personal, phone, and electronic communications with the Smith family.

61.     On March 3, 2022, the Lillys hired lawyers to pursue legal avenues for the return of their litter of puppies.

62.     On March 10, 2022, Counsel for Jeffrey and Raquel Lilly sent a written demand letter via certified mail to Robert Smith, Delphine Smith, and Lekeshia Blue.  The letter demanded the immediate return of the puppies to Jeffrey and Raquel Lilly.

63.     On March 15, 2022, counsel received confirmation that the Demand Letter was delivered to Robert Smith, Delphine Smith, and Lekeshia Blue.  The demand was never met, and the litter was never returned.

64.     Because of the actions of the Smith family, Jeffrey and Raquel Lilly were unable to complete three contracts for buyers that had made deposits for puppies from this litter. Each dog was to be sold for $10,000.00.

65.     On March 25, 2022, Jeffrey Lilly received written notification from Major Jason Callaghan, who reports directly to Deputy Commissioner Nadeau, that he was the subject of an internal investigation being conducted by the PIB of the BPD.  The letter claimed that Jeffrey Lilly "harassed Mr. Robert Smith and his family during the time of January 2022 and February 2022."  It also claimed that Jeffrey Lilly provided "false information to Baltimore County Police" during the same period.  Jeffrey Lilly acknowledged receipt of the notification on March 28, 2022.

66.     On information and belief, the complaint made against Jeffrey Lilly was initiated by the Smith family.

67.     After receiving notice of the investigation, the Lillys became concerned that they had not been contacted about the complaint that they filed on February 2, 2022. They took no action at this time and continued to trust the process.

68.     On April 8, 2022, Jeffrey Lilly was informed that he had been referred to the Early Intervention System and was required to schedule his "intervention" because of the complaints against him.

69.     On April 13, 2022, Jeffrey Lilly contacted his union attorney, Michael Davey, to represent him during the PIB complaint process. After Mr. Davey learned that the complainants included current and former high-ranking officers in the PIB, and that the Lillys had filed a complaint involving the same dispute, Mr. Davey concluded that there was a conflict of interest, and he requested a change of venue. That request was denied by Deputy Commissioner Nadeau via an email sent to Mr. Davey.

70.     On April 13, 2022, Jeffrey Lilly, through his attorney, Michael Davey, scheduled his initial interrogation with the PIB for Tuesday, April 26th at 9:00AM. Per Section 2.A.I.A.2 of the PIB Investigations Manual, the time and place of this interrogation was confidential. Neither Mr. Lilly nor his attorney alerted anyone to the details of the interrogation.

71.     On information and belief, Lekeshia Blue and Deputy Commissioner Nadeau told Delphine Smith the date and time of Mr. Lilly's interrogation.

72.     On April 21, 2022, Raquel Lilly contacted the PIB to check the status of the complaint she filed on February 2nd and to discuss how it related to the complaint made against her husband. She spoke with Detective Atancil, who informed her that there was no record of her complaint.

73.     Armed with the details of Mr. Lilly's scheduled interrogation, and with malicious intent to injure Jeffrey and Raquel Lilly, on April 25, 2022, at 5:45 PM, Delphine Smith appeared before a Baltimore County Commissioner and swore out a criminal charge of

Forgery of a Private Document, a charge she knew to be false. Every named member of the Smith family in Delphine Smith's complaint had seen the document in question months earlier. Though the Smith family chose to ignore the contract, this was the first time any of them expressed any doubts at all about its authenticity, or of the existence of a business relationship between the parties to the document.

74. Following the murder of James Blue, the Department defended its failure to serve the outstanding warrants for Sahiou Kargbo. BPD released a public statement that the charges contained in Mr. Kargbo's December 28, 2021, arrest warrant were, "all misdemeanor offenses and the detectives prioritize their efforts on serving warrants for incidents such as homicides and non-fatal shootings."

75. In contrast to the Department's statement of its priorities above, on April 26, 2022, minutes before Mr. Lilly was scheduled to appear for his confidential interrogation with the PIB, the BPD served Mr. Lilly with a criminal summons for the Forgery charges sworn out by Delphine Smith just fifteen hours earlier.

76. Upon advice of counsel, Mr. Lilly refused to make any statements and left the interrogation.

77. On April 27, 2022, Mr. Lilly received notice that he was being suspended from his prestigious assignment as a Task Force Officer with the FBI through the Baltimore City Police Department. In more than eighteen years as a BPD officer, this was the first and only time Mr. Lilly had been suspended. The suspension was without pay and benefits, including his departmentally paid health insurance.

78. At the time of his suspension, Mr. Lilly was the Affiant on a wiretap investigation that sought to solve a series of drug-trafficking crimes, non-fatal shootings, and homicides in Baltimore City.

79.     On May 4, 2022, Mr. Lilly appeared before members of the PIB, overseen by Deputy Commissioner Nadeau, to determine if his suspension would continue to be unpaid. During the hearing, Mr. Lilly presented evidence of an electronically signed and authenticated "DocuSign" contract between Jeffrey and Raquel Lilly, and James Blue, which outlined their business relationship.  This contract was the document that Delphine Smith claimed was a forgery, a document which had been shown to her by Jeffrey and Raquel Lilly on January 27th. In addition to the signed contract, Mr. Lilly presented text messages and photos at the hearing as further proof of the validity of his business relationship with Mr. Blue.

80.     Despite the compelling nature of the evidence presented, and to the shock of Mr. Lilly, his attorney Mr. Davey, and indeed the BPD's own attorney Phil Motsay, Captain Michael Newton of the PIB upheld the decision to suspend Mr. Lilly without pay.

81.     Captain Newton reports directly to Major Jason Callaghan, who reports directly to Deputy Commissioner Nadeau.

82.     Mr. Motsay stated to Captain Newton, "You're going to reinstate him with pay *when* these charges are dropped, right?" Captain Newton agreed.  Mr. Motsay then followed Mr. Lilly and Mr. Davey out of the room and requested copies of the evidence presented during the hearing, which Mr. Davey provided.

83.     On June 7, 2022, Jeffrey Lilly gained insight regarding Deputy Commissioner Nadeau's and the BPD's intimidation when he received a photograph via text message from another BPD officer. The photograph was of a letter sent by the Law Office of Billy Murphy dated May 31, 2022, and addressed to the Office of Legal Affairs at BPD.

84.     The letter notified the Department of the Smith family's intent to sue the BPD for the wrongful death of James Blue.  The letter detailed the BPD's failure to serve the arrest warrants from Baltimore County for Sahiou Kargbo, despite multiple documented requests from Baltimore County Police to have BPD S.W.A.T. assist in his apprehension.

85.     Ultimately, Baltimore County apprehended Mr. Kargbo when they executed the second warrant, a search and seizure warrant, on January 26, 2022. Mr. Kargbo was not on the run when the warrant was executed. He was at his home in Baltimore City.

86.     On January 25, 2022, prior to the murder of Mr. Blue, Mr. Kargbo was present at Mergenthaler High School where he was enrolled.

87.     On June 9, 2022, Mr. Lilly appeared before the District Court for Baltimore County to face the criminal charge sworn out by Delphine Smith on April 25th. Mr. Lilly provided the Baltimore County State's Attorney's Office with much of the same evidence provided to the BPD during Mr. Lilly's May 4th hearing.

88.     As a result of the evidence presented, the Baltimore County State's Attorney's Office declined to prosecute Mr. Lilly and entered a *nolle prosequi*, dismissing the charges.

89.     Immediately after the court proceeding, Robert Smith, Delphine Smith, and Lekeshia Blue stormed out of the courtroom and demanded to speak with supervisors at the Baltimore County State's Attorney's Office. As the family yelled at the Assistant State's Attorney for her decision to drop the charges, Lekeshia Blue peeled away from the group in order to direct a series of vitriolic and inflammatory insults and threats at Jeffrey and Raquel Lilly. There in the hallway of the District Court of Maryland and in the presence of Raquel Lilly's teenaged daughter, court personnel, and the public, Lekeshia Blue screamed at Raquel Lilly, calling her a "thirsty ho" and a "fucking bitch."

90.     On June 14, 2022, Mr. Lilly was informed that his suspension would be lifted and that his policing powers and compensation would be reinstated.

91.     On June 17, 2022, Jeffrey Lilly, accompanied by Raquel Lilly, reported to BPD headquarters and the offices of the PIB to sign his reinstatement paperwork. After signing, he was told that in order to receive his back pay, totaling $12,520.20, he would have to disclose all of his financial records, waive any claims against the BPD, and indemnify the BPD from

all claims, damages, losses and expenses arising out of his disclosure. Considering the intimidation and pressure that had been applied to Mr. Lilly up to that point, he declined to sign the Authorization for Release of Financial Information and has yet to be reimbursed for his back pay.

92.    Prior to leaving the PIB office, Jeffrey Lilly asked why the complaint that Raquel Lilly filed on February 2nd was never found or followed up on. Lieutenant Sean Mahoney excused himself and hurried out of the closed room only to return a few moments later with a sticky note that contained the complaint number for Mrs. Lilly's filed complaint.

93.    Lieutenant Mahoney stated that the complaint was miraculously found in the Ethics Department of the PIB. By that point, Mrs. Lilly's complaint had gone unanswered for more than four months, despite Raquel Lilly's persistence in checking on its status and Jeffrey Lilly's attorney, Michael Davey, referencing the complaint in a request for a change of venue months earlier.

94.    Lekeshia Blue was the lieutenant in charge of the Ethics Department of the PIB at the time Raquel Lilly's complaint was filed and through July of 2022.

95.    Upon information and belief, Lekeshia Blue and Deputy Commissioner Brian Nadeau intentionally stalled the investigation into Raquel Lilly's complaint.

96.    The final task for the Lillys that day was to report to the armory so that Mr. Lilly could retrieve his departmentally issued firearm. There, he was met by Sergeant Jared Fried who told Jeffrey Lilly that he had heard a lot of bad rumors about him, but that he was glad that Mr. Lilly was back.

97.    On June 21, 2022, Mr. Lilly asked his supervisor at the FBI, Supervisory Special Agent ("SSA") Adonis Wesbey, whether he would be returning to the unit as a Task Force Officer. SSA Wesbey indicated in a text message on June 28, 2022, that the FBI wanted him to return and that she had left a voicemail for Lieutenant Billy Simmons of the BPD conveying

the FBI's desire to have Mr. Lilly return to work with the task force and re-join the investigation he had been working on.

98.     That same day, Lt. Simmons stated that Mr. Lilly was being demoted out of the prestigious Federal Task Force and reassigned to the Warrant Apprehension Task Force. In this assignment Mr. Lilly would be under the direct supervision of Lamont Pride, Lekeshia Blue's brother, who is a sergeant assigned to that unit. Mr. Lilly refused the transfer and requested another assignment.

99.     On August 4, 2022, Police Commissioner Michael Harrison signed an order promoting Lekeshia Blue to the rank of Captain, effective August 7, 2022. Her promotion was announced fifty-five (55) days after she attended a session of the District Court of Maryland planning to testify in support of false charges, brought under penalty of perjury, and hurling vile public insults at the Lillys in the presence of their teenage daughter.

100.    Captain Blue is now one of the highest-ranking officers under the command of Deputy Commissioner Nadeau, and now leads a unit that includes the word "integrity" in its name.

### Jeffrey and Raquel Lilly's Damages

101.    Since late January of 2022, the BPD has intentionally, maliciously, and with deliberate indifference, acted to deprive Jeffrey Lilly of his constitutional rights.

102.    After learning that their failure to timely serve a warrant resulted in the death of James Blue, the BPD had an opportunity to address that failure with the urgency and transparency consistent with the promises made in the Consent Decree. Instead, the BPD's highest-ranking officials orchestrated and executed a continuous campaign of pressure and intimidation by abusing the power of the PIB. The BPD's actions were maliciously intended to punish Jeffrey and Raquel Lilly in order to placate the Smith family and avoid negative publicity from another wrongful death lawsuit.

103.   During this ordeal, Mr. Lilly began showing physical signs of extreme stress, anxiety, and despair.  He attributes these feelings to the inability to regain possession of his litter of puppies; the false criminal charges levied against him by members of his own family; and the campaign of pressure and intimidation that the Defendants have exerted on him since January.

104.   Starting in February of 2022, Mr. Lilly gained weight, complained of an inability to sleep, and complained of shortness of breath and chest pains.

105.   On June 22, 2022, Jeffrey Lilly sought medical attention from his primary care physician.  During his visit, Dr. Mokarroma Sharmin noted Mr. Lilly's weight gain and demeanor and ordered an electrocardiogram.  Dr. Sharmin informed Mr. Lilly that the results of his ECG revealed that Mr. Lilly had likely suffered a heart attack.  Dr. Sharmin ordered Mr. Lilly to stay home on sick leave until July 19, 2022.

106.   As that date approached Mr. Lilly's anxiety increased and was accompanied by the same chest pains, shortness of breath and trouble sleeping that he had been experiencing. Accordingly, Mr. Lilly began mental health counselling.

107.   The actions of the BPD, spearheaded by Deputy Commissioner Nadeau, actually and proximately caused Jeffrey Lilly to suffer a deprivation of his rights under the Constitution, as well as various financial, physical, and emotional damages.  Mr. Lilly has endured extreme stress, anxiety, an inability to sleep, damage to his health, loss of business revenue, loss of wages, and the loss of the important assignment he had been working on for seven years.

108.   Since late January of 2022, Raquel Lilly has had the burden of watching helplessly as her husband suffered embarrassing, demoralizing, and unjust treatment by the BPD.  When she decided to speak up against leaders in the Department who had acted inappropriately, the BPD buried her complaint.  In the four months that her complaint went

unanswered, she watched as her husband was interrogated and threatened by Deputy Commissioner Nadeau, investigated by the PIB despite a lack of credible evidence and obvious conflicts of interest, accused of a false criminal charge by the mother of a then-lieutenant of the PIB, suspended without pay, demoted, and humiliated. Witnessing her husband's treatment caused Raquel Lilly a great deal of emotional stress and trauma.

109. As a result of the actions taken by Lekeshia Blue and Deputy Commissioner Nadeau, Raquel Lilly temporarily abandoned her constitutional right to pursue her property and contract rights against the Smith family.

110. Because of the actions of the Defendants, Raquel Lilly has experienced a loss of business revenue, a loss of property, emotional distress, embarrassment, and public humiliation.

## Deputy Commissioner Nadeau's abuse of the internal investigations and disciplinary process amounts to a policy and practice of BPD.

111. In August of 2016, after a thorough investigation, the Department of Justice ("DOJ") published a report which stated that the BPD was engaging in patterns and practices of conduct in violation of the Constitution and statutory provisions of Federal and State Law. DOJ's report highlighted the Department's systematic failures in investigating and adjudicating complaints against officers, and determined that the Department's persistent failure to hold officers accountable for misconduct contributed to an erosion of trust within the community. Not surprisingly, the Consent Decree required the Department to implement significant systematic changes to the Internal Affairs Division, now the PIB, in order to ensure a well-functioning system of accountability.

112. On August 9, 2019, Baltimore Police Commissioner Michael Harrison was quoted in the *Baltimore Sun* announcing Nadeau's hiring, stating, "[Brian Nadeau] is quite familiar with some of the challenges we're facing." Commissioner Harrison (who was

recruited because of his experience in navigating a DOJ consent decree in New Orleans) was referring to the challenges the BPD faced in implementing reforms throughout the Department, starting with the PIB. In hiring Brian Nadeau as Deputy Commissioner of the Public Integrity Bureau, the BPD conferred upon him the final policymaking authority with regard to a central part of the Department's mandate to restore public trust.

113.    Deputy Commissioner Brian Nadeau is one of the five highest-ranking officials in a Department that employs more than thirty-one hundred civilian and sworn personnel. Deputy Commissioner Nadeau is part of a team assembled to lead the BPD through federal monitoring required by the Consent Decree. Deputy Commissioner Nadeau has the sole delegated responsibility of making policy determinations that govern the conduct of the Public Integrity Bureau. His position and status classify him as a policymaker for the BPD.

114.    Deputy Commissioner Nadeau's denial of a fair hearing for Jeffrey Lilly on May 4, 2022, his intentional exertion of coercion and pressure upon Jeffrey Lilly through the PIB's illegitimate investigation, and the burying of Raquel Lilly's complaint against BPD command staff are all sufficient proof of the BPD's policy and practice of abusing the process of internal investigations and disciplinary proceedings.

115.    The BPD has actual knowledge of the policy and practice described herein, and, despite that knowledge, has continued to perpetuate its abuse of internal investigations and disciplinary proceedings with deliberate indifference to the rights of Jeffrey and Raquel Lilly.

**The BPD engages in the policy and practice of mishandling internal investigations conducted by the PIB.**

116.    The actions of Deputy Commissioner Nadeau and other Officer Defendants, as alleged above, were taken pursuant to a series of de facto policies, practices, and/or customs of the BPD. The Department has a well-documented history of maintaining a policy, pattern, and practice of failing to properly conduct internal investigations into complaints of

misconduct against its officers.  In a report of its investigation of the BPD published in

August 2016, the DOJ found that the Department discourages members of the public from

filing complaints through unnecessarily burdensome procedural requirements.  If complaints

are filed, the DOJ found that BPD fails to investigate complaints in a timely manner and

deploys ineffective investigative techniques.  The Department's investigative deficiencies

limit its ability to discipline its officers and promotes a culture of unconstitutional policing

and unethical behavior.

117.    As the facts above indicate, PIB investigations continue to be bungled in a

variety of ways, including: detectives in the PIB do not timely answer complaints lodged by

citizens through publicly available channels; detectives in the PIB do not contact witnesses in

a timely matter; the PIB fails to properly identify obvious conflicts of interest and to transfer

investigations involving said conflicts to outside agencies; the PIB fails to keep sensitive

information confidential as required by its governing General Orders; and the PIB fails to

apply proper scrutiny with regard to witness credibility and fails to apply the proper weight to

evidence presented during disciplinary hearings.

118.    In addition to the present case, several other incidents demonstrate that the

BPD systematically mishandles internal investigations.

119.    In 2012, a confidential informant who worked in the sex trade informed BPD

investigators that she regularly had sex with an officer in his patrol car in exchange for

money or immunity from arrest.  The Department closed the case nine months later.  They

never interviewed the accused officer or any potential witnesses.

120.    In 2013, the Department received an anonymous tip that the same officer was

having sex in his patrol car with another woman involved in the sex trade.  An investigation

was opened, and an assistant state's attorney instructed a detective to subpoena the woman's

phone records.  The detective waited a month before doing so, and then waited another four

months before looking at the phone records. The phone records showed that the officer and the woman had exchanged hundreds of text messages over a period of six months. Several months later the Office of the State's Attorney declined to prosecute, though the investigation remained open.

121.    In 2015, a neighboring police department informed the BPD that the same officer was engaging in sexual activity with the same woman mentioned in the previous complaint. The neighboring police department opened an investigation, interviewed the woman, and subpoenaed her phone records. The BPD also opened another investigation into the officer, even though the second investigation was still open. Eventually, BPD investigators reviewed the officer's phone records, and found that he had exchanged text messages with other women whose numbers were linked to prostitution websites. Based largely on the evidence provided by the neighboring police department's investigation, the charges were sustained, and the officer was allowed to resign.

122.    In 2013, a man alleged that he was arrested by two plainclothes officers who spat in his face, put him a chokehold, and punched him in the face. The charges stemming from the arrest were later dropped. He had a formal interview at the Internal Investigations Division ("IID"), where he provided the investigator with the name of a witness to the arrest. For eight months the IID took no action in following up on this complaint. Then, after making a single attempt to locate the witness's wife, the investigator recommended the case be closed.

123.    Another complaint was filed in 2013, which involved a man who alleged that he was hospitalized after two officers slammed him to the ground while unlawfully arresting him. The man filed a complaint, which languished for more than a year while the complaint was passed back and forth by two command investigations units. The complaint was subsequently rediscovered during an audit of IAPro. Another four months passed before the

complaint was assigned to an IID investigator. The BPD closed the case when witnesses were contacted nearly a year and a half after the complaint was filed and failed to show up for interviews. The IID never interviewed the accused officers.

124.   The 2016 DOJ report details the many ways in which the IID/IAD/PIB has mishandled investigations for years, including the above-mentioned incidents. The DOJ report served as the basis for the Consent Decree signed by then-Mayor Catherine Pugh and then-Police Commissioner Kevin Davis in 2017. Despite having actual knowledge of the failures within the PIB to adequately conduct investigations, the Department has not corrected those failures, in turn promoting these failures as the policy and practice of the BPD.

125.   These policies and practices are consciously approved at the highest policymaking level by policymakers who are deliberately indifferent to the violations of constitutional rights stated herein, and which are the direct cause of the injuries suffered by Jeffrey and Raquel Lilly.

## CLAIMS FOR RELIEF

## FEDERAL LAW CLAIMS

### Count 1 - 42 U.S.C. § 1983
### Violation of Due Process (Fifth and Fourteenth Amendments)
### *Brian Nadeau's Malicious Abuse of PIB's Investigative and Disciplinary Process*

126.   Each foregoing paragraph is incorporated as if fully restated herein.

127.   This claim is brought against Defendant the Baltimore Police Department and Deputy Commissioner Nadeau in his official capacity by Plaintiff Jeffrey Lilly.

128.   Defendant at all times relevant to this action acted under color of state law and within the scope of his employment.

129.   As described above in paragraphs 111 to 115 above, Deputy Commissioner Brian Nadeau's final policymaking authority over the PIB imputes upon him the status of a

municipal policymaker, and his intentional abuse of the PIB's investigative and disciplinary process in order to intimidate Jeffrey Lilly constitute an official policy and practice of the Baltimore Police Department.

130. The Baltimore Police Department, through Deputy Commissioner Brian Nadeau, had actual knowledge of the abuse of the PIB's investigative and disciplinary process toward Jeffrey Lilly.

131. The Baltimore Police Department's policy and practice described in this count were implemented by the Department with, at least, deliberate indifference to Mr. Lilly's constitutional rights, if not specific intent to deprive him of his constitutional rights.

132. At all times relevant hereto, Defendants Brian Nadeau and the BPD acted pursuant to a policy or custom of abusing the PIB's investigative and disciplinary process to deny Plaintiff Jeffrey Lilly his constitutional rights.

133. As a direct and proximate result of the BPD's policy or custom, Mr. Lilly's constitutional rights were violated. Specifically, the BPD deprived Mr. Lilly of 1) his right to enforce his contract and retrieve his property from the Smith family; and 2) his ability to enter into contracts with buyers for the puppies who had already made deposits. Mr. Lilly suffered additional physical, emotional, and financial damages as outlined in the Complaint as a direct and proximate result of the BPD's actions outlined herein.

WHEREFORE, Plaintiff Jeffrey Lilly demands judgment against Defendants for a dollar amount in excess of $75,000.00, plus interest and costs of this actions, and punitive damages.

### Count 2 – 42 U.S.C. § 1983
### *Monell* Claim Under Fifth and Fourteenth Amendments
### *BPD's policy and practice of mishandling investigations conducted by the PIB*

134. Each foregoing paragraph is incorporated as if fully restated herein.

135.   Defendants at all times relevant to this action were acting under color of state law.

136.   This claim is brought against the Defendant the Baltimore Police Department by Plaintiff Jeffrey Lilly.

137.   The actions of the Officer Defendants were undertaken pursuant to the policies and practices of the BPD, which were ratified by policymakers with final policymaking authority.  These policies and practices result in mishandled investigations by the PIB by failing to answer complaints in a timely manner; failing to contact witnesses in a timely matter; failing to identify obvious conflicts of interest and transfer investigations involving such conflicts to outside agencies; failing to keep sensitive information confidential as required by its governing General Orders; failing to apply the proper scrutiny with regard to witness credibility; and failing to apply the proper weight to evidence presented during disciplinary hearings.  The policies and practices also include the failure to adequately train or supervise officers in the PIB with regard to proper investigative techniques, and the failure to discipline officers that employ improper investigative techniques.

138.   These policies and practices permeate the BPD and constitute a "custom or usage" that BPD leaders had actual knowledge of.

139.   BPD's policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative actions, and its policy custom, or pattern and practice of failing to adequately train, supervise, and discipline members of the PIB is reflected in the multiple examples of misconduct as described in paragraphs 116 to 125 above.

140.   The policies and practices described herein were maintained and implemented by the BPD with deliberate indifference to Jeffrey Lilly's constitutional rights.

141.   At all times relevant hereto, Defendants acted pursuant to a policy or custom of the Baltimore Police Department of mishandling investigations conducted by the Public Integrity Bureau.

142.   As a direct and proximate result of the BPD's policy or custom, Mr. Lilly's constitutional rights were violated.  Specifically, the BPD deprived Mr. Lilly of 1) his right to enforce his contract and retrieve his property from the Smith family; and 2) his ability to enter into contracts with buyers for the puppies who had already made deposits. Mr. Lilly suffered additional physical, emotional, and financial damages as outlined in the Complaint as a direct and proximate result of the BPD's actions outlined herein.


WHEREFORE, Plaintiff Jeffrey Lilly demands judgment against Defendants for a dollar amount in excess of $75,000.00, plus interest and costs of this actions, and punitive damages.

## STATE LAW CLAIMS

### Count 3 - Civil Conspiracy: Tortious Interference With a Contract
### (Against All Defendants)

143.   Each foregoing paragraph is incorporated as if fully restated herein.

144.   This claim is brought against each Officer Defendant in their official and individual capacity, Robert Smith, and Delphine Smith by Plaintiffs Jeffrey and Raquel Lilly.

145.   Defendants entered into an agreement with one another to pressure and intimidate Plaintiffs Jeffrey Lilly and Raquel Lilly in order to force them to abandon their legal efforts to reclaim their property, thus tortiously interfering with the contract between James Blue and Jeffrey and Raquel Lilly.

146.   Defendants' actions were intentional and undertaken with actual malice, with the specific aim of causing harm to Plaintiffs.

147.   As a direct and proximate result of the Defendants' civil conspiracy, the Plaintiffs Jeffrey and Raquel Lilly sustained compensatory damages, including but not limited

to lost revenue from the sale of the litter, loss of future business, reputational damage, and emotional damages including pain and suffering.

148. Plaintiff Jeffrey Lilly also sustained damage to his physical health.

WHEREFORE, Plaintiffs Jeffrey and Raquel Lilly demand judgment against Defendants for a dollar amount in excess of $75,000.00, plus interest and costs of this actions, and punitive damages.

### Count 4 - Civil Conspiracy: Abuse of Process
### (Against Lekeshia Blue, Robert Smith, and Delphine Smith)
### *Filing a False Criminal Charge in Baltimore County District Court*

149. Each foregoing paragraph is incorporated as if fully restated herein.

150. This claim is brought against Lekeshia Blue in her individual capacity, Robert Smith, and Delphine Smith by Plaintiffs Jeffrey and Raquel Lilly.

151. Defendants entered into an agreement to file false charges that the Plaintiff Jeffrey Lilly had forged a document which the Defendants knew to be a valid contract. Furthermore, they conspired to break the law when they planned to testify in an effort to suborn perjury.

152. Defendants' actions were intentional and undertaken with actual malice, with the specific aim of causing harm to Plaintiffs.

153. As a direct and proximate result of the Defendants' civil conspiracy, the Plaintiffs Jeffrey and Raquel Lilly have sustained compensatory damages, including but not limited to emotional damages including pain and suffering.

154. Plaintiff Jeffrey Lilly also sustained lost wages, reputational damage, and damage to his physical health.

WHEREFORE, Plaintiffs Jeffrey and Raquel Lilly demand judgment against Defendants for a dollar amount in excess of $75,000.00, plus interest and costs of this action, and punitive damages.

### Count 5 - Conversion
### (Against Lekeshia Blue, Robert Smith, and Delphine Smith)

155.    Each foregoing paragraph is incorporated as if fully restated herein.

156.    This claim is brought against the Defendants Lekeshia Blue, Robert Smith, and Delphine Smith by Plaintiffs Jeffrey and Raquel Lilly.

157.    After the death of James Blue, Defendants moved the Plaintiffs' litter of puppies to the home of Robert and Delphine Smith, without consent of the Plaintiffs.

158.    Plaintiffs demanded the immediate return of their property on multiple occasions, but Defendants refused.

159.    As a direct and proximate result of the Defendants' actions, the Plaintiffs Jeffrey and Raquel Lilly have sustained compensatory damages, including but not limited to loss of business revenue, loss of future income, reputational damage, and pain and suffering.


WHEREFORE, Plaintiffs Jeffrey and Raquel Lilly demand judgment against Defendants for a dollar amount in excess of $75,000.00, plus interest and costs of this action.

### Count 6 - Tortious Interference With a Contract
### (Against Lekeshia Blue, Robert Smith, and Delphine Smith)

160.    Each foregoing paragraph is incorporated as if fully restated herein.

161.    This claim is brought against the Defendants Lekeshia Blue, in her individual capacity, Robert Smith, and Delphine Smith by Plaintiffs Jeffrey and Raquel Lilly.

162.    Plaintiffs had a valid contract with James Blue to breed and sell a litter of French bulldogs.

163.    Defendants knew of the existence of Plaintiffs' contract with James Blue.

164.    Following the death of James Blue, the Estate of James Blue constituted a successor in interest.

165.    Defendants, notwithstanding Plaintiffs' contract with James Blue, intentionally, and in bad faith, disrupted, obstructed, and harmed the contractual relationship between the Estate of James Blue and Plaintiffs Jeffrey and Raquel Lilly.

166.    As a direct and proximate result of the Defendants' actions, the Plaintiffs Jeffrey and Raquel Lilly have sustained compensatory damages, including but not limited to loss of business revenue, loss of future income, reputational damage, and pain and suffering.


WHEREFORE, Plaintiffs Jeffrey and Raquel Lilly demand judgment against Defendants for a dollar amount in excess of $75,000.00, plus interest and costs of this action.

### Count 7 - Tortious Interference With a Contract
### (Against Officer Defendants)

167.    Each foregoing paragraph is incorporated as if fully restated herein.

168.    This claim is brought against the Officer Defendants, in their official and individual capacity, by Plaintiffs Jeffrey and Raquel Lilly.

169.    Plaintiffs had a valid contract with James Blue to breed and sell a litter of French bulldogs.

170.    Defendants knew of the existence of Plaintiffs' contract with James Blue.

171.    Following the death of James Blue, the Estate of James Blue constituted a successor in interest.

172.    Defendants, notwithstanding Plaintiffs' contract with James Blue, intentionally, and in bad faith, disrupted, obstructed, and harmed the contractual relationship between the Estate of James Blue and Plaintiffs Jeffrey and Raquel Lilly.

173.   As a direct and proximate result of the Defendants' actions, the Plaintiffs Jeffrey and Raquel Lilly have sustained compensatory damages, including but not limited to loss of business revenue, loss of future income, reputational damage, and pain and suffering.

WHEREFORE, Plaintiffs Jeffrey and Raquel Lilly demand judgment against Defendants for a dollar amount in excess of $75,000.00, plus interest and costs of this action.

### Count 8 - Intentional Infliction of Emotional Distress
### (Against Robert Smith, Delphine Smith, Lekeshia Blue, and Brian Nadeau)

174.   Each foregoing paragraph is incorporated as if fully restated herein.

175.   This claim is brought against the Defendants Robert Smith, Delphine Smith, Lekeshia Blue, in her individual capacity, and Brian Nadeau, in his individual capacity, by Plaintiffs Jeffrey and Raquel Lilly.

176.   The foregoing actions by Defendants were intentional, willful, abusive, with actual malice, and were outrageous and extreme.  They were the type of actions that the Defendants did foresee or reasonably should have foreseen would cause great emotional distress, anxiety, and expense, including attorneys' fees, on the part of Plaintiffs.

177.   As a direct and proximate result of the Defendants' actions, the Plaintiffs Jeffrey and Raquel Lilly did in fact experience emotional distress and have sustained compensatory damages, including but not limited to emotional pain and suffering.

WHEREFORE, Plaintiffs Jeffrey and Raquel Lilly demand judgment against Defendants for a dollar amount in excess of $75,000.00, plus interest and costs of this action, and punitive damages.

### Count 9 - Abuse of Process
### (Against Deputy Commissioner Brian Nadeau and the Baltimore Police Department)

178.   Each foregoing paragraph is incorporated as if fully restated herein.

179.    This claim is brought against the Defendant Brian Nadeau by Plaintiff Jeffrey Lilly.

180.    At all times relevant in this claim Defendant Brian Nadeau was acting under color of law and within the scope of his employment.

181.    Defendant Deputy Commissioner Brian Nadeau initiated a formal disciplinary process against the Plaintiff Jeffrey Lilly, with an improper purpose or motive underlying the use of process.   The Defendant initiated the disciplinary process as part of a continuing campaign of pressure and intimidation directed towards the Plaintiff Jeffrey Lilly and based on false charges from a party the Defendant knew to be involved in a civil dispute with the Plaintiff.

182.    Defendant undertook the abuse of process with actual malice and the intent to cause harm to Plaintiff Jeffrey Lilly.

183.    As a direct and proximate result of the Defendants' actions, the Plaintiffs Jeffrey and Raquel Lilly have sustained compensatory damages, including but not limited to loss of wages, reputational damage, emotional pain and suffering, and damage to his physical health.


WHEREFORE, Plaintiff Jeffrey Lilly demands judgment against Defendants for a dollar amount in excess of $75,000.00, plus interest and costs of this action, and punitive damages.

### Count 10 - Abuse of Process
### (Against Delphine Smith)

184.    Each foregoing paragraph is incorporated as if fully restated herein.

185.    This claim is brought against the Defendant Delphine Smith by Plaintiff Jeffrey Lilly.

186.    Defendant Delphine Smith initiated criminal legal proceedings against the Plaintiff Jeffrey Lilly when she swore out a charge of forgery which she knew to be false.  The Defendant did this with an improper purpose or motive underlying the use of process, namely,

to damage the Plaintiff's career and intimidate him into stopping his attempts to enforce a valid

contract and retrieve his property.

187.   Defendant undertook the abuse of process with actual malice and the intent to

cause harm to Plaintiff Jeffrey Lilly.

188.   As a direct and proximate result of the Defendants' actions, the Plaintiff Jeffrey

Lilly has sustained compensatory damages, including but not limited to loss of wages,

reputational damage, emotional pain and suffering, and damage to his physical health.


WHEREFORE, Plaintiff Jeffrey Lilly demands judgment against Defendant for a dollar

amount in excess of $75,000.00, plus interest and costs of this action, and punitive damages.

### Count 11 - Defamation
### (Against Delphine Smith)

189.   Each foregoing paragraph is incorporated as if fully restated herein.

190.   This claim is brought against the Defendant Delphine Smith, by Plaintiff Jeffrey

Lilly.

191.   Defendant Delphine Smith made a false and defamatory statement concerning

the Plaintiff Jeffrey Lilly when she knowingly falsely accused him of the crime of forgery. The

Defendant's false and defamatory statements were at least negligent, if not malicious.

192.   As a direct and proximate result of the Defendants' actions, the Plaintiff Jeffrey

Lilly has sustained compensatory damages, including but not limited to loss of wages,

reputational damage, emotional pain and suffering, and damage to his physical health.


WHEREFORE, Plaintiff Jeffrey Lilly demands judgment against Defendant for a dollar

amount in excess of $75,000.00, plus interest and costs of this action, and punitive damages.

## Count 12 – Action for Recovery of Unpaid Wages
## (Against Baltimore Police Department)

193.    Each foregoing paragraph is incorporated as if fully restated herein.

194.    This claim is brought against employer Defendant Baltimore Police Department by Plaintiff Jeffrey Lilly for back pay of wages pursuant to MD Code, Labor and Employment § 3-507.2.

195.    At all times relevant herein, Defendant Baltimore Police Department was an employer in the State of Maryland.

196.    At all times relevant herein, Plaintiff Jeffrey Lilly was (and continues to be) employed by Defendant.

197.    Plaintiff Jeffrey Lilly was suspended without pay by Defendant on April 27, 2022, because a criminal charge of forgery had been filed in the District Court of Baltimore County against him.

198.    On June 9, 2022, the State's Attorney's Office for Baltimore County entered a *nolle prosequi* as to the sole count of forgery that gave rise to Plaintiff's unpaid suspension.

199.    Pursuant to MD Code, Public Safety, § 3-107(b), Plaintiff Jeffrey Lilly was entitled to back pay after a *nolle prosequi* was entered.

200.    More than two weeks have passed since the disposition of Plaintiff's criminal charges and since Mr. Lilly's employment was reinstated.

201.    As a result of Defendant's actions, Plaintiff Jeffrey Lilly has sustained compensatory damages totaling $12,520.20 of owed compensation.


WHEREFORE, Plaintiff Jeffrey Lilly demands judgment against Defendant in the amount of $12,520.20, plus interest and costs of this action, including counsel fees, and treble damages as the court determines reasonable.

## Count 13 – Unlawful Retaliation Against a Police Officer
### (Against Deputy Commissioner Brian Nadeau and Baltimore Police Department)

202.   Each foregoing paragraph is incorporated as if fully restated herein.

203.   This claim is brought against Defendants Brian Nadeau, in his individual and official capacity, and Defendant Baltimore Police Department by Plaintiff Jeffrey Lilly pursuant to MD Code, Public Safety § 3-110.

204.   Plaintiff Jeffrey Lilly is a police officer as defined in MD Code, Public Safety § 3-201.

205.   As more fully stated above, Plaintiff Jeffrey Lilly was disciplined, demoted, and threatened in regard to his employment by Defendant Brian Nadeau because he lawfully exercised his constitutional right to pursue the return of his property through legal process.

206.   The actions of the Defendants were intentional and carried out with actual malice.

207.   As a result of Defendants' actions, Plaintiff Jeffrey Lilly has sustained compensatory damages, included but not limited to loss of wages, reputational damage, emotional pain and suffering, and damage to his physical health.


WHEREFORE, Plaintiff Jeffrey Lilly demands judgment against Defendant for a dollar amount in excess of $75,000.00, plus interest and costs of this action, and punitive damages.

## Count 14 – Indemnification
### (Against Defendant Baltimore Police Department)

208.   Each foregoing paragraph is incorporated as if fully restated herein.

209.   This claim is brought against Defendant Baltimore Police Department by Plaintiffs Jeffrey and Raquel Lilly.

210.   Defendant is a local government under Maryland law as defined in MD Code, Courts and Judicial Proceedings § 5-301.

211.   Maryland law provides that local governments are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

212.   The Officer Defendants were employees of the Baltimore Police Department and at all times relevant acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiffs Jeffrey and Raquel Lilly demand judgment against Defendants, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each Defendant, as well as any and all other relief this Court deems appropriate.

## JURY DEMAND

Plaintiffs Jeffrey and Raquel Lilly hereby demand a trial by jury pursuant to Maryland Rules, Rule § 2-325 on all issues so triable.

## RELIEF

Plaintiffs pray for a judgment providing the relief demanded in each numbered claim above.

Respectfully submitted,

By:

Michael Turiello

Attorney for the Plaintiffs

24. C. 22-003986

208. Maryland law provides that local governments are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

209. The Officer Defendants were employees of the Baltimore Police Department and at all times relevant acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiffs Jeffrey and Raquel Lilly demand judgment against Defendants, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each Defendant, as well as any and all other relief this Court deems appropriate.

## JURY DEMAND

Plaintiffs Jeffrey and Raquel Lilly hereby demand a trial by jury pursuant to Maryland Rules, Rule § 2-325 on all issues so triable.

## RELIEF

Plaintiffs pray for a judgment providing the relief demanded in each numbered claim above.

Respectfully submitted,

By:

Michael Turiello
Attorney for the Plaintiffs
Jennings, Turiello & Hirshorn
222 Purchase Street, Suite 130
Rye, NY 10580
mturiello@jthfirm.com
(914) 786-0920

24. C. 22-003986

IN THE CIRCUIT COURT FOR ___Baltimore City___
<span style="font-size:small">(City or County)</span>

## CIVIL - NON-DOMESTIC CASE INFORMATION REPORT

### DIRECTIONS

*Plaintiff*: This Information Report must be completed and attached to the complaint filed with the Clerk of Court unless your case is exempted from the requirement by the Chief Judge of the Court of Appeals pursuant to Rule 2-111(a).

*Defendant*: You must file an Information Report as required by Rule 2-323(h).

**THIS INFORMATION REPORT CANNOT BE ACCEPTED AS A PLEADING**

FORM FILED BY: ☑PLAINTIFF ☐DEFENDANT   CASE NUMBER _____
<span style="font-size:small">(Clerk to insert)</span>

CASE NAME: Jeffrey & Raquel Lilly    vs. Baltimore Police Dept. et al
<span style="font-size:small">Plaintiff                                      Defendant</span>

PARTY'S NAME: Jeffrey & Raquel Lilly   PHONE: _____

PARTY'S ADDRESS: 10 Windemere Court, York, PA 17402

PARTY'S E-MAIL: mrjeffrey.lilly@gmail.com

If represented by an attorney:

PARTY'S ATTORNEY'S NAME: Michael Turiello   PHONE: 914-768-0922

PARTY'S ATTORNEY'S ADDRESS: 222 Purchase Street, #130 Rye, NY 10580

PARTY'S ATTORNEY'S E-MAIL: mturiello@jthfirm.com

JURY DEMAND? ☑Yes ☐No

RELATED CASE PENDING? ☐Yes ☑No  If yes, Case #(s), if known: _____

ANTICIPATED LENGTH OF TRIAL?: ____ hours __7__ days

*(handwritten sideways: Call 973-903-3768)*

### PLEADING TYPE

New Case: ☑Original   ☐Administrative Appeal   ☐Appeal
Existing Case: ☐Post-Judgment   ☐Amendment
*If filing in an existing case, skip Case Category/ Subcategory section - go to Relief section.*

### IF NEW CASE: CASE CATEGORY/SUBCATEGORY (Check one box.)

**TORTS**
☐ Asbestos
☐ Assault and Battery
☐ Business and Commercial
☑ Conspiracy
☑ Conversion
☑ Defamation
☐ False Arrest/Imprisonment
☐ Fraud
☐ Lead Paint - DOB of Youngest Plt: ____
☐ Loss of Consortium
☐ Malicious Prosecution
☐ Malpractice-Medical
☐ Malpractice-Professional
☐ Misrepresentation
☐ Motor Tort
☐ Negligence
☐ Nuisance
☐ Premises Liability
☐ Product Liability
☐ Specific Performance
☐ Toxic Tort
☐ Trespass
☐ Wrongful Death

**CONTRACT**
☐ Asbestos
☐ Breach
☐ Business and Commercial
☐ Confessed Judgment (Cont'd)
☐ Construction
☐ Debt
☐ Fraud

**Government**
☐ Government
☐ Insurance
☐ Product Liability
**PROPERTY**
☐ Adverse Possession
☐ Breach of Lease
☐ Detinue
☐ Distress/Distrain
☐ Ejectment
☐ Forcible Entry/Detainer
☐ Foreclosure
  ☐ Commercial
  ☐ Residential
  ☐ Currency or Vehicle
  ☐ Deed of Trust
  ☐ Land Installments
  ☐ Lien
  ☐ Mortgage
  ☐ Right of Redemption
  ☐ Statement Condo
☐ Forfeiture of Property / Personal Item
☐ Fraudulent Conveyance
☐ Landlord-Tenant
☐ Lis Pendens
☐ Mechanic's Lien
☐ Ownership
☐ Partition/Sale in Lieu
☐ Quiet Title
☐ Rent Escrow
☐ Return of Seized Property
☐ Right of Redemption
☐ Tenant Holding Over

**PUBLIC LAW**
☐ Attorney Grievance
☐ Bond Forfeiture Remission
☑ Civil Rights
☐ County/Mncpl Code/Ord
☐ Election Law
☐ Eminent Domain/Condemn.
☐ Environment
☐ Error Coram Nobis
☐ Habeas Corpus
☐ Mandamus
☐ Prisoner Rights
☐ Public Info. Act Records
☐ Quarantine/Isolation
☐ Writ of Certiorari

**EMPLOYMENT**
☐ ADA
☐ Conspiracy
☐ EEO/HR
☐ FLSA
☐ FMLA
☐ Workers' Compensation
☐ Wrongful Termination

**INDEPENDENT PROCEEDINGS**
☐ Assumption of Jurisdiction
☐ Authorized Sale
☐ Attorney Appointment
☐ Body Attachment Issuance
☐ Commission Issuance

**Constructive Trust**
☐ Constructive Trust
☐ Contempt
☐ Deposition Notice
☐ Dist Ct Mtn Appeal
☐ Financial
☐ Grand Jury/Petit Jury
☐ Miscellaneous
☐ Perpetuate Testimony/Evidence
☐ Prod. of Documents Req.
☐ Receivership
☐ Sentence Transfer
☐ Set Aside Deed
☐ Special Adm. - Atty
☐ Subpoena Issue/Quash
☐ Trust Established
☐ Trustee Substitution/Removal
☐ Witness Appearance-Compel

**PEACE ORDER**
☐ Peace Order

**EQUITY**
☐ Declaratory Judgment
☐ Equitable Relief
☐ Injunctive Relief
☐ Mandamus

**OTHER**
☐ Accounting
☐ Friendly Suit
☐ Grantor in Possession
☐ Maryland Insurance Administration
☐ Miscellaneous
☐ Specific Transaction
☐ Structured Settlements

CC-DCM-002 (Rev. 04/2017)        Page 1 of 3

## IF NEW OR EXISTING CASE: RELIEF (Check All that Apply)

- ☐ Abatement
- ☐ Administrative Action
- ☐ Appointment of Receiver
- ☐ Arbitration
- ☐ Asset Determination
- ☐ Attachment b/f Judgment
- ☐ Cease & Desist Order
- ☐ Condemn Bldg
- ☐ Contempt
- ☑ Court Costs/Fees
- ☑ Damages-Compensatory
- ☑ Damages-Punitive

- ☐ Earnings Withholding
- ☐ Enrollment
- ☐ Expungement
- ☐ Findings of Fact
- ☐ Foreclosure
- ☐ Injunction
- ☐ Judgment-Affidavit
- ☑ Judgment-Attorney Fees
- ☐ Judgment-Confessed
- ☐ Judgment-Consent
- ☐ Judgment-Declaratory
- ☐ Judgment-Default

- ☑ Judgment-Interest
- ☐ Judgment-Summary
- ☐ Liability
- ☐ Oral Examination
- ☐ Order
- ☐ Ownership of Property
- ☐ Partition of Property
- ☐ Peace Order
- ☐ Possession
- ☐ Production of Records
- ☐ Quarantine/Isolation Order
- ☐ Reinstatement of Employment

- ☐ Return of Property
- ☐ Sale of Property
- ☐ Specific Performance
- ☐ Writ-Error Coram Nobis
- ☐ Writ-Execution
- ☐ Writ-Garnish Property
- ☐ Writ-Garnish Wages
- ☐ Writ-Habeas Corpus
- ☐ Writ-Mandamus
- ☐ Writ-Possession

*If you indicated Liability above*, mark one of the following. This information is not an admission and may not be used for any purpose other than Track Assignment.

☐ Liability is conceded. ☐ Liability is not conceded, but is not seriously in dispute. ☐ Liability is seriously in dispute.

## MONETARY DAMAGES (Do not include Attorney's Fees, Interest, or Court Costs)

☐ Under $10,000          ☐ $10,000 - $30,000          ☐ $30,000 - $100,000          ☑ Over $100,000

☐ Medical Bills $_____          ☐ Wage Loss $_____          ☐ Property Damages $_____

## ALTERNATIVE DISPUTE RESOLUTION INFORMATION

Is this case appropriate for referral to an ADR process under Md. Rule 17-101? (Check all that apply)

A. Mediation          ☐ Yes   ☑ No          C. Settlement Conference   ☐ Yes   ☑ No
B. Arbitration        ☐ Yes   ☑ No          D. Neutral Evaluation       ☐ Yes   ☑ No

## SPECIAL REQUIREMENTS

☐ If a Spoken Language Interpreter is needed, **check here and attach form CC-DC-041**

☐ If you require an accommodation for a disability under the Americans with Disabilities Act, **check here and attach form CC-DC-049**

## ESTIMATED LENGTH OF TRIAL

*With the exception of Baltimore County and Baltimore City, please fill in the estimated LENGTH OF TRIAL.* *(Case will be tracked accordingly)*

☐ 1/2 day of trial or less          ☐ 3 days of trial time

☐ 1 day of trial time               ☑ More than 3 days of trial time

☐ 2 days of trial time

## BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM

*For all jurisdictions, if Business and Technology track designation under Md. Rule 16-308 is requested, attach a duplicate copy of complaint and check one of the tracks below.*

☐ **Expedited**- Trial within 7 months of Defendant's response          ☐ **Standard** – Trial within 18 months of Defendant's response

## EMERGENCY RELIEF REQUESTED

## COMPLEX SCIENCE AND/OR TECHNOLOGICAL CASE MANAGEMENT PROGRAM (ASTAR)

*FOR PURPOSES OF POSSIBLE SPECIAL ASSIGNMENT TO ASTAR RESOURCES JUDGES under Md. Rule 16-302, attach a duplicate copy of complaint and check whether assignment to an ASTAR is requested.*

☐ **Expedited** - Trial within 7 months of Defendant's response     ☐ **Standard** - Trial within 18 months of Defendant's response

*IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE CITY, OR BALTIMORE COUNTY, PLEASE FILL OUT THE APPROPRIATE BOX BELOW.*

## CIRCUIT COURT FOR BALTIMORE CITY (CHECK ONLY ONE)

| | | |
|---|---|---|
| ☐ | Expedited | Trial 60 to 120 days from notice. Non-jury matters. |
| ☐ | Civil-Short | Trial 210 days from first answer. |
| ☑ | Civil-Standard | Trial 360 days from first answer. |
| ☐ | Custom | Scheduling order entered by individual judge. |
| ☐ | Asbestos | Special scheduling order. |
| ☐ | Lead Paint | Fill in: Birth Date of youngest plaintiff_____. |
| ☐ | Tax Sale Foreclosures | Special scheduling order. |
| ☐ | Mortgage Foreclosures | No scheduling order. |

## CIRCUIT COURT FOR BALTIMORE COUNTY

| | | |
|---|---|---|
| ☐ | Expedited (Trial Date-90 days) | Attachment Before Judgment, Declaratory Judgment (Simple), Administrative Appeals, District Court Appeals and Jury Trial Prayers, Guardianship, Injunction, Mandamus. |
| ☐ | Standard (Trial Date-240 days) | Condemnation, Confessed Judgments (Vacated), Contract, Employment Related Cases. Fraud and Misrepresentation, International Tort, Motor Tort, Other Personal Injury, Workers' Compensation Cases. |
| ☐ | Extended Standard (Trial Date-345 days) | Asbestos, Lender Liability, Professional Malpractice, Serious Motor Tort or Personal Injury Cases (medical expenses and wage loss of $100,000, expert and out-of-state witnesses (parties), and trial of five or more days), State Insolvency. |
| ☐ | Complex (Trial Date-450 days) | Class Actions, Designated Toxic Tort, Major Construction Contracts, Major Product Liabilities, Other Complex Cases. |

September 13, 2022
_____
Date

_____
Address

_____
City     State     Zip Code

_____
Signature of Counsel / Party

Michael Turella
_____
Printed Name

Attorney for plaintiffs

CC-DCM-002 (Rev. 04/2017)        Page 3 of 3

```
[18s
Case: 24-C-22-003986
CV File New
                        $80.00
Appear Fee
                        $20.00
RIF-New Case
                        $30.00
MLSC
                        $55.00
TOTAL            $185.00

Receipt #202200016868
Cashier: KE cbc04051STID
09/13/22   2:48pm




[1s
```