IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JEFFREY LILLY, *et al.*,                         *

      *Plaintiffs*,                              *

      v.                                         *          Civil Action No. RDB-22-2752

BALTIMORE POLICE                            *
DEPARTMENT, *et al.*,
                                                 *

      *Defendants*.                              *

*    *    *    *    *    *    *    *    *    *    *    *    *

## <u>MEMORANDUM OPINION</u>

This case stems from a private contractual dispute between parties previously or currently employed by the Baltimore Police Department. (ECF No. 24 ¶¶ 4–11; ECF No. 26-1 at 2.) With the exception of one defendant, all of the individual parties are in fact related by blood or marriage. (*Id.*) Plaintiffs Jeffrey Lilly and Raquel Lilly (collectively, "the Lillys") operate a side business breeding French and English bulldogs. (ECF No. 24 ¶ 6.) The business is run as a "joint venture," using the name Twisted Roots Kennels. (*Id.*) In October 2020, the Lillys entered into a contract whereby James Blue purchased a dog for $8,500 for the purpose of producing a litter of puppies. (*Id.* ¶ 20.) James Blue was to share the proceeds of the sale of the litter with the Lillys. (*Id.* ¶ 21.) In January 2022, James Blue was tragically shot and killed. (*Id.* ¶ 27.) This action stems from the Lillys' subsequent efforts retrieve the litter of puppies. The Lillys allege that the Baltimore City Police Department through a supervising official wrongfully assisted James Blue's family members, including Defendants Captain Lekeisha Blue ("Lekeisha Blue"), Robert Smith, and Delphine Smith, in their failure to return the puppies.

On September 13, 2022, the Lillys initiated the instant lawsuit in the Circuit Court for Baltimore City against Defendants Baltimore Police Department ("BPD"), Deputy Police Commissioner Brian Nadeau ("Nadeau"), Captain Lekeshia Blue, Unknown Employees of the Baltimore Police Department ("Unknown Employees"), Robert Smith, and Delphine Smith (collectively, "Defendants"). (ECF No. 2.) The lawsuit alleges that the Baltimore Police Department feared a negligent death claim from James Blue's family, including his wife, Lekeshia Blue, and her stepfather, former Lieutenant Colonel Robert Smith. (ECF No. 24.) According to the Lillys, this became the basis of a sham internal affairs investigation into Jeffrey Lilly that the Baltimore Police Department only allowed to escalate in order to pacify Robert Smith and prevent legal action from the Blue family. (*Id.*)

On October 26, 2022, Defendants removed this action to this Court pursuant to this Court's federal question jurisdiction and diversity jurisdiction. (ECF No. 1 at 3.) Defendants BPD, Nadeau, Lekeshia Blue, and Unknown Employees (collectively, the "BPD Defendants") subsequently filed a Motion to Dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 12), which remains pending on this Court's docket.[1]

On January 31, 2023, Plaintiffs Jeffrey Lilly and Raquel Lilly filed their First Amended Complaint, adding Plaintiff Twisted Roots Kennels, and bringing fourteen claims against the various Defendants. (ECF No. 24.) Also on January 31, 2023, Defendants Robert Smith and Delphine Smith (collectively, "the Smiths") answered that Complaint. (ECF Nos. 21, 22.) On February 14, 2023, the BPD Defendants filed a Motion to Dismiss Plaintiffs' First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 25). Plaintiffs

---

[1] An amended complaint has since been filed, thus ECF No. 12 is DENIED AS MOOT.

Jeffrey Lilly, Raquel Lilly, and Twisted Roots Kennels (collectively, "Plaintiffs") responded in opposition, (ECF No. 26), and the BPD Defendants replied. (ECF No. 33.) The parties' submissions have been reviewed and no hearing is necessary. Local Rule 105.6 (D. Md. 2023).

For the reasons that follow, the BPD Defendants' Motion to Dismiss Plaintiffs' Complaint (ECF No. 12) is DENIED AS MOOT; and the BPD Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 25) is GRANTED IN PART AND DENIED IN PART. Specifically, Plaintiffs' 42 U.S.C. § 1983 claim in Count 2 against the Baltimore Police Department for its policy and practice of mishandling investigations conducted by the Public Integrity Bureau is DISMISSED WITH PREJUDICE; the civil conspiracy claims for tortious interference with a contract and abuse of process in Count 3 and 4 are DISMISSED WITH PREJUDICE as to all Defendants except Defendants Robert Smith and Delphine Smith who have filed answers; the claim for tortious interference with a contract in Count 7 against Defendant Brian Nadeau is DISMISSED WITH PREJUDICE; the intentional infliction of emotional distress claim in Count 8 is DISMISSED WITH PREJUDICE as to all Defendants except Defendants Robert Smith and Delphine Smith who have filed answers; the abuse of process claim in Count 9 is DISMISSED WITH PREJUDICE, as Plaintiffs withdrew the claim; the claim for recovery of unpaid wages in Count 12 is DISMISSED WITH PREJUDICE; the retaliation claim in Count 13 is DISMISSED WITH PREJUDICE, as Plaintiffs withdrew the claim; and the indemnification claim in Count 14 is DISMISSED WITH PREJUDICE, as Plaintiffs withdrew the claim.

The BPD Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 25) is DENIED with respect to the Plaintiffs' 42 U.S.C. § 1983 claim set forth in Count

1 against the Defendant Baltimore Police Department for Brian Nadeau's alleged malicious abuse of the Public Integrity Bureau's investigative and disciplinary process; and is DENIED with respect to the conversion claim set forth in Count 5 against Defendants Lekeisha Blue, Robert Smith, and Delphine Smith. Accordingly, this case shall proceed with respect to the 42 U.S.C. § 1983 claim set forth in Count 1 against the Defendant Baltimore Police Department; the civil conspiracy claims for tortious interference with a contract and abuse of process set forth in Count 3 and 4 against Defendants Robert Smith and Delphine Smith; the conversion claim set forth in Count 5 against Defendants Lekeisha Blue, Robert Smith, and Delphine Smith; the tortious interference with a contract claim set forth in Count 6 against Defendants Robert Smith and Delphine Smith; the intentional infliction of emotional distress claim set forth in Count 8 against Defendants Robert Smith and Delphine Smith; the abuse of process claim set forth in Count 10 against Defendant Delphine Smith; and the defamation claim set forth in Count 11 against Defendant Delphine Smith.

## BACKGROUND

In ruling on a motion to dismiss, this Court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)). Except where otherwise indicated, the following facts are derived from Plaintiffs' First Amended Complaint (ECF No. 24), and accepted as true for the purpose of the BPD Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 25).

## I.     Background on the Parties

All individual parties involved in the instant action are presently or have previously been employed by the Baltimore Police Department. (ECF No. 24 ¶¶ 4–11; ECF No. 26-1 at 2.) Plaintiff Jeffrey Lilly has been employed by the Baltimore Police Department since 2004, and he has been assigned to a joint task force with the Federal Bureau of Investigation ("FBI") since 2015. (ECF No. 24 ¶ 4.) Plaintiff Raquel Lilly was formerly employed by the Baltimore Police Department as an officer assigned to the Internal Affairs division, now known as the Public Integrity Bureau ("PIB").[2] (ECF No. 26-1 at 2.) Defendant Brian Nadeau is currently Deputy Commissioner of the Baltimore Police Department's PIB. (ECF No. 24 ¶ 8.) Defendant Lekeshia Blue is currently employed by the Baltimore Police Department as a Captain in the PIB. (*Id.* ¶ 9.) Defendant Robert Smith achieved the rank of Lieutenant Colonel prior to his retirement from the Baltimore Police Department in 2009. (*Id.* ¶ 10; ECF No. 26-1 at 2.) Defendant Delphine Smith achieved the rank of Lieutenant of the Internal Affairs division prior to her retirement. (ECF No. 24 ¶ 11.)

Apart from Defendant Brian Nadeau, all of the individual parties are related by blood or marriage. (*Id.* ¶¶ 4–11; ECF No. 26-1 at 2.) Plaintiffs Jeffrey Lilly and Raquel Lilly are married. (ECF No. 24 ¶¶ 4–5.) Defendant Lekeshia Blue is James Blue's widow, the daughter of Defendant Delphine Smith, the stepdaughter of Defendant Robert Smith, and the first cousin of Plaintiff Raquel Lilly. (*Id.* ¶ 9.) Defendants Robert Smith and Delphine Smith are

---

[2] The Internal Affairs division was rebranded as the Public Integrity Bureau in 2019. *Crime Reduction & Departmental Transformation Plan*, BALT. POLICE DEP'T 5 (June 2019), https://www.baltimorepolice.org/sites/default/files/General%20Website%20PDFs/BPD_Crime_Reduction_and_Departmental_Transformation_Plan.pdf.

married. (*Id.* ¶¶ 10, 11.)

## II.     Factual Background

In October 2020, James Blue and the Lillys allegedly entered into a contract[3] (the "Contract") whereby James Blue purchased a dog for $8,500.00 for the purpose of producing a litter of puppies in cooperation with Twisted Root Kennels. (ECF No. 24 ¶ 20; Ex. 1, ECF No. 24-2.) The Contract provided that James Blue was to receive sixty percent of the proceeds from the sale of the litter, with the Lillys having first pick of the litter for future breeding efforts prior to any sale. (ECF No. 24 ¶ 21; ECF No. 24-2.) The Contract further stated that the Lillys "are solely responsible and are the only authority of the brand, stock, product, revenue and intentions of [Twisted Roots Kennels]," (ECF No. 24 ¶ 22; ECF No. 24-2), with "[t]he monetary investment made by James Blue[] giv[ing] no rights or responsibilities to any part, procedure, profit (with the exception of the agreed terms of the return of investment), opportunities, operations, other partnerships, entities, or umbrella companies of [Twisted Roots Kennels]." (ECF No. 24-2.)

Beginning in late December 2021, James Blue was in possession of a litter of five French bulldog puppies bred in accordance with the Contract. (ECF No. 24 ¶ 24.) On January 25, 2022, James Blue was sitting in his car when Sahiou Kargbo ("Kargbo") approached his car and began shooting. (*Id.* ¶ 27.) At the time of the shooting, the Baltimore Police Department had two outstanding warrants for Kargbo's arrest but had not yet arrested him. (*Id.* ¶¶ 27–29.)

---

[3] A copy of the Contract allegedly executed between the Lillys and James Blue in October 2020 is attached as Exhibit 1 to Plaintiffs' Amended Complaint (ECF No. 24-2).

James Blue was transported to and later declared dead at Johns Hopkins Hospital. (*Id.* ¶¶ 27, 30.) Several of the parties involved in this litigation, including the Lillys, joined the Blue family at the hospital. (*Id.* ¶ 30.) Family and friends, including the Lillys, then gathered at the home of Robert and Delphine Smith. (*Id.* ¶ 32.) Before the Lillys left the Smith residence on January 25, 2022, the Lillys spoke with Lekeshia Blue and Jadan Blue[4] and requested that the puppies be cared for until they could be returned to the Lillys. (*Id.* ¶ 33.) The Lillys contend that all parties agreed to this arrangement. (*Id.*)

During a telephone conversation on January 27, 2022, Jadan Blue informed Jeffrey Lilly that Lekeshia Blue, Robert Smith, and Delphine Smith "had decided to keep the puppies permanently." (*Id.* ¶ 34.) The Lillys contend that they made several additional attempts to arrange for the return of the litter. (*Id.* ¶¶ 35–40.) After several unsuccessful attempts, the Lillys contacted non-emergency police services on January 30, 2022, but the Blue and Smith families continued to refuse to return the litter. (*Id.* ¶¶ 41–46.)

The Lillys allege that the Baltimore Police Department began a "pressure campaign against Jeffrey Lilly." (*Id.* ¶¶ 47–59.) Specifically, the Lillys allege that, between January 31, 2022 and February 8, 2022, Jeffrey Lilly was contacted by or spoke to several members of the Baltimore Police Department, all of whom encouraged the Lillys to abandon the pursuit of their property, and a formal complaint made regarding such contact went unanswered. (*Id.*) A summary of the alleged pressure campaign follows.

Jeffrey Lilly alleges that he was contacted by Lieutenant Colonel John Herzog ("Herzog") of the Detectives Division of the Baltimore Police Department on

---

[4] Jadan Blue is the son of Lekeisha Blue and the late James Blue. (ECF No. 24 ¶ 33.)

January 31, 2022. (*Id.* ¶¶ 48–49.) According to the Lillys, Herzog advised Jeffrey Lilly that Deputy Commissioner Sheree Briscoe ("Briscoe") of the Operations Bureau asked him to contact the Lillys on behalf of Robert Smith to request that the Lillys "stop bothering them." (*Id.*)

On February 2, 2022, a former colleague of Jeffrey Lilly contacted him and advised him "that someone had informed the FBI that Mr. Lilly was conducting his kennel business on department time and that the FBI was about to initiate an investigation against him." (*Id.* ¶ 50.) Later that same day, Jeffrey Lilly met with Detective Jared Stern ("Stern") at the FBI's field office in Baltimore. (*Id.* ¶¶ 51–52.) During that meeting, Jeffrey Lilly informed Stern about the phone call he had received earlier that morning and explained the civil dispute between the Lilly, Blue, and Smith families. (*Id.*) Also on February 2, 2022, Raquel Lilly filed a formal complaint with the Public Integrity Bureau ("PIB") alleging that Herzog and Briscoe "had inappropriately interfered in a private family matter and that interference was creating a hostile work environment for Mr. Lilly." (*Id.* ¶ 53.)

On February 7, 2022, Deputy Director Olufemi Akanni ("Akanni") of the Equal Opportunity and Diversity Section of the Baltimore Police Department notified Jeffrey Lilly that Deputy Commissioner Brian Nadeau of the PIB wanted to speak with him privately. (*Id.* ¶ 56.) The next day, Jeffrey Lilly, Akanni, and Nadeau met at Baltimore Police Department headquarters. (*Id.* ¶ 57.) Jeffrey Lilly alleges that Nadeau "repeatedly attempted to intimidate Mr. Lilly into abandoning the pursuit of his property and ending his efforts to enforcing the contract," and further "admitted to taking a back-channel complaint from Robert Smith." (*Id.* ¶¶ 58–59.)

8

In March 2022, the Lillys retained counsel to try and enforce the Contract. (*Id.* ¶ 61.) On March 10, 2022, counsel for Plaintiffs sent a demand letter via certified mail to the Smiths and Lekeshia Blue, demanding the immediate return of the litter. (*Id.* ¶ 62.) The litter was never returned, and Plaintiffs were unable to complete three contracts for buyers that had made deposits for puppies from this litter. (*Id.* ¶¶ 63–64.)

On March 25, 2022, Jeffrey Lilly received written notification from Major Jason Callaghan that he was the subject of an internal investigation being conducted by the PIB. (*Id.* ¶ 65.) According to Plaintiffs, the letter claimed that Jeffrey Lilly "'harassed [the Smith] family during the time of January 2022 and February 2022'" and "provided 'false information to Baltimore County Police.'" (*Id.*) Plaintiffs allege that the complaint was initiated by the Smith family. (*Id.* ¶ 66.)

On April 13, 2022, Jeffrey Lilly contacted his union attorney, Michael Davey ("Davey") regarding representation during the PIB complaint process. (*Id.* ¶ 69.) After Davey learned that the complaint against Jeffrey Lilly involved current and former high-ranking officers of the PIB and Raquel Lilly's related complaint, Davey requested a change of venue. (*Id.*) The request was denied via an email from Nadeau. (*Id.*) Jeffrey Lilly's initial interrogation was subsequently scheduled for April 26, 2022. (*Id.* ¶ 70.) While PIB policy mandated that the time and place of the interrogation remain confidential, Plaintiffs allege that Lekeshia Blue and Nadeau informed Delphine Smith of the details of the upcoming interrogation. (*Id.* ¶¶ 70–71.)

On April 25, 2022, Delphine Smith appeared before a Baltimore County Commissioner and swore out a criminal charge of forgery of a private document against Jeffrey Lilly. (*Id.* ¶ 73.) Prior to his initial interrogation on April 26, 2022, BPD served Jeffrey Lilly

with a criminal summons for the forgery charges. (*Id.* ¶ 75.) Upon advice of counsel, Jeffrey Lilly refused to make any statements and left the interrogation. (*Id.* ¶ 76.)

On April 27, 2022, Jeffrey Lilly received notice that he was being suspended without pay and benefits. (*Id.* ¶ 77.) On May 4, 2022, Jeffrey Lilly appeared before members of the PIB to determine if his suspension would continue to be unpaid. (*Id.* ¶ 79.) After Jeffrey Lilly presented evidence of his business relationship with James Blue, Captain Michael Newton of the PIB upheld the decision to suspend Jeffrey Lilly without pay. (*Id.* ¶¶ 80–81.)

On June 7, 2022, Jeffrey Lilly alleges that he "gained insight regarding [Nadeau's] and the BPD's intimidation when he received a photograph via text message from another BPD officer." (*Id.* ¶ 86.) The photograph was of a letter sent to the Office of Legal Affairs at BPD by an attorney dated May 31, 2022, which notified BPD of James Blue's family's intent to sue the BPD for wrongful death. (*Id.* ¶¶ 86–87.)

On June 9, 2022, Jeffrey Lilly appeared before the District Court of Baltimore County regarding the forgery charges. (*Id.* ¶ 90.) The Baltimore County State's Attorney entered a *nolle prosequi*, dismissing the charges. (*Id.* ¶ 91.) The Lillys allege that immediately after the court proceeding, the Smith and Blue family demanded to speak to the Assistant State's Attorney regarding her decision to drop the charges, and when Lekeshia Blue saw the Lillys in the court hallway, she screamed profanities at Raquel Lilly. (*Id.* ¶ 92.)

On June 14, 2022, Jeffrey Lilly was informed that his suspension would be lifted, and his policing powers and compensation reinstated. (*Id.* ¶ 93.) On June 17, 2022, the Lillys reported to the PIB office located in the Baltimore Police Department headquarters to sign Jeffrey Lilly's reinstatement paperwork. (*Id.* ¶ 94.) Jeffrey Lilly alleges that after he signed the

paperwork, he was told that in order to receive his backpay, "he would have to disclose all of his financial records, waive any claims against the BPD, and indemnify the BPD from all claims, damages, losses, and expenses arising out of his disclosure." (*Id.*) Thereafter, Jeffrey Lilly declined to sign the Authorization for Release of Financial Information. (*Id.*) Before leaving the PIB office, the Lillys inquired about Raquel Lilly's February 2, 2022 complaint, which the Lillys allege was stalled by Lekeshia Blue and Nadeau. (*Id.* ¶¶ 95–98.)

On June 21, 2022, Jeffrey Lilly contacted Supervisory Special Agent Adonis Wesbey ("Wesbey") to inquire whether he would be returning to the unit as a Task Force Officer. (*Id.* ¶ 100.) On June 28, 2022, Wesbey indicated via text message that the FBI wanted him to return, noting that she had left Lieutenant Billy Simmons ("Simmons") of the BPD a message stating the same. (*Id.*) Later that same day, Simmons stated that Jeffrey Lilly was being reassigned to the Warrant Apprehension Task Force. (*Id.* ¶ 101.) According to Jeffrey Lilly, this assignment would require him to be under the direct supervision of Lamont Pride, who is Lekeshia Blue's brother and a sergeant assigned to that unit. (*Id.*) Jeffrey Lilly requested another assignment. (*Id.*)

On August 4, 2022, Lekeshia Blue was promoted to the rank of Captain, effective August 7, 2022. (*Id.* ¶ 102.) The Lillys allege that Lekeshia Blue's promotion was "in contravention of departmental policy because there was an open complaint, filed by Raquel Lilly, involving the actions of Lekeshia Blue." (*Id.*)

### III.   Procedural History

On September 13, 2022, Plaintiffs Jeffrey Lilly and Raquel Lilly initiated the instant lawsuit in the Circuit Court for Baltimore City against Defendants Baltimore Police

Department, Deputy Police Commissioner Brian Nadeau, Captain Lekeshia Blue, Unknown Employees of the BPD, Robert Smith, and Delphine Smith. (ECF No. 2.)

On October 26, 2022, Defendants removed this action pursuant to this Court's federal question and diversity jurisdiction. (ECF No. 1.) On November 21, 2022, the BPD Defendants filed a Motion to Dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 12.)

On January 31, 2023, Plaintiffs Jeffrey and Raquel Lilly filed their First Amended Complaint against Defendants, adding Plaintiff Twisted Roots Kennels, bringing fourteen claims against the various Defendants. (ECF No. 24.) Also on January 31, 2023, Defendants Robert Smith and Delphine Smith answered Plaintiffs' First Amended Complaint. (ECF Nos. 21, 22.)

On February 14, 2023, the BPD Defendants filed a Motion to Dismiss Plaintiffs' First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 25). Plaintiffs responded in opposition, (ECF No. 26), and the BPD Defendants replied. (ECF No. 33.) The BPD Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 25) is ripe for review.

## STANDARD OF REVIEW

### I.    Motion to Dismiss Pursuant to Rule 12(b)(6)

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a Complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P 8(a)(2). The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of

defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotations omitted).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (quoting *Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). A complaint need not include "detailed factual allegations." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A complaint must, however, set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim. *Iqbal*, 556 U.S. at 678; *see A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011).

## II.    Applicable Law for State Law Tort Claims

This case was removed to this Court on the basis of federal question jurisdiction, 28 U.S.C. § 1331, as well as diversity jurisdiction, 28 U.S.C. § 1332. (ECF No. 1 at 3.) With the exception of the § 1983 claims, all of Plaintiffs' claims against the BPD Defendants are state law claims, over which this Court has diversity jurisdiction. 28 U.S.C. § 1332. While Plaintiffs' claims for unpaid wages, unlawful retaliation, and indemnification are brought under Maryland statute, Plaintiffs' various claims for tortious interference with a contract, abuse of process,

conversion, and intentional infliction of emotional distress are state law tort claims. "When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state." *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011); *see Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *Baker v. Antwerpen Motorcars, Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011). Maryland is the forum state.

The parties assume, without discussion, that Maryland law applies here. In tort actions, Maryland adheres to the rule of *lex loci delicti*, meaning it applies the substantive law of the state where the wrong occurred. *Ben-Joseph v. Mt. Airy Auto Transporters*, LLC, 529 F. Supp. 2d 604, 606 (D. Md. 2008) (citing *Erie Ins. Exch. v. Heffernan*, 925 A.2d 636, 648–49 (Md. 2007); *Lab. Corp. of Am. v. Hood*, 911 A.2d 841, 844 (Md. 2006); *Philip Morris v. Angeletti*, 752 A.2d 200, 230 (Md. 2000)). It is undisputed that any asserted wrongs occurred in Maryland. Accordingly, this Court shall apply Maryland law as to the state law tort claims.

## ANALYSIS

Through their First Amended Complaint, Plaintiffs assert fourteen claims against the Defendants, eleven of which implicate the various BPD Defendants. (ECF No. 24.) The eleven claims against the BPD Defendants include two federal claims: a 42 U.S.C. § 1983 due process claim under *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), against Defendant Baltimore Police Department ("Count 1"), (*id.* ¶¶ 130–137); and a 42 U.S.C. § 1983 due process claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), against Defendant Baltimore Police Department ("Count 2"), (*id.* ¶¶ 138–146); as well as several state law claims, including: a civil conspiracy claim for tortious interference with a contract against "each

Officer Defendant,[5] except Lekeshia Blue, in their official and individual capacity" ("Count 3"),[6] (*id.* ¶¶ 147–152A[7]); a civil conspiracy claim for abuse of process against Lekeshia Blue for filing a false criminal charge in Baltimore County District Court ("Count 4"),[8] (*id.* ¶¶ 149B– 155); a claim for conversion against Lekeshia Blue ("Count 5"),[9] (*id.* ¶¶ 156–160); a claim for tortious interference with a contract against Nadeau ("Count 7"), (*id.* ¶¶ 168–174; a claim for intentional infliction of emotional distress against Lekeshia Blue and Nadeau ("Count 8"),[10] (*id.* ¶¶ 175–178); a claim for abuse of process against Nadeau ("Count 9"), (*id.* ¶¶ 179–184); a claim for recovery of unpaid wages against Baltimore Police Department ("Count 12"), (*id.* ¶¶ 194–203); a claim for unlawful retaliation against a police officer against Nadeau and Baltimore Police Department ("Count 13"), (*id.* ¶¶ 204–209); and a claim for indemnification against Baltimore Police Department ("Count 14"), (*id.* ¶¶ 210–214). The BPD Defendants seek dismissal of all claims brought against them. (ECF No. 25.)

## I.   Count 1 of Plaintiffs' First Amended Complaint Alleges Facts Sufficient to State a § 1983 Claim, But Count 2 Is Dismissed with Prejudice.

The first two counts of Plaintiffs' First Amended Complaint are brought under 42

---

[5] Paragraph 13 of the Complaint defines "Officer Defendants" as "Defendant Deputy Commissioner Brian Nadeau, Defendant Lekeshia Blue, and Defendants Unknown Employees of BPD." (ECF No. 24 ¶ 13.)

[6] Count 3 is also brought against Robert Smith and Delphine Smith. Because the Smiths filed answers (ECF Nos. 21, 22) and did not join the BPD Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint, allegations against the Smiths are not presently before the Court or addressed by this Memorandum Opinion.

[7] Beginning on page 28, the Amended Complaint includes two sequences of paragraphs numbered 149, 150, 151, and 152. (ECF No. 24.) For clarity, this Court will refer to the first appearance of this sequence of numbers as paragraphs 149A, 150A, 151A, and 152A, and the second appearance of this sequence of numbers as paragraphs 149B, 150B, 151B, and 152B.

[8] Count 4 is also brought against Robert Smith and Delphine Smith. As noted above, allegations against the Smiths are not presently before the Court or addressed by this Memorandum Opinion.

[9] Count 5 is also brought against Robert Smith and Delphine Smith. As noted above, allegations against the Smiths are not presently before the Court or addressed by this Memorandum Opinion.

[10] Count 8 is also brought against Robert Smith and Delphine Smith. As noted above, allegations against the Smiths are not presently before the Court or addressed by this Memorandum Opinion.

U.S.C. § 1983. Specifically, Count 1 lodges a 42 U.S.C. § 1983 due process claim under *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), against Defendant Baltimore Police Department for "Nadeau's Malicious Abuse of PIB's Investigative and Disciplinary Process." (ECF No. 24 ¶¶ 130–137.) Count 2 asserts a 42 U.S.C. § 1983 claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), against Defendant Baltimore Police Department for "BPD's policy and practice of mishandling investigations conducted by the PIB." (ECF No. 24 ¶¶ 138–146.)

Count 1 and Count 2 both plead municipal liability claims against the Baltimore Police Department under different theories of liability—Count 1 alleges a municipal liability claim against BPD resulting from Nadeau's decision as a person with final policymaking authority, and Count 2 alleges a municipal liability claim resulting from BPD's policy and practice of mishandling investigations. While neither count is a model of clarity, both counts appear to allege the same underlying deprivation of a constitutional right. As such, Counts 1 and 2 would have been properly pled as a single claim against BPD. Nevertheless, this Court addresses them separately below.

### A.  Section 1983 and Municipal Liability

Pursuant to 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *Owens v. Balt. City State's Attorney's Off.*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015). However, § 1983 "'is not

16

itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see also Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).

Simply stated, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999). To state a claim under § 1983, a plaintiff must allege that a person acting under color of state law deprived him of a constitutional right or a right conferred by a law of the United States. *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Safar*, 859 F.3d at 245 ("The first step in any such claim is to pinpoint the specific right that has been infringed."). "The statutory color-of-law prerequisite is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

In *Monell v. Department of Social Services*, the Supreme Court concluded that Congress intended "municipalities and other local government units to be included among those persons to whom § 1983 applies." 436 U.S. 658, 690 (1978). The Court further explained that "[l]ocal governing bodies [] can be sued directly under § 1983 for monetary, declaratory, or injunctive relief, where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* A state agency, however, cannot be sued under § 1983 because a state agency is not a "person" under 42 U.S.C. § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989).

In *Chin v. City of Baltimore*, 241 F. Supp. 2d 546 (D. Md. 2003), this Court held that BPD

17

is subject to suit for violation of § 1983 because it "is too interconnected with the government of the City" to constitute a state agency. *Id.* at 548. This Court has repeatedly affirmed the holding in *Chin. See, e.g.*, *Nicholson v. Balt. Police Dep't*, No. DKC-20-3146, 2021 WL 1541667, 2021 U.S. Dist. LEXIS 75798, at *16 (D. Md. Apr. 20, 2021) (holding that "the BPD, while a state entity under Maryland law, is considered a municipal entity subject to suit for purposes of § 1983"); *Fish v. Mayor of Balt.*, No. CCB-17-1438, 2018 WL 348111, 2018 U.S. Dist. LEXIS 4222, at *9 (D. Md. Jan. 10, 2018) (holding that "BPD is not entitled to Eleventh Amendment immunity and, as a result, is a 'person' subject to suit under § 1983"). Accordingly, for purposes of an action for violation of § 1983, BPD is a local government entity.

To state a § 1983 claim against a municipality, a plaintiff must "adequately plead . . . the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994); *see also Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (stating that "it is by now well settled that a municipality is only liable under section 1983 if it causes such a deprivation through an official policy or custom"). However, "a municipality cannot be held liable . . . under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691. Municipal liability attaches only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694.

A plaintiff may allege four types of policies, customs, or practices for which a municipality may be held liable: "(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through

an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter*, 164 F.3d at 217). Regardless of which theory a plaintiff proceeds under, a plaintiff asserting a § 1983 claim against a municipality must plead factual content that would allow the Court to draw a reasonable inference that: (1) the plaintiff has suffered a deprivation of a constitutional right; and (2) the violation of that right was caused by the enforcement of a municipal policy or practice, the decision of an official with final policymaking authority, or inadequate training amounting to deliberate indifference to a plaintiff's constitutional rights. *See Monell*, 436 U.S. at 694; *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987).

### B.  Count 1

In Count 1 of the First Amended Complaint, Plaintiffs assert a 42 U.S.C. § 1983 due process claim under *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), against Defendant Baltimore Police Department for "Nadeau's Malicious Abuse of PIB's Investigative and Disciplinary Process." (ECF No. 24 ¶¶ 130–137.) The BPD Defendants contend that this claim should be dismissed as duplicative of Count 2. (ECF No. 25-2 at 5.) In the alternative, the BPD Defendants argue that Plaintiffs failed to state a *Pembaur* claim, as Deputy Commissioner Brian Nadeau is not a municipal official with final policymaking authority. (*Id.* at 5 n.3; ECF No. 33 at 3–5.)

The Court will briefly address the BPD Defendants' first argument. The BPD Defendants appear to argue that Plaintiffs' *Pembaur* claim against BPD should be dismissed because *Pembaur* does not authorize an independent claim; it merely provides another basis for

holding a municipality liable for § 1983 claims. In *Pembaur*, the Supreme Court expanded the scope of § 1983 liability and held that a municipality could be civilly liable for constitutional violations resulting from a single decision of a municipal official responsible for establishing governmental policy. 475 U.S. at 481 (holding that the municipality could be held liable for a single decision by a county prosecutor, which authorized an unconstitutional entry into the plaintiff's clinic). As noted above, there are four types of policies, customs, or practices for which a municipality may be held liable: "(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." *Lytle*, 326 F.3d at 471. Simply stated, *Pembaur* established the second theory of municipal liability: liability for the decisions of a policymaking official.

### 1. Deprivation of a Constitutional Right

The BPD Defendants argue that Plaintiffs have not sufficiently pled the deprivation of a constitutional right, advancing a myriad of arguments[11] in support of this position. (ECF No. 25-2 at 6–8.) Indeed, this Court must first "identify the specific constitutional right" establishing Plaintiffs' claim, as § 1983 "is not itself a source of substantive rights." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). In

---

[11] The BPD Defendants contend that, as pleaded, Jeffrey Lilly is not a party to the Limited Partnership Agreement and the litter is not his personal property. (ECF No. 25-2 at 6–7.) They further argue that the Limited Partnership Agreement is unenforceable. (*Id.* at 7–8.) The Court will not address the BPD Defendants' latter argument, as whether a contract is enforceable depends upon the facts and circumstances under which the contract is made. As such, it cannot be appropriately determined at the pleading stage.

their First Amended Complaint, Plaintiffs entitle Count 1 "42 U.S.C. § 1983 – *Pembaur* Claim for Violations of the Fifth and Fourteenth Amendments – Brian Nadeau's Malicious abuse of PIB's Investigative and Disciplinary Process." (ECF No. 24 at 25.) Therein, Plaintiffs contend:

> As a direct and proximate result of the Deputy Commissioner Nadeau's acts, Jeffrey Lilly's constitutional rights were violated. Specifically, the BPD deprived Mr. Lilly of 1) his right to enforce his contract and retrieve his property from the Smith family; and 2) his ability to enter into contracts with buyers for the puppies who had already made deposits.

(*Id.* ¶ 137.) In their Opposition to BPD Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint, Plaintiffs do not contest the BPD Defendants' assertion that the Plaintiffs have not sufficiently pled the deprivation of a constitutional right, nor do they provide further clarity as to what specific constitutional right establishes Jeffrey Lilly's § 1983 claim. Instead, they further confuse the issue, submitting that "[i]t is plausible, that in a system so corrupt and inept, that the constitutional rights of members of the public and/or officers under investigation will be violated." (ECF No. 26-1 at 9.)

While Plaintiffs' factual allegations and assertions of their causes of action in the First Amended Complaint are far from clear with respect to the § 1983 claims against BPD, this Court construes Plaintiffs' claim in Count 1 to mean that Nadeau's actions infringed upon Plaintiffs' liberty to contract. The Supreme Court has suggested that such interests are fundamental to the "liberty" protected by the Due Process Clause.[12] *See Lochner v. New York*, 198 U.S. 45, 53 (1905) (proclaiming freedom of contract to be a fundamental right under the due process clause) (citing *Allgeyer v. Louisiana*, 165 U.S. 578, 579 (1897)); *Meyer v. Nebraska*,

---

[12] The Court is mindful that while *Lochner v. New York*, 198 U.S. 45 (1905), was never expressly overruled, it was cast aside in a practical sense by subsequent rulings such as *West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937).

262 U.S. 390, 399 (1923) (defining liberty broadly to include "not merely freedom from bodily restraint, but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge . . . and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free [persons]"); *see also Bd. of Regents v. Roth*, 408 U.S. 564, 572 (1972); *but see West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 391 (1937) ("The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation [of] liberty without due process of law."). Thus, Count 1 of the Plaintiffs' First Amended Complaint appears to assert a claim for violation of Jeffrey Lilly's substantive due process rights under the Fifth and Fourteenth Amendments.

The Fourteenth Amendment protects individuals against the deprivation of property by the government without due process. U.S. CONST. amend. XIV. "[T]he Due Process Clause of the Fourteenth Amendment 'guarantees more than fair process' and 'includes a substantive component that provides heightened protection against government interference with certain fundamental rights.' . . . The core of the concept of substantive due process is the 'protection of the individual against arbitrary action of government.'" *Martin v. Saint Mary's Dep't Soc. Servs.*, 346 F.3d 502, 511 (4th Cir. 2003).

To prove a violation of substantive due process rights under the Fourteenth Amendment, a plaintiff must show that a defendant's behavior was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 413 (4th Cir. 2020) (quoting *Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005)), *cert. denied*, 141 S. Ct. 2800 (2021). Unfortunately, neither party addressed

whether the alleged conduct "shocks the conscience" in their submissions to the Court, and this Court is mindful that ultimately considerably more will be necessary to establish liability under § 1983. However, taking Plaintiffs' allegations as true, the Court finds that Plaintiffs' allegations are sufficient at the pleading stage to allege the deprivation of a constitutional right. As such, this Court proceeds to analyze the BPD Defendants' remaining arguments regarding the sufficiency of Count 1.

## 2. Decision of a Person with Final Policymaking Authority

The BPD Defendants contend that Plaintiffs failed to state a claim in Count 2, as Deputy Commissioner Brian Nadeau is not a municipal official with final policymaking authority. (ECF No. 25-2. at 5 n.3; ECF No. 33 at 3–5.) "[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur*, 475 U.S. at 480. Indeed, a "governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances" so long as that governmental unit possessed "final authority to create official policy." *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (citing *Pembaur*, 475 U.S. at 481). "If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur*, 475 U.S. at 477. Accordingly, in assessing whether a municipality may be held liable for the constitutional or statutory violations of their decisionmakers, the touchstone inquiry is whether "the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Liverman v. City of Petersburg*, 844 F.3d 400, 413 (4th Cir. 2016) (quoting *Pembaur*, 475 U.S. at

481). If so, the decisionmaker's actions may fairly be attributed as reflecting municipal policy. *See Pembaur*, 475 U.S. at 481.

Plaintiffs contend that Count 1 alleges that Nadeau and BPD "deprived him of his right to enforce a contract when Mr. Nadeau threatened [] Mr. Lilly in a closed[-]door meeting and thereafter weaponized the investigative authority of the PIB." (ECF No. 26 at 9 (citing ECF No. 24 ¶¶ 56–59, 65).) They further that contend that their Amended Complaint avers that Deputy Commissioner Nadeau, who had "final policymaking authority from the BPD," (*id.* ¶¶ 133–134), "has repeatedly and forcefully instructed officers conducting disciplinary hearings in the PIB to uphold the Department's position regardless of what evidence is presented." (ECF No. 26 at 9 (citing ECF No. 24 ¶ 84).) According to Plaintiffs, "[t]his directive evidences how Nadeau weaponized the powers of the PIB against Jeffrey Lilly in order stop him from pursuing his contract remedies against the Estate of James Blue." (*Id.*)

Whether or not an official is a final policymaker is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). A final policymaker will generally be someone whose decisions are not subject to review by another official or governmental body. *McMillian v. Monroe Cnty.*, 520 U.S. 781, 785–86 (1997). Therefore, if there is any kind of review of an individual's decision, that individual is not the final policymaker. *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1326 (11th Cir. 2003) ("Because the Career Service Council has the power to reverse any termination decision made by Roberts, he is not a final policymaker with respect to termination decisions at the library."); *Tharling v. City of Port Lavaca*, 329 F.3d 422, 427 (5th Cir. 2003) (finding that a local law requiring approval of City Council for employment decisions made by City Manager rendered City Council the final policymaker); *Gernetzke v.*

24

*Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468 (7th Cir. 2001) ("The question is whether the promulgator, or the actor, as the case may be-in other words, the decisionmaker-was at the apex of authority for the action in question."). However, it is not sufficient that the relevant decisionmaker has "'discretionary authority in purely operational aspects of government.'" *Lane v. Anderson*, 660 F. App'x 185, 197 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1386 (4th Cir. 1987)).

Here, the BPD Defendants claim that Nadeau is not an official with final policymaking authority. (ECF No. 33 at 3–5.) In support of their position, the BPD Defendants cite to the BPD Policy 302 and the established Public Local Laws of Baltimore City § 16-4, which provides that only the Police Commissioner has the authority to make official policies on behalf of BPD. (*Id.*) However, the fact that Nadeau serves under the Police Commissioner does not necessarily establish that Nadeau is not an official with final policymaking power. This Court finds that the analysis advanced by the BPD Defendants misapprehends the requisite authority required to impose municipal liability under *Pembaur*. Taking Plaintiffs' allegations as true, this Court finds that Plaintiffs have sufficiently alleged the decision of an official with final policymaking authority.

### 3. Causation

Plaintiffs must still sufficiently plead a causal connection between the decision and the constitutional injury Jeffrey Lilly allegedly suffered. *Spell*, 824 F.2d at 1391. Here, Plaintiffs expressly allege that "[a]s a direct and proximate result of the Deputy Commissioner Nadeau's acts, Jeffrey Lilly's constitutional rights were violated." (ECF No. 24 ¶ 146.) Taking Plaintiffs' allegations as true, this Court finds that Plaintiffs have plead sufficient factual content allowing

this Court to draw a reasonable inference that Jeffrey Lilly suffered a deprivation of a constitutional right caused by the decision of an official with final policymaking authority. *See Monell*, 436 U.S. at 694; *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987). Therefore, the Court DENIES the BPD Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 25) as to Count 1.

### C. Count 2

In Count 2, Plaintiffs assert a 42 U.S.C. § 1983 claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), against Defendant Baltimore Police Department for "BPD's policy and practice of mishandling investigations conducted by the PIB." (ECF No. 24 ¶¶ 138–146.) In order to state a § 1983 *Monell* claim against a municipality, Plaintiff must "adequately plead . . . the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994); *see also Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (stating that "it is by now well settled that a municipality is only liable under section 1983 if it causes such a deprivation through an official policy or custom").

As noted above, a plaintiff may allege four types of policies, customs, or practices for which a municipality may be held liable: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law. *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter*, 164 F.3d at 217). In Plaintiffs' Opposition to the

instant Motion to Dismiss, they clarify that Count 2 claim is brought under the fourth theory

of liability—commonly referred to as a "condonation theory" theory of liability. (ECF No. 26

at 8–9.) Accordingly, the Court will analyze Count 2 as such.

Under the "condonation" theory, a municipality violates § 1983 if "municipal policy

makers fail to put a stop to or correct a widespread pattern of unconstitutional conduct."

*Owens v. Balt. City State's Atty's Off.*, 767 F.3d 379, 402 (4th Cir. 2014) (citing *Spell v. McDaniel*,

824 F.2d 1380, 1389–90 (1987)). "A municipal custom may arise if a practice is so 'persistent

and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with

the force of law.'" *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (quoting *Monell v. Dep't of*

*Social Servs.*, 436 U.S. 658, 691 (1978)). "A municipality is not liable for mere 'isolated incidents

of unconstitutional conduct by subordinate employees . . . Rather, there must be numerous

particular instances of unconstitutional conduct in order to establish a custom or practice.'"

*Smith v. Ray*, 409 F. App'x 641, 650 (4th Cir. 2007) (quoting *Lyte v. Doyle*, 326 F.3d 463, 473

(4th Cir. 2003)).

Here, Plaintiffs have not plausibly pled the existence of a persistent and widespread

practice of engaging in mishandling investigations conducted by the PIB. (ECF No. 24 ¶¶

120–129; 138–146.) Plaintiffs allege that such policies include, but are not limited to, "failing

to answer complaints in a timely manner; failing to contact witnesses in a timely matter; failing

to identify obvious conflicts of interest and transfer investigations involving such conflicts to

outside agencies; failing to keep sensitive information confidential as required by its governing

General Orders; failing to apply the proper scrutiny with regard to witness credibility; and

failing to apply the proper weight to evidence presented during disciplinary hearings." (*Id.*

¶ 141.) In support of their position, Plaintiffs' First Amended Complaint cites the Department

of Justice Civil Rights Division's August 2016 report entitled "Investigation of the Baltimore

City Police Department" (the "DOJ Report"), which, as Plaintiffs note, served as the basis for

the Consent Decree entered between the United States, Baltimore City, and the BPD that was

approved and is currently being monitored by Chief Judge James K. Bredar of this Court. (*Id.*

¶¶ 123–128); *see United States v. Balt. Police Dep't*, No. JKB-17-99 (D. Md. filed Jan. 12, 2017).

The Plaintiffs reference three[13] examples cited in the DOJ Report that Plaintiffs aver

"demonstrate that the BPD systematically mishandles internal investigations." (ECF No. 24

¶¶ 123–127.) One of the three examples cited involved a single officer who coerced sex in

exchange for immunity from arrest between 2012 and 2015 and complaints made to the BPD

regarding the officer were not properly investigated by the PIB. (*Id.* ¶¶ 123–125); *Investigation*

*of the Baltimore City Police Department*, U.S. DEP'T OF JUST. CIV. RTS. DIV. 149–50 (Aug. 10,

2016), https://www.justice.gov/d9/bpd_findings_8-10-16.pdf. The other two examples—

both from 2013—involved complaints made against BPD officers who used excessive force

against arrestees, and the subsequent PIB investigations were mishandled. (ECF No. 24

¶¶ 126–127); *Investigation of the Baltimore City Police Department*, U.S. DEP'T OF JUST. CIV. RTS.

DIV. 142–43 (Aug. 10, 2016), https://www.justice.gov/d9/bpd_findings_8-10-16.pdf.

   At bottom, allegations from 2012, 2013, and 2015 are likely too remote in time,[14] and

---

[13] While Plaintiffs assert that they cite to "examples of five additional investigations that outline the systemic failure of a bungling IID and PIB unit," (ECF No. 26-1 at 9), three of the instances cited involve the same BPD officer. (ECF No. 24 ¶¶ 123–125.)

[14] Moreover, much has happened to the Baltimore Police Department since 2015. As Plaintiffs note in their First Amended Complaint (ECF No. 24), the City of Baltimore entered into a Consent Decree on April 7, 2017 after the DOJ Report was published in 2016. (*Id.* ¶ 14.) Further, Plaintiffs note that "the Consent Decree required the [Baltimore Police] Department to implement significant systemic changes to the Internal Affairs [d]ivision, now the PIB, in order to ensure a well-functioning system of accountability." (*Id.* ¶ 115.) In other

allegations giving rise to the instant action are likely too isolated to establish policy or custom. Even taking Plaintiffs' allegations as true, this Court finds that Plaintiffs' allegations are insufficient at the pleading stage to allege the existence of a policy or custom of mishandling investigations, the "extent" of which is "widespread or flagrant" enough for a condonation claim. *See Owens*, 767 F.3d at 403 (quoting *Spell*, 824 F.2d at 1387). Therefore, Count 2 is DISMISSED WITH PREJUDICE.

## II.     Plaintiffs' Official Capacity Claims Against Nadeau Are Not Duplicative of the § 1983 Claims Against the BPD.

Through their First Amended Complaint, Plaintiffs sue Nadeau and Blue in both their official and individual capacities. (ECF No. 24 ¶¶ 8, 9.) The BPD Defendants contend that Plaintiffs' allegations against Nadeau and Blue in their official capacities are simply another way for them to sue BPD. (ECF No. 25-2 at 4–5.) As such, the BPD Defendants argue that such claims are duplicative of Plaintiffs' *Monell* claim against BPD and must be dismissed with prejudice. (*Id.*) In turn, Plaintiffs contend that such claims are expressly permitted by Maryland's Local Government Tort Claims Act as well as Federal Rule of Civil Procedure 8(e)(2). (ECF No. 26-1 at 6–7.)

To the extent that Plaintiffs assert either of their § 1983 claims (Counts 1 and 2) against either Nadeau and/or Lekeshia Blue in their official capacities,[15] those claims are duplicative of the *Monell* claim against BPD because "an official capacity claim . . . is a claim against a government entity of which an agent is an officer." *Kentucky v. Graham*, 473 U.S. 159, 165

---

words, the Baltimore Police Department has undergone significant changes since the last prior incident cited by Plaintiffs.

[15] This Court construes Count 1 as brought only against Defendant Baltimore Police Department. If Plaintiffs intended to assert Count 1 against Defendant Brian Nadeau in his individual capacity, they may move this Court for leave to amend their pleadings to state as such.

(1985); *see also Grim v. Baltimore Police Dep't*, No. ELH-18-3864, 2019 U.S. Dist. LEXIS 194461, 2019 WL 5865561, at *16 (D. Md. Nov. 8, 2019) (dismissing a claim against the BPD Commissioner "as it is duplicative of [the plaintiff's] *Monell* claim against the BPD" (citing *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) ("The district court correctly held that the § 1983 claim against [the defendant] in his official capacity as Superintendent is essentially a claim against the Board and thus should be dismissed as duplicative."))). However, Plaintiffs' First Amended Complaint does not appear to assert either of the § 1983 claims against either Nadeau and/or Lekeshia Blue in their official capacities. (ECF No. 24 ¶¶ 130–137; 138–146.) Only two of the remaining claims are brought against either Nadeau and/or Lekeshia Blue in their official capacities: Count 3 asserts a civil conspiracy claim for tortious interference with a contract against Nadeau in both his official and individual capacity, (*id.* ¶¶ 147–152A); and Count 7 asserts a claim for tortious interference with a contract against Nadeau in both his official and individual capacity, (*id.* ¶¶ 168–174). As Defendants correctly note, official capacity claims are in effect claims against BPD rather than the individual defendant. *Huggins v. Prince George's Cnty.*, 683 F.3d 525, 532 (4th Cir. 2012) (citing *Graham*, 473 U.S. at 166 ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.")). However, to the extent that the BPD Defendants argue that Counts 3 and 7 are "duplicative" of the § 1983 claims against BPD and should be dismissed, this argument is misplaced. The remaining official capacity claims are separate claims against BPD and are not duplicative of the § 1983 claims against it. Nevertheless, and as further detailed below,  this Court finds that Counts 3 and 7 are deficient for other reasons.

### III.   Count 3 Is Dismissed with Prejudice with Respect to Defendants Unknown Employees of BPD and Brian Nadeau.

In their First Amended Complaint (ECF No. 24), Plaintiffs appear to assert Count 3 for civil conspiracy for tortious interference against Unknown Employees of the Baltimore Police Department, as well as against Deputy Commissioner Brian Nadeau and the Smiths. (*Id.* ¶¶ 147–152A). As a preliminary matter, there is generally no authority to proceed against a fictitious party in the absence of a statute or rule. 59 AM. JUR. 2D *Parties* § 16 (2023). Some states by statute or rule authorize "John Doe" pleadings and then the subsequent substitution of the person's true name when discovered, but as the BPD Defendants correctly note in their Motion to Dismiss Plaintiffs' First Amended Complaint, (ECF No. 25-2 at 4), Maryland is not one of them. *Nam v. Montgomery Cnty.*, 732 A.2d 356, 363 (Md. App. 1999). Nevertheless, Plaintiffs withdrew all counts against "Unknown Employees of BPD" in their Opposition to the BPD Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint. (ECF No. 26-1 at 16.)

The BPD Defendants further contend that Plaintiffs fail to state a civil conspiracy claim against Nadeau in his official and individual capacity. (ECF No. 25-2 at 15–17.) In Maryland, a claim for civil conspiracy requires proof of the following elements: 1) a confederation of two or more persons by agreement or understanding; 2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and 3) actual legal damage resulting to the plaintiff. *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 284 (Md. 2007). Civil conspiracy is not an independent cause of action under Maryland law, *Hejirika v. Md. Div. of Corr.*, 264 F. Supp. 2d 341, 346–47 (D. Md. 2003), and a "defendant's liability for civil conspiracy depends entirely on its liability for a substantive tort."

*Fare Deals, Ltd. v. World Choice Travel.Com, Inc.*, 180 F. Supp. 2d 678, 692 (D. Md. 2001).

Even if this Court assumes, without deciding, that Plaintiffs sufficiently alleged an underlying tortious injury, Plaintiffs fail to provide facts indicative of any agreement between Nadeau and the Smiths, his alleged co-conspirators. *Murdaugh Volkswagen, Inc. v. First Nat. Bank of South Carolina*, 639 F.2d 1073, 1076 (4th Cir. 1981) (explaining a plaintiff must also allege a clear agreement to conspire because the "[i]ndependent acts of two wrongdoers do not make a conspiracy"); *Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 454 A.2d 367, 372 (Md. App. 1983) (holding that a plaintiff must allege that there was a "unity of purpose of a common design and understanding, or a meeting of the minds in an unlawful arrangement"). Plaintiffs fail to state when the alleged conspiracy was formed, and also to present any facts tending to show that such agreement was, in fact, reached. Count 3 is purely speculative and is not entitled to judicial deference. Accordingly, it is DISMISSED WITH PREJUDICE with respect to Defendants Unknown Employees of BPD and Brian Nadeau.[16]

### IV.  Count 4 Fails to State a Claim for Civil Conspiracy for Abuse of Process Against Lekeshia Blue.

Count 4 of the Amended Complaint brings a civil conspiracy for abuse of process claim against Lekeshia Blue, Robert Smith, and Delphine Smith. (ECF No. 24 ¶¶ 149B–155.) The BPD Defendants contend that Plaintiffs' Amended Complaint fails to allege a civil conspiracy and the underlying tort of abuse of process more generally. (ECF No. 25-2 at 15–17.)

Again, civil conspiracy is not an independent cause of action under Maryland law, *Hejirika v. Md. Div. of Corr.*, 264 F. Supp. 2d 341, 346–47 (D. Md. 2003), and a "defendant's

---

[16] Count 3 asserting civil conspiracy is not dismissed with respect to the Smiths. As noted above, the Smiths filed answers and have not challenged the legal sufficiency of the pleading. (ECF Nos. 21, 22.)

liability for civil conspiracy depends entirely on its liability for a substantive tort," *Fare Deals, Ltd. v. World Choice Travel.Com, Inc.*, 180 F.Supp.2d 678, 692 (D. Md. 2001).

To sustain a cause of action for abuse of process, the plaintiff must prove: first, that the defendant willfully used process after it has issued in a manner not contemplated by law; second, that the defendant acted to satisfy an ulterior motive; and third, that damages resulted from the defendant's perverted use of process. *One Thousand Fleet Ltd. Pshp. v. Guerriero*, 694 A.2d 952, 956 (Md. 1997); *Berman v. Karvounis*, 518 A.2d 726, 727 (Md. 1987); *Keys v. Chrysler Credit Corp.*, 471 A.2d 297, 207 (Md. 1985); *Palmer Ford, Inc. v. Wood*, 471 A.2d 297, 311 (Md. 1984). Additionally, Maryland law requires a plaintiff to allege an unlawful arrest or seizure of property to support the damages element of an abuse of process claim. *See One Thousand Fleet*, 694 A.2d at 960.

Here, Plaintiffs' allegations raise questions as to whether Delphine Smith initiated criminal proceedings against Jeffrey Lilly in good faith. (ECF No. 24 ¶ 73.) However, the "mere issuance of process itself . . . is not actionable, even if it is done with 'ulterior motive' or 'bad intention.'" *Campbell v. Lake Hallowell Homeowners Ass'n*, 852 A.2d 1029, 1044 (Md. App. 2004). Even if this Court assumes, without deciding, that the Amended Complaint sufficiently alleges "ulterior motive," Jeffrey Lilly does not allege that he was arrested or his property seized. As such, Plaintiffs cannot maintain a claim of civil conspiracy for abuse of process under Maryland law. Therefore, Count 4 is DISMISSED WITH PREJUDICE with respect to Defendant Lekeshia Blue.[17]

---

[17] Count 4 alleging civil conspiracy is not dismissed with respect to the Smiths. As noted above, the Smiths filed answers and have not challenged the legal sufficiency of the pleading. (ECF Nos. 21, 22.)

### V.    Count 5 Remains.

Next, the BPD Defendants contend that Count 5 of the Amended Complaint fails to state a claim for conversion against Defendant Lekeshia Blue. (ECF No. 24 ¶¶ 156–160.) Under Maryland law, "[c]onversion is an intentional tort, consisting of two elements, a physical act combined with a certain state of mind." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.2d 828, 835 (Md. 2004). "The physical act can be summarized as 'any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it.'" *Id.* (citations omitted). The requisite intent is "an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." *Keys v. Chrysler Credit Corp.*, 494 A.2d 200, 208 (Md. 1985). "The defendant may have the requisite intent even though he or she acted in good faith and lacked any consciousness of wrongdoing, as long as there was an intent to exert control over the property." *Darcars*, 841 A.2d at 836.

In Count 5, Plaintiffs allege that Defendants Lekeshia Blue, Robert Smith, and Delphine Smith moved the litter of dogs to the Smiths' home without the Plaintiffs' consent. (ECF No. 24 ¶ 158.) According to Plaintiffs, they demanded the immediate return of their property on multiple occasions, but Defendants refused. (*Id.* ¶ 159.) While the BPD Defendants raise numerous arguments as to why Plaintiffs' conversion claim should fail, (ECF No. 25-2 at 21–23), their arguments ignore that, at the motion to dismiss stage, this Court must take the Plaintiffs' allegation that the litter is the property of the Plaintiffs as true. Because the litter potentially is the property of Plaintiffs, the claim for conversion against the Defendant Blue will not be dismissed and the BPD Defendants' Motion to Dismiss Plaintiffs'

First Amended Complaint is DENIED as to Count 5.

### VI. Count 7 of the Amended Complaint Fails to State a Claim for Tortious Interference with a Contract Against Nadeau.

Next, the BPD Defendants advance a host of arguments contending that Plaintiffs have failed to state a claim for tortious interference with a contract against Nadeau in his official and individual capacity.[18] (ECF No. 25-2 at 23–26.) To establish a claim for tortious interference with contract under Maryland law,[19] a plaintiff must allege the following five elements: (1) a contract exists between the plaintiff and a third party, (2) the defendant knows of that contract, (3) the defendant intentionally interferes with that contract (and the interference is wrongful and without justification); (4) the third party breaches that contract; and (5) the plaintiff suffers damages from the breach. *Océ North Am., Inc. v. MCS Servs.*, 795 F. Supp. 2d 337, 346 (D. Md. 2011) (citing *HavePower, LLC v. Gen. Elec. Co.*, 183 F. Supp 2d 779, 784 (D. Md. 2002); *see also Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 117 (Md. 1994).

In their motion, the BPD Defendants attack Plaintiffs' efforts to establish all five elements required to establish tortious interference with a contract under Maryland law. (ECF

---

[18] The BPD Defendants contend that Count 7 is deficient for several reasons, including "[t]he claim against Nadeau in official capacity must be dismissed with prejudice because it is duplicative of Plaintiffs' *Monell* claim against BPD," and "the Lillys are not parties to the Limited Partnership Agreement and do not own the litter at issue in this case." (ECF No. 25-2 at 23–24.) With respect to the first argument, and as discussed above, to the extent that BPD Defendants argue that Count 7 is "duplicative" of the § 1983 claims against BPD and should be dismissed, this argument is misplaced. The remaining official capacity claims are separate claims against BPD and are not duplicative of the § 1983 claims against it. Because this Court finds that the Amended Complaint is insufficient to establish, at minimum, the third and fourth elements of a claim for tortious interference with a contract, it need not address the BPD Defendants' various arguments about the enforceability of the alleged Contract.

[19] The tort has "two general manifestations." *Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 117 (Md. 1994). The first manifestation is often described as "'inducing the breach of an existing contract,'" and the second, "more broadly, constitutes maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract." *Blondell v. Littlepage*, 991 A.2d 80, 97 (Md. 2010) (citation omitted). In other words, under Maryland law, one may claim tortious interference with a contract, or, in the absence of a contract or breach of contract, one may claim tortious interference with business or economic relations.

No. 25-2 at 23–26; ECF No. 33 at 6–7.) The Court limits its discussion to the second, third, and fourth elements. With respect to the second element, Plaintiffs make a conclusory assertion that Nadeau knew of that contract. (ECF No. 24 ¶ 171 ("Defendant knew of the existence of Plaintiffs' contract with James Blue.").) The only factual allegation in the Amended Complaint that remotely suggests that Nadeau had knowledge of the alleged Contract provides that:

> During the [February 8, 2022] meeting, Deputy Commissioner Nadeau repeatedly attempted to intimidate Mr. Lilly into abandoning the pursuit of his property and ending his efforts to enforce his contract.

(*Id.* ¶ 58.) While Plaintiffs do not elaborate further, this Court infers Nadeau's knowledge that the Contract existed between Plaintiffs and James Blue, though the Amended Complaint fails to specify when Nadeau allegedly committed the interference or his knowledge at that time.

Conversely, regarding the third element—Nadeau's intent to induce a breach—the Plaintiffs contend:

> Defendant, notwithstanding Plaintiffs' contract with James Blue, intentionally, and in bad faith, disrupted, obstructed, and harmed the contractual relationship between the Estate of James Blue and Plaintiffs.

(*Id.* ¶ 173.) These are not factual allegations from which the Court can infer Nadeau's intent to induce breach, but rather a statement of the legal element at issue. Plaintiffs do not allege any facts from which the Court can infer how Nadeau may have induced a breach by a third party. In their Opposition to the BPD Defendants' Motion to Dismiss, Plaintiffs attempt to clarify their claim:

> Plaintiffs allege that Mr. Nadeau confronted Jeffrey Lilly mere days after the Plaintiffs requested the Baltimore County Police Department help retrieve the litter from the Smith Family. During that confrontation, Nadeau admitted to speaking with Robert Smith about the dispute and pressured him to stop

pursuing the return of his property.[20]

(ECF No. 26-1 at 13 (citing ECF No. 24 ¶¶ 47–59, 65–72, 75, 77, 79–82).) Again, allegations as to how Nadeau induced a *third party* to breach the alleged Contract are wholly absent from Plaintiffs' submissions to this Court. *See Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 354 (4th Cir. 2013) (affirming dismissal of the first tortious interference claim because the plaintiff's allegations "regarding how the defendants intentionally interfered with this contract fail to state a claim that is facially plausible"); *Service 1st Vending, Inc. v. Compass Grp. USA, Inc.*, No. DKC-20-3723, 2021 U.S. Dist. LEXIS 68493, 2021 WL 1312906, at *3 (D. Md. Apr. 8, 2021) (dismissing tortious interference claim where "the nature of the supposed interference is unclear" and the plaintiff did not allege facts allowing an inference of the requisite intent); *Jennings v. Hous. Auth. of Balt. City*, No. WDQ-13-2164, 2014 U.S. Dist. LEXIS 11045, 2014 WL 346641, at *8 (D. Md. Jan. 29, 2014) (dismissing tortious interference claim where the plaintiff did not allege "any facts that would allow the Court to infer that the [defendant's conduct] caused the destruction of her business relationship"); *Webb v. Green Tree Servicing, LLC*, No. ELH-11-2105, 2011 U.S. Dist. LEXIS 141806, 2011 WL 6141464, at *7 (D. Md. Dec. 9, 2011) (holding tortious interference claim survived dismissal where the complaint alleged "ample facts" about the defendant's alleged conduct inducing the breach, allowing an inference of the requisite intent).

With respect to the fourth element, the meeting between Nadeau and Jeffrey Lilly

---

[20] Elsewhere in their Opposition to the BPD Defendants' Motion to Dismiss, Plaintiffs assert that they "also allege that Mr. Nadeau and/or Captain L[e]keisha Blue alerted the Smith family of the date and time of Jeffrey Lilly's initial interrogation, enabling the Smith family to swear out false charges hours before said hearing and have those charges served prior to the interrogation." (ECF No. 26-1 at 10 (citing ECF No. 24 ¶¶ 71–72).) Likewise, this allegation does not address how Nadeau induced a third party to breach the alleged Contract.

occurred on February 8, 2022, (ECF No. 24 ¶¶ 57–60), and the Amended Complaint appears to allege that James Blue's family refused to honor the alleged Contract no later than January 30, 2022, but as early as January 27, 2022. (*Id.* ¶¶ 34–46.) Thus, even if Plaintiffs could establish that Nadeau intentionally interfered with the alleged Contract, and that interference was wrongful and without justification, any interference by Nadeau occurred several days after the alleged breach. As such, this Court finds that Plaintiffs have not plausibly alleged, at minimum, the third and fourth elements of a *prima facie* case for tortious interference with a contract. As such, Count 7 is DISMISSED WITH PREJUDICE.

## VII.   Count 8 of the Amended Complaint Fails to State a Claim for Intentional Infliction of Emotional Distress Against Lekeshia Blue and Nadeau.

A claim for intentional infliction of emotional distress ("IIED") is disfavored in Maryland, difficult to establish, and is "rarely viable." *Respess v. Travelers Cas. & Sur. Co. of Am.*, 770 F. Supp. 2d 751, 757 (D. Md. 2011) In order to sufficiently state a claim for IIED in Maryland, a plaintiff must allege: (1) conduct that is "intentional or reckless"; (2) conduct that is "extreme and outrageous"; (3) "a causal connection between the wrongful conduct and the emotional distress"; and (4) emotional distress that is "severe." *Takacs v. Fiore*, 473 F.Supp.2d 647, 651–52 (D. Md. 2007) (quoting *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)). When attempting to make such a showing, plaintiffs need to plead with specificity, as reciting "in conclusory form the bare elements of an intentional infliction of emotional distress claim" will not do. *Vance v. CHF Int'l*, 914 F. Supp. 2d 669, 683 (D. Md. 2012).

The "extreme and outrageous" standard is quite high. *See generally Bagwell v. Peninsula Reg'l Med. Ctr.*, 665 A.2d 297, 319 (Md. App. 1995) (the tort of intentional infliction of emotional distress is "rigorous, and difficult to satisfy"). The defendant's conduct must be "'so

extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized [community].'" *Farasat v. Paulikas*, 32 F. Supp. 2d 244, 247–48 (quoting *Harris*, 380 A.2d at 614). Indeed, "[t]o be actionable, the conduct relied upon 'must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Id.* at 248 (quoting *Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1064 (Md. App. 1986)).

The allegations in Count 8 fall far short of stating a claim for IIED under Maryland law. Plaintiffs' Amended Complaint fails to allege that Lekeshia Blue engaged in conduct that was outrageous as required under Maryland law. Under Count 8, Plaintiffs allege:

> The foregoing actions by [Lekeshia Blue and Nadeau][21] were intentional, willful, abusive, with actual malice, and were outrageous and extreme. They were the type of actions that the Defendants did foresee or reasonably should have foreseen would cause great emotional distress, anxiety, and expense, including attorneys' fees, on the part of Plaintiffs. As a direct and proximate result of the Defendants' actions, the Plaintiffs Jeffrey and Raquel Lilly did in fact experience emotional distress and have sustained compensatory damages, including but not limited to emotional pain and suffering.

(ECF No. 24 ¶¶ 177–178.) No specific allegations of conduct are included under Count 8, though other parts of the Amended Complaint are incorporated by reference into this count. (*Id.* ¶ 175.) Plaintiffs attempt to clarify their IIED claim in their Opposition to the BPD Defendants' Motion to Dismiss, asserting:

> Defendants' actions caused Jeffrey Lilly the stress, humiliation, and embarrassment of being subject to criminal proceedings for false charges that were initiated specifically to intimidate him. These actions of the Defendants, among many others alleged, contributed to the severe emotional distress both Jeffrey and Raquel endured. The severity of this distress manifested in the physical toll that Jeffrey Lilly endured, including sudden weight gain, chest

---

[21] Count 8 is also brought against Robert Smith and Delphine Smith. As noted above, the Smiths filed answers and have not challenged the legal sufficiency of the pleading. (ECF Nos. 21, 22.)

pains, insomnia, and a heart attack.

(ECF No. 26-1 at 1 –15 (citing ECF No. ¶¶ 104–106).)

The behavior alleged in the instant action simply does not rise to the level of extreme or outrageous conduct required to support an IIED claim under Maryland law. This Court is wholly unpersuaded that the Amended Complaint describes any conduct of Lekeshia Blue or Nadeau that is "so extreme in degree [] as to go beyond all possible bounds of decency." *Farasat*, 32 F. Supp 2d at 247–48. Accordingly, Count 8 of the Amended Complaint is DISMISSED WITH PREJUDICE with respect to Defendants Lekeshia Blue and Brian Nadeau.

## VIII.   Counts 9, 13, and 14 Are Dismissed.

In Plaintiffs' Opposition to the BPD Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 26-1), Plaintiffs voluntarily withdraw Count 9 for abuse of process, (ECF No. 24 ¶¶ 179–184); Count 13 for unlawful retaliation against a police officer, (*id.* ¶¶ 204–209); and Count 14 for indemnification, (*id.* ¶¶ 210–214). Accordingly, this Court DISMISSES WITH PREJUDICE Plaintiffs' withdrawn Counts 9, 13, and 14.

## IX.   BPD Is Not an "Employer" Within the Meaning of the Maryland Wage Payment Collection Law. Therefore, Dismissal of Count 12 Is Required.

In Count 12, Plaintiffs bring a claim for recovery of unpaid wages pursuant to § 3-507.2 of the Maryland Labor and Employment Code. (ECF No. 24 ¶¶ 204–209.) The BPD Defendants argue that Plaintiffs "baselessly assert that [Jeffrey Lilly's] claim for unpaid wages should be reviewed under the Maryland State Labor and Employment Code." (ECF No. 33 at 11.) This Court agrees that Count 12 should be dismissed, but for a more obvious reason. Fatal to Plaintiffs' claim for recovery of unpaid wages is the fact that BPD is not an "employer"

within the meaning of the Maryland Wage Payment Collection Law ("MWPCL"). MD. CODE, LAB. & EMPL. § 3-501 *et seq.*; *Crystal v. Batts*, No. JKB-14-3989, 2015 U.S. Dist. LEXIS 129825 (D. Md. Sep. 25, 2015) ("The definition of 'employer' to include a 'governmental unit' in one segment of the MWPCL pertaining to confidentiality of Social Security Numbers, MD. CODE ANN., LAB. & EMPL. § 3-502(d)(1), would be unnecessary if the general statutory definition of 'employer,' § 3-501(b), could be read to include governmental units." (citing *Koelker v. Mayor & City Council of Cumberland*, 599 F. Supp. 2d 624, 638–39 (D. Md. 2009))). Accordingly, Count 12 is DISMISSED WITH PREJUDICE.

**CONCLUSION**

For the reasons stated above, the BPD Defendants' Motion to Dismiss Plaintiffs' Complaint (ECF No. 12) is DENIED AS MOOT. The BPD Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 25) is GRANTED IN PART AND DENIED IN PART.

Specifically, Plaintiffs' 42 U.S.C. § 1983 claim in Count 2 against the Baltimore Police Department for its policy and practice of mishandling investigations conducted by the Public Integrity Bureau is DISMISSED WITH PREJUDICE; the civil conspiracy claims for tortious interference with a contract and abuse of process in Count 3 and 4 are DISMISSED WITH PREJUDICE as to all Defendants except Defendants Robert Smith and Delphine Smith who have filed answers; the claim for tortious interference with a contract in Count 7 against Defendant Brian Nadeau is DISMISSED WITH PREJUDICE; the intentional infliction of emotional distress claim in Count 8 is DISMISSED WITH PREJUDICE as to all Defendants except Defendants Robert Smith and Delphine Smith who have filed answers; the abuse of process claim in Count 9 is DISMISSED WITH PREJUDICE, as Plaintiffs withdrew the claim; the claim for recovery of unpaid wages in Count 12 is DISMISSED WITH PREJUDICE; the retaliation claim in Count 13 is DISMISSED WITH PREJUDICE, as Plaintiffs withdrew the claim; and the indemnification claim in Count 14 is DISMISSED WITH PREJUDICE, as Plaintiffs withdrew the claim.

The BPD Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 25) is DENIED with respect to the Plaintiffs' 42 U.S.C. § 1983 claim set forth in Count 1 against the Defendant Baltimore Police Department for Brian Nadeau's alleged malicious

abuse of the Public Integrity Bureau's investigative and disciplinary process; and is DENIED with respect to the conversion claim set forth in Count 5 against Defendants Lekeisha Blue, Robert Smith, and Delphine Smith. Accordingly, this case shall proceed with respect to the 42 U.S.C. § 1983 claim set forth in Count 1 against the Defendant Baltimore Police Department; the civil conspiracy claims for tortious interference with a contract and abuse of process set forth in Count 3 and 4 against Defendants Robert Smith and Delphine Smith; the conversion claim set forth in Count 5 against Defendants Lekeisha Blue, Robert Smith, and Delphine Smith; the tortious interference with a contract claim set forth in Count 6 against Defendants Robert Smith and Delphine Smith; the intentional infliction of emotional distress claim set forth in Count 8 against Defendants Robert Smith and Delphine Smith; the abuse of process claim set forth in Count 10 against Defendant Delphine Smith; and the defamation claim set forth in Count 11 against Defendant Delphine Smith.

A separate Order follows.

Dated: September 25, 2023

/s/
_____
Richard D. Bennett
United States District Judge