**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division**

| | |
|---|---|
| Jeffrey Lilly, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No.: 1:22-cv-02752-BAH |
| BALTIMORE CITY POLICE DEPARTMENT, *et al*. | |
| Defendants. | |

## TABLE OF CONTENTS

PROCEDURAL HISTORY ................................................................................................2

BACKGROUND .............................................................................................................2

STATEMENT OF UNDISPUTED FACTS .......................................................................5

STANDARD OF REVIEW ............................................................................................19

ARGUMENT ................................................................................................................19

    **I.**    **Jeffrey Lilly Did Not Suffer a Due Process Violation** ...............................**20**

    *A. Jeffrey Lilly, in his personal capacity, is not a party to the Limited Partnership Agreement nor does he have a property interest in the litter puppies* ................................................*21*

    *B. BPD's conduct, through the actions of Nadeau, was not so egregious or outrageous as to shock the contemporary conscience* ...................................................................*22*

    *C. Jeffrey Lilly has post-deprivation rights available to rectify any deprivation* .................*24*

    **II.**    **BPD, through the actions of Nadeau, did not cause the deprivation of Jeffrey Lilly's contractual rights** .............................................................................**25**

    **III.**    **Nadeau's actions did not create a policy or custom that caused BPD to violate Jeffrey Lilly's constitutional rights** ..........................................................**27**

    **IV.**    **BPD was acting as Jeffrey Lilly's employer** ...........................................**29**

    **V.**    **Jeffrey Lilly is not entitled to punitive damages against BPD** ...............**30**

CONCLUSION ............................................................................................................30

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | |
|---|---|
| Jeffrey Lilly, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No.: 1:22-cv-02752-BAH |
| BALTIMORE CITY POLICE DEPARTMENT, *et al.* | |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF BALTIMORE POLICE DEPARTMENT'S MOTION FOR SUMMARY JUDGMENT

This case arises out of a contractual dispute among family members over the rights to a litter of puppies. Plaintiff, Jeffrey Lilly, a Detective with the Baltimore Police Department ("BPD"), claims he suffered harm because he lost his right to enforce his contract and his right to the proceeds of puppy sales after his family breached a contract. Somehow, from this harm, Lilly seeks to hold his employer, BPD, accountable for decisions and actions over which it had no control; namely, the independent and unilateral choices of his family members.

At its core, this case is uncomplicated. Indeed, the Court need look no further than Brian Nadeau's benign interaction with Jeffrey Lilly on February 8, 2022 to find BPD did not violate the Constitution. Because the absence of a substantive due process violation is so obvious, though, Jeffrey Lilly attempts to obfuscate the issue by concocting a grand conspiracy that a pressure campaign was orchestrated against him, which simply does not exist. As a result, and despite this case's simplicity, BPD will demonstrate, through an extensive review of an inflated record, how Brian Nadeau's conduct – or more accurately lack of conduct – created no basis to impute liability on BPD. Accordingly, the Court should grant Summary Judgment in favor of BPD.

## PROCEDURAL HISTORY

Plaintiffs filed this lawsuit on September 13, 2022. ECF No. 1. By Order dated September 25, 2023, this Court granted, in part, BPD's Motion to Dismiss Plaintiff's First Amended Complaint. ECF No. 35. This Court dismissed all counts against BPD except for Count I, Jeffrey Lilly's constitutional claim directly against BPD for the actions of Nadeau. ECF No. 24 ¶¶ 130–137; ECF No. 34 at 29 n.15. In its Memorandum Opinion, this Court construed Count I as a substantive due process claim involving the deprivation of Jeffrey Lilly's right to enforce an existing contract and to contract with prospective buyers. ECF No. 34 at 21.

## BACKGROUND

Much of the record is immaterial to resolving the lone claim against BPD. However, BPD will provide the full context of the actions involving Jeffrey Lilly. The record presents a tangled web of individuals, dogs, and the innerworkings of BPD. To assist navigating the facts, below is a brief discussion of BPD's organizational structure, along with the individuals and the dogs involved in this case and their relationships to each other.

### I.    BPD's Organizational Structure

    **A.** Public Integrity Bureau ("PIB") is the bureau within BPD responsible for investigating allegations of police misconduct. Exhibit 1, Deposition of Popp, 77:3–25. The previous name for PIB was Internal Affairs. Exhibit 2, Deposition of Raquel Lilly, 11:6–11. PIB is subdivided into three sections, General Investigations, Ethics, and Equal Opportunity and Diversity Section ("EODS"). Ex.1, 100:2–7.

### II.    Individuals

    **A. Akanni, Olufemi ("Akanni")** – Akanni is the civilian Director of BPD's Equal Opportunity and Diversity Section ("EODS"). Exhibit 3, Jeffrey Lilly's Answers to BPD's Interrogatories, Answer No. 1

    **B. Blue, Jadan** – Jadan Blue is the biological son of James Blue and Lekeshia Blue, the biological grandson of Delphine Smith, and the step-grandson of Robert Smith. Ex. 3, Answer No. 1.

   **C. Blue, James** – James Blue is the husband of Lekeshia Blue. Exhibit 4, Deposition of Nadeau, 157:4–8. James Blue was murdered on January 25, 2022. Exhibit 5, Deposition of Jeffrey Lilly, 217:18–21. His funeral was held on February 19, 2022. Exhibit 6, Deposition of Lekeshia Blue, 95:13–15.

   **D. Blue, Lekeshia** – Lekeshia Blue is the wife of James Blue, the stepdaughter of Robert Smith, the biological daughter of Delphine Smith, the mother of Jadan Blue, and the cousin of Raquel Lilly. Ex. 6, 15:9–16, 129:14; Ex.4, 157:4–8; Ex. 2, 39:18. Lekeshia Blue was a Lieutenant in PIB's Ethics Division. Ex. 6, 80:8–11. Lekeshia Blue was promoted to Captain of PIB on August 3, 2022. Exhibit 7, Human Resources Order 991-2022, BPD 239.

   **E. Bowling, Anthony ("Bowling")** – Bowling is a detective in PIB. Exhibit 8, Deposition of Bowling, 12:1–10.

   **F. Briscoe, Sheree ("Briscoe")** – Briscoe was BPD's Deputy Commissioner of Operations. Exhibit 9, Deposition of Briscoe, 52:1–5. Briscoe retired from BPD on June 1, 2024. *Id.*, 9:13–15.

   **G. Callaghan, Jason ("Callaghan")** – Callaghan was a Major in PIB from May 30, 2021 through November 6, 2022. Exhibit 10, Deposition of Callaghan, 18:16–19:9.

   **H. Davey, Mike ("Davey")** – Davey is a Fraternal Order of Police attorney who represented Jeffrey Lilly in the PIB case filed against him by Robert Smith. Ex. 3, Answer No. 1.

   **I. Harrison, Michael ("Harrison")** – Harrison was the Police Commissioner of BPD from February 2019 through August 12, 2023. Exhibit 11, Deposition of Harrison, 32:14–15, 183:18–22.

   **J. Herzog, Jack ("Herzog")** – Herzog was a Lieutenant Colonel in BPD's Criminal Investigation Division. Ex. 9, 58:18–19.

   **K. Howard, Lamar ("Howard")** – was a Captain in PIB. Howard and is retired from BPD. Ex. 6, 74:21–76:2.

   **L. Jackson, Glen ("Jackson")** – Jackson was an EODS Seargent. Ex. 3, Answer No. 1.

   **M. Lilly, Jeffrey** – Jeffrey Lilly is the husband of Raquel Lilly and a Detective for BPD. Ex. 5, 12:21–13:1; Ex. 3, Answer No. 14.

   **N. Lilly, Raquel** – Raquel Lilly is the wife of Jeffrey Lilly. Ex. 3, Answer No. 14. Raquel Lilly worked for BPD and resigned in 2010. Ex. 2, 13:14–16.

   **O. Longo, Steven ("Longo")** – Longo is a Lieutenant in the Baltimore County Police Department. Ex. 3, Answer No. 1.

**P. Mathis, Jahlik ("Mathis")** – Mathis was an EODS Detective. Ex. 3, Answer No 1.

**Q. McClairn, Jerry ("McClairn")** – McClairn was a PIB Detective. Ex. 4, 168:5–7.

**R. Nadeau, Brian ("Nadeau")** – Nadeau was the Deputy Commissioner of PIB. Ex. 4, 34:12–16.

**S. Popp, Daniel ("Popp")** – Popp was a Lieutenant within PIB General Division from 2019 until his promotion on August 3, 2022. Ex. 1, 106:4–6; Ex. 7; Ex. 6, 82:2–16.

**T. Smith, Delphine** – Delphine Smith is the wife of Robert Smith, the biological mother of Lekeshia Blue, the grandmother of Jadan Blue, and the aunt of Raquel Lilly. Exhibit 12, Deposition of Robert Smith, 28:8–14, 29:3–9; Ex. 3; Ex. 6, 15:19–16; Exhibit 13, Deposition of Delphine Smith, 71:14–15. Delphine Smith is a retired BPD member. Deposition of Robert Smith, 28:8–14.

**U. Smith, Robert** – Robert Smith is the husband of Delphine Smith, the stepfather of Lekeshia Blue, the step grandfather of Jadan Blue, and the uncle of Raquel Lilly. Ex. 12, 28:8–14, 29:3–9; Ex. 6, 15:9–16. Robert Smith retired from BPD as a Colonel. Ex. 12, 10:11– 12.

## III. Dogs

**A. Bandito** – Bandito was born on December 22, 2022. Exhibit 14, Lekeshia Blue's Answers to BPD's Interrogatories, Answer Nos. 1 and 2. Bandito was sold to Lamont Pride on March 7, 2022 for $4,000.00. Ex. 14, Answer No. 1; Ex. 6, 123:8–10.

**B. Big Booty Judy** – Big Booty Judy was born on December 22, 2022. Ex. 14, Answer Nos. 1 and 2. Big Booty Judy was sold to William Jackson on February 25, 2022 for $5,000. *Id.*, Answer No. 1; Ex. 6, 121:12–122:13.

**C. Kanye** – Kanye was born on December 22, 2022. Ex. 14, Answer Nos. 1 and 2. Lekeshia Blue gifted Kanye to Jadan Blue. Ex. 6, 118:1–13. Jadan Blue changed Kanye's name to Saint and took him Virginia where he attended college. *Id.*

**D. Kim K.** – Kim K. was born on December 22, 2022. Ex. 14, Answer Nos. 1 and 2. Lekeshia Blue still has Kim K., who was renamed Hailey. Ex. 6, 116:21–117:3.

**E. Lottie Dottie** – Lottie Dottie was born on December 22, 2022. Ex. 14, Answer Nos. 1 and 2. Lekeshia Blue sold Lottie Dottie, who was renamed Cardi, to Delphine Smith for $5,000.00 on March 11, 2022. Ex. 6, 119:14–120:1; Ex. 14, Answer No. 1. Delphine Smith agreed with James Blue to purchase Cardi before his death. Ex. 13, 93:14–20.

**F. Raine**: Raine is the female French bulldog that James Blue purchased from Twisted Roots Kennels on October 18, 2022. Exhibit 15, Twisted Roots Kennels Puppy

Purchase Agreement, Plaintiff's 100–103; Ex. 6, 99:14–100:13. Raine had the litter of five puppies at issue in this case on December 22, 2022. Ex. 14, Answer Nos. 1 and 2.

## STATEMENT OF UNDISPUTED FACTS

In 2019, Jeffrey Lilly and Raquel Lilly formed a Pennsylvania French bulldog breeding business named Twisted Roots Kennels. Ex. 2, 134:11–135:19, 136:14–137:11. Jeffrey and Raquel Lilly are co-owners of Twisted Roots Kennels, with Jeffrey Lilly handling matters related to sales and Raquel Lilly handling the business management aspects. *Id*. 138:9–15, 8:8–19; Ex. 5, 291:7–12. Jeffrey Lilly and Raquel Lilly did not formally register Twisted Roots Kennels with the Pennsylvania Secretary of State. Ex. 2, 134:11–135:8. Twisted Roots Kennels has an Employer Identification Number, but it has not filed any taxes since its inception. *Id*. at 137:12–138:8. Twisted Roots Kennels is no longer operational. *Id*. 145:15–21.

On October 12, 2020, Twisted Roots Kennels and James Blue entered into a Limited Partnership Agreement whereby James Blue agreed to invest $8,500.00 into Twisted Roots Kennels through the purchase of one female French bulldog. Exhibit 16, Limited Partnership Agreement between Twisted Roots Kennels and James Blue with DocuSign Certificate of Completion, Plaintiff's 6–7. James Blue would keep 60% and Twisted Roots Kennels would keep 40% of the total litter sales. *Id*. Twisted Roots Kennels was also entitled to the pick of the litter.  *Id*. Raquel Lilly drafted the Limited Partnership Agreement without an attorney. Deposition Ex. 2, 147:7–17.

On or about October 18, 2020, Jeffrey Lilly and Raquel Lilly met James Blue and Lekeshia Blue in Hunt Valley, Maryland. Ex. 16; Ex. 2, 192:17–193:14. At that meeting, James Blue purportedly signed the Limited Partnership Agreement via DocuSign on Raquel Lilly's iPhone. *Id*. James Blue also received Raine, the female French Bulldog that he agreed to purchase from Twisted Roots Kennels for $8,500.00. *Id*.; Ex. 6, 99:14–100:13. James Blue did not want Lekeshia Blue to know about the Limited Partnership Agreement. Ex. 2, 197:5–8; Ex. 5, 324:15–325:20. Later that

day, Twisted Roots Kennels emailed James Blue a copy of the signed Limited Partnership Agreement. Exhibit 17, Email from Twisted Roots Kennels to James Blue, Plaintiff's 8–9. On October 20, 2020, Twisted Roots Kennels emailed both James Blue and Lekeshia Blue a copy of the sales agreement for the purchase of Raine. Exhibit 18, Email from Twisted Roots Kennels to James Blue and Lekeshia Blue, Plaintiff's 28–29.

Subsequently, Raine was artificially inseminated by Rozay, a Twisted Roots Kennels stud. Ex. 6, 107:9–108:6. To prepare for puppies, James Blue built a whelping box and installed heating lamps at his home. *Id*. 108:12–109:3. On December 22, 2021, Raine birthed five puppies. Ex. 14, Answer Nos. 1 and 2. Although the Limited Partnership Agreement did not specify who would maintain physical custody of Raine's litter, James Blue was in possession of the puppies at his home from their birth until January 25, 2022. Ex. 2, 149: 8–16, 151 1–6; Ex. 16. Neither Jeffrey Lilly nor Raquel Lilly had an issue with puppies remaining at James Blue's home nor did they believe Twisted Roots Kennels should be in possession of the puppies. *Id*.; Ex. 5, 64: 7–20. During this time, Twisted Roots Kennels received deposits for the sale of two the puppies and had interest from another buyer. Ex. 2, 79:13–21. Neither James Blue nor Lekeshia Blue knew about the deposits. Ex. 6, 148:1–5.

On January 25, 2022, James Blue was tragically murdered while in his car speaking with Jadan Blue on the phone. Ex.6, 129: 12–19, 132 4–9; Ex. 13, 65:13–15. That evening, Lekeshia Blue and her family gathered at Robert and Delphine Smith's home. Ex. 2, 41:11–13. Jeffrey Lilly and Jadan Blue began discussing the dogs. *Id*. 41:17–42:2. They agreed that the Blue family would watch the dogs that evening and the Lillys would check on them the next day. *Id*. 42:5–11. The next day, Jeffrey Lilly and Raquel Lilly went to Lekeshia Blue's home by themselves to check on the puppies. *Id*., 159:2–7, 42:12–43:5. While there, they decided that they should have possession of Raine and her litter of puppies. *Id*. 159:9–13. Jeffrey and Raquel Lilly then went to Robert and

Delphine Smith's home, where Lekeshia Blue and her family were also present. *Id.* 42:12–16. There, Jeffrey and Raquel Lilly announced their intention to sell the puppies and give the proceeds to Lekeshia Blue. *Id.* 43:5–21; Ex. 13, 91: 5–12. However, "[i]t was a bad time. [There] was grief, [and] people were falling apart." Deposition of Ex. 2, 44:10–45:15. As a result, there was no resolution to who would keep possession of the puppies. *Id.*

Shortly after midnight the morning of January 27, 2022, Jadan Blue texted Jeffrey Lilly. Exhibit 19, Text Message between Jadan Blue and Jeffrey Lilly, Plaintiff's 12–15. Jadan Blue told Jeffrey Lilly that he should not come to the Blue home that day because his family was not being responsive or understanding of what Jeffrey Lilly and James Blue "had going on." *Id.* As Lekeshia Blue testified at her deposition:

> "…[Jeffrey Lilly] was trying to get [Jadan Blue] to get him to give him the dogs, which I found ridiculous because why are you talking to my son the day after my husband was murdered…So this is a traumatizing event for everyone involved, especially my son who heard his father being murdered, and you're trying to get him to give you dogs. Like what is your mindset at this point? So insensitive to the situation. It's beyond ridiculous. My son is a child. My son does not speak for me…."

Ex. 6, 129:12–130:5. On January 27, 2022, Lekeshia Blue decided that she would keep the litter of puppies permanently. Ex. 2, 153:3–13. Part of Lekeshia Blue's rationale was that her children had been taking care of the puppies every night with their father. Ex. 13, 64:20–65:6, 67:10–68:3. Lekeshia Blue also did not want to take the puppies from her children after their father's tragic murder, and believed the puppies could provide therapy to her children. *Id.*

Unsurprisingly, Lekeshia Blue was struggling with the trauma surrounding her husband's murder at this time – she could not eat, sleep, or otherwise function. Ex. 6, 94:17–21. So, Lekeshia Blue moved into Robert and Delphine Smith's home and took Family and Medical Leave Act leave from BPD. *Id.* Consistent with her decision to keep the puppies, Lekeshia Blue asked Robert Smith

to move Raine and her litter to his home where Lekeshia Blue was going to be living. Ex. 13, 106:15–107:5. However, Jeffrey and Raquel Lilly did not consent to Robert Smith moving Raine and her litter. Ex. 2, 154:1–7. As a result, Jeffrey Lilly sent a copy of the Limited Partnership Agreement to Robert Smith and members of his family later that day. *Id*., 161:17–162:7; Exhibit 20, Text from Jeffrey Lilly to Robert Smith and Family, BPD 114. On January 28, 2022, Jeffrey Lilly called Robert Smith and told him that he was not permitted to move the dogs. Deposition of Ex. 5, 65:1–12; Ex. 12, 131:1–20, Ex. 2, 162:1–7. Despite Jeffrey Lilly and Raquel Lilly's demand for the return of the dogs, nobody ever contacted them to arrange their return. *Id*.

On January 30, 2022, Jeffrey Lilly and Raquel Lilly again demand possession of the dogs via text message. Ex. 2, 150:10–21, 156:1–21; Exhibit 21, Text Message from Raquel Lilly, Plaintiff's 522–523. Jeffrey Lilly and Raquel Lilly also went to the Court Commissioner, but they ultimately decided against filing criminal charges. Ex. 5, 129:17–130:4. Instead, they went to the Baltimore County Police Department and reported the theft of the dogs. *Id*., 129:3–12; Exhibit 22, Baltimore County Police Report, BPD 146–149. The Baltimore County Police were dispatched to Robert and Delphine Smith's home. Ex. 12, 150:3–153:11. The Baltimore County Police left without taking any action, having deemed the matter a civil issue. *Id*. 153:6–11. The Baltimore County Police advised Jeffrey and Raquel Lilly of their available court process. Ex. 22, BPD 149.

Lekeshia Blue telephoned Raquel Lilly to ask why she would call the police to report theft of dogs the Lillys did not own. Ex. 2, 154:15–155:11. Lekeshia Blue refused again to return the dogs and ended the conversation by saying "fuck you and your dogs." *Id*, 150:10–21, 155:1–11. Raquel Lilly understood Lekeshia Blue to mean she was not returning the dogs. *Id*. 163:1–4. In fact, Lekeshia Blue never had any intention to return the dogs because she believed that she owned them.; Ex. 6 129:5–8 ("The dogs were never going anywhere."), 132:4–9. ("My husband was murdered for no reason…And then I have a family member that I thought was close, right, that I

allowed to come into my house, into my sanctuary that are accusing me of theft, saying I stole property that I owned."). When Lekeshia Blue sold the puppies, she did not seek permission from anyone at BPD, she was not promised anything for selling the puppies, and no one at BPD told her to sell them. Ex. 6, 145:9–16.

That same day, Robert Smith sent a text message to Briscoe detailing the situation, stating that he felt like Jeffrey and Raquel Lilly were harassing him and his family. Exhibit 23, Text Message from Robert Smith to Briscoe, BPD 133–134. Robert Smith and Briscoe then spoke on the telephone to discuss the family conflict, and Briscoe told Robert Smith that she would see what she could do to diffuse the situation. Ex. 12, 160:16–23; Ex. 9, 95:7–9. Briscoe called Herzog to ask for Jeffrey Lilly's phone number. Ex. 9, 95:12–14. After hearing about the conflict, Herzog asked if he could call Jeffrey Lilly instead because they had a rapport from working together in the Western District. *Id*. 96:6–14.

On January 31, 2022, Herzog telephoned Jeffrey Lilly and asked Jeffrey Lilly if he would leave the Blue and Smith families alone while they were burying James Blue. Ex. 5, 69:16–70:5. Jeffrey Lilly explained his side of the story and communicated that he "wasn't really trying to hear what [Herzog] was trying to say." *Id*. 72: 12–19. When Herzog realized that Jeffrey Lilly was not going to budge, Herzog tried to de-escalate the situation by asking Jeffrey Lilly to "do [him] a favor, at least till after the funeral." *Id*. 72:2–8; 73:1–6. Herzog did not tell Jeffrey Lilly that he could not file a civil lawsuit, but Jeffrey Lilly perceived Herzog's favor request as an order because Herzog was a superior rank. *Id*. 19–21, 71:10–15.

On February 2, 2022, a colleague told Jeffrey Lilly that he heard from another person that the FBI and PIB were investigating Jeffrey Lilly, at the behest of the Smiths, for operating Twisted

Roots Kennels while working for BPD.[1] Ex. 3, Answer Nos. 1 and 4; Ex. 5, 89:19–90:4. Apprehensive of an investigation, Jeffrey Lilly consulted another coworker, who advised him to contact Akanni. Ex. 5, 103:3–104:4. Jeffrey Lilly also called Herzog to convey his concerns that the dispute had traveled to the FBI. *Id.*, 93:4–21.

By this time, Jeffrey Lilly and Raquel Lilly engaged legal counsel for this civil matter. Ex. 2, 52:20–53:18. On the afternoon of February 2, 2022, Raquel Lilly submitted a complaint to PIB. Exhibit 24, PIB Complaint filed by Raquel Lilly, BPD 26–27. Raquel Lilly lodged a complaint with PIB against Briscoe, Herzog, and Lekeshia Blue for their actions. *Id.* Raquel Lilly said she advised Jeffrey Lilly to "contact internal affairs and seek further instruction from [their] attorney." *Id.* Raquel Lilly concluded her complaint by stating that supporting documentation must be requested through their attorney. *Id.* EODS was assigned to investigate Raquel Lilly's complaint. Ex. 1, 184:185:6. Shortly thereafter, Jeffrey Lilly emailed Akanni to discuss, "a civil matter involving a retired LTC, Baltimore Police, and a current member assigned to [PIB]." Exhibit 25, Emails between Jeffrey Lilly and Akanni, BPD 1015–1022.

On February 3, 2022, Briscoe telephoned Jeffrey Lilly. Ex. 5, 96:10–13. Briscoe apologized to Jeffrey Lilly and indicated that she understood how Herzog's telephone call could have been viewed as intimidating. Ex. 5, 97:6–12. Jeffrey Lilly did not want to involve Briscoe into his family dispute, and the conversation turned to Briscoe checking on Jeffrey Lilly's well-being. *Id.*, 98:2–13. On February 4, 2024, Jeffrey Lilly met with Akanni and Jackson at BPD Headquarters. *Id.*, 106:7–13. Jeffrey Lilly did not want the meeting to take place at PIB and Akanni honored that request so that Jeffrey Lilly felt safe expressing his concerns. *Id.*, 106:12–13; Ex. 25. Akanni and Jackson also did not record the meeting at Jeffrey Lilly's request. Ex. 5, 108:1–8. At the meeting,

---

[1] There is no record of any such investigation. Ex. 27.

10

Jeffrey Lilly informed Akanni and Jackson of everything that had happened, and he voiced his concern that he was being investigated. *Id*. 108:9–10; Exhibit 26, Glen Jackson Memorandum, BPD 20. Akanni assured Jeffrey Lilly that there was no investigation involving him and, in fact, Jeffrey Lilly did not have any open investigations into his conduct at that time. Ex. 5, 108:9–13; Exhibit 27, Comprehensive PIB History of Jeffrey Lilly, BPD 157–227.

Around this time, Lekeshia Blue contacted Nadeau and asked him to prohibit Jeffrey Lilly from attending James Blue's funeral, a request that Nadeau declined. Ex. 4, 165:4–16. During their conversation, Lekeshia Blue informed Nadeau that Robert Smith had contacted Briscoe. *Id*. 10–13. Akanni, who was in Nadeau's office during this conversation, then informed Nadeau about his meeting with Jeffrey Lilly. *Id*., 177:6–13. Nadeau said that he knew Jeffrey Lilly from their time in the FBI task force and asked Akanni to schedule a meeting so that they could "calm this all down before it gets out of control." *Id*., 177:14–178:1. Nadeau hoped that he could help Jeffrey Lilly understand the grieving process because Jeffrey Lilly suffered a similar family tragedy while they were both working for the FBI. *Id*. 177:15–18. Nadeau knew Jeffrey Lilly, in part, because he had offered resources to Jeffrey Lilly at the time of his family tragedy. Ex. 5, 30:4–16. Nadeau did not speak with anyone else about the situation involving Jeffrey Lilly. Ex. 4, 183:6–21; Exhibit 28, Lekeshia Blue's Answers to Plaintiff's Interrogatories, Answer No. 4; Exhibit 29, Delphine Smith's Answers to Plaintiffs' Interrogatories, Answer No. 1; Exhibit 30, Robert Smith's Answers to Plaintiff's Interrogatories, Answer No. 1.

Upon advice of their attorney, Raquel Lilly called the Baltimore County Police to conduct another wellness check on the litter of puppies on February 7, 2022. Exhibit 31, Baltimore County Police Call for Service, BPD 142–143; Ex. 2, 157:5–21. Robert Smith informed the officers who arrived that the previous officers already deemed this a civil dispute when they were at his home on January 30, 2022. Ex. 12, 154:6–16. The arriving officers said that they would tag their dispatch

system to ensure police would not be dispatched again for the same issue. *Id*. 17–23. That day, Jeffrey Lilly posted a picture on social media featuring him with his cousin, who had shot a family member over a family dispute. *Id*. 188:5–189:25, 191:2–11. The caption stated: "MF's act like I didn't have connections! To the gravel with this shit! ON MY MAMA!" Exhibit 32, Jeffrey Lilly Social Media Post, BPD 103.

On the evening of February 7, 2022, Akanni contacted Jeffrey Lilly to schedule a discussion with Nadeau. Ex. 5, 111:7–16. On February 8, 2022, Jeffrey Lilly met with Akanni and Nadeau at BPD Headquarters. *Id*., 112:6–8. At the meeting, Nadeau asked Jeffrey Lilly why he continued to call the police over a civil matter. Ex. 3, Answer No. 12. Nadeau said he did not want to know more of the story, but that the dispute over the puppies was a civil matter and that Jeffrey Lilly should not involve the Baltimore County Police. Ex. 3, Answer No. 12. Nadeau said that if Jeffrey Lilly continued to call Baltimore County Police for a civil dispute, it would be possible for Baltimore County to charge him *Id*. According to Jeffrey Lilly, Nadeau told him that he did not want Jeffrey Lilly to embarrass the BPD by calling the police over a civil matter, and that Jeffrey Lilly would be laughed out of court, especially given the timing of everything. *Id*. Nadeau did not tell Jeffrey Lilly that he could not file a civil lawsuit. Ex. 5, 122:2–9.

Despite Nadeau's request, Raquel Lilly contacted the Baltimore County Police to conduct another welfare check on the dogs at Robert Smith and Delphine Smith's home on February 10, 2022. Ex. 3, Answer No. 3. On February 15, 2022, Raquel Lilly contacted the Baltimore County Police a fourth time to conduct a welfare check on the dogs. *Id*. On or about February 17, 2022, Twisted Roots Kennels posted an apology to their customers via their social media account, stating that they are "patiently waiting for the legal process to take its course." Exhibit 33, Twisted Roots Kennels Social Media Post, BPD 105. On March 3, 2022, Jeffrey and Raquel Lilly retained new counsel because they were dissatisfied with their previous attorney. Ex. 2, 100:8–14, 53:2–18. On

12

March 8, 2022, counsel for Twisted Roots Kennels sent a demand letter to the Blue and Smith family for the return of Raine, Raine's puppies, and another adult French bulldog. Exhibit 34, Twisted Roots Kennels Demand Letter, BPD 83–85. Lekeshia Blue, Robert Smith, and Delphine Smith all received copies of the demand letter. Ex. 6, 130:13–15. If the dogs were not returned within 48 hours, Twisted Roots Kennels said they would file a civil suit and refer the matter to the Baltimore County's State's Attorney's Office for criminal sanctions. Ex. 34. Counsel for Twisted Roots Kennels also referenced an earlier conversation he had with Herzog about the matter. *Id*.

The demand letter was received on March 10, 2022. Ex. 13, 98:13–21. When the letter was received, Delphine Smith told McClairn, who was visiting her home at the time, that her family was being harassed. *Id*., 114:6–9. As a result, McClairn contacted his Captain, Howard, who scheduled a time for Robert and Delphine Smith to report Jeffrey Lilly's harassment. *Id*., 104:14–20. On March 14, 2022, Robert and Delphine Smith arrived in-person to PIB so that Robert Smith could lodge a complaint against Jeffrey Lilly for harassment and filing a false police report. Ex. 30, Answer No. 1; Exhibit 35, PIB Complaint Summary, BPD 212–218. Bowling and Popp conducted the intake of Robert Smith's complaint. Ex. 12, 168:11–169:2; Ex. 30, Answer No. 1; Ex. 35. Robert Smith did not speak with Lekeshia Blue or Nadeau before filing his complaint. Ex. 12, 199:7–16; Ex. 6, 131:16–17. Moreover, no one from BPD coerced Robert Smith into filing his complaint nor did anyone from BPD promise Robert Smith anything if he filed his complaint. Ex. 12, 207:7–21; Ex. 30, Answer No. 5. The only reason Robert Smith filed his complaint was his own free will. Ex. 12, 207:14–17.

As a result of Robert Smith's complaint, PIB opened an investigation against Jeffrey Lilly for conduct unbecoming a police officer, discourtesy, and false statement/untruthfulness. Ex. 35. On March 24, 2022, Popp emailed Howard, indicating that he believed the case should be moved "out of the building" because the case could involve Briscoe, Nadeau, and Akanni for their failure

to report Jeffrey Lilly's harassment when they learned of his misconduct. Exhibit 36, Email from Popp to Howard, BPD 1097. Rather than reassign the case, on March 25, 2022, Callaghan instructed Howard to update him after Jeffrey Lilly's interview. Exhibit 37, Email from Callaghan to Howard, BPD 1099. Callaghan's normal approach was to ask his investigators conduct initial interviews before immediately moving the investigation to another agency. Ex. 10, 76:17–78:1. On March 28, 2022, BPD served Jeffrey Lilly notification of the complaint lodged against him. Exhibit 38, Notice of Internal Investigation, BPD 59.

On March 29, 2022, Bowling drafted a memorandum detailing his perceived conflict of interest. Exhibit 39, Bowling Memorandum, BPD 69–70. Bowling quoted Twisted Roots Kennels' demand letter and detailed how Nadeau and Briscoe may have violated BPD policy for failing to report Jeffrey Lilly's misconduct. *Id*. Bowling believed those circumstances created a conflict of interest for him. *Id*.; Ex. 8, 42:4–43:3. Bowling was removed from the case and Howard instructed Popp to investigate the matter. *Id*., 38:12–13; Ex. 1, 126:1–12.

On April 4, 2022, Davey emailed Nadeau to request that an outside agency investigate the complaint against Jeffrey Lilly. Exhibit 40, Email from Davey to Nadeau and Nadeau to Callaghan, BPD 1110–1111. Nadeau did not respond to Davey and instead forwarded the email to Callaghan. *Id*. When Davey emailed a second time, Nadeau emailed Callaghan again and stated: "I have no oversight of this case, so I am forwarding to you. I don't know who the case is assigned to." Exhibit 41, Emails among Davey, Nadeau, and Callaghan, BPD 1126–1129. On April 14, 2024, Callaghan emailed Davey and informed him that Nadeau had recused himself from the matter. *Id*. Callaghan further stated that he would be handling the decisions related to the case. *Id*. The emails are consistent with Nadeau's testimony that he did not take any action in the pending cases after his meeting with Jeffrey Lilly, and that Callaghan and Akanni handled everything related to the

investigations. Ex. 4, 199:1–15. Callaghan said he would decide how to proceed after Jeffrey Lilly's

interview. Ex. 41. Davey did not object to Callaghan's approach. *Id*.

On April 22, 2024, Robert Smith called PIB to check the status of his complaint. Exhibit

42, Email from Popp to Howard, BPD 1130. Popp informed Robert Smith that he had not yet

interviewed Jeffrey Lilly and would be doing so on April 26, 2024. *Id*. Popp also told Robert Smith

that Jeffrey Lilly was being charged with "harassment and false report." Ex. 30, Answer No. 2.

When asked whether Jeffrey Lilly was being charged with forgery, Popp stated that forgery was an

issue for the Baltimore County Police to investigate. *Id*.; Ex. 1, 118:7–15. When Robert Smith and

Delphine Smith said they had not been to the Court Commissioner about the forgery issue, Popp

said, "that's what I would do." Ex. 29, Answer No. 2.  Delphine Smith does not believe Popp's

comment pressured her into pursuing forgery charges. Ex. 13, 119:20–120:2; Ex 29, Answer No. 3.

On April 25, 2022, Robert Smith and Delphine Smith went to the Baltimore County Court

Commissioner to file forgery charges against Jeffrey Lilly. Ex. 13, 12:14–13:20. At that time,

Delphine Smith did not believe she was falsely accusing Jeffrey Lilly of forgery. Deposition of *Id*.,

60:21–61:4. Delphine Smith filed forgery charges because the signature on the Limited Partnership

Agreement did not match James Blue's DocuSign signature known to her, and she believed that

Raquel Lilly had a propensity to forge documents. *Id*., 77:2–7, 78:6–79:1; Exhibit 43, Jeffrey Lilly

Forgery Charges, BPD 86–91. Ex. 13, 119:20–120:6. No one from BPD told Delphine what to write

in her application for statement of charges nor did anyone from BPD review the application before

submission to the Court Commissioner. *Id.*, 121: 7–15. Delphine Smith's decision to seek forgery

charges against Jeffrey Lilly was done of her own free will. *Id*. 120:11–15; Ex. 5, 150:16–151:20;

Ex. 29, Answer No. 3.

After reviewing Delphine Smith's application for charges and the supporting documents,

the Baltimore County Court Commissioner charged Jeffrey Lilly with felony forgery. Ex. 43. Later

that evening, Delphine Smith emailed Popp a copy of the charging documents from the Baltimore County Court Commissioner. Exhibit 44, Email from Delphine Smith to Popp, BPD 1137. Popp responded that he would add it to the case folder and ensure that it was served. *Id*. Because of the pending criminal charges, Jeffrey Lilly did not give a statement to PIB investigators on April 26, 2022. Ex. 5, 158: 8–10.

On April 27, 2022, Jeffrey Lilly was served with the criminal summons and suspended without pay. Exhibit 45, Suspension of Jeffrey Lilly, BPD 71–72; Ex. 5, 158:18–159:3. BPD scheduled a suspension hearing for May 4, 2022. Ex. 45. Suspension hearings normally occur after a member is suspended. Ex. 10, 56:22–57:2. The purpose of the suspension hearing was to determine whether the suspension would be in-pay status or continue in out-of-pay status after hearing each party's position. *Id*., 57:3–8. The hearing officer found that Jeffrey Lilly's suspension should continue without pay because he had pending felony charges.[2] Ex. 5, 164:14–19. That decision was consistent with previous decisions of hearing officers. Ex. 4, 213:9–18 ("So the statute says may. BPD has, since before I ever got there, has always followed the statute on a felony and suspended without pay."); Ex. 10, 57:15–58:1 ("But one of the factors I recall is if somebody is criminally charged with a felony, that would have been a no-pay suspension…"), 58:6–13. Brian Nadeau was not involved in any part of the decision to file criminal charges against Jeffrey Lilly, nor did he participate in any part of the decision to suspend Jeffrey Lilly without pay. Ex. 4, 198:13–15, 199:1–15.

On June 9, 2022, the State of Maryland declined to prosecute the felony forgery charges against Jeffrey Lilly. Ex. 5, 180:6–8. Delphine Smith emailed Popp stating that she was disappointed by the outcome of the case. Exhibit 46, Email from Delphine Smith to Popp, BPD

---

[2] There is no evidence in the record that Jeffrey Lilly filed an Application of Show Cause with the circuit court to challenge the decision of the hearing officer.

1227–1234. Delphine Smith outlined how the Assistant State's Attorney did not return her phone calls, meet with her, or review the evidence she provided. *Id*. Delphine Smith restated her position as to why she still believed Jeffrey Lilly forged James Blue's signature. *Id*. Delphine Smith also attached a complaint she filed with the Assistant State's Attorney's supervisor, once again outlining why she believed James Blue's signature was forged and why she believed she had evidence to prove it. *Id*. On June 14, 2022, BPD reinstated Jeffrey Lilly to full duty with pay. Exhibit 47, Reinstatement of Jeffrey Lilly, 1264–1265. Despite his reinstatement, Jeffrey Lilly, under advice of counsel, refused to sign the financial disclosure to receive his back pay because he was concerned that BPD would investigate him for Twisted Roots Kennels not paying its taxes. Ex. 5, 185:3–186:14; Exhibit 48, Email from Jeffrey Lilly to Sean Kirkpatrick, BPD 1306–1308. Requiring the financial disclosure to receive back pay was the normal practice of BPD and required by Internal Revenue Service standards. Ex. 5, 186:1–3; Ex. 48.

On May 31, 2022, an attorney for Lekeshia Blue sent notice of her intention to file a lawsuit against BPD for the death of her husband. Exhibit 49, Lekeshia Blue Claim Notice, BPD 243–245. In July 2022, Mathis called Raquel Lilly and left her a voicemail concerning the complaint she had filed on February 2, 2022. Exhibit 50, Email from Mathis to Raquel Lilly, BPD 3; Ex. 2, 75:11–76:19. Raquel Lilly did not respond to Mathis, and she believed that her complaint could have been irrelevant given what happened to Jeffrey Lilly. Ex. 2, 75:18–76:6. On August 3, 2022, Jeffrey Lilly was transferred from his position at Safe Streets to medical leave. Exhibit 51, Human Resources Order 992-2022, BPD 1311; Ex. 5, 234:1–4. Jeffrey Lilly stayed on medical leave for approximately one year. Ex. 5, 208:7–16.

On August 12, 2022, counsel for Plaintiffs served a notice of legal representation and intent to file suit on the BPD. Exhibit 52, Plaintiffs' Claim Notice, BPD 241–242. That same day, Michael Payne sent Robert Smith notification that BPD had opened its investigation for the complaint he

lodged against Jeffrey Lilly. Exhibit 53, PIB Notification to Robert Smith, BPD 73. Michael Payne

then conducted interviews with Robert Smith, Delphine Smith, and Lamont Pride on September 1,

2022. Exhibit 54, Payne Memoranda, BPD 42–45. Such a delay was normal for PIB at that time.

Ex. 1, 131:6–9. On September 13, 2022, Mathis sent a follow up email to Raquel Smith to discuss

her complaint. Ex. 50. Raquel Lilly did not receive the email because Twisted Roots Kennels email

account was not operational. Ex. 2, 74:14–15.

   On October 13, 2022, Callaghan directed a subordinate to contact the Office of the Inspector

General to ask if they would conduct the investigations. Exhibit 55, Emails Between Callaghan and

Roeser, BPD 1446–1450. The Office of the Inspector General declined. Ex. 10, 90:16–91:1. On

November 21, 2022, Callaghan contacted the Office of the Attorney General to ask if they would

conduct the investigations. Exhibit 56, Emails Between Callaghan and Office of Attorney General,

BPD 1604, 1631. On December 6, 2022, the Office of the Attorney General also declined to

investigate. *Id*. On December 15, 2022, Baltimore County Police agreed to consider handling the

investigations and assigned the matter to Longo. Exhibit 57, Deposition of Longo, 13:19–14:3.

After Longo interviewed Akanni on December 21, 2022, Baltimore County declined to conduct the

investigations due to time constraints. *Id*. 50, 9–16, 24:15–18.

   On January 3, 2023, Harrison assigned both complaints to the Equal Opportunity and

Diversity Section because Akanni reports to Eric Melancon who is not part of the chain of command

for any of the involved members. Exhibit 58, Harrison Memorandum, 155–154. EODS rendered a

finding of "unfounded" with respect to Raquel Lilly's complaint because of her failure to participate

in the investigation. Exhibit 59, EODS Report Regarding Raquel Lilly's Complaint, BPD 16–19.

EODS rendered a decision of "not sustained" with respect to Robert Smith's complaint because it

did not meet the requisite burden of proof. Exhibit 60, EODS Report Regarding Robert Smith's

Complaint, BPD 63–68. Accordingly, BPD did not take any disciplinary actions against Jeffrey

Lilly, Lekeshia Blue, Briscoe, or Herzog. Exhibit 61, Policy 308, General Disciplinary Process.

## STANDARD OF REVIEW

A motion for summary judgment is appropriate where "there is no genuine issue as to any

material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

In assessing a motion for summary judgment, all reasonable inferences must be drawn in favor of

the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The party

opposing summary judgment, however, "may not rest upon mere allegations or denials of his

pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 256.

A complete failure of proof "necessarily renders all other facts immaterial." *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986).

## ARGUMENT

Title 42, United States Code, Section 1983 is the mechanism for individuals who had their

constitutional rights violated to seek a remedy individual against state actors. *See* 42 U.S.C. § 1983.

Section 1983 permits a plaintiff to bring a claim directly against a municipality, but only if the

municipality itself causes a deprivation of a constitutional right through an official policy or custom.

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1970). Relevant to this case, a municipality can

be held liable for constitutional harms stemming from a policy or custom instituted by "official

actions" of municipal officials who "have the responsibility and authority to implement final

municipal policy with respect to a particular course of action." *Riddick v. Sch. Bd. of the City of

Portsmouth*, 238 F.3d 518, 522-23 (4th Cir. 2000) (citations omitted).

Nadeau's involvement in this case was negligible as the evidence shows that his actions

were limited to his February 8, 2022 meeting with Jeffrey Lilly. Therefore, the question before this

Court is whether that interaction created a policy that caused BPD to violate Jeffrey Lilly's

substantive due process by depriving him of his ability to (1) enforce the Limited Partnership Agreement; and (2) his ability to contract with prospective buyers who made deposits. ECF No. 24 ¶ 137; ECF No. 34 at 21–22. Count I fails because Jeffrey Lilly did not suffer a substantive due process violation nor did BPD, through the actions of Nadeau, cause the deprivation of Jeffrey Lilly's contractual rights. Moreover, Nadeau's actions did not create a policy of BPD, and BPD was acting in its capacity as Jeffrey Lilly's employer. Therefore, the Court should enter summary judgment in favor of BPD.

## I.    Jeffrey Lilly Did Not Suffer a Due Process Violation.

Section 1983 claims against municipalities require a predicate constitutional injury. *Evans v. Chalmers*, 703 F.3d 636, 655 (4th Cir. 2012). The Due Process Clause was intended to "prevent the government 'from abusing [its] power, or employing it as an instrument of oppression.'" *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989) (quoting *Davidson v. Cannon*, 474 U.S. 344, 348 (1986)). Substantive due process exists as the "last line of defense" against such official abuses of power that are so arbitrary as to shock the conscience of the court. *Washington v. Hous. Auth. of the City of Columbia*, 58 F.4th 170, 181–82 (4th Cir. 2023) (quoting *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980)). Only "the most egregious official conduct" qualifies as arbitrary in the constitutional sense. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992)).

To prove that BPD violated his substantive due process rights, Jeffrey Lilly must prove (1) that he had a specific liberty or property interest; (2) that BPD, through the actions of Nadeau, deprived him of this liberty or property interest; and (3) that BPD's action, through Nadeau, falls, "so far beyond the outer limits of legitimate government action that *no process* could cure the deficiency." *CMDS Residential, LLC v. Mayor & City Council of Baltimore,* 714 F. Supp. 3d 583, 620 (D. Md. 2024) (quoting *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810 (4th Cir. 1995)

(emphasis in original); *Bills v. Virginia Dep't of Educ.*, 605 F. Supp. 3d 744, 757 (W.D. Va. 2022), *aff'd*, 2024 WL 4834231 (4th Cir. Nov. 20, 2024). As set forth more fully below, there is no evidence in the record to support any of the required elements.

A.      *Jeffrey Lilly, in his personal capacity, is not a party to the Limited Partnership nor does he have a property interest in the litter of puppies.*

Plaintiffs asserting a substantive due process claim must prove the deprivation of a cognizable interest in life, liberty, or property. *Gravitte v. N. Carolina Div. of Motor Vehicles*, 33 F. App'x 45, 48 (4th Cir. 2002). In this case, Jeffrey Lilly contends that BPD deprived him of his right to enforce the Limited Partnership Agreement and to contract with prospective buyers who made deposits. ECF No. 24 ¶ 137; Ex. 3, Answer Nos. 7 and 8. However, whether Jeffrey Lilly and Raquel Lilly intended to or not, they created a Pennsylvania General Partnership when they formed Twisted Roots Kennels. In Pennsylvania, "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intended to form a partnership." Pa. Stat. and Cons. Stat. Ann., § 101, *et seq*. § 8422. "A partnership is an entity distinct from its partners." *Id*. § 8421. Importantly, "property owned by a partnership is partnership property and is not owned by the partners individually." *Id*. § 8423.

Plaintiffs state explicitly that only Jeffrey Lilly brought Count I against BPD. ECF No. 24 ¶ 131. However, Twisted Roots Kennels, not Jeffrey Lilly in his individual capacity, is vested with the contractual rights at issue in this case. The only two parties to the Limited Partnership Agreement are Twisted Roots Kennels and James Blue. Ex. 16. Therefore, Twisted Roots Kennels has the right to enforce the Limited Partnership Agreement and the ownership interest in the puppies necessary to contract with prospective buyers. *See Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 363 (2012). Twisted Roots Kennels acknowledged they alone possessed the contractual rights at issue in their March 8, 2022 demand letter. Ex. 34. Twisted Roots Kennels then followed through

with their demand by filing this lawsuit, seeking damages against Lekeshia Blue, Robert Smith, and Delphine Smith based upon the Limited Partnership Agreement. *See* ECF No. 24. Because Twisted Roots Kennels has the liberty or property interest at issue in this case, Jeffrey Lilly was not deprived of a fundamental interest necessary to establish a due process violation. However, even if Jeffrey Lilly was a party to the Limited Partnership Agreement, BPD's conduct, through Nadeau, was not conscience shocking.

> B.  *BPD's conduct, through the actions of Nadeau, was not so egregious or outrageous as to shock the contemporary conscience.*

To establish a substantive due process violation, a plaintiff must also show that a defendant's behavior was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 413 (4th Cir. 2020) (citations omitted). Only "the most egregious official conduct" qualifies as arbitrary in the constitutional sense. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). In *Lewis*, the Supreme Court outlined a "culpability spectrum," emphasizing that conduct most likely to "shock the conscience" is that which is "intended to injure in some way unjustifiable by any government interest." *Id*. at 849. However, substantive due process claims may also arise from conduct that exceeds negligence but falls short of intentional harm. *Id*. Deliberate indifference occurs when a defendant knows of a "substantial risk of serious harm" and disregards it by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). The deliberate indifference standard applies when "actual deliberation is practical." *Lewis*, 523 U.S. at 851. Here, the deliberate indifference standard governs because there are no allegations of exigent circumstances or emergency decision-making. *See id*. at 851 (1998).

Courts require extreme conduct to meet the "shocks the conscience" standard. In the seminal case using the "conscience shocking" framework, the Supreme Court found that police illegally

breaking into a suspect's private bedroom, handcuffing him, and then forcibly extracting morphine capsules from his stomach rose to such a level. *Rochin v. California*, 342 U.S. 165, 209–210 (1952). In *Dean*, the Fourth Circuit held that a police officer could be found to have engaged in conscience-shocking behavior under the deliberate indifference standard when, in a non-emergency situation, he deactivated his emergency lights and drove nearly forty miles per hour over the posted speed limit on a dark and curved road, resulting in serious injuries. *Dean*, 976 F.3d 407 at 416–17. Unlike such reckless conduct, Nadeau's single meeting in which he asked Jeffrey Lilly to be understanding during a mourning period and telling him not to call the police over a civil matter was appropriate under the circumstances.

Importantly, when this Court allowed Count I to proceed through discovery, it noted that Jeffrey Lilly would need to produce significantly more evidence than what he pleaded to establish conduct that "shocks the conscience." *See* ECF No. 34 at 22–23 ("Unfortunately, neither party addressed whether the alleged conduct 'shocks the conscience' in their submissions to the Court, and this Court is mindful that ultimately *considerably more will be necessary* to establish liability under § 1983.") (emphasis added). However, Jeffrey Lilly proved substantially less through discovery, as the record before the Court on summary judgment falls short of what Plaintiffs pleaded in their Amended Complaint. Despite Jeffrey Lilly's allegations that Nadeau orchestrated a protracted "pressure campaign" against him, Nadeau's only involvement in this case stems from a single meeting on February 8, 2022, during which he told Jeffrey Lilly to stop calling the police over a civil matter. Nadeau did not direct Jeffrey Lilly to abandon his contractual rights, nor did he tell Jeffrey Lilly that he could not file a civil lawsuit. Nadeau's words did not even stop Twisted Roots Kennels from trying to enforce the Limited Partnership Agreement through criminal and civil avenues. The record is replete with examples of enforcement actions post-February 8, 2022, both civil and criminal. There are absolutely no facts in the record to suggest that Nadeau was aware that

his actions—a single advisory meeting—would create or lead to a "substantial risk of serious harm." Accordingly, no reasonable jury could find that Nadeau's conduct shocks the conscience as required by a substantive due process claim.

> C. *Jeffrey Lilly has post-deprivation remedies available to rectify any deprivation.*

Even if Jeffrey Lilly had a property or liberty interest and BPD's conduct was "conscience shocking," there is no evidence that post-deprivation state remedies are inadequate to rectify BPD's supposed error. *MDS Residential, LLC*, 714 F. Supp. 3d at 620. As the Fourth Circuit has explained:

> If state law is transgressed, state courts are open to redress that violation and remedy an unlawful deprivation of property. We have repeatedly stated that 'governmental actions that are violative of state law are properly challenged in state courts which exist, in part, to protect citizens from abuses of state law.' And the fact that state courts are available to redress and correct violations of state law 'belies the existence of a substantive due process claim.'

*Tri Cnty. Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 441 (4th Cir. 2002) (internal citations omitted).

Jeffrey Lilly contends that Nadeau's actions interfered with his state law contractual rights. However, after his meeting with Nadeau, Jeffrey Lilly had myriad options available to him through the state courts to rectify any deprivation of his rights, such as filing a replevin or detinue action for the return of the puppies. Maryland Rule 12-601; Maryland Rule 12-602. Indeed, Jeffrey Lilly was advised of his options by Baltimore County Police on January 31, 2022, and even had legal counsel as early as February 2, 2022 to guide him through civil contractual enforcement process. And on March 3, 2022, he hired a different attorney to send a demand letter seeking criminal and civil redress for the deprivation of Twisted Roots Kennel's property. Ironically, the most obvious post-deprivation remedy available to Jeffrey Lilly, was his right to file state court tort and contract claims that he included in this lawsuit. *See* ECF No. 24. Because Jeffrey Lilly had, and does have, post-deprivation remedies available to him, his substantive due process claim fails.

The Court should grant summary judgment in favor of BPD because the record does not demonstrate that Jeffrey Lilly has met any element necessary to establish that he suffered a violation of his substantive due process rights. Even if Jeffrey Lilly did suffer a substantive due process violation, it was not the actions of BPD, through Nadeau, that deprived him of his rights.

## II.    BPD, through the actions of Nadeau, did not cause the deprivation of Jeffrey Lilly's contractual rights.

All torts, including Constitutional torts, require a demonstration of both but-for and proximate causation. *Evans*, 703 F.3d at 647; *Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014). Accordingly, Jeffrey Lilly must prove both but-for and proximate causation to prove his due process violation claim. *Gilliam v. Sealey*, 932 F.3d 216, 283 (4th Cir. 2019). In other words, Nadeau's actions, on their own, are insufficient to prove a claim for a due process violation. *Massey*, 759 F.3d at 454. Rather, Jeffrey Lilly must also show that his loss of liberty – right to enforce the Limited Partnership Agreement and to contract with prospective buyers – resulted from Nadeau's actions and were reasonably foreseeable consequence of those actions. *Id*.  As previously discussed, the only evidence in the record concerning Nadeau's conduct is that he suggested that Jeffrey Lilly should stop calling the police to the Smith home over a civil issue. There is simply no objective evidence in the record that the February 8, 2022, meeting between Jeffrey Lilly and Nadeau caused Jeffrey Lilly to lose his ability to enforce the Limited Partnership Agreement or his ability contract with prospective buyers.

With respect to enforcement of the Limited Partnership Agreement, the Court need not look further than Jeffrey Lilly and Raquel Lilly's post-February 8, 2022 conduct. After the meeting, Raquel Lilly called the Baltimore County Police two days later and again on February 15, 2022. The decision to call the Baltimore County Police was based upon advice of an attorney who was counseling the Lillys as early as February 2, 2022. On or about February 17, 2022, Twisted Roots

Kennels then broadcasted to its customers their intention to enforce the Limited Partnership Agreement by "patiently waiting for the legal process to take its course." Jeffrey Lilly and Raquel Lilly fulfilled their promise by hiring a new attorney on March 3, 2022 to send a demand letter threatening civil and criminal sanctions if the puppies were not returned. After sending their claim notice to BPD, Jeffrey Lilly, Raquel Lilly, and Twisted Roots Kennels followed through on their demand and filed this lawsuit to enforce their contractual rights.

Similarly, BPD did not cause Jeffrey Lilly's inability to contract with prospective buyers. Jeffrey Lilly claims that he could not contract with prospective buyers because he did not have puppies to sell them after they made deposits. As an initial matter, Jeffrey Lilly's claim fails because he was only entitled to the proceeds of the sale of the litter, not possession of the puppies to sell. Additionally, Jeffrey and Raquel Lilly said they would give those proceeds to Lekeshia Blue. But even if Jeffrey Lilly had the right sell the puppies, Lekeshia Blue decided that she was going to keep the litter of puppies permanently on January 27, 2022. Lekeshia Blue then unequivocally communicated her intention to keep the puppies on January 30, 2022. To the extent he had it, Jeffrey Lilly lost his ability to contract with prospective buyers more than a week before his meeting with Nadeau. Jeffrey Lilly's inability to contract with prospective buyers was not caused by any actions of Nadeau, but rather by Lakeshia Blue's decision to permanently keep the puppies.

There is overwhelming evidence in the record that Nadeau's actions had no bearing on Jeffrey Lilly's ability to enforce the Limited Partnership Agreement or to contract with prospective buyers. Jeffrey Lilly never lost his ability to enforce the Limited Partnership Agreement, he took concrete enforcement actions almost immediately after his meeting with Nadeau and is enforcing his contract right now through this lawsuit. Jeffrey Lilly lost the ability to sell puppies to prospective buyers well before Nadeau, or anybody from BPD, acted in this case. Jeffrey Lilly's inability to enforce the Limited Partnership Agreement or contract with prospective buyers was not a

foreseeable result of Nadeau's actions and the Court should enter summary judgment in favor of BPD. But, even if Nadeau's conduct caused the deprivation of Jeffrey Lilly's rights, there is insufficient evidence in the record to impute liability on BPD.

### III.    Nadeau's actions did not create a policy or custom that caused BPD to violate Jeffrey Lilly's constitutional rights.

Although a municipality is considered a "person" under § 1983, it cannot be held liable solely because it employs a tortfeasor. *Monell*, 436 U.S. at 691. In other words, a municipality cannot be held liable under § 1983 based upon a theory of *respondeat superior. Id.* However, a municipality may be imposed for a single decision by a municipal final policymaker under appropriate circumstances. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 477 (1986). "The question of who possesses final policymaking authority is one of state law." *Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000). As set forth by the Fourth Circuit,

> Several principles guide our analysis of whether a municipal official possesses final policymaking authority with respect to a challenged action. For one thing, '[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. 'Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies.' In other words, there is a marked difference between 'the authority to make final policy [and] the authority to make final implementing decisions.'

*Hunter v. Town of Mocksville, N. Carolina*, 897 F.3d 538, 555 (4th Cir. 2018) (internal citations omitted). In *Greensboro Pro. Fire Fighters Ass'n, Loc. 3157 v. City of Greensboro*, the Fourth Circuit found that the city's fire chief was not a final policymaker when the fire chief denied plaintiff a promotion. *Greensboro Pro. Fire Fighters Ass'n, Loc. 3157 v. City of Greensboro*, 64 F.3d 962, 963–964 (4th Cir. 1995). In reaching its conclusion, the Fourth Circuit relied on North Carolina state law, which vested only the City Manager and City Council with the authority to fashion

employment policy. *Id*. at 965. Moreover, the fire chief's decision-making authority was constrained by the policies adopted by City Council and City Manager. *Id*.

Jeffrey Lilly attempts to label Nadeau as a final policymaker because he was the deputy commissioner of PIB. However, BPD's Police Commissioner, not his deputies, has the exclusive authority to set policy governing the conduct and discipline of BPD officers. The Maryland General Assembly passed the Public Local Laws of Baltimore City, which vests the Police Commissioner with all powers regarding the management of BPD. *Franklin v. Clark*, 2005 WL 8174443, at \*5 n.6 (D. Md. Sept. 28, 2005); *See also* Policy 302. With respect to the conduct and discipline of BPD officers, the Public Local Laws of Baltimore City specifically states the Police Commissioner has the authority to, "regulate attendance, conduct, training, discipline, and procedure for all members of [BPD]." *Holloman v. Rawlings-Blake*, 2014 WL 7146974, at \*3 (D. Md. Dec. 12, 2014). The Public Local Laws of Baltimore City does not provide a mechanism for the Police Commissioner to delegate policymaking authority to deputy commissioners. *Id*. The mandates of the Consent Decree[3] also provide an additional layer before BPD can enact final policies. The Consent Decree mandates that BPD policies receive public comment, review by the Department of Justice and the Monitoring Team, and then approval from this Court. Ex. 11, 56: 7–23. Moreover, the Police Commissioner ordered the policy used to temporarily suspend Jeffrey Lilly in this case. *See* Exhibit 62, Policy 306, Suspension Procedures. And Commissioner Harrison would have been the final decision maker if there was disciplinary action taken against Jeffrey Lilly. *Id*., Page 158:22–159:4.

Nadeau's actions, to the extent his meeting with Jeffrey Lilly even constitutes a "decision," do not constitute a policy or custom of BPD because he cannot create policy concerning the discipline or conduct of BPD officers. Only the Police Commissioner can set policy on behalf of

---

[3] *See United States v. Baltimore City Police Dep't*, 1:17-cv-00099-JKB (D. Md. January 12, 2017).

28

BPD under the auspices of the Federal Consent Decree. At all times, Nadeau's actions were constrained by BPD's policies pertaining to discipline of its officers. Finding otherwise, would be tantamount to holding BPD liable on a *respondeat superior* theory for Nadeau's actions, which is prohibited by law.[4] Accordingly, the Court should grant summary judgment in favor of BPD.

**IV.    BPD was acting as Jeffrey Lilly's employer.**

Plaintiffs may only bring a § 1983 lawsuit for actions taken under the color of state law. *See* 42 U.S.C. § 1983. The fundamental question as to whether an action was taken under the color of state law is whether the actor engaged in, "[m]issue of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *U.S. v. Classic*, 313 U.S. 299, 326. By contrast, when the challenged conduct "entail[s] functions and obligations in no way dependent on state authority," state action does not exist. *Polk County v. Dodson*, 454 U.S. 312, 318–319(1981). In cases involving the constitutional rights of police officers, courts must distinguish between a police department's actions in its capacity as an employer and its actions as the law enforcement arm of the state. *See Driebel v. City of Milwaukee*, 298 F.3d.622, 637 (7th Cir. 2002); *Francis v. Giacomelli*, 2008 WL 7469231, at *1 (D. Md. July 16, 2008), *aff'd,* 588 F.3d 186 (4th Cir. 2009)).

Here, BPD's authority over Jeffrey Lilly arose in the private employer context governed by BPD policy requiring members to cooperate with PIB and follow orders of their superiors. *See* Exhibit 62, Policy 302, Rules and Regulations. A private workplace meeting, such as what happened in this matter, does not implicate the Constitution because BPD's actions were taken in

---

[4] In its Memorandum Opinion, this Court gave Plaintiffs explicit guidance to amend their case to name Brian Nadeau individually. However, Plaintiffs chose not to do so and instead proceeded directly against BPD.

its capacity as Jeffrey Lilly's employer, not as the law enforcement arm of the state. *See Driebel*, 298 F.3d. at 637. As a result, the actions here do not trigger the remedies afforded under § 1983.

**V.      Jeffrey Lilly is not entitled to punitive damages against BPD.**

In Count I, Jeffrey Lilly includes a claim for punitive damages under his *Monell* claim. ECF No. 24 ¶ 137. However, the Supreme Court has long held that municipalities are immune from punitive damages claims under § 1983. S*ee City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("…we hold that a municipality is immune from punitive damages under 42 U.S.C. § 1983."). Therefore, the Court should enter summary judgment in favor of BPD with respect to Jeffrey Lilly's claim for punitive damages.

<u>**CONCLUSION**</u>

The record is insufficient for Jeffrey Lilly's to convert his family contractual dispute into a constitutional claim against the BPD. Jeffrey Lilly did not suffer a substantive due process violation nor did BPD, through the actions of Nadeau, cause the deprivation of Jeffrey Lilly's contractual rights. Moreover, Nadeau's actions did not create a policy of BPD, and BPD was acting as Jeffrey Lilly's employer. Given the foregoing, the Court should enter summary judgment in favor of BPD.

Dated: January 17, 2025                                    Ebony M. Thompson
                                                           BALTIMORE CITY SOLICITOR

                                                           _____/s/_____
                                                           Gregory T. Fox (Bar No. 21472)
                                                           Brent D. Schubert (Bar No. 19593)
                                                           BALTIMORE CITY DEPARTMENT OF LAW
                                                           100 N. Holliday Street, Suite 101
                                                           Baltimore, Maryland 21202
                                                           Telephone: (443) 651-9633
                                                           Facsimile: (410) 396-2126
                                                           Gregory.Fox@baltimorepolice.org
                                                           Brent.Schubert@baltimorepolice.org
                                                           *Attorneys for Defendant, BPD*