# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

JEFFREY LILLY, et al.,

Plaintiffs

vs. Case No. 1:22-CV-02752-BAH

BALTIMORE CITY POLICE
DEPARTMENT, et al.,

Defendants

* * * * * * * * *

VIDEO RECORDED DEPOSITION OF BRIAN NADEAU

DEFENSE FACT WITNESS

Tuesday, October 22, 2024

Reported by: Laurie Baker
* * *
Magna Legal Services
866-624-6221

VIDEO RECORDED DEPOSITION OF BRIAN NADEAU

Video Recorded Deposition of Brian Nadeau, taken in the above-entitled case on Tuesday, October 22, 2024, commencing at 10:13 a.m., held at Homewood Suites, 625 South President Street, Baltimore, Maryland 21202, and transcribed by Laurie Baker, a Notary Public and Shorthand Reporter.

Magna Legal Services
866-624-6221
www.MagnaLS.com



I N D E X

VIDEO RECORDED DEPOSITION OF BRIAN NADEAU

October 22, 2024


| EXAMINATION BY | PAGE |
|---|---|
| Mr. Turiello | 8 |
| Mr. Schubert | 234 |

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| 1 | PIB Investigations Manual | 92 |
| 2 | Pg. 58 of manual | 119 |
| 3 | Pg. 64 -- Procedures for identifying & contacting complainants, witnesses & accused | 130 |
| 4 | Pg. 71 of manual | 144 |
| 5 | Pg. 105 Conflict Investigations | 149 |
| 6 | BPD Memorandum | 186 |
| 7 | Form 92/95 | 191 |
| 8 | Policy 304 Suspension Procedures | 199 |
| 9 | Forms 344 & 154 | 216 |


(Exhibits are attached hereto.)



APPEARANCES:

Michael Turiello, Esquire
Patrick Jennings, Esquire
Skeen Law Offices
258 East High Street
3rd Floor
Charlottesville, VA 22902
mturiello@skeenlaw.com
On Behalf of Plaintiffs

Randall J. Craig, Jr., Esquire
Craig Law Group
711 Saint Paul Street
Baltimore, Maryland 21202
rjcraig@craiglawyers.com
On Behalf of Defendants, Delphine Smith, Robert Smith, Lekeshia Blue



APPEARANCES CONTINUED:

Brent Schubert, Esquire
Office of Legal Affairs
Baltimore City Department of Law
100 N. Holliday Street
City Hall, Suite 101
Baltimore, Maryland 21202
gregory.fox@baltimorepolice.org
brent.schubert@baltimorepolice.org
On Behalf of Defendant, Baltimore City Police Department

ALSO PRESENT:
Raquel Lilly
Jeffrey Lilly
Robert Smith
Delphine Smith
Michael Gay, videographer



MAGNA LEGAL SERVICES

S T I P U L A T I O N

It is stipulated that the reading and signing of this deposition by the deponent is hereby NOT waived.

* * * * *

THE VIDEOGRAPHER: We are on the record. The time now is 10:13. This marks the beginning of disk number one for the videotaped deposition testimony of Brian Nadeau in the matter of Jeffrey Lilly, et al., vs. The Baltimore City Police Department, et al.

This case is pending in the United States District Court for the District of Maryland, Northern Division. Case number 1:22-CV-02752-BAH.

Today's date is October 22nd, 2024. This deposition is being conducted at 625 South President Street, Baltimore, Maryland.

Will all attorneys present please identify themselves and who they represent?

MR. JENNINGS: Patrick Jennings on behalf



of plaintiffs, Jeffrey Lilly and Raquel Lilly and Twisted Roots Kennels.

MR. TURIELLO: Michael Turiello also on behalf of the plaintiffs.

MR. CRAIG: Randall Craig on behalf of Lieutenant -- Captain Lekeisha Blue and Delphine Smith and Robert Smith.

MR. SCHUBERT: Brant Schubert on behalf of the Baltimore Police Department and the witness, Brian Nadeau.

THE VIDEOGRAPHER: My name is Michael Gay, with Magna Legal Services. Court reporter today is Laurie Baker, also with Magna, and will now swear in the witness.

* * * * *

B R I A N N A D E A U, called as a witness and having been duly sworn, testified as follows:

* * * * *

THE VIDEOGRAPHER: You may proceed.

MR. TURIELLO: Thank you, Ms. Baker.



EXAMINATION BY MR. TURIELLO:

Q Good morning.

A Morning.

Q Deputy Commissioner, is it Nadeau? Is that the correct pronunciation?

A Yes.

Q Deputy Commissioner Nadeau, before we begin, I just -- there are some procedural things we like to go over. This is a very odd form of communication. Not quite as formal as the courtroom, which I'm sure you're familiar with. Have you ever been deposed before, sir?

A I have not.

Q It's in a lot of ways very similar inasmuch as you're under oath. There is a record being kept. But because of the record, it's important that you and I try not to speak over one another just because Ms. Baker will eventually get mad and yell at me. I don't want to make her mad.

So to the best of my abilities, I'm going to try not to cut you off during an answer,



and I would ask that you -- even if you think you know where my question is going, that you try to wait for me to finish, and then we go ahead and proceed with your answer.

Just like in a courtroom, your attorney here may have an objection. Typically in depositions of this nature, objections are for lawyers and for the record to form only. So he may state an objection. Unless you are specifically instructed by your attorney not to answer, you should answer every question. He'll let you know if you shouldn't.

My intention is to try to have this be as much of a conversation. It's a discovery process, so we're all just trying to learn what happened. But again, typical conversations, folks are a little more fluid. To the extent that we can, keep the fluidity without stepping on one another, if possible. Does that make sense?

A Yes.

Q Thank you. Also, some procedural



MAGNA LEGAL SERVICES

Page 10

questions just to go over.
About your current state of mind today, as you sit here today, do you feel like you are clear of mind and able to give sound, competent testimony?
A Yes.
Q Are you currently under the care of a psychiatrist or psychologist?
A No.
Q Are you currently taking any medications that might affect your mental acuity or your memory?
A No.
Q Have you taken any drugs or alcohol or any other substance that might otherwise impede your ability to give truthful, honest testimony this morning?
A No.
Q Thank you. So I think where I want to begin is just learning a little bit about you, your career and what brought you to Baltimore. Okay. So first of all, how old are you, sir?

Page 11

A Sixty-one.
Q Sixty-one. And how long have you been in law enforcement?
A Since nineteen-eighty -- full time since 1984.
Q Okay. So 40 years. Congratulations on a 40-year career.
A It is 40 years.
Q I was born in '84. So I know that all too well, forty years. So is it -- based on my math, is it my understanding that you attended college and then immediately entered law enforcement?
A I attended college and went into law enforcement and then finished college.
Q Where did you go to school?
A University of Southern Maine for my bachelor's degree. Western New England in Massachusetts for my master's degree.
Q Okay. And what did you receive your bachelor's degree in?
A Criminal justice administration.

Page 12

Q And what about your master's?
A Criminal justice administration.
Q What was your first sort of entry or how did you enter law enforcement back in 1984? What agency were you with?
A Wells, Maine, Police Department.
Q How long were you with Wells, Maine?
A Three years.
Q What did you do in Wells, Maine?
A Police officer.
Q What roles or assignments did you have as a police officer?
A Patrol officer.
Q Say again?
A Patrol officer.
Q So you were in patrol?
A Correct.
Q So then that takes us then to '87. What did you do after that?
A Became a police officer in York, Maine, Police Department.

Page 13

Q How long were you in York, Maine?
A Ten years.
Q Okay. What duties or assignments did you have as member of the York Police Department?
A Patrol officer.
Q And were you patrol the entire time in the ten years you were there?
A I was patrol officer and instructor.
Q Walk me through a little bit. How long were you in patrol before you moved to being an instructor?
A That was a collateral duty.
Q Collateral duty, so same time?
A Correct.
Q How did you -- how were you brought into -- strike that. That's a terrible way to start that question. Are all patrol officers in York, Maine, assigned to be instructors as well?
A No.
Q How did you become an instructor?
A I was selected.



MAGNA LEGAL SERVICES

Q Who selected you?
A Chief of police.
Q And do you know why you were selected to that specific duty?
A I had an interest in firearms and was a fairly good firearms helper at the range, so I was selected to be the firearms instructor.
Q Okay. Was firearms instruction the only subject matter that you -- that you taught?
A Yes.
Q And how long were you a firearms instructor, if you recall?
A I would guesstimate probably six years.
Q Okay.
MR. SCHUBERT: That's fine. Just provide approximations to the best you can. Don't guess or speculate.
A Sure. So I got there in '87. I probably -- I'm guessing I went to the instructor school in maybe '91 or '92. So...



BY MR. TURIELLO:
Q Okay. And Mr. Schubert just cued me right up to another procedural thing I should have gone over, which is, as I'm sure you'll notice today, many times I ask poorly phrased questions. It is not my intent to be deceitful or otherwise unclear. I'm just sometimes not very good at asking questions.
So if there's a question that I ask you that is either unclear or for whatever reason you don't understand what I'm asking, just say, you know, Mike, Mr. Turiello, whatever makes you comfortable, would you please rephrase that? I'll ask it again.
If you give an answer, I will presume and the record will indicate that you understood what I was asking. So again, just to make sure that we're both on the same page, do not be shy about saying I don't know what you just asked, and I'll try again.
Additionally, some of my questions



might ask you for timelines or they might ask you for numbers or calculations of any sort. Do not -- certainly if you can provide an approximation to either a timeline or calculation or whatever, do so. Just qualify the answer and say I'm not sure, my best guesstimate is X, but don't guess.
MR. SCHUBERT: Sure.
MR. TURIELLO: Fair?
MR. SCHUBERT: Yeah, we would agree with that.
BY MR. TURIELLO:
Q Obviously, Mr. Schubert will instruct you along the way if it doesn't seem like it's going well.
So you were -- you said earlier about ten years you were in York. So does that mean that around 1997 you changed again?
A That's correct.
Q Where did you go to?
A FBI.
Q The FBI. Can you tell me about that



transition specifically? What I mean by that is what inspired you or moved you or brought you to the decision to pursue a career with the Federal Bureau of Investigations?
A I had an interest in federal law enforcement, so I applied to the FBI.
Q How did you develop that interest in federal law?
A Just as a law enforcement officer, I had an interest.
Q Was it a sort of, to use an analogy, it's the major leagues, right? It's the FBI, so I presume that many people who are passionate about law enforcement dream of a career at the FBI? Is that a fair statement? Does that -- in any way congruent with your decision?
A I wouldn't presume to know what many people think. I will say that is how I felt.
Q So when did you apply to become a member of the FBI?
A 1997.



MAGNA LEGAL SERVICES

Page 18

Q '97 you did your application. And when were you accepted into the academy?
A 1997.
Q When you were accepted, can you tell us the process of what that transition is like? You apply. You're accepted. What happened next?
A I went to the FBI academy.
Q Where is that?
A Quantico, Virginia.
Q How long is that academy?
A At the time, it was 16 weeks.
Q Four months or so. That's living, correct? You're down there, it's a residential academy, correct?
A Correct.
Q Did you have a family at that time?
A No.
Q After the academy -- well, first of all, let's talk about the academy a little bit. What type of things are covered in Quantico from a training perspective?

Page 19

MR. SCHUBERT: So I'm going to object, and I'm going to instruct him not to answer. My understanding is that is -- you know, requires the FBI, and there's security things involved with that. So I'm going to instruct him not to answer that question. You can ask it for the record, but...
MR. TURIELLO: Okay. So to be clear, you're instructing him not to answer what he was trained on?
MR. SCHUBERT: Yes.
MR. TURIELLO: And the basis of that is what?
MR. SCHUBERT: That's secret. It's covered by the FBI in those topics, so I'm going to instruct him not to answer that.
MR. TURIELLO: Okay.
BY MR. TURIELLO:
Q Nevertheless, you did complete the academy, correct?
A That is correct.

Page 20

Q Where did you rank in your class?
A There's no rank.
Q There's no ranking. So everybody -- it's either pass/fail?
A Correct.
Q So you get through your 16 weeks at Quantico. What's the next step in your career at the FBI?
A Assigned as a special agent in New York City.
Q Okay. So you went to the New York City --
A Field office.
Q Field office. Are there -- obviously there are other field offices in the FBI, is that correct?
A That's correct.
Q How do you -- does the FBI just place you in an office, or do you request a specific assignment?
A They place you.
Q Okay. So as a special agent in the New

Page 21

York field office, what were -- what was your first assignment at that office?
A Background investigations.
Q What did you do in background investigations?
A Investigated backgrounds.
Q For who?
A Presidential appointees. Anybody who had to get a clearance that was being appointed by the White House.
Q Okay. What's involved in conducting a background investigation?
MR. SCHUBERT: I'm going to object. It's going to be the same thing. FBI's processes and procedures is outside the scope of this and certainly we think protected.
MR. TURIELLO: Okay.
BY MR. TURIELLO:
Q So that objection is noted. You're not going to answer. But you did background investigations?


MAGNA LEGAL SERVICES

A Correct.
Q How long were you conducting background investigations for the FBI?
A I'm going to guesstimate this, but it was six to eight weeks.
Q Okay. What did you do after that assignment?
A Surveillance.
MR. TURIELLO: That certainly --
MR. SCHUBERT: Yes.
MR. TURIELLO: That's obvious.
BY MR. TURIELLO:
Q So you were on a surveillance team, or you were assigned to a surveillance assignment or whatever, correct?
A Correct.
Q We won't ask you what you were surveilling. Everybody understands that is obviously confidential.
How long were you on a surveillance squad or team or assignment, whatever it's called?



A Eight to 12 weeks.
Q Eight to 12 weeks. Okay. After that stint, what did you do?
A I was assigned to an organized crime squad.
Q Still in New York?
A Correct.
Q In the late '90s?
A Nineteen ninety -- this time is 1998.
Q Was that an exciting assignment?
MR. SCHUBERT: I'll object. You can answer.
A Was it exciting for who? For me?
BY MR. TURIELLO:
Q For you, yeah. That's a big assignment. Organized crime investigator in New York at the time the mob is being taken down.
A There was a lot of agents in New York City. You're not the only organized crime investigator.
Q No. Of course.



A It's a position.
Q How long were you working organized crime investigations?
A Until 9/11, which was 2001.
Q What did you do after 2001, or at that break in your career, what was your next assignment?
A Worked the 9/11 terrorism case.
Q And how long were you on that specific case or assignment?
A So that was in 2001. Until sometime in 2002.
Q What did you do next?
A Went back to organized crime.
Q So this next stint in organized crime, how long were you assigned to that specific assignment?
A Until 2006.
Q Where did you go after 2006?
A I was promoted to supervisor, and I transferred to D.C. to headquarters.
Q Okay. What did you supervise? I'm not asking you for specific investigations obviously.



But what was your role?
A Program. The program I supervised was the -- it was the theft unit, which covered organized retail theft, auto theft, art theft, and jewelry and gem theft for the U.S.
Q Did you have a team of investigators that you supervised?
A I did not.
Q So did you supervise people, or did you supervise a program?
A I supervised the program, and had one MAPA, which is a civilian who did -- who was an expert.
Q Were there any other special agents under your command at that point?
A Special agents, no.
Q How long were you in that role?
A Until late 2007.
Q What happened after that?
A I transferred back to New York City.
Q In what role?



MAGNA LEGAL SERVICES

A Special agent.
Q As the special agent on your second stint in the field office in New York, again, not asking for specific cases or specific investigations, but what division or program were you a part of?
A Organized crime.
Q Back to organized crime. How long were you there that time?
A Three months, I believe.
Q Then what happened?
A I was promoted to supervisor of the public corruption squad.
Q What type of cases? Again, not asking specifics. What type of cases does the public corruption squad investigate?
A Corruption in public officials.
Q So politicians, people holding office, is that correct?
A Correct.
Q In that capacity, did you have special agents under your command?



A That is correct.
Q How many?
A Twelve.
Q Okay. So it's correct to say that I guess we're in 2007 now?
A Eight.
Q 2008. Thank you. So in 2008, you were managing people, special agents?
A That's correct.
Q Did you enjoy that work?
A I enjoyed it.
Q What did you enjoy?
A The people.
Q How long were you in that managerial capacity in a public corruption unit?
A Four years.
Q So now we're in 2012?
A Correct.
Q What happened then?
A I was promoted to chief of public corruption for the Bureau, which brought me back to



D.C.
Q Okay. So best you can, just so I have an understanding, chief of public corruption, was that for the entire federal agency?
A Correct.
Q Okay. So am I correct in assuming that you were in charge of managing a team of people across the United States who were investigating public corruption?
A That is not correct.
Q Okay. Correct me.
A I was in charge of the public corruption program across the United States. Every field office has their own program. I was in charge of the programs. The supervisors would report to us and then I was in charge of a team of supervisors who were at headquarters who oversaw all of those programs.
Q So there were layers. You weren't necessarily -- you weren't in direct management of the actual agents performing the investigations, is



that correct?
A Not of the agents that were in the field. Supervisors that were at headquarters.
Q Okay. So in that capacity, is it, I mean, obviously an administrative function, correct?
A That's correct.
Q You were in charge of budgets, you were in charge of overarching strategies, you know, big picture, 30,000-foot strategies, correct?
A Correct.
Q But not the actual investigations?
A Except for undercover operations.
Q Okay. So now that's -- get my math right. 2012. You're back in D.C. You hold that job. How long are you in that position?
A Until the fall of 2014.
Q What happened then?
A I went back to New York, and I was the coordinating supervisor for all of the white-collar crime squads.
Q Was that specifically in New York, in the



MAGNA LEGAL SERVICES

southern district -- not southern district.
A Specifically in New York.
Q So coordinating supervisor for white-collar crime in New York City in 2014?
A Correct.
Q How many agents were in your command in that position?
A Well, so I supervised supervisors who were over all of the agents. So again it's a layered position. And I was there for four months.
Q So what happened four months later?
A I was promoted to assistant special agent in charge of Baltimore field office.
Q Okay. And assistant special agent in charge, ASAC, is that the right terminology?
A That's correct.
Q So as an ASAC in the Baltimore field office, what were your responsibilities?
A I was responsible at the time for counterterrorism, domestic terrorism, and intelligence programs.



Q Is that a -- so who did you report to in that position? What --
A Special agent in charge.
Q Special agent in charge, is that an appointed position, or is that a sworn position, if you will? I don't know if there's a distinction.
A Rephrase that.
Q Special agent in charge in the field office, is that a position that a sworn agent holds, or is that someone that is appointed by Main Justice?
A No. It's a sworn position. It's appointed by the Director of the FBI.
Q Okay. So how long did you hold the position of ASAC in the Baltimore field office?
A Until August of 2019.
Q Okay. So August of 2019, so you were 22 years -- no, 25 years as an FBI agent?
A Twenty-two.
Q Ninety-seven -- yeah, that's the right math. Thank you. So 22 years in the FBI. Where



did you go next?
A Baltimore Police Department.
Q Okay. Can you tell me why you pursued a career with the Baltimore Police Department?
A Well, I wouldn't say I pursued a career with the Baltimore Police Department.
Q What would you say?
A I would say the Baltimore Police Department was looking for somebody with my capabilities to come in and assist them in reforming the Baltimore Police Department and I took them up on that offer.
Q So were you recruited instead?
A Yes.
Q Obviously I think we all know what was happening here in 2019. There was an obvious need for reform, correct?
MR. SCHUBERT: I'll object. You can answer.
A Yes.



BY MR. TURIELLO:
Q That's kind of public knowledge. At the time that you were -- that an offer was made to you, was Commissioner Harrison the commissioner of the Baltimore Police Department?
A That is correct.
Q So Commissioner Harrison had already been here, and then you joined BPD?
A That is correct.
Q Did any specific individual reach out to you to recruit you? How did that recruiting process look like?
A I got a phone call from his chief of staff.
Q Who was his chief of staff?
A Eric Melancon.
Q Do you know how to spell that?
A M-E-L-A-N-C-S-O-N [sic].
Q Okay. So how did he convince you to come?
A Well, the department needed reform. He came from the outside. They needed people from the



MAGNA LEGAL SERVICES

outside. I had a background in corruption investigations, had a background investigating people, I had a background in knowing the department, and I have a background of being in Maryland, so it was a natural selection that I would be able to come over and help them do the reform. I was also retirement-eligible with the FBI. So I weighed the options and accepted it.

Q Okay. So when you joined -- first of all, what was your first -- what was your actual joining date or your swear-in date?

A September 3rd, 2019.

Q So what duties did you have on September 3rd of 2019?

A I was the Deputy Commissioner of the Public Integrity Bureau.

Q Okay. Did you have a role in -- I don't want to say rebranding because that's sounds snide, but essentially rebranding internal affairs into the Public Integrity Bureau, or was that already decided before you took the role?



A Repeat the question.

Q Sure. Were you involved in the rebranding from internal affairs to PIB, or was that sort of shift, that had already happened when you stepped in?

MR. SCHUBERT: Objection. Form. You can answer.

A That already happened.

BY MR. TURIELLO:

Q It already happened. Thank you.

A That's correct.

Q So what were your -- you still hold that role today, is that correct, sir?

A Well, I have an expanded role, but yes, I still have that one.

Q So the initial role that you held, what were your responsibilities or duties?

A My responsibility was to reform the Public Integrity Bureau and assist in reforming the agency with policies and procedures into -- worked for transparency with the public and to bring people



into the Public Integrity Bureau that could actually do the job, work on training aspects, do an entire reform of what is called PIB.

Q So that sounds like a pretty comprehensive reform of that bureau of the agency, is that a fair statement?

A That's a fair statement.

Q So I want to break that up into -- because that's a lot of responsibilities for one person to have. So let's start with -- why don't we start with what you did first. You listed a whole bunch of things that needed to be changed. You mentioned policies, recruitment. So where did you start? What was the first task that you undertook when you got the job?

A I met with everybody who worked for Public Integrity Bureau.

Q Okay. What did you tell them?

A I didn't tell them anything. I listened to them. See what were the problems, what were they doing, where did they come from, where did they want



to go, what was their vision for the future.

Q Without naming any individuals, I think that would probably be pretty difficult, because I'm sure there's many people you spoke to. Could you identify any overarching themes or consistent problems that were expressed to you in those meetings?

A Yeah. Yeah. Process was flawed. Supervision was flawed. And there was a very -- a need for additional resources to actually do the volume of cases that they were asked to do, and they needed supervisors to assist them in sort of pushing those along. So the overall theme was the process was flawed.

Q Okay. How was the process flawed, or how did you learn that the process was flawed?

A That was two different questions.

Q Sure. So let's start with how did you learn? I think we can probably deduce from the fact that people told you because you had meetings with them. How did you or what about the process that



MAGNA LEGAL SERVICES

Page 38

was flawed did you seek to correct?

A Well, the flawed process was that cases would come in and sometimes would sit, sit, sit for a long period of time before they were actually getting either assigned or looked at, and then when they were getting finished, there was a long delay before supervisors were reviewing the cases, which two or three months later detectives had already done many other cases by then, and if there were problems with the case they did two months ago, they had to go back and sort of refresh themselves about the case. And really what we need to have is supervisors doing reviews quicker so that it's still fresh in the minds of the detectives. And we needed more detectives because the volume -- detectives were carrying -- some had 80, 90, 100 cases.

Q That's a lot.

A That's too much.

Q Did you -- through your experience in supervising cases of this type, this type is corruption cases investigating police, et cetera,

Page 39

were you able to identify sort of what a best practice would be for a caseload of an investigator under your command, what should be, based on your experience?

A That's not a numeric figure.

Q Okay. Why is it not numeric?

A Because it has to deal with the severity of the case, the number of witnesses there might be in a case, the amount of evidence that might need to be obtained for a case, and the experience of the investigator doing the case. All of those would have an impact on that number.

Q Okay. So to draw an analogy, having a hundred homicide cases is not the same as having a hundred traffic tickets?

A That's correct.

Q Right? Okay. So how were you able to -- what did you do to start reorganizing or breaking that logjam or getting the resources where you needed to get them so those cases could be more efficiently processed?

Page 40

A Well, I had to assess everybody that was there and what their skills and abilities were, and then sit with the command folks that were there and go over what they thought everybody's strengths were and come up with a plan of moving people that weren't working in certain areas around.

Also, I put more the -- what you referred to as the traffic citation cases in certain groups, and more of the homicide -- what you referred to as homicide-type cases in a different group that could handle more complexity really based on their skills and ability.

Q Okay. Was that -- did those efforts produce any tangible results that you thought -- well, did they produce any tangible results in your mind?

A In addition to adding more staff, yes.

Q What were those results?

A So we brought it down to investigators carrying anywhere, depending on the type of cases, 18 to 20 cases. Some had 30 cases. Also, it sped

Page 41

up the timeline for getting cases and the timeline for completion, and it sped up the timeline for supervisors to actually review the cases and to get them through the process so they could get to legal if there were charging documents that had to be done.

Q Why -- in this specific type of investigation, why is timeline from initiation to completion important?

A Well, that's a generic statement, which I wouldn't necessarily agree with. So I would say in some cases it's important, and other cases it's not as important. So it's not -- it's not the same for all cases.

Q Sure. Similarly, if a homicide investigation takes a year, has a bunch of witnesses and it's very complex and you want to be thorough, that's fine. But parking tickets shouldn't take a year to write, right?

A Well, I would agree with your analysis in that example, yes.

Q So we're just -- I'm trying to understand, and it seems obvious. This is the other thing I probably should have said. If we were two people talking on the street, we probably would not have such a normal analysis of these sorts of questions because the answers are obvious, right? It's obvious that some cases take more time. They should take more time. And time is not the important thing. Outcome, process, effectiveness are important, right?

But for the purposes of this, I'm just trying to get an idea of really what the goals of the agency were when it came to time to completion on investigations. To the extent there were any, so we'll start there.

Did the agency have a goal or a target for time to completion for internal affairs investigations?

A Yes.

Q What was that goal?

A At the time, it was 90 days.



Q And why was 90 days the goal?

A I wasn't here when that goal was set. It was set by DOJ.

Q Okay. That brings me to my next question, which is what role did the Department of Justice have in recommending or overseeing, whatever, the goals of your bureau?

MR. SCHUBERT: Let me object. Again, sort of similar to yesterday. It's still an open case. You can answer this question because you were there, but we'll go as the questions come and I don't know.

MR. TURIELLO: Sure.

BY MR. TURIELLO:

Q And I will say this. I don't intend to -- it's still an open case. Much of this is sort of public, there's public hearings on it, there's public comment on it. I know there's a goal. To the extent you can, why was the goal 90 days, if you know?

MR. SCHUBERT: Objection. You may answer.



A Well, the goal was 90 days, because in a perfect world, if someone comes and makes a complaint, you'd want to get an answer to them sooner rather than later.

And so -- and if you're a police officer and somebody makes a complaint against you, you'd want to have it resolved sooner rather than later, all in a perfect world. There's a lot of things that come into play that don't make this a perfect world.

BY MR. TURIELLO:

Q Law enforcement generally is not a perfect world, right? There's a lot of complications doing investigations and police generally?

A I wouldn't agree with that statement, but...

Q Okay. So how could you best -- so with the goal of 90 days, what did you do in order to try to meet that goal?

A So that's what I said before. We added more investigators. We -- our -- I wouldn't say --



we put into groups serious misconduct cases versus minor misconduct cases, selected detectives who were already working that could more handle minor misconduct cases versus serious, and vice versa. Put additional supervisors in place to manage those cases and make sure that the cases were not lingering as best as possible.

There are still other complications that come into play. People leave the agency, we have no access to them; doesn't become a priority. Some witnesses don't want to cooperate; doesn't become a priority. Sometimes we get anonymous cases; doesn't become a priority. Like there's a lot of things that come into play to make not everything fit into that perfect circle that we'd like.

Q Okay. When you arrived as deputy commissioner of the Public Integrity Bureau, did you have a sense of how long it was taking to investigate cases from start to finish?

A I did.



MAGNA LEGAL SERVICES

Q What was that number?
A 365 days.
Q And as you sit here today, are you able to provide an estimate of how long it is taking, start to finish, again writ large, not for any particular case?
A Generically, 136 days.
Q That's a pretty big improvement. Congratulations on that.
So were there any -- when you arrived, were there any existing resources for investigators by means of -- specifically what I'm asking, investigative manuals or standard operating procedures that existed to help guide investigators on how to effectively investigate matters brought to their attention, or complaints?
A That, I don't recall.
Q Are there any now?
A Yes.
Q What are they?
A So we paid for a subject matter expert to



develop a 40-hour -- well, he developed a 32-hour training course, legal developed another eight hours. And we had every investigator that was there go through this total 40-hour training course. We had our IT shop video-record it.
And now as new agent -- new detectives are coming on, they're all required to take the 40-hour training course which is proctored by a sergeant to go through any questions they have during the training. And then they're assigned to another detective as sort of a field training detective to assist them in getting up to speed on process and following them for whatever the captain feels necessary, 30 days, 60 days, et cetera, to get them up to speed on doing cases.
Q Who did you hire? What subject matter expert was retained in order to produce that training?
A He was a retired New Jersey state trooper. He was the commandant of the New Jersey State Police Academy.



Q Do you remember his name?
A I do not. I do not.
Q Did you have a role in selecting this individual?
A I did.
Q What did you do in order to vet to determine that this was the person that you wanted to come in?
A So we have a monitoring team that we pay that monitors our progress. They gave us a few people that they had -- they were familiar with that had done work in the past that was acceptable by DOJ, because any training has to go through DOJ. So that was limited down to two. We interviewed two with them, and we selected the person from New Jersey.
Q Okay. So was it -- is -- well, first of all, what is the monitoring team? Why is there a monitoring team, I guess?
MR. SCHUBERT: I'll object. You may answer.



A So if you're under consent decree, you're required to have a team of law enforcement professionals that assist, sort of mediate between DOJ and the department, sort of assist the department with subject matter experts, reviewing, doing audits of progress, and report back to DOJ as to what those audits are. And they also present in the court in front of the judge as to how we're doing, what they see, based on their expertise.
BY MR. TURIELLO:
Q Okay. So they're -- I don't want to say middleman, that's not the right thing, but they -- they -- they are approved by the Department of Justice and they help you all -- you all, the Baltimore Police Department, come into compliance with DOJ's -- what the order -- whatever the standing order is, is that correct?
A I missed the first part of that.
Q Sure. The monitoring team is essentially helping guide the department to come to compliance based on the consent decree, is that a fair --



MAGNA LEGAL SERVICES

Page 50

A That's a fair assessment.
Q Fair assessment. Okay. So the monitoring team had a stable of people that says, hey, we've used Jim or Joe or Jane in the past?
A I wouldn't say they said they have used. They have seen them be used, because they're not -- they don't select. The department does. But they had seen them be used in other departments.
And again, because the training has to be approved by the Department of Justice, they knew the ones that the Department -- that the people that used to work with the Department of Justice, which is -- you know, can be tricky. So they were -- they gave us -- people that have gone through the process before and have been accepted by the Department of Justice and their training has been accepted, so in that case they recommended two.
Q Right. So you all aren't spending unnecessary time spinning your wheels pursuing a candidate that isn't ultimately going to be accepted?

Page 51

A That is correct.
Q Okay. Yeah. Okay. So now, in part because of this expert, there is a 40-hour training class for all new detectives in the agency, correct? New detectives in the bureau?
A The PIB.
Q Yes. Am I correct, just so I have the right terminology, the agency is the department, writ large; the bureau is your section, PIB?
A There's more than one bureau, but for this setting, if you're referring to the bureau as PIB, that would be the bureau. There are other bureaus in the agency.
Q Yes. So there's an operations bureau, there's an administrative bureau, there's PIB.
A Correct.
Q So your bureau that you are chiefly responsible for --
A At the time.
Q -- is PIB?
A Correct.

Page 52

Q So we'll use bureau. We'll all understand that to be PIB. Okay. I just want to make sure I get that right. So you have this training and also the shadowing or field training, is that correct? This component?
A Yes.
Q How long are new detectives in your bureau, how long do they go through that field training portion?
A I mean, that depends on the individual. That's up to the captain.
Q So that's not a everybody does six weeks; it's you make an independent assessment on the abilities and the strengths of that investigator, and then the captain, whoever is overseeing that, says --
A Correct.
Q -- they're ready or they're not ready?
A Correct.
Q Okay. In addition to that resource, am I correct that there is an investigative manual in

Page 53

PIB?
A There is now, yes.
Q Was there prior to when you arrived?
A No.
Q What was involved in the drafting of the investigative manual?
A So I wasn't there for the drafting. The drafting was happening before I got there.
Q Was it already in place when you arrived?
A Was it active?
Q Yeah.
A No, it was not.
Q So what, if any, role did you play in taking it from that sort of drafting phase to active implementation?
A Zero.
Q Who did?
MR. SCHUBERT: I'll object. You can answer.
A It was done before I got there.



MAGNA LEGAL SERVICES

BY MR. TURIELLO:

Q So I know there was a draft that was done. You said but it wasn't in place, it wasn't active when you got there, correct?

A So yeah, the process is what you're missing. So the process is when things are done, it has to go through a review period with DOJ, the monitors go in front of the judge. That takes time. And then it goes active. So all of that drafting was done before I got there. It had already been submitted. They were already going through the review process. Eventually, once it got passed and signed off by the judge, it went active.

Q Okay. So the judge being Judge Bredar?

A Correct.

Q All right. So now I -- so you had no role in the drafting. That had already been done. It was in review when you arrived?

A That is correct.

Q And then sometime after you arrived, it was approved and then implemented?



A That is correct.

Q Okay. How long after you arrived was it before it was approved and implemented?

A I don't recall.

Q Was it a year?

A I don't recall.

Q It's active now, correct?

A That is correct.

Q Have there been any changes or modifications to it, to your knowledge?

A There haven't been any. We have a list of ones to correct, but we haven't -- they -- it hasn't come up for its review yet.

Q Okay. All right. So can you tell me a little bit about the manual as it exists today? That's not a question. I'm just transitioning. I take it you're familiar with the investigative manual?

A It's very long, which is part of the problem. But I'm familiar with conceptually what it is.



Q Sure. What is its purpose?

A So the purpose is to be sort of a guide for investigators as to how to do cases. And also a guide for the bureau, in general, on the processes that should be in place. That's what the intended purpose is.

Q Okay. Do you find that intended purpose is being met?

A Sometime -- well, yes and no. So it's being met where it makes sense. It's not being met when things don't make sense in the manual. And again, none of the team there had any drafting of the manual, which is part of the problem, because just like in the consent decree, we find things sometimes that don't make sense, but other persons drafted it, so we have to go back and go to the court and get those things changed. That takes time.

Q Sure. And in theory, something might being a good idea but in practice it might not work?

A Many times that's true.



Q What are some of the things in your opinion that are not -- that either need to be changed or aren't working as they were intended, if you know?

MR. SCHUBERT: I'll object. You may answer.

A So the 90 days, it does not -- it makes sense in theory. It's not obtainable. Just due to the volume. We have 1,500 cases a year. The volume of that alone with the staffing of the agency is never going to be met. So that's one.

In the manual, it also says if cases can't be done by PIB for a reason, it has to go to an outside agency. There's nothing in the law that allows that to happen, nor is there anything in the law that mandates another agency take anything.

We get called often by city police, the county, asking us to take cases. We don't take them because we have our own cases. We don't want to take theirs. They don't take ours. Waivering -- some of the waivers that get signed off get elevated



MAGNA LEGAL SERVICES

up to the deputy, which works. Unless I want to recuse myself from a case, there's nothing written in there that allows some of that to happen.

So our investigators, sergeants, lieutenants, captains, whenever they have issues that make the manual complicated, that doesn't sort of fit the manual, they talk about it with legal, then they reach out to the compliance folks that do the policies and notify them what the issues are, so when we conduct a review we can discuss them and decide whether or not they should be changed, whether or not they should be corrected a little bit, or whether or not they should stay the same.

BY MR. TURIELLO:

Q Okay. Until a change is made, you go through that sort of revision process, which I understand has many layers, and someone is depending on folks outside the agency, am I correct?

A That is correct.

Q Until those changes are made, are officers sort of bound by the requirements or the policies in



that manual?

A What's your definition of bound?

Q Are they required to follow the policies?

A No.

Q When is an investigator not required to or under what circumstances would an investigator --

A So the manual is a guide to assist, to move forward. If a -- if every detective that didn't meet the 90 days where it's in violation, every detective every day would be in violation.

Q Sure.

A Can't do it. So it's a guide. It's not -- it's not a mandated policy. It's a guide to use as they move through the process.

Q Okay. So those are obviously some of the challenges you said works where it works and doesn't work where it doesn't. We just kind of talked about ways it doesn't. In what ways is it working?

A Well, it works in theory because it gives detectives a guide as to what to do. Like there's a checklist they should go through, make sure they



have all the stuff. Again, when you have so many cases you're working, you know, you might forget. If you're doing three cases at one time, you might forget that you downloaded the bodyworn camera on one case, but not on another one because it might all conflate together.

So it's good that it has like the checklist to go through to make sure that they do everything on each case so they don't forget. But again, it's a guide to go through to make sure they're doing things in the right direction. And if there's a question or somebody disagrees, there's a process in there that allows that to be vetted through.

And again, that's sort of a guide process to say, hey, this is how it should be vetted through, so you don't have a detective with one answer, a sergeant with a different answer, and nobody knows what to do. So they go back to the manual to find out what should we do in that case, and then they can follow the process. So it's a



guide.

Q Okay. When there are situations wherein a detective needs to deviate or otherwise not strictly follow the guide, they escalate that I presume to a commanding officer who assists?

A No, that's not correct.

Q So what do they do?

A So it would depend on what the deviation is.

Q Okay. So internally, outside the guide, do you have any internal SOP or procedures for escalating certain requests or deviations from the guide?

A No.

Q Okay. So folks just take it upon themselves to escalate on what they think is something that needs to be escalated, is that --

MR. SCHUBERT: I'll object. You can answer.

A That's why we have sergeants. That's why we have lieutenants. That's why we have captains.



MAGNA LEGAL SERVICES

That's why we have a major. That's why we have a chief. Like that is their job is to assess and work with detectives.

Detectives aren't sitting -- one, they're not working from home. So they're not sitting in a vacuum doing their own thing and doing whatever they want. They're working with sergeants every day that are responsible for those cases, lieutenants that are responsible for those cases.

So they're always looking through and meeting with them to find out where they are. And if something pops up that's a rarity, those are discussions that take place. Is that written that that's what you have to do? That's police supervision, so no, that's not written.

BY MR. TURIELLO:

Q Okay. And that makes sense to me. But I want to make sure, right, because there's a lot of cases, there's a lot of problems, some complex, some not. The fact is you have a supervisory structure that is intended to handle those requests as they



come, is that correct?

A That is correct.

Q Okay. What is the reporting structure? I never -- I've never been a police officer or served in the military or had -- I'm not as familiar with the chain of command. Can you walk me through the chain of command within your bureau? Lowest being the detectives. Highest being you, the deputy commissioner, what are the layers in between?

A So there's a sergeant, a lieutenant, a captain, a major, a chief, and myself.

Q Okay. Okay. So who is your current chief?

A Olufemi Akanni.

Q And is there only one?

A Yes.

Q So Mr. Akanni is the current chief. And then how many majors does Mr. Akanni have?

A One.

Q Who is the major?

A Anthony Smith.



Q Smith. And then how many -- is it captain next?

A Yes.

Q How many captains does Mr. Smith supervise?

A Three.

Q Who are they?

A Daniel Popp, Lekeshia Blue, and Alicia White.

Q Okay. And then underneath that, each --

A Lieutenants.

Q Captain Popp, Captain Blue, Captain White, how many lieutenants do you have?

A Seven.

Q Okay. Can you tell me where they're assigned and whom they report to?

A Where they're assigned?

Q Who is in their direct chain. Does Popp have three?

A Popp has one lieutenant. And -- no, Popp has two lieutenants. Blue has three lieutenants.



And White has two lieutenants.

Q Okay.

A There's also a director. There's a director that -- there's a director underneath Akanni that reports to -- no. There's a deputy director that reports to Smith. So besides those three captains, he has a deputy director as well.

Q Smith has a deputy director, or Akanni?

A Smith.

Q Who's the deputy director?

A Thomas. Ken Thomas.

Q Did you say Ken Thomas?

A Ken Thomas.

Q Okay. All right. And --

A Don't go one more layer because I will never remember all those names.

Q I won't. Okay. And that's as the organization stands right now presently today?

A That is correct.

Q Give me one moment, please. Okay. So --

A That's that bureau. I have another bureau



MAGNA LEGAL SERVICES

Page 66

too, so that's just that bureau.
Q You have another bureau?
A I do.
Q What other bureau do you have?
A Compliance.
Q Compliance. And what's the compliance -- what is the purpose of the Compliance Bureau?
A It's in charge of education and training; IT; CDIU, which is consent decree implementation unit; bodyworn camera; audits; inspections; PSS; equity office. That's it.
Q Is that -- does the Compliance Bureau -- obviously you've named a few. We have, for lack of a better word, tasks departments, divisions underneath Compliance. Is the Compliance Bureau -- does it exist in order to come into compliance with the consent decree?
A Well, education and training is the academy. They exist anyway. IT is IT. That exists anyway. Audits and inspections and -- audits and inspections and consent decree implementation units

Page 67

are part of the compliance portion. Then our equity office is our equity office. Some of them are there for compliance purposes to come into the consent decree. Some are there anyway.
Q Sure. So they exist. They have to be folded in somewhere, so that for whatever reason the agency has said this is the Compliance Bureau?
A Correct.
Q And you're in charge of that as well?
A It's really the public corruption -- it's the Public Integrity and Compliance Bureau.
Q Okay. So it's one bureau -- but there's really two arms, right?
A That's correct.
Q One arm is the meat and potatoes, we're doing internal investigations, that's the PIB. And then these other functions, but they're separate as far as --
A That is correct.
Q -- operations?
A Right. Well, they both have a chief and

Page 68

they both report to me.
Q Got it. And Ken Thomas is over the Compliance Bureau?
A No. He's in the PIB.
Q He's in PIB. Okay.
A He runs EODS.
Q What does EODS stand for?
A Equal Opportunity Diversity Section.
Q That is -- I'm going to wall that off so I understand.
A It's part of PIB.
Q Okay. As a deputy commissioner, who are your peers or the other individuals at your level of the agency?
A Kevin Jones.
Q Kevin Jones. What is Kevin Jones?
A He's the deputy commissioner over Criminal Intelligence Bureau and Operations Bureau.
Q And are there any other deputy commissioners that are your peer presently?
A No.

Page 69

Q And you -- is it safe to assume you both report directly to Commissioner --
A Worley.
Q Worley now. Commissioner Worley. Okay. When you first came to PIB, who were your peers back when you first got to the job?
A Michael Sullivan, he was the deputy commissioner of Operations Bureau. Jim Gillis was the deputy commissioner of Administration. Danny Murphy was deputy commissioner of Compliance Bureau, and I was deputy commissioner of Public Integrity Bureau.
Q And at the time you were here when you first started, Harrison was the commissioner, correct? Commissioner Harrison?
A Correct.
Q Did you know Commissioner Harrison prior to your time in Baltimore?
A I did not. When you say know him, what's your definition of know?
Q That's a terrible question. So there's



MAGNA LEGAL SERVICES

two. Have you -- had you heard of him prior to your time?
A I had.
Q What did you know of him, just whatever your limited knowledge was? What did you know of Commissioner Harrison?
A I knew he was the superintendent of the New Orleans Police Department from my work in the FBI.
Q Had you ever interacted with him previously to joining?
A I had not.
Q So you knew of him; you didn't know him?
A That's correct.
Q I guess you could say I didn't know him like that, right?
A Correct.
Q So what, to the extent you can, understanding that your day-to-day has a ton of tasks or there are a ton of things you're responsible for, within that upper level management,



just deputy commissioner, commissioner, right, can you describe how often you would meet with the commissioner during your work week?
A Daily.
Q Did you have formal meetings set up, or you guys are in the same physical office space, I presume?
A Correct.
Q So is it safe to say you daily met and had interactions with other deputy commissioners at your rank when you first arrived?
A Say the question again.
Q Is it fair to say you had daily interactions with other deputy commissioners, people of your rank?
A No, that's not safe to say.
Q Who would you interact with regularly at the time that you first started in 2019?
A Well, Police Commissioner Harrison, and then most likely I would say Deputy Commissioner Gillis because he was over the Admin Bureau. And he



had been a chief of staff, so he knew his way around BPD. So I would interact with him to find my way to get around, get things that I needed.
Deputy Commissioner Murphy I would interact with somewhat because he had Compliance, and we were trying to get into compliance. We had multiple court hearings, so I would interact with him for those. And then I would interact with Deputy Commissioner Sullivan because he had Operations, and dealing with people that would be suspended, not suspended, et cetera.
We would have discussions and try to figure out a way that all of us could work together to reform the agency. I would say that was not daily, though.
Q Sure. So maybe is it fair to say that at least when you first arrived, you were interacting with Commissioner Harrison daily, is that fair?
A That's not fair to say.
Q How often would you?
A I mean, it would depend on the week and



what was going on. He was also --
Q Sure. He's traveling, you can't interact with him, right?
A Also he has a very busy schedule. So if he's out doing community events. I mean, I think we all sort of forget, first time you started a new job, there's a lot to learn. So he's out meeting with a lot of people, and he'd only been here about six months when I came on the job.
So learning your way around a new city and a new coast that you're not familiar with is a lot of interaction, so he was doing a lot of meet-and-greets, going to meetings. I would say we always had a meeting every Monday morning. And then, if necessary, throughout the week.
Again, at the time I sat in a different location than I do now, so I wasn't -- I was not in the same building that he was in. So, you know, we probably talked on the phone more than we actually met, except we always met Monday for the -- we had an executive meeting Monday morning.



MAGNA LEGAL SERVICES

Q Who attends the executive meetings on Monday morning?
A Executives.
Q So other deputy commissioners?
A Correct.
Q Okay. What type of things are discussed at the weekly executive meetings on Monday morning?
A Operations.
Q Operations of the whole agency. One of the -- does Commissioner Harrison basically go round table and check in?
A Correct.
Q Everybody is present for those, it's like open forum?
A Correct.
MR. SCHUBERT: Just clarification, everybody you had said previously?
A Yes.
BY MR. TURIELLO:
Q The attendees that would have been there.
Okay. So I want to backtrack a



little bit to sort of the resources that were available to your detectives in the bureau when you first got there. We've already talked about the manual being a new thing. And the training that you guys implemented. That was one. Were there any other updates to the resources available to detectives by way of technology or software or capabilities?
A Yes. We updated our IAPro system, which is our internal affairs system. We also updated all the computers for the detectives that were working there. We also reran the internet line from headquarters there because that's how the computers worked, and the internet line was very slow at the time.
There was issues with it and it was unable to be resolved, so they rebuilt that line. All for the purpose of having detectives be able to use the new, upgraded IAPro software, which is faster, but you also had to have the internet speed that's faster. So we got new computers for that,



new internet service for that, and the new IAPro software.
Q Can't drive a car without gas, right?
MR. SCHUBERT: I'll object.
A So there was gas, it just had water in it.
BY MR. TURIELLO:
Q Okay. Fair enough. So if you could, please explain to me what IAPro is, what it does, and why it's important.
A It's a case management system for internal affairs.
Q That's what it is. What does it do? How is it actually used?
A So when cases come in, they get put into IAPro, they get sent to a sergeant to assign them to a detective. And then currently you actually work the case in IAPro, so all your interviews, reports, checklists, all the stuff goes into IAPro direct.
And then that's how management can check the progress of cases, see where they are, do queries if you need queries for certain things.



That's how we do background checks on people if we get a request for a background check from another agency. But it sort of houses all the disciplinary records and case files.
Q Okay. So a portion of that -- I'm sort of breaking down what you said. It seems like a centralized case management system for PIB, correct?
A Correct.
Q And in its current iteration, evidence can be stored in there, detective notes can be stored in, basically an entire file can be in there for review by supervisors currently, is that correct?
A Currently, yes.
Q But there's also an intake component to IAPro?
A Blue Team.
Q Blue Team. What is Blue Team?
A Blue Team is an access for anybody in the agency that wants to go on and file a complaint against -- or file a complaint. They can go into Blue Team, put the complaint in. That automatically



MAGNA LEGAL SERVICES

gets routed to PIB.
Q Okay. So PIB detectives and command staff has the full IAPro, the Blue Team is available to anybody in the agency to make a complaint that routes to IAPro?
A That is correct.
Q Okay. What are the -- do you have any standard operating procedures for the -- that govern the use of Blue Team and IAPro?
A You have to rephrase that.
Q Sure. Are there standard operating procedures or rules concerning how one is to use either Blue Team or IAPro?
A Use?
Q Use, yeah.
A No.
Q I'll give an example. It might illustrate what I'm asking. I'm a detective working in PIB, and I have -- I obviously have access to IAPro, it's a centralized case management system, right? But I don't like computers. I think they're stupid. So I



want to do everything on paper and keep all of my paper files in my house. That's where I take my notes. That's where I collect my evidence. That's just what I do. Is that allowed?
A No.
Q Okay. So why is it not allowed?
A Because that's what used to happen, and that became a problem where we couldn't track cases where they were, couldn't find things. We have a whole filing room full of paper files from old systems like that. And so we converted everything to electronic only. So we only accept stuff from the detective electronically. And if it happens to be a paper document for some reason, it has to be scanned into IAPro.
Q So the -- I guess what I'm asking is, it has to be scanned in, right? That's a rule?
A Correct.
Q Where does that rule reside?
A That was sent out in an email to all the people in PIB back when we first converted that. I



believe we converted on January 1st of 2020. We had some competition -- competition. We had some complex issues that arose with the system, wasn't accepting a lot of things, so it didn't fully get properly implemented. Probably took about a year to get all the kinks worked out of it. Probably January of 2021. But we started in January of 2020.
Q Okay. So -- and policies that state, hey, investigators, you have to put stuff in IAPro, that exists in an email that was sent?
MR. SCHUBERT: I'm going to object. You can answer.
A We had -- we would have bureau meetings where that stuff would get discussed. And the purpose of us changing from the old way to the new way in what that was going to help us with. There's old-school people that like to do it one way. We had to convert people. During meetings, we discussed that.
I believe the lieutenant reiterated by putting it out again. That was not by me, but



the lieutenant has said that he has expressed that again. But I can tell you that I have addressed it at the all-hands meetings, that it only exists if it exists in that system. That is the system of record. Just like Workday is our system of record for payroll. That is our system of record for PIB and discipline. That is the only system that we use, and so that was verbally told to everybody by me during at least two hands-on meetings.
BY MR. TURIELLO:
Q Do you recall when those hands-on meetings were?
A I don't.
Q Would it have been in 2020 when you first implemented?
A I have no idea. We have hands-on meeting at least once a year, so I don't know which -- I couldn't tell you what month they were.
Q Who attends the all hands meetings?
A Everyone who's not on leave.
Q If someone is on leave, how did you ensure



MAGNA LEGAL SERVICES

they received the message?
A So they received the message from their supervisor when they come back.
Q So -- but it's safe to say that -- can you confirm that the general knowledge or the direction from you to the people in PIB is if it doesn't exist in the system, it doesn't exist?
MR. SCHUBERT: Objection. Form. You can answer.
A Yeah. I mean, unless there's some reason why it doesn't exist. I don't know. You'd have to give me an example of that.
BY MR. TURIELLO:
Q Yeah, I'm speaking in generalities, and I understand that. But the idea is you're in charge of administering, of leading the bureau and trying to put in place these new systems to bring the office -- to bring the agency into compliance and reform. Right? So it stands to reason that everyone in your command should know that if it doesn't exist in IAPro, it doesn't exist, right?



They know that they have to put stuff in IAPro?
MR. SCHUBERT: Same objection. Form. You can answer.
A Yeah. That is true, except for you're not giving me the timing of that. So is it possible that a detective goes down and gets -- I'm just giving an example -- a transcript from the court, comes back and it's not in IAPro, therefore it doesn't exist. Well, that's true. But when the case is over, closed, done with, and locked up, and it's finished, then it should be in IAPro.
BY MR. TURIELLO:
Q Perfect. And I understand that there are in real time things have to be scanned, right? Stuff has to happen.
A Let's not forget my position. I'm a deputy police commissioner. I'm not a sergeant. So there again, you know, you made the comment a few minutes ago like you're responsible. No, I'm not responsible for the day-to-day operations of a detective. Just like a Deputy Commissioner Jones is



not responsible for the officer walking down the street right now. Ultimately if they do something wrong, we have to fix that. But we're not literally responsible for the actions for the officer on the street every second of the day. That's just -- that would be ludicrous to think that would be a belief.
Q Certainly. But again, that's why chain of command. Certainly people underneath you, directly your report, know that things need to be in IAPro, and certainly stands to reason they are responsible for disseminating that information down and down and down, correct?
MR. SCHUBERT: Same objection. Form. You can answer.
A Yeah, it it's something that needs to be in IAPro, yes. Not everything needs to be in IAPro.
BY MR. TURIELLO:
Q What doesn't need to be in IAPro?
A You'd have to give me an example and I can tell you.
Q I can't give you an example for something



I don't know.
A If you give me an example, I can tell you if it needs to be in IAPro. I can't make up what -- I can't give you a list of what doesn't need to be there. That's like maybe hypothetical, so if you gave me an example, I could tell you whether it needs to be in IAPro.
Q If I had a file from -- a closed file from IAPro, and there was something not there.
A What?
Q Anything. I'm just saying I'm looking at IAPro. I don't see any investigative notes from a phone call. You'd be able to tell me, well, that should be in there, right?
A From a phone call, or a phone call that didn't exist?
Q From a phone call. I'm a detective. I made a phone call.
A About what?
Q To a witness. I made an effort to call a witness.



MAGNA LEGAL SERVICES

A No, that wouldn't go in there.
Q Why not?
A If you had a conversation with a witness and you took notes about it, that would go in there, or that would go in your investigative write-up. If you try to make a call to a witness, they didn't answer the phone, no, that doesn't go in there.
That would be an entire nother job because unfortunately there's a lot of people that make complaints that don't want to participate. They like to make the complaint. They don't want to be part of it. So we have people make efforts to reach out to them.
We don't document every time we reach out to them. That's just paperwork, paperwork, paperwork. We talked about the volume before. That would be overwhelming for a detective to be documenting, documenting, documenting. We are not talking about homicide cases where, you know, every little thing has to be documented. We're talking about a PIB investigation where the detective makes



every effort to do what they can do.
If we wrote these all up like they were going in front of a federal judge for a court trial, I would need triple the number of people we have now. So we have to make -- we have to have what's reasonable. What reasonable is, if you try to contact somebody and they don't answer, that's fine, you don't have to document every time you do that. Just like if somebody walks in the front door and says, I want to make a complaint, but I don't, I'll come back later. You don't document that they said that. There's no time for that. That would be outside the realm of possibility.
Q Okay. So you do not expect investigators to document the investigative steps they took in order to close the case?
MR. SCHUBERT: Objection. Form. You can answer.
A That's not what I said. You said. That's not what I said.



BY MR. TURIELLO:
Q Okay. Help me understand where I'm missing it. You know what, we'll come back to that.
All right. So we talked about the resources that are now available in PIB that weren't when you were there. We have beefed up IAPro, right? Blue Team.
A We didn't add Blue Team. Blue Team was there.
Q Blue Team was there. I didn't know that. Blue Team already existed. That was a preexisting policy pre -- not policy. It was a preexisting resource for complaints to be made, correct?
A Correct.
Q Okay. But there was an improvement to IAPro made?
A That's correct.
Q So improvement to IAPro. We have 40-hour training class in concert with some -- depending on the skills and abilities and aptitude, shadowing program for new detectives, and the PIB detective



manual. Are there any other resources that you -- that were not present when you took the job that are present now that help your investigators?
A Well, when you say resources, I look at resources as people.
Q Sure.
A So do we have more people? We have more people.
Q That's absolutely a resource. You've upped the staffing. Yes, of course. How many more people are now there?
A How many what?
Q How many investigators do you have now versus how many investigators were present when you took the job?
A Overall, twice as many.
Q So you have twice as many investigators. I'm assuming, correct me if I'm wrong, that with all of those investigators, you probably need more supervisors, right? Sergeants, lieutenants --
A No.



MAGNA LEGAL SERVICES

Q -- to help supervise that work?
A We added one more. We added one more captain, because some of the cases now have to go to the ACC, which is the accountability charge committee, which is the city. So to help with that process, to make it quicker, we added another captain to help review cases. But we haven't added any additional sergeants or lieutenants.
Q Okay. Okay. We've been going for an hour and 20 minutes. I should have mentioned this earlier. I'm sorry that I didn't. If at any time during this, you need a break for any reason, this is informal, we can take breaks. The only thing I would ask, if there's a question pending, you answer the question, then we take a break.
However, I think this is a good stretching-your-legs point, so we're going to take a ten-minute break. I'm going to --
A I mean, we could continue if you want. I have a lot of stuff to do today, so if you want to keep going, I'm fine.



MR. TURIELLO: I understand, but we have --
MR. SCHUBERT: We can take a five-minute break, ten-minute break.
MR. TURIELLO: Let's take ten. Let's walk. Come back. We're going to come back at 11:45. We're going to take lunch. I'm going to aim for lunch at one. Thirty minutes or so. And then as many as we need in between. Okay?
MR. SCHUBERT: Sounds good.
MR. TURIELLO: We are off the record.
THE VIDEOGRAPHER: Time now is 11:37. We are off the record.
(A recess was held.)
THE VIDEOGRAPHER: The time now is 12:05. We are back on the record.
BY MR. TURIELLO:
Q Deputy Commissioner Nadeau, I want to go through a few exhibits in this round, look at some of the policies that we discussed briefly a moment ago, starting with what my colleague here is marking



with Exhibit 1.
(Nadeau Deposition Exhibit No. 1 was marked for identification.)
MR. TURIELLO: Counsel, have them?
MR. CRAIG: Yeah.
BY MR. TURIELLO:
Q So, Deputy Commissioner, if you would, please, I think this exhibit is five pages. Starts with at the bottom yours should say BPD 000331, is that right, through 335. Can you confirm that's what you have in front of you, sir?
A That is correct.
Q Take a moment to review the document if you need to. Please tell me whether or not you recognize this, and if so, what you recognize it to be?
A It's part of the PIB investigative manual.
Q And is this manual currently in place today?
A That's correct.
Q And is this the manual you said you did



not have any authorship over, but it was in the review process and then was implemented after you started, is that correct?
A That is correct.
Q To your knowledge, has there been any substantive changes to that document, or has this been consistent from -- it says Filed 15 November, but have there been any changes since when it started to today?
A Not that I'm aware of.
Q All right. So drawing your attention to the first page under subsection one, Introduction, third paragraph down. If you would not mind reading that third paragraph. I guess it's the second paragraph, PIB's mission, if you would.
A PIB's mission is to conduct fair, thorough, objective, and timely investigations of all obligations of potential officer misconduct.
Q In doing so?
A In doing so, PIB investigators will treat all individuals with dignity and respect and without



MAGNA LEGAL SERVICES

preference or discrimination. All conclusions drawn throughout investigations are based on objective, unbiased, and independent information. PIB rigorously tests the accuracy and reliability of information from all sources and presents the facts and findings without regard to personal beliefs or concerns for personal, professional, or political consequences. All investigative findings are based on the appropriate standard of proof delineated within this manual.

Q From your reading and that understanding, is there anything in this paragraph of the introduction that is inconsistent with what you believe the mission of the PIB is?

A Repeat that.

Q Sure. Is the section that you just -- or the excerpt that you just read that appears under the introduction subheading, is there anything that you just read that you believe is inconsistent with the mission or objective of PIB?

A I would agree that is the -- that is the



mission objective that we strive to live up to, yes.

Q Okay. Directly under that is, you know, 1A talks about confidentiality. I'll read this because -- but I read, Personnel assigned to PIB must maintain the highest degree of confidentiality concerning all matters related to PIB complaints.

And it goes on on number 2, 3 and 4. But specifically I want to direct your attention to subheading 2 and the confidentiality. The policy, as I read it, is PIB personnel, other than the PIB chief or designee, are prohibited from disclosing or confirming to anyone outside of PIB whether a complaint has been made or an investigation is being conducted, including the identity of complainants and named witnesses, employees, unless PIB protocols -- unless required by other protocols or disclosure laws.

Earlier we discussed that there were portions of the policy of this manual that were not necessarily -- I don't want to say important. I don't know what the word was, but the word you



used --

A Could you repeat? I can't hear you, sir.

Q Sure. I'm getting to my question. I'm referring back to a comment you testified to earlier that there's specific provisions -- some specific provisions within this policy that may need to be revisited or reformed because in practice it's not practical. Right? Is that a fair recitation of your prior testimony just a few moments ago?

A An hour ago, yes.

Q Sure. Is there anything in -- as you read the confidentiality portion of this document that you believe needs to be revisited or is not practical?

A Yeah. I don't make determinations that quickly. I would assess it, review it with my team, discuss it, so I'm not in a position to answer that question at this point.

Q Have you previously reviewed this policy --

A I have not.



Q -- to determine whether or not any provisions herein need to be reformed?

A I have not.

Q Have you reviewed any portion of the manual prior to today with members of your team and made a determination that that policy or provision needs to be reformed?

MR. SCHUBERT: I'll object. You may answer.

A Yes.

BY MR. TURIELLO:

Q What are those?

A The 90-day provision.

Q And for reasons you already discussed?

A That's correct.

Q Are there any other provisions that you can think of off the top of your head that are not practical?

A Yeah. The provision where it says if the case -- if a case should be investigated by an outside agency, because there's no provision in the



MAGNA LEGAL SERVICES

statute to allow that to happen, nor we do have any control over an outside agency to do that, so that would also need to be changed.

And I'm sure the team, when we get ready to go through it, are the ones that have come up during reviews that they have, but we haven't gone through this because it's not time for revision.

Q When is the time for revision? Do you know?

A I don't know when this is on the list.

Q Is there a list?

A Is there a list? No, but there's a process to go through to revise things along the way. Depends on what's going on with the court and the consent decree, what DOJ is ready to hear from us next on, so it's their timeline.

Q Okay. So the review period is one -- I'm trying to understand. I don't want to put words in your mouth. Please correct me. The review period is one that is set by DOJ, not your agency or your



bureau, is that correct?

MR. SCHUBERT: I'm going to object. This is kind of getting into the deliberative process of the whole consent decree and stuff.

You may answer that limited question, but to the extent there's going to be a lot of questions about deliberative process under the consent decree.

MR. TURIELLO: Noted.

A Correct.

BY MR. TURIELLO:

Q Okay. During -- let's see where we are now.

A Can I mention? So this is not a policy. This is an investigative manual. It's a guide. Not a policy.

Q What's the difference?

A You must follow policy. If you don't follow policy, you're subjected to discipline. You're not required to follow a manual. It's a guide.



Q So in the portions of this manual where it states detective shall, investigator shall, that's not an actual policy, is that your testimony?

A That is correct.

Q Okay. What are the policies that investigators must follow?

A Departmental policies.

Q Okay. Did you review the discovery request that we served on the defendant, the police department, prior to today?

MR. SCHUBERT: I'll object. You can answer.

A No.

BY MR. TURIELLO:

Q You signed off on interrogatory answers, correct, sir?

A Yes.

Q So there was some review of the request that we made, I presume?

A Yeah. You'd have to show that to me to refresh my memory.



Q That's okay. So what policies exist that your investigators must follow?

A Same policies as every other member of the Baltimore Police Department.

Q So what are -- are they titled? Are they codified? Is there a document specifically that I should request that I didn't?

A You can go onto the Baltimore Police Department website. Every one of our policies are publicly displayed on the website.

Q So this is on the website, but this is not one of the policies?

A That's correct. This says manual.

Q Okay. So these -- do they have any force and effect at all in PIB?

A Describe what you mean by force.

Q If someone doesn't follow these policies, are they ever subject to discipline?

A No.

Q Never?

A No.



MAGNA LEGAL SERVICES

Page 102

Q Okay. Are the policies that BPD personnel is subject to, is that in the general orders?
A That is correct.
Q Are there any other policies or documents that codify official BPD policy that I should look at?
A I have no idea what you're looking for, so I can't answer that question.
Q I'm looking for policies that govern the behavior and investigative process of the investigators in command. Where would I find those?
A We have probably hundreds of policies. In those policies, talks about behavior. You could review those and see what's -- what might be in the realm of what you're looking for. I'm not sure what you're looking for. So I would not be in a position to tell you what policy to read. I will just say all of our policies through transparency are posted on the Baltimore Police Department's public website for every citizen to read at any time, day or night.
Q Okay.

Page 103

MR. TURIELLO: So Brant -- I'm sorry, Mr. Schubert, tomorrow I believe --
MR. SCHUBERT: Yeah, let's meet and confer about discovery responses.
MR. TURIELLO: Okay.
BY MR. TURIELLO:
Q Okay. Regardless of the fact that these are -- sorry. So under the subsection for investigative due diligence, I believe that's on page 54 of the manual, page 000332 Bates-stamped, subsection B1 says, All investigations must be conducted in a thorough and consistent fashion. This means that investigators thoroughly explore and pursue all reasonable investigative leads.
Is there a policy that your investigators are subject to that mirrors or otherwise has the same spirit of B1?
A There is not. There's not a policy that mirrors that language.
Q Is it true that investigators are not required to explore and pursue all reasonable

Page 104

investigative leads?
A I did not say that.
Q Is there a policy that requires investigators to explore and pursue all reasonable investigative leads?
A There is not.
Q There is not. Okay.
Under B6, If at any time during the intake or investigation of a misconduct complaint, the investigator finds evidence indicating potential criminal conduct by the BPD personnel, the investigator shall promptly notify their chain of command via their direct supervisor. The PIB investigator shall consult with the relevant prosecuting agency or federal law enforcement agency regarding the initiation of a criminal investigation.
Is there any policy that exists that mirrors that language?
A There is not.
Q Do you have an expectation if officers in

Page 105

your command, investigators in the command of the -- in your bureau, notify their chain of command if they think there is evidence of criminal activity?
A I mean, dependent what the evidence is, and if it fits the criteria for which it should be, they should be notified, then they should notify if it fits the criteria.
Q What is the criteria?
A It depends on the facts.
Q Okay. Facts within -- there has to be some standard by which someone says to themself I think a crime has occurred here, I need to reach out to an investigative law enforcement agency, are you able to tell me what that is?
MR. SCHUBERT: Objection. Form. You can answer.
A Yeah, you asked me to give you a hypothetical. That may not fit all circumstances, so I don't feel comfortable giving you a hypothetical that doesn't fit all circumstances.


MAGNA LEGAL SERVICES

BY MR. TURIELLO:
Q Sure.
A For instance, if we're doing an investigation of a member and we find out they committed a homicide, that's one. That is pretty clear-cut.
Q Okay. What about a theft?
A If they committed a theft and there was evidence they actually committed a theft, and it was either on duty or as a result, then yes, they should do that as well.
Q Forgery?
A If they thought they committed a forgery and there was evidence they committed a forgery and it was on duty, yes.
Q Okay. So in that specific hypothetical, if there was evidence of a forgery, you would expect --
A Evidence.
Q Evidence?
A Yes.



Q Of course, not intonation, not suspicion, evidence?
A Correct.
Q If there was evidence that a forgery had occurred, you would expect your investigators to talk to their supervisors, and if the supervisors agree, to reach out to the appropriate prosecuting agency, correct?
A Depending on the totality of the information, that would be a decision they would make, yes.
Q Page 55, subsection D, references conflicts of interest. The BPD -- not the. BPD recognizes the negative impact of actual bias or perceived bias on the legitimacy of internal investigations. For that reason, conflicts of interest in misconduct investigations within those assigned by BPD to recommend or make disciplinary decisions shall be prohibited.
Is there anything in that provision as I just read it that is incongruent with the



policies of the department?
A Repeat the question. Is there any what?
Q Is there anything I just read in that -- anything that I just read, is there anything incongruent with the policies of BPD?
MR. SCHUBERT: Objection. Form. You can answer.
A There is no policy that says that in BPD.
BY MR. TURIELLO:
Q BPD has no policies on whether or not -- BPD has no policy governing conflicts of interest in investigations?
A Not that I'm aware of.
Q Under subheading three at the bottom of the page 56. Additionally, if at any point during the investigation, the investigator thinks it will be difficult to maintain neutrality within any witness, complainant, or respondent for any reason, or if specific concerns about a conflict of interest are raised by any person, they shall document the issue in the case file, consult with PIB sergeant



and/or recuse themselves from the case.
Is there anything in that provision which I just read that is incongruent with the policies of the department?
MR. SCHUBERT: Objection. Form. You can answer.
A There's no policy in BPD that states that.
BY MR. TURIELLO:
Q Do you think, you personally, that conflicts of interest should be documented and avoided in PIB?
MR. SCHUBERT: I'll object to form. You can answer.
A I would have to have the details. I can't have a generic conflict. I need details and I can answer you on a detail.
BY MR. TURIELLO:
Q Okay. So in a detail, specifically if a detective raised a concern to you or a member of your staff that said I do not believe that I can objectively maintain neutrality with witness or



MAGNA LEGAL SERVICES

Page 110

complainants or respondents in my duties and I need to be recused, is that something that you would find meritorious?
MR. SCHUBERT: Same objection. You can answer.
A What was the last three words?
BY MR. TURIELLO:
Q Is that something that you would find meritorious, you would give that consideration?
MR. SCHUBERT: Same objection. Form.
A I would say it's something that should be reviewed. I don't necessarily think because a person has an opinion, whether or not their opinion is right nor wrong, should be reviewed and a decision would be made whether or not to honor that.
BY MR. TURIELLO:
Q Okay. How would that review occur?
A Either the person they made it to would do the review and make the determination, or if they wanted to move it up the chain, they could do that as well. And then the review would be made, and

Page 111

they would either say yes, you have a point, or they say no, you don't have a point.
Q Okay. And once that decision is made by the command of that officer, what is that officer to do? Whatever the decision is.
A Whatever the decision is is what they would do.
Q So is it true that they must follow their command and the decisions that command makes on that particular issue that they've raised?
A Unless it's illegal, yes.
Q Of course, unless it's illegal. If officers do not comply to the command of their superiors in the case where it's not illegal --
A What was the last part?
Q In the case where it's not illegal. If officers do not?
A Where it's not legal?
Q Where it's not illegal.
A Oh, illegal.
Q Command has made a determination. This is

Page 112

illegal, you don't have to follow it. If someone disobeys that command, are they subject to discipline?
A Yes.
Q What type of discipline?
A Insubordination.
Q What is insubordination?
A When you fail to follow a command of a senior officer.
Q What are the penalties of insubordination?
A It would depend on the type of insubordination. You have to refer to the disciplinary matrix for that.
Q Would an official charge be drafted or an investigation be conducted to see whether or not someone was, in fact, insubordinate?
A Well, there would be an investigation to see whether or not, in fact, it was insubordination. And if it was sustained as insubordination, then there would be a charge of insubordination.
Q Okay. So I just want to make sure I have

Page 113

that right. So there would be a review and a determination whether it is, in fact, insubordination, and if so, there would be a charge of insubordination. Is that charge then something that is investigated by your agency or by your bureau?
A Well, you have the process out of order in your scenario. So there would be a review to determine whether or not the detective was insubordinate by refusing to do something.
If it was determined that they were insubordinate, then they would be investigated by somebody else. If that investigation determined that they, in fact, were insubordinate, then there would be a sustained finding. That would then go to legal for review, and then legal, if they concurred, would do a charge of insubordination.
Q Can someone be discharged or fired from BPD for insubordination?
A Depends on the situation. You could be.
Q Could someone be suspended pending a


MAGNA LEGAL SERVICES

determination of whether or not that insubordination actually occurred?

A That would be a gray area. It could depend on the insubordination.

Q Depending on the facts and circumstances?

A Correct.

Q Have you ever disciplined someone -- during your time in PIB, have you ever disciplined an officer?

MR. SCHUBERT: I'll object. Form. You can answer.

A I haven't disciplined anybody.

BY MR. TURIELLO:

Q Have you ever recommended discipline?

A I don't recommend discipline.

Q Have you ever brought a charge or sought to initiate a charge for insubordination?

A I don't charge anybody or issue a charge.

Q Who does?

A Investigators.

Q What if it was an investigator that was



being insubordinate, someone else, would another investigator charge them?

A That is correct.

Q Would their commander charge them?

A It would be very unlikely that a commander would do an investigation. So the answer to that question would be no.

Q So investigator says, for whatever reason, let's just say lieutenant tells an investigator you've got to do a thing, whatever that thing is, and the investigator says no, not doing that thing. Would the lieutenant then -- and lieutenant believed it to be disciplined, that officer needs to be disciplined, what would that lieutenant do?

MR. SCHUBERT: Objection. Form. You can answer.

A So the lieutenant would most likely go speak to their supervisor, which would be a captain, and make a determination whether or not that lieutenant's position was accurate or not accurate. If they believed it was accurate, that lieutenant



could then Blue Team the detective for not following the order.

BY MR. TURIELLO:

Q Okay. Got it. So that's -- I think that's what I was looking for, what's the process. It's initiating or using the Blue Team, correct, making an entry?

A We say Blue Team. If you're in PIB, you can -- you don't necessarily have to enter into Blue Team. You can enter it into IAPro direct because you have access to it. If you're outside of PIB, you enter it into Blue Team.

Q Are there any departmental policies governing when someone must enter something into Blue Team?

MR. SCHUBERT: I'll object. Form. Let me just put on the record, he's not like a 30(b)(6) witness for all policies and procedures.

So with that noted, answer just to the best of your knowledge and recollection.



A If you're a member of the agency and you believe that someone has violated a policy or procedure, and you believe that, and you want that to be investigated, any member of the agency has the option to Blue Team a member who they believe has violated the policy or procedure.

BY MR. TURIELLO:

Q Are they -- is there any situation which a person would be compelled to enter a Blue Team?

A Compelled, no.

Q They must?

A No.

Q So there's no requirement to your knowledge that BPD has of officers -- I'll use a term that is somewhat in general -- mandatory reporter, right? Sees misconduct and must report it?

MR. SCHUBERT: Objection. Form. You can answer.

A Yeah, I'd have to review the policy what the word says. But there is -- I mean, you are --



MAGNA LEGAL SERVICES

Page 118

you should be reporting misconduct. That's apparent misconduct. You should be reporting that. I'd have to read the exact language of the policy to see. I don't believe it says you must. I believe it says -- I don't think it says you shall. I think it says you can report. But I would have to review the policy for the exact language of that.
BY MR. TURIELLO:
Q Sure. In your experience, as a person who's led -- you know, you've had a decorated career, leading investigations, leading teams of investigators, corruption investigations, obviously you took this job to help reform the department.
Do you believe that a department can actually be reformed if folks are not required to report misconduct when you see it?
A Well, yes, because your idea of misconduct may be different from the other 1,900 police officers we have. So what is misconduct becomes the question. Showing up late for work, is that misconduct? Could be. Do we want everybody being

Page 119

Blue Teamed for showing up five minutes late for work, or 30 seconds late for work? We don't.
A lot of those things come into performance as opposed to misconduct. So there's -- sometimes there's a fine line between misconduct and performance. And if it's performance, that's dealt with in a different way as opposed to misconduct.
Q Okay. Two.
(Nadeau Deposition Exhibit No. 2 was marked for identification.)
BY MR. TURIELLO:
Q If you would, you already are, if you could flip through that, familiarize yourself with the document. Tell me whether or not you recognize it, and if so, what do you recognize it to be?
A It's another five pages of the PIB investigative manual.
Q And subsection three, planning the investigation. So do you have any rules in PIB for how investigators should be planning their investigations?

Page 120

A Other than what's in this guide, no.
Q Is it your expectation that folks follow this guide in order to plan their investigations?
A If possible, yes. This is the guide that they use, this entire manual.
Q This is their go-to, if you will, right?
A In a perfect world, yes.
Q I mean, absent any other bureau-specific policies for conducting investigations, which I think you said there aren't any, is that correct?
A That's correct.
Q This is the guide?
A Guide, yes.
Q Okay.
A In no way do I want anybody to think this is a mandate. This is a guide.
Q I think that's clear.
A It's no different than me trying to put together a bureau. I toss the instructions to the side. I try to put it together because I don't want to follow the guide. This is a guide. This is a

Page 121

guide to make sure they follow a process, if possible.
Q Yeah.
A Get this bug away.
Q I'll take it up with management.
Okay. So on page -- second page of the exhibit, all the way down at the bottom. Actually, we'll start at the top. I apologize. Start at the top. The investigator shall create an investigative plan -- and there's reference to an appendix -- to help focus and guide the investigation and review it with their PIB agent within 24 hours of being assigned a case. The plan will provide an investigative strategy, identify witnesses and other potential sources of information, set out anticipated timelines for conducting the investigation, and help the investigator anticipate problems before they arise.
If an immediate supervisor is not available to review the plan, the investigator must meet with the next available permanent rank



MAGNA LEGAL SERVICES

Page 122

supervisor in the chain of command. So that's --
A Impossible.
Q It is. How so?
A Because the volume of cases, you don't have -- if a case comes in, you don't -- within 24 hours you're not sitting with the sergeant making an investigative plan. There's no time for that. With the volume of caseload, this works well when you have no volume of caseload.
We have 1,500 a year. No volume of caseload, or we have a completely staffed agency where we have enough people assigned to PIB to actually make this stuff work. This is one area that does not work because of the volume of cases. There's no possibility within 24 hours of anybody's drafting an investigative plan and sitting with a sergeant. It doesn't happen in any case.
Q Do you have any expectation that investigative plans are done at all?
A Well, at some point you will sit with your sergeant. Now, again, depending whether or not

Page 123

you've been there for a long time or short time, but you will sit with your sergeant during what we call IA Stat and sit there and go over your cases. And at that point, they'll ask you what your investigative plan is.
But it's not getting done within 24 hours. Nobody gets it done within 24 hours. This is something that was written into a manual for a perfect situation when everything is lined up and we have a thousand people to do this. We don't have that. And we're not going to have it in my lifetime here, I assure you, because of staffing.
Q Okay. So you mentioned IA Stat. What's IA Stat?
A When the sergeant sits with the -- the sergeant or lieutenant sits with their team and reviews cases, where they are, what's happening, any complications, et cetera.
Q How often does IA Stat occur?
A You'd have to ask the captain.
Q Do you have any specific guidance,

Page 124

direction, mandate, order, whatever, to your captains regarding how often IA Stat should occur?
A I do not.
Q So do you leave that specifically within their purview?
A That's correct.
Q Do they report that to you? Do they say, Deputy Commissioner, I haven't had an IA Stat in six months? Or in your meetings with your commanders, do you ask them about IA Stat?
A I do not.
Q So how can anyone be sure that it's done?
A You'd have to ask the major.
Q So the major talks to the captains about IA Stat?
A You'd have to ask the major.
Q Do you have any questions for the majors yourself about policies and procedures like this?
A About what?
Q Policies like investigative case review?
A I do not.

Page 125

Q Are those all delegated to folks below you?
A I think delegated is a strong word. I'm deputy commissioner. There's levels. This is at a lower level. It's not at my level.
Q Okay. So do you -- are you generally concerned with this in your day-to-day operations as deputy commissioner at all?
A I am not.
Q Officers have -- do investigators have an option to not create an investigative plan?
MR. SCHUBERT: I'll object. Form. You can answer.
A Well, I'm not sure what you mean by not create.
BY MR. TURIELLO:
Q Just not do it. They just say I'm not going to do that.
A Are they told to do it?
Q The guide says they should do it. So I guess what I'm saying is, if you found out that a



MAGNA LEGAL SERVICES

Page 126

team of your investigators just wasn't creating an investigative plan, would that be a problem?

A So I think there is a difference between they decide not to do it, or they're told to do it and then they don't do it. If you're talking about if they did follow the guide and didn't do it, then that's something that would come up at IA Stat or should come up at IA stat.

If they were then told to do it on a particular case, could that possibly be insubordination? It could be if they were told to do it. But if it's just to follow the guide and they didn't do it, that's more of a performance issue, if the captain felt that was a performance issue.

Not all cases need an investigative plan. Some cases are easier. They don't require investigative plan. Again, an investigative plan, that's part of the problem with this entire manual, is people that wrote it who sit in Washington, D.C., don't necessarily always understand the day-to-day

Page 127

operations and that not everything is perfect.

There are things that happen on the outside that, you know, may affect this 24 hours. Might affect whether or not it needs an investigative plan. Maybe it's a very quick case. So there's a lot of questions which is why this is a guide.

Q So there's nuance obviously to this profession?

A That's correct.

Q Okay. I want to direct your attention to page 62. I believe on 61, there's a subheading, special considerations. Okay. So in making a plan and timeline for the investigation, investigators must consider whether the investigation involves or requires special considerations and address the following questions. It lists four questions.

The third question, second question. I'm sorry. Is assistance from outside PIB necessary, such as forensic video analysis? That seems obvious, right? If it is, you want to consult

Page 128

with your forensic team in house, right?

1.3. Is the complaint related to another PIB complaint or to any other BPD investigation, investigation by another agency, or litigation from which material evidence might be obtained.

I know this is just a guide. To your knowledge -- I won't even talk about policies. Have you specifically ever directed the people under your command to consider these complicated special circumstances when evaluating a case?

MR. SCHUBERT: Objection. Form. You can answer.

A I don't know what you mean by would evaluate in a case.

BY MR. TURIELLO:

Q Do you have meetings with commanders such as majors or captains where you identify, hey, we need to be considering any of the enumerated scenarios that appear in this guide?

A Yeah. I'm deputy police commissioner.

Page 129

This is below my level of what I do. So unless it's a case that I'm familiar with because it's been in the news, or, you know, for some reason it has been raised to my level, no, I would not have those discussions.

Q Okay. So -- but for cases that may have been raised to your level, that you were aware of, would you weigh in or have you weighed in?

A Have I weighed in on what? Whether or not we should speak to another agency or speak to -- or whether or not it has to do with another PIB case or whether it has to do with another PIB investigation? I mean, has that come to my attention before because something has been in the news, yes.

Q Okay. Thank you. I think we've already discussed time limitations, the 90 days. I understand your answer, not in a perfect world. This is not a perfect world. Skip that. Nevertheless, you are making concerted efforts to conduct investigations on an average -- average for less than 365 days or so, correct?



MAGNA LEGAL SERVICES

A On an average, less than 365, yes.
Q You said you're currently at 136?
A Give or take, yes.
Q You've reported in hearings before Chief Judge Bredar that PIB is actively working to -- I don't want to say compress -- essentially to process investigations more quickly. Do you know whether or not Chief Judge Bredar is pleased with those efforts?
MR. SCHUBERT: Objection. Form. You can answer.
A I can answer that one. You'd have to ask Chief Judge Bredar.
BY MR. TURIELLO:
Q Whether or not he's pleased?
A Correct.
(Nadeau Deposition Exhibit No. 3 was marked for identification.)
BY MR. TURIELLO:
Q If you can take a moment and please review 3.



Thank you, Pat.
I have page 64 through 69 of the manual. Is that what you have in front of you, sir?
A I do. Exhibit 2 goes up to page 62. So as long as we all agree page 63 has been --
Q Of course. These are not -- we don't have the entire manual. I'm not going through the entire manual. So there's -- 63 is missing.
So as I read it, this is procedures for identifying and contacting complainants, witnesses and accused. I want to turn your attention to page 65 under subsection four at the top: As with all contacts or attempts to contact anyone regarding a specific case, the investigator must promptly document all calls, call attempts, voicemails left, letters sent, texts and emails sent in the case file. The investigator must describe the reason for the communication and summarize any communications that resulted.
Sir, is this one of the policies that you feel needs revision? Or is this portion of the



guide that you feel needs revision?
A Yes, it is.
Q Why?
A Because the volume of cases that we have, this is a perfect -- this is something you could do in a perfect world if you had the time to, but with the number of emails we send, letters we send to people. We have a lot of people that don't want to respond. Not police officers. Outsiders that don't want to respond.
And normally what we do is they try to make attempts, try to make attempts. If they have the IAPro case file up and open, do sometimes they go in and make notes that they did that? Yes, they do. Do they talk about that in IA Stat? Maybe they do. But the documentation of repeated trying to reach out to people multiple times is not always documented because of the volume that that entails and the amount of work that entails.
Q How much work is it to type in to IAPro called, left message?



MR. SCHUBERT: Objection. Form. A little argumentative, but go ahead.
BY MR. TURIELLO:
Q How much is it?
A So you have to actually go to the case file, open it up, go in and make the edits, actually pull out a document, type it in the document, send it all the way up through approval before it goes in the system. It takes a lot of people a lot of time to do all that. Which is why we don't necessarily always do it. Sometimes we do depending what the case is. Sometimes it is done.
If the detective at the time is having a lighter day, doesn't have other things to do, sometimes they do put it in there. Again, this is a guide. It's not a mandate. We don't require everybody to do it. Would it be a best practice? It could be. But it's not a mandate because of the volume of work that it takes to do, and it involves a lot of people.
Q Okay. Can you help me understand -- so,



MAGNA LEGAL SERVICES

you know, I read this, and it's probably my own ignorance. I have case management systems. I pull them up. When I'm working on a case, right in front of me, make a phone call, I'll say called Bob, he didn't answer, I type it in. Immediately goes in. Takes no time. Two seconds.

It's different in PIB. What more than what I just described is required for that note to be entered into the case file?

MR. SCHUBERT: Objection. Form. You can answer.

A I can. So the layperson doesn't necessarily understand the system. So what we have to do is actually go into the case. So you're getting billable hours. When you're sitting there doing it, it's billable hours for you.

When a detective is doing it and they have ten cases to do, that's ten different ones they have to go into, that's ten different forms they have to fill out, that's ten different documents they have to make. And if they sent an email, they



have to wait to see if they ever responded.

Now, by the time somebody might respond to an email, they've done 30 other -- worked on 30 other cases by then. And all of a sudden they don't get a response, they have to remember to go back and say, well, I sent an email on the 1st and nobody ever responded. There's a lot of coordination.

So when they get asked, maybe at IA Stat or when the case actually goes to legal, hey, did they ever respond back? And they're like, no, I sent them an email, they didn't. You know, at that point they haven't documented it, it's volumes of work because of the volume of cases, and a lot of people don't answer their phone, respond to email, or respond to letters that are sent.

I would agree with you that if you're on the phone and they don't answer the phone, you could say called, they didn't answer the phone. But if you're going to call them the next day and they do answer the phone, it made no sense to even



document they didn't answer it the first time. They're on the phone all day talking to people. They're doing interviews all day. So it is a ton of work. And it's a ton of work to keep it coordinated, which is why this is a guide and is not a mandate.

BY MR. TURIELLO:

Q Do investigators ever leave PIB with cases that are not closed?

A Say that again.

Q Do investigators ever leave PIB through injury, retirement, ailments, or transfer, or any other reason, with open investigations, so not all of their work is completed when they leave?

A Yes.

Q What happens to those cases?

A They get reassigned.

Q When they get reassigned, what does that new investigator do?

A They review the case file and review with a sergeant what's been done on the case.



Q Is it not a best practice for that person who's assuming a new case to know what someone has done?

A Sir, we're not going to quibble over best practice. What I'm going to tell is it's not a mandate, and I told you why it's not a mandate.

Q Okay. Do you think it should be or it shouldn't be?

A I do not think it should be.

Q Okay. You mentioned that there are -- there's a large volume of work for your investigators.

A There's a what?

Q That there are --

MR. SCHUBERT: Mike.

A What did you say? There's a what?

BY MR. TURIELLO:

Q I'm sorry. I thought you said there's a lot. I apologize.

A No. You said there's a what?

Q A large volume of work for your



MAGNA LEGAL SERVICES

investigators. I thought that your response was confirmatory. I'm sorry about that.

So I'll say it again. You have mentioned today that there is a large volume of work for your investigators, correct?

A Correct.

Q And that there are some complaints where the complainant does not answer the phone or wish to follow up or wish to participate?

A That's correct.

Q Are there any -- do you have any orders that you pass on to your commanders as to whether or not individuals are -- whether or not investigators -- I apologize -- should continue following other leads, or does everything stop if the complainant does not answer?

MR. SCHUBERT: Objection. Form. You can answer.

A No. I've not had that discussion with my commanders.



BY MR. TURIELLO:

Q As an experienced investigator, someone who's investigated crimes for 40 years, is it your experience that you stop investigating a case if a complainant, for whatever reason, does not respond to you?

A At some point, yes.

Q What point?

A Depends on the case.

Q Would it depend on whether or not there are other witnesses to call?

A No. It would depend on the case. Totality of the circumstances.

Q Okay.

A And what the complaint was, what's the evidence. What I could surmise in my head I could do to solve the case, if there's something to solve, to prove it one way or the other. It would be a totality of the circumstances.

Q Okay. So whether or not a complainant's cooperation terminates an investigation or lack of



cooperation terminates an investigation is dependent on a whole lot of other circumstances, correct?

A If there are other circumstances.

Q If there are, yes. You can't make something up that's not there, but it depends is what you're saying?

A Correct.

Q It depends. Okay. Just wanted to make sure. So there's no policy where wherein your investigators stop investigating purely because a complainant does not respond to calls?

MR. SCHUBERT: Objection. Form. You can answer.

A There is no policy that says either way, correct.

BY MR. TURIELLO:

Q Either way. What about in practice? Has it been your experience that investigators just stop investigating cases if they do not hear from a complainant?

A That's far below my level. I don't know.



Q Have you heard from your commanders or anybody beneath you that that is something that's occurred?

A It's not up for discussion.

Q It's not been discussed. Okay.

So on page 67, number four, I understand this is not a mandate, it's a guide. Investigators must ensure that the reason stated for the recommendation -- for the recommended finding is based on evidence collected and not the fact that a complainant is uncooperative.

Does that statement -- is that congruent with this totality of circumstances argument that we were -- or totality of circumstances conversation that we're having?

A So this is referring to the recommended finding. The recommended finding based on the evidence that was collected. So if there is no evidence collected, using your theory, based on the person is not cooperating, then there is nothing to state. There's nothing to state if the person



MAGNA LEGAL SERVICES

doesn't cooperate.
Q Right. But I guess what this says is like regardless of their cooperation, there's other evidence that may be collected, may not be, but if it exists, the evidence informs the recommendation, correct?
A So this process is written in here for the case of excessive force, right? Where somebody makes a complaint about excessive force. They then don't want to cooperate, but we have bodyworn camera that can show whether there's excessive force.
So what the investigators are required to do is go watch the bodyworn camera to see whether or not there was excessive force, not just say, well, the person was -- filed a complaint but doesn't want to cooperate. They then have to go watch the video. This is what this is directed to, is following evidence that the department might have.
Q Sure. If, for example, the bodyworn camera had three other witnesses in view, maybe



identifying those witnesses, contacting those witnesses?
A Well, if it's on the bodyworn camera, we wouldn't need to because on the bodyworn camera we would see it.
Q Sure. Bodyworn camera only activates when someone presses it. There's a whole bunch of stuff that happens --
A That's --
MR. SCHUBERT: I'll object. Form.
A That's the only way I'd see the witnesses, if they activated it.
BY MR. TURIELLO:
Q What I'm saying is there are circumstances to investigate that might not be captured on the video, correct?
MR. SCHUBERT: Objection. Form. You can answer.
A I would have to have the facts, but...
BY MR. TURIELLO:
Q Okay. The facts lead the investigation,



and the facts lead to evidence in every single case, right?
A If there are facts, yes.
Q If there are facts. Okay. And, again, I understand some of this is hypothetical although --
A Most of it is hypothetical, sir.
Q That's why guides exist. But if confronted with a series of specific facts, we might be able to actually nail this down a little bit better, is that correct?
MR. SCHUBERT: I'll object. Form. You can answer.
A I don't know. It's a hypothetical.
BY MR. TURIELLO:
Q Okay. Okay. So Pat, if you would mark Number 4, please?
(Nadeau Deposition Exhibit No. 4 was marked for identification.)
BY MR. TURIELLO:
Q Sir, if you can please familiarize yourself with the document marked 4. I believe I



have page 71 and 72. Is that what you have in front of you?
A Yes. So Exhibit 3 to 4, page 70 is missing.
Q Yes. Correct. So is it your expectation that investigators under -- in PIB use the information they have to identify all witnesses?
A Say that again.
Q Is it your expectation that investigators in PIB will use the information that they have to identify all witnesses?
A All witnesses that they need to speak to, yes.
Q When would someone not need to speak to a witness?
A You'd have to give me a specific case.
Q I mean, sir, if someone is a witness, they have potential facts, correct, that could lead an investigation?
MR. SCHUBERT: I'll object to form.
A It's possible. It's not a criminal case.



MAGNA LEGAL SERVICES

Page 146

It's an administrative investigation, so it's not quite like a criminal case where you want to have everything all the way up because you had to prove something beyond a reasonable doubt. You have to prove preponderance of the evidence. So it's facts which will lead to a conclusion of sustained, not sustained. So not every witness is always interviewed. So that's why I said if you gave me an example, I could tell you.

BY MR. TURIELLO:

Q So -- okay. I want to unpack that a little bit. PIB and its administrative hearings -- in its administrative process has a different standard of proof?

A That's correct.

Q What is that standard of proof?

A Preponderance of the evidence.

Q What do you understand preponderance of the evidence to be?

A You have to prove the facts 50.00001 percent.

Page 147

Q Right. Just little bit more than half, right?

A That is correct.

Q Okay. So -- and your testimony is that you'd expect investigators to only interview witnesses necessary to draw a conclusion?

A That is not my testimony.

Q Or meet the preponderance standard? I think that's what your testimony was.

MR. SCHUBERT: Yeah, I'm going to object. Mischaracterization of the prior testimony.

A I would say that's a large mischaracterization of my testimony.

BY MR. TURIELLO:

Q Please help me understand it.

A I said they don't need to interview every witness on every complaint of every person because it's not necessary. Sometimes it's repeated information or they don't have anything that is going to be relevant. As long as we get enough information to prove whether or not somebody has

Page 148

either a sustained case or not sustained case, and it's going to pass the legal requirements for a conviction if it is a sustained case. Not every -- it's not a criminal case where we have to go and interview every possible person who ever might have seen the person. It's not that type of investigation. It's not required to be that type of investigation. It is an investigation to prove whether or not a case is going to be sustained or not sustained. Also could be exonerated or unfounded. But sustained or not sustained.

Q Sir, how does someone know what information a witness might have one way or the other if that witness is not identified and/or interviewed?

A I'd have to know the facts of the case.

Q Right. You just posited a scenario where not every person needs to be interviewed because they might have repeat information, right? How does one know what information someone has if they don't talk to them?

Page 149

MR. SCHUBERT: Objection. Form. You can answer.

A So it would depend on the situation.

BY MR. TURIELLO:

Q Okay. So more totality of the circumstances, we make sort of a holistic analysis of who we should interview and who we shouldn't?

A That is correct.

Q Okay.

Five.

(Nadeau Deposition Exhibit No. 5 was marked for identification.)

BY MR. TURIELLO:

Q Okay. Sir, do you have 5? I have 105 and 106. Page 105 and 106 of the manual. I want to confirm we're looking at the same thing.

A That is correct.

Q Okay. So as I read it, it appears that subsection VI, Conflict Investigations. You've already talked about the challenges in deconflicting cases because of the available resources to the



MAGNA LEGAL SERVICES

agency. Right? Like not everybody has to take your investigation. If you refer it to Anne Arundel County, for example, Anne Arundel County can say no, I'm not doing that, and that's a challenge, correct?
A Well, it's not a challenge, but they don't have to take a case.
Q Okay. How do you address and how does your bureau address conflict investigations, given the circumstances that exist? When I say the circumstances that exist, I mean given the fact that there is not a legal requirement for another agency to take your investigation.
A Well, I'd have to know the details, and I could give you an answer.
Q Sure. So we'll take a detailed -- number one, for cases involving PIB personnel, the complaint must be immediately forwarded to the deputy commissioner of PIB to determine the nature and extent of the conflict. So I understand this is a guide; these are not standing orders. But has this occurred while you've been the deputy



commissioner?
A Yes.
Q And tell me when it's occurred. Without mentioning names and all that.
MR. SCHUBERT: No open investigations. No names.
A Correct. Generically, we had a case where there was a member of PIB that might have been accessing cases that he or she shouldn't have. And so that case was then moved to our ethics unit to do the investigation, because that's another unit within PIB, but it's separate from the investigative section.
BY MR. TURIELLO:
Q Are they housed -- is the ethics section firewalled in some way physically?
A Yes.
Q How so?
A Separate floors, separate space, separate access.
Q Okay. Separate floors, separate space,



separate access. Separate command structure, totally separate, correct?
A They have their own sergeant, lieutenant. Their captain reports to our captain who may have other captains. And their major is the same major and their chief is the same chief, and I'm the same deputy commissioner.
Q But that's one example of how you firewalled it off?
A Correct.
Q In that example, you said that the charge is that an individual was accessing cases that they shouldn't have been. Why is that a problem?
A Well, it's a problem because they had no business accessing other cases, which is information about another employee.
Q Okay. Is that a potential breach of confidentiality that should exist in internal investigations?
A Well, you're able to access other cases if it has something to do with a case you're



investigating. But you can't just on a free-for-all look at other people's cases. So we do random audits. And during the random audit, it came up that that person was accessing cases for which he or she had no authorization to, so they were investigated.
Q How is that auditing done? How would one audit and discover someone was doing that?
A So there's an audit mechanism built into IAPro.
Q Okay. So you can see who's checked in a case, checked out a case, or whatever?
A Correct.
Q Login or access -- maybe not login, but if I click on case 1234 --
A If you have no access to a case and you try to access a case, I can see that.
Q You can see that. Okay. So there's some mechanism for making sure that that wall is not breached?
A That is correct.



MAGNA LEGAL SERVICES

Page 154

Q Okay. So I'm deducing from that -- I'm sure you'll correct me if I'm wrong, that there are some safeguards to confidentiality in investigations in your bureau, correct?
A Correct.
Q Why?
A Well, that's a generic statement, safeguard. What specifically are you speaking about and I can give you an answer.
Q Why is it -- so you audited -- in this specific example, you audited someone's access to cases they had no involvement in or not in any way consequential to their own assigned cases, is that correct?
A Correct.
Q So there's I suppose some investigation or disciplinary process initiated, correct?
MR. SCHUBERT: I'll object. You can answer.
A No longer employed by the agency.

Page 155

BY MR. TURIELLO:
Q I couldn't hear you.
A No longer employed by the agency.
Q Okay. So that sounds pretty serious then. I guess what I'm saying is why is it so serious? What is the problem with someone checking out other cases?
A So the result of that investigation is not why they're longer employed with the agency, but because you -- we don't want other -- there's a lot of people that work in PIB, so we don't want people to have access to other people's records that they have no business having access to.
Q I understand you don't want to, but I guess I'm still at why don't you want them to?
A Because we don't want them to have that information and use it outside of PIB to either tell a family member, tell a friend, et cetera, of what's going on with people's lives within PIB. And a lot of cases that are investigated by PIB are either not sustained, unfounded, or exonerated, so we wouldn't

Page 156

want somebody to speak outside of PIB and say, you know, so-and-so has a case for whatever, when it hasn't even been adjudicated.
MR. TURIELLO: All right. We said one. I'm sorry, we're a little late. It's 1:13. Come back at two from lunch.
MR. SCHUBERT: That's fine.
THE VIDEOGRAPHER: 1:16, we are going off the record.
(A lunch recess was held.)
THE VIDEOGRAPHER: The time now is 2:14. We are back on the record.
BY MR. TURIELLO:
Q Afternoon, Deputy Commissioner.
Deputy Commissioner, when did you first meet Robert Smith?
A Not really sure of the exact date. It was sometime I'd say the end of January 2022.
Q And likewise Delphine Smith?
A Same time.
Q Same time frame. So the end of January of

Page 157

2022, the family was dealing with the death of James Blue. You're aware of that, correct?
A I do.
Q I think the record's clear, everybody knows James Blue is the husband, former husband of Captain Lekeshia Blue, correct?
A That is correct. She was lieutenant at the time.
Q She was lieutenant at the time, yes, sir. How did you first learn of his death?
A I was in my office, and I believe Major Callahan came into my office to inform me that he received a phone call that he had been involved in a shooting, and he was on his way to Johns Hopkins. No. He was on his way to -- trying to remember what hospital he went to. But one of the hospitals in Baltimore.
Q Okay. Did you reach out to Lieutenant Lekeshia Blue once you heard the news?
A She had already left the building, was on her way to the scene. So Major Callahan and I left



MAGNA LEGAL SERVICES

Page 158

and went to the hospital.
Q When did you arrive at the hospital? I'm not asking for a specific time. I understand that. How long after you heard the news did you arrive at the hospital?
A Fifteen minutes.
Q Do you recall who was present at the hospital when you arrived? I understand there were a lot of people, but to the best of your knowledge, can you describe who was there?
A Doctors and nurses.
Q Was there anybody that wasn't doctors and nurses, specifically anybody from BPD that was there, that you can recall?
A Not that I recall.
Q What did you do when you got to the hospital?
A We went to the back where James Blue was. At that point, there was an officer there for the Northeast -- I don't know who he was -- who was standing there outside the door where they were

Page 159

working on him. And then at one point they called it, and they had him down as a John Doe, so I informed them I did know who he was, and that I would get the bio information for them.
Q Did you have occasion to speak with the family members at the hospital that day?
A I did.
Q Who did you speak with, sir?
A I spoke to Lieutenant Blue when she came to the hospital. And that might be the only family member that I interacted with.
Q How long did you stay at the hospital that evening?
A I don't recall.
Q What did you do after you left the hospital?
A I don't recall what time I left the hospital. I don't recall if I went back to the office. At some point, I went home, but I don't recall what time I left, nor do I recall if I went back to my office or not.

Page 160

Q Sure. Did you, either that night or in the immediate aftermath, did you have an occasion to visit with the family again?
A I did.
Q When did you do that?
A I'm not sure what day that was.
Q Where did you do that?
A Where I did visit with them?
Q Yes, sir.
A I believe it was at their -- the residence of -- their residence in Baltimore County.
Q Just for the record, their residence, you were pointing in the direction of Mr. and Mrs. Smith?
A That's correct.
Q Okay. Do you recall who was present at the Smith house when you visited that first night or that first day?
A When you say first day, first day I visited?
Q First day you visited, yes. Correct.

Page 161

A No, I don't recall.
Q Do you remember what the circumstances were, what was happening, what folks were talking about during that time?
A Well, they were grieving.
Q Yes. Were there any other arrangements being made or things happening that you can recall?
A Not that I recall.
Q Do you recall any conversations that you may -- that you had or may have had during that visit?
A With who?
Q With anybody.
A Yes.
Q Please describe them.
A Well, it's the first time I met both Mr. and Mrs. Smith, so I introduced myself and told them I was sorry for their loss, and then I spent time with Lieutenant Blue.
Q During that visit, did it come to your attention that James and Lieutenant Blue's oldest


MAGNA LEGAL SERVICES

Page 162

son was on his way home from I believe it was Virginia Tech, from college, wherever he was?
A No.
Q Do you recall any conversations that evening about transporting or helping to transport their son from the hospital -- or from -- I'm sorry, from the airport to the home?
A He was already there.
Q He was there when you left?
A (Witness nodded.)
Q Do you recall or did you take any steps to help facilitate his transfer from BWI to the family's home?
A Clarify what you mean by facilitate.
Q Did you offer any assistance? Did you make any calls? Did you try to help in any way?
A Yes.
Q What did you do?
A I called the FBI liaison at BWI and asked him if he would get him from the plane and bring him, and bring him to the hospital.

Page 163

Q And -- okay. Thank you. Do you recall whether or not if that happened? Were you made aware?
A It's my understanding it did not happen because somebody from the family was at the airport to pick him up.
Q Do you recall how long you stayed on that -- I'll call it the first evening or first day that you visited the home, how long you were there?
A I don't recall.
Q Do you recall at the time of the -- at the time of the shooting, at the hospital -- the hospital immediately following the shooting is what I mean, do you recall my clients, either Jeffrey or Raquel Lilly, being present?
A I do not.
Q So if you don't recall, is it safe to say you did not speak with either of them on that evening?
A I did not speak with either one of them.
Q Do you recall whether or not they were

Page 164

present when you visited the Smith home the following day?
A Well, it wasn't the following day, I don't believe. So the day I visited, and I don't recall them being there.
Q So then safe to say you didn't have any conversations with them if you don't recall them being there?
A That's correct.
Q At some point in the aftermath of the tragedy, were you -- were you made aware that Jeffrey Lilly and Raquel Lilly were also related to the Smith family, to the Blue family?
A I was.
Q Do you remember when that happened?
A I do not.
Q How were you made aware?
A I don't recall who told me that.
Q Is it possible that Deputy Commissioner Sheree Briscoe told you that?
A No, that's not possible.

Page 165

Q Why is that not possible?
A Because I only spoke to her one time. And it had nothing to do with a relationship.
Q When did you speak with Sheree Briscoe?
A I don't recall the date.
Q What did you discuss?
A I discussed with her that I was told by Lekeshia Blue that Lekeshia wanted me to ask Mr. Lilly not to attend the funeral, and I told her that it's a civil matter, we're not going to get involved in that. And she told me she believed her father-in-law had reached out to Sheree Briscoe about the same thing. And so then I reached out to Sheree Briscoe to find out if that, in fact, did happen, and she said she had received a text from him, but she had not called him back yet.
Q Okay. All right. So the conversation with Deputy Commissioner Briscoe then was before she -- at least to your knowledge, based on what she said to you, was before she made any calls to Jeffrey Lilly, is that correct?



MAGNA LEGAL SERVICES

A Made calls to who?
Q To Jeffrey Lilly.
A Yeah, I don't know anything about her calling Jeff Lilly.
Q You said that she had not been able to -- she hadn't reached out to him yet.
A That was reached out to Mr. Smith.
Q Okay. So it was before she communicated back with Mr. Smith after --
A She said she had received a text message from Mr. Smith, and she had not reached back out to Mr. Smith. I don't know if that's the first time, the second time. I have no knowledge. I only know about that specific ten-second conversation.
Q That conversation. Okay. Okay. Were you made aware -- do you know who Jack Herzog is?
A I do.
Q Who is Jack Herzog?
A Lieutenant colonel.
Q And he falls under the operations bureau, is that correct?



A He falls under CIB.
Q Is that in the operations bureau?
A No.
Q Where is that?
A Criminal Investigative Bureau.
Q At the time, did you know that -- do you recall whether or not Jack Herzog was in Sheree Briscoe's command structure?
A Yes. She was the deputy commissioner, yes.
Q You testified earlier that -- back that up. Strike that. I'm sorry. After her husband's murder, did Lieutenant Blue, now Captain Blue, did she take time off from work?
A Yes, she did.
Q Do you know how much time she took?
A I do not.
Q Do you know where she was staying?
A I do not.
Q Did you ever visit her or the Smith family home again?



A I did not.
Q So it was just the one time that you visited, is that correct?
A That is correct.
Q Who is Jerry McLaurin?
A At the time, he was a detective in the Public Integrity Bureau.
Q Okay. Are you friendly with Jerry McLaurin? Do you know him in a social capacity outside of work?
A I do not.
Q Does he -- do you and him -- I know he's an investigator.
A He's not an investigator. He's a property officer.
Q Property officer. Where does that fall in the chain of command in the bureau?
A So he would report to a sergeant.
Q So as far as chain of command goes, he's below the rank of sergeant obviously?
A That is correct.



Q Do you speak with Jerry McLaurin on a regular basis, or I'll say at all?
A Well, he retired. He retired at some point. He came back as a contract service specialist. I haven't spoken to him in at least three weeks, but I speak to him. He works for me. If I pass him, I speak with him.
Q Sure. During the time period in the immediate aftermath, I'll say between January of 2022 and let's just say June, that sort of six-month time period, did you have occasion to speak with Mr. McLaurin?
A Sure.
Q Did you ever talk about the Smith family or Blue family and their household, what was going on during that time?
A We talked about how Lieutenant Blue was doing. You know, going through a tragedy like that is very taxing on a family. So he was close to the family, so he would have contact with her and let me know when the appropriate time to call, when they



MAGNA LEGAL SERVICES

were going to be home, when she would have time, because they had a lot of stuff going on.

And we always want to reach out and make sure she knew we supported her. So I would check with him to see if he knew, you know, when would be a good time to call because he sort of spent more time over there than probably anybody else I knew did. So I would talk to him about that.

Q Okay. In February, you mentioned a conversation in passing, I think, with Deputy Commissioner Briscoe about the communication she said she had with -- or that Mr. Smith had with her, I should say. Is it possible that that was on or about February 1st of 2022?

A I don't know.

Q Don't recall. Do you know where you were when that conversation occurred?

A I was in my office at PIB.

Q Earlier you mentioned that the executive staff, which I take to mean deputy commissioner and commissioner, had weekly meetings on Mondays.



Was -- were these events and Mr. Blue's murder discussed at any of those meetings?

A Not that I recall.

Q On --

THE VIDEOGRAPHER: Excuse me. Time now is 2:30. We're going off the record.

(Discussion was held off the record.)

THE VIDEOGRAPHER: Time now is 2:31. We are back on the record.

BY MR. TURIELLO:

Q When did you learn, Deputy Commissioner, of the dispute between Jeffrey Lilly, my clients, and the Smith family?

A I don't recall the date.

Q When you learned of the dispute -- well, strike that. Did you learn of the dispute? Because I don't want to presuppose that you learned.

A Yes, I did.

Q What did you do with that information?

A At the time, I didn't do anything with it.



It's not a BPD matter.

Q At any time did you learn that Jeffrey Lilly was having concerns about the dispute affecting his assignment at the FBI in his role as an FBI task force officer?

A What was the first part of the question?

Q Sure. Now I haven't --

MR. SCHUBERT: Dispute about the task force.

MR. TURIELLO: Thank you.

BY MR. TURIELLO:

Q Did you learn about Jeffrey Lilly being concerned that his role as an FBI task force officer was being complicated, compromised, whatever, by this dispute?

A Did I ever learn of that?

Q Did you ever learn of that?

A I learned when this was filed.

Q Not before?

A No.

Q You testified earlier that you were



previously the ASAC of the Baltimore field office, correct?

A Correct.

Q Do you still maintain relationships with individuals that were working at the field office when Jeffrey Lilly was a task force officer?

A There are very few people that still work there at this point. They've either retired or transferred.

Q Well, the very few people that do, do you have a relationship with any of them, and if so, who are they?

A The only people I really have a relationship with are those who actually work for me that are working over there.

Q Who are those people?

A Sergeant Brian Patterson and Jared Stern.

Q How do you know Jared Stern? I know you work together, but...

A He works for me.

Q He works for you. Okay. So is Jared



MAGNA LEGAL SERVICES

Stern a member -- he works for you. He's a member of the Public Integrity Bureau, is that correct?
A That's correct.
Q Is he assigned over at the field office?
A Correct.
Q What is his role?
A Task force officer.
Q Okay. Is he in charge -- I guess does he investigate all crimes, or does he have a sort of a role that's in step with the Public Integrity Bureau?
A He investigates public corruption.
Q Thank you. So who is the other one? You said Jared Stern. Who was the other person?
A Brian Patterson.
Q How do you know Brian Patterson?
A He's a sergeant.
Q Does he work for you currently, or did he work for you while you were at the field office?
A He works for me currently.
Q And --



A He did work for me when I was at the field office, but he was in a different role at that time.
Q What role did he occupy when he was working with you at the field office?
A He was a detective on the squad C3 at the time.
Q Okay. And is he BPD task force, or was he an FBI special agent?
A BPD task force.
Q Thank you. So on February 2nd of 2022, Raquel Lilly filed a complaint with the Public Integrity Bureau. Were you aware of that complaint when it was filed?
A I was not.
Q When did you become aware of that?
A When this was filed.
Q When this was filed. Not sooner.
A Yeah.
Q On February 4th, Jeffrey Lilly had a meeting with Olufemi Akanni to discuss the dispute that he was having. Were you aware of that meeting?



A Is that the meeting I was at, or is that a different meeting?
Q Different meeting. Earlier than the one you were at.
A Was I aware? I am aware of it now.
Q Were you aware at the time?
A I was not.
Q Did you have any communications with Mr. Akanni about the dispute prior to when you met with him?
A I did not.
Q You met with Jeffrey Lilly on February 8th of 2022, is that correct?
A That date sounds accurate, but I don't have a specific recollection of the date.
Q Okay. Do you recall how that meeting was initiated?
A I do.
MR. CRAIG: He said yes.
MR. TURIELLO: Oh, I didn't hear. I'm sorry.



A I do.
BY MR. TURIELLO:
Q I'm sorry. I've got to get my hearing checked, apparently. How was that meeting initiated?
A So I believe it was the same conversation that I had had with Lieutenant Blue about him coming to -- going to the funeral, which was when I learned about the dog situation. And then at the time Director Akanni was in my office and I mentioned to him about my conversation with Lieutenant Blue, and he said that he had had a conversation with Mr. Lilly about his concerns.
And I said, Well, I know Jeff Lilly when I was in the task force. You know, the family is grieving, he would know about that because he went through a tragedy himself where seven of his members were killed. He would understand the grieving part. So if you had a meeting with him, call and see if he'll have a meeting with us and go down and talk to him and see if we can sort of calm



MAGNA LEGAL SERVICES

this all down before it gets out of control.

Q So -- and so is it your understanding then that was it Director Akanni at the time?

A At the time.

Q Did Director, to your knowledge, Akanni call Jeffrey Lilly to arrange that meeting?

A I would assume so.

Q Okay. When you discussed wanting to speak with Jeff Lilly, was your -- from your perspective, was it an invitation to meet, or an order to meet?

A Invitation.

Q Where did you meet him?

A BPD headquarters in the conference room.

Q Who attended?

A Mr. Lilly, Director Akanni, and myself.

Q During that meeting, do you recall what was discussed?

A I mean, the context of it, yes.

Q To the best of your ability, can you please tell me what was discussed specifically in that meeting?



A Sure. So I told Detective Lilly that, you know, the Blue family was going through a tragedy. He knows -- that he had gone through a similar tragedy where a lot of his members of his family had been killed, and that when I was in the FBI, we worked to help him out, and he knows the trauma he was going through and said that's the same thing the family is going through.

And he brought up his dogs. And I said, well, your dogs is a civil issue that you need to take up with an attorney. And he said, I already hired an attorney. And I said, I'm sure your attorney is giving you good advice. So if you could just leave the family alone for now, they're trying to plan a funeral, similar to what you went through. You of all people understand what they're going through.

And he said my dogs, those are my dogs. I said, I don't know anything about the dogs. What you need to do is follow the advice of your attorney.



Q So your direction to him was to --

A Not direction. My suggestion.

Q Your comment to him was to follow the advice of his attorney?

A Correct.

Q Did you ever say that you believe that this was going to be laughed out of court?

A I don't recall if I said that or not.

Q Do you recall saying that no jury is going to have any sympathy for you?

A I doubt I would ever say that, so I would say I did not say that. But if you have a transcription or something you want me to read, I'll be more than happy to read it.

Q If we had one, we'll give to you.

A You don't have one?

Q Not that I'm going to give to you.

A I take that as you don't have one.

Q Okay. So do you recall during that meeting discussing a call that was placed to the Smith family house wherein Baltimore County



responded to do a welfare check on the animals?

A I do.

Q What do you recall about that?

A So somewhere it came up that -- I think it was Lieutenant Blue had told me that the Baltimore County Police had come there about the dogs. And that, according to her, the police told them and him that it was a civil matter and to go through the civil process. And I said to him, Baltimore County has also told you to settle the matter, like you don't want to get this escalated, you don't want to have any problems, just follow the advice of your attorney.

Q Okay. Do you -- in that conversation, did you ever say anything to Mr. Lilly to the effect of this is embarrassing and it's ruining the relationship between Baltimore County and Baltimore Police Department?

A No, not that I recall. But if you have a transcription, I'd be more than happy to read it.

Q Do you think that reading a transcription



MAGNA LEGAL SERVICES

Page 182

would refresh your recollection?
A If it's an accurate transcription.
Q Okay. I will note that.
Do you recall, as you sit here now, whether or not you indicated to Jeffrey Lilly that you didn't want to see anything bad happen to him?
A In subcontext, I probably said that, yes.
Q What did you mean by that?
A I didn't want him to continue to call Baltimore County and they end up charging him with filing a false report.
Q Okay.
A I can see there was a lot of emotion in him about the dogs. Understandable. But sometimes when people are under a lot of emotion, they make bad decisions, which come to affect them for a long period of time.
As a friendly piece of advice, because I did know him from before, I tried to have him see what the Smith family was going through, very similar to what he went through. It's very

Page 183

emotional. So if he continued to call Baltimore County, it's very possible that they would charge him, and that I did not want to see that happen.
Q Who would charge him?
A Baltimore County.
Q Okay. Did you have any communications with police officers in Baltimore County about this dispute?
A I did not.
Q Were you made aware about the call only from the Smith family? I say the Smith family. Lekeshia Blue.
A I believe she is the one that told me about that.
Q Do you recall having any conversation -- do you recall any conversations with Robert Smith in or around that same time period?
A When you -- are you talking about other than the day that I was there at the house?
Q Correct.
A I've never talked to Robert Smith.

Page 184

Q He's never called you, you've never spoken to him personally on the phone?
A Never.
Q What happened --
A Can I clarify one thing? So I've only had one other contact with Mr. Smith was when his -- when Lekeshia Blue got promoted to captain, they had a promotional gathering which they invited a bunch of people to. I did attend that event, which I did see him there. But we had no conversation about this event.
Q Okay. Fair enough. Do you -- what happened after your meeting with Jeffrey Lilly? What did you do next?
A Went back to work.
Q Did you have any communications with him or anybody else about this dispute?
A No. This is not a BPD matter.
Q We agree. On March 14th, Robert and Delphine Smith made a complaint to the Public Integrity Bureau, is that correct?

Page 185

A I don't know.
Q Were you ever made aware that they made a complaint to the Public Integrity Bureau on March 14th?
A I was not.
Q So as you sit here today, until we just had this conversation, you weren't aware that they made a complaint against Jeffrey Lilly?
A I saw the complaint you filed.
MR. SCHUBERT: Don't reveal any of the substance of our conversations, but if you've learned since this was filed, you can say that.
A Yes, since this was filed I have learned.
BY MR. TURIELLO:
Q So when the complaint was filed or in the investigation immediately following, you were not aware that they had made an Internal Affairs complaint against Jeffrey Lilly?
MR. SCHUBERT: Just to clarify in this context, when you say complaint, you're talking about a PIB complaint?



MAGNA LEGAL SERVICES

MR. TURIELLO: PIB complaint filed.
A That is correct.
MR. TURIELLO: Will you mark 6, Pat?
(Nadeau Deposition Exhibit No. 6 was marked for identification.)
BY MR. TURIELLO:
Q Deputy Commissioner Nadeau, if you would please review Exhibit 6. It should be two pages Bates-stamped 154 and 155. Let me know when you've reviewed it. You reviewed it?
A I've reviewed it.
Q Do you recognize it?
A I do not.
Q You are cc'd on this document, is that correct?
A It does say that.
Q Have you ever received this document prior to today?
A I have not.
Q Do you recall having any conversations in or around January of 2023 with either Mr. Akanni or



Michael Harrison about the contents of this document?
Yeah, review the contents.
MR. SCHUBERT: Take your time. Read it.
BY MR. TURIELLO:
Q Not in a rush. Okay. Have you familiarized yourself with the contents of that document, sir?
A I have.
Q I'll ask it again. In or around January of 2023, did you recall having any conversations with either Director Akanni or Commissioner Michael Harrison about the contents of that document?
A I do not.
Q So did you have, I take it, any role in drafting this document?
A I did not.
Q And prior to today, you've never seen this document?
A I have not.
Q Well, let's go through it. First, if you



can turn to the second page. It appears to have been authored by Commissioner Michael Harrison, is that correct?
A I don't know if it was authored by him. It was signed by him.
Q That is his signature?
A Yes.
Q In February and March of 2022, the Baltimore Police Department received cross-complaints by members of the public against some of its members. Typically these cases would have been investigated by either the ethics section or the Internal Affairs section of the Public Integrity Bureau.
However, PIB quickly determined that both of these cases had either a possible respondent or a witness, a member of the PIB who at the time of the complaints was assigned to the ethics section as its lieutenant. This member was assigned to the Internal Affairs section and as a sergeant at another time.



Does that seem to be referencing Lekeshia Blue, that member who was a lieutenant in the ethics section, formerly someone in Internal Affairs as a sergeant?
A Yes.
Q So my question to you is twofold. Number one, what does the word quickly mean to you? And number two, when did PIB identify the potential conflict?
MR. SCHUBERT: Objection. Form. You can answer.
A Well, I'm not going to give you a definition of the word quickly. And I didn't make this determination, so you'd have to ask the person that made that determination, which would be -- you'd have to ask Commissioner Harrison where that came from. I didn't draft it.
BY MR. TURIELLO:
Q Okay. So we'll ask Commissioner Harrison. Earlier we talked about identifying potential conflicts of interest per the policy. That's not



MAGNA LEGAL SERVICES

actually policy. So I'll ask --
MR. SCHUBERT: I'll object to that. Go ahead. Just the characterization.
MR. TURIELLO: Sure.
BY MR. TURIELLO:
Q How are conflicts identified in your bureau?
A Well, you'd have to give me a situation, I can explain it.
Q This specific situation.
A I don't know the specific situation because I don't know who filed what because I was not made aware people were filing them. That is far below my position in this agency.
Q Okay. So in the second paragraph, because of this conflict, per the PIB manual, which provides for the procedures the department should take in conflict investigations, the department made several attempts to have other complaint -- to have these complaints investigated by our external partners, such as the Office of the Inspector General for



Baltimore City, the Attorney General's Office, and the Baltimore County Police Department. We'll stop there. Even though there's a semicolon.
Are you aware of any efforts made by members of your bureau to transfer the investigation of these complaints outside of your agency?
A I was not part of that. I am subsequently aware that did happen, but I was not part of the discussion.
Q You were not part of any discussion about any of this?
A That's correct.
Q Not part of -- did you not have any role or knowledge of these complaints, as you sit here today, prior to this lawsuit being filed?
A That is correct.
MR. TURIELLO: Okay. Seven.
(Nadeau Deposition Exhibit No. 7 was marked for identification.)
BY MR. TURIELLO:
Q Sir, showing you Plaintiff's 7, which is



two pages long. Should be marked at the bottom BPD69 and 70. Please take a moment to review that document and its contents. Tell me when you're ready.
Have you reviewed the contents of that document, sir?
A I have.
Q Who is Detective Anthony Bowling?
A He's a detective in the Public Integrity Bureau.
Q Where is he currently assigned?
A Public Integrity Bureau.
Q Who is in his chain of command?
A I don't know.
Q Captain Popp?
A No.
Q No. Is Detective Bowling currently on active duty, I'll say?
A Last I knew, he was on medical, but I'm not sure.
Q Do you know how long he's been on medical?



A I do not. Well, when I say medical, light duty.
Q Light duty. Do you know the reason?
A Excuse me?
Q Do you know the reason he's on light duty?
MR. SCHUBERT: Hold on.
A I know the reason, yes.
MR. SCHUBERT: Is it medical?
THE WITNESS: Yes.
MR. SCHUBERT: We're not going to talk about --
MR. TURIELLO: That's fine. I'll ask him.
BY MR. TURIELLO:
Q So, sir, can you please describe or educate us here what is a Form 92/95?
A It's a document used by BPD that anybody can use to write any memo, report, author anything that we don't have a regular form, they can put it onto a Form 92/95.
Q Okay. So on March 29 of 2022, this document indicates that Anthony Bowling was



MAGNA LEGAL SERVICES

requesting to be removed from investigating case number 20220347, is that correct?
A That's what the document says.
Q Were you aware that case number 20220347 is the complaint filed by Robert Smith against Jeffrey Lilly in this case?
A No, I did not know that.
Q Do you know that now?
A I do not.
Q Does it not say that, according to the recorded interview of Mr. Smith, that he advised and it goes on to describe the dispute between the families in this case?
A That's what the document says. I don't know if that's the case number, but that's what the document says.
Q Okay. At the time that Anthony Bowling wrote this memo, Form 95, was his lieutenant Daniel Popp?
A That is possible.
Q Do you know whether or not Detective



Bowling was allowed to recuse himself from the investigation?
A I do not.
Q I think it was two weeks ago during Captain Popp's deposition, he stated that he was presented with this scenario with this request for recusal. And when I asked whether or not he was able to recuse himself, Lieutenant Popp stated no. Is that surprising to you?
MR. SCHUBERT: I'm going to object to form. I don't have that transcript. I don't know if that is the exact testimony. With that --
A Would it matter whether it's correct or not, I wouldn't have any idea.
BY MR. TURIELLO:
Q You wouldn't have any idea. Detective Popp testified routinely -- not detective. Captain Popp testified routinely that it was not his decision whether or not to recuse Anthony Bowling, and then stated that that decision came above him.



So my question to you is, who was above Lieutenant Popp on March 29 of 2022?
MR. SCHUBERT: Same objection to the question and the characterization of the testimony. Form. You can answer.
MR. TURIELLO: There's a ghost. Thank you, Mike.
BY MR. TURIELLO:
Q I'll repeat the question. Who was above Lieutenant Popp in March of 2022?
MR. SCHUBERT: Same objection. You can answer.
A To the best of my recollection, it would have been Captain Lamar Howard would have been the captain. This is two years ago. Yeah, Captain Lamar Howard would have been the captain. And Major Jason Callahan would have been the major, to the best of my recollection.
BY MR. TURIELLO:
Q Is it true that there was no chief above Major Callahan?



A That is correct.
Q So did Major Callahan report directly to you?
A That is correct.
Q Your name appears multiple times here, and Detective Bowling stated that there was potential -- one of the potential conflicts was that you might have to be interviewed as a potential accused for failing to abide by policies of PIB.
So my question to you is, did Major Callahan say anything to you about that?
A No, he did not.
Q Did you have regular meetings with Major Callahan about the goings-on in his command?
A If you could describe goings-on.
Q The operation, his duties as the major. Did you check in with Major Callahan during that time?
A Our offices were side by side, so we had regular conversations.
Q Do you find it -- and Mr. Callahan never



MAGNA LEGAL SERVICES

mentioned this memo or its contents to you at all?
MR. SCHUBERT: Object to form. You can answer.
A What was the question? Do I find it odd?
BY MR. TURIELLO:
Q Major Callahan -- my first question is, Major Callahan -- is it your testimony he never mentioned this memo or their contents to you?
A That's correct.
Q Do you find that odd?
A I do not.
Q Why not?
A Because I had no part of this investigation. This was Major Callahan and Director Akanni.
Q So you work with Major Callahan, I presume, every day, right? You said your offices are right next to each other, correct?
A Correct.
Q Is this information that you would like to know if you're named in a memorandum like this?



A No. No, not in this case, because once I had the meeting with Mr. Lilly and he was being what I call unreasonable, I wanted -- I pulled myself from it. Realizing that he would probably file a complaint of some sort. I pulled myself from it and Major Callahan and Director Akanni oversaw any of this.
Q Did you give any specific directions to Major Callahan or Director Akanni as to how to have communications or whether to have communications with you regarding this case?
A I did not.
Q So you stepped away from it. Didn't have any other involvement with it?
A That's correct.
Q And it's their monkey, their circus?
MR. SCHUBERT: I'll object. Form.
A You are correct.
BY MR. TURIELLO:
Q Okay.



(Nadeau Deposition Exhibit No. 8 was marked for identification.)
BY MR. TURIELLO:
Q Actually pause on that for one second. You can mark it.
When did you make the determination that you needed to step away from everything that was happening?
A Shortly after the meeting that I had with Mr. Lilly.
Q Was it because I think you just said in your mind he was being unreasonable and this was going to blow up and you didn't want anything to do with it?
MR. SCHUBERT: I'll object to the characterization.
A That would be it, because at the time I knew there were no complaints that were filed. It was a civil matter, so there was nothing for us to do. So when either -- I think it was Lieutenant Blue told me that her stepfather had called D.C.



Briscoe, you know, it was nothing to do with BPD.
I stepped away from it and said, hey, this has nothing to do with BPD. As the complaints apparently came in, they were all handled with the major.
BY MR. TURIELLO:
Q Major Callahan?
A That's correct.
Q Okay. Do you recall, sir, whether or not you ever had any communications with anybody about this complaint, the complaint filed against Jeffrey Lilly prior to, of course, the filing of this lawsuit and today?
A Before we get to that, which is why Exhibit 6 is from Police Commissioner Harrison to Akanni, which is in my chain, which is why it has skipped me. It's to him, because they were the ones that all had discussions about that. I recused myself of. I'm sorry. Could you repeat the question?
Q Yes, of course. Do you recall having any



MAGNA LEGAL SERVICES

Page 202

conversations with anybody about the complaint filed with Jeffrey Lilly -- against Jeffrey Lilly by the Smiths during this period -- I'm talking March, April, May, June -- while the complaint was being investigated?
A No, I didn't even know it was filed.
Q You didn't know it was filed. Okay. Okay. So you didn't know it was filed. You didn't have any communications about it. That's -- this was Major Callahan's investigation to monitor?
A It's not Major Callahan's investigation. He does not do investigations.
Q It was -- he was supervising it, is that correct?
A He supervised all 1,500 investigations, so this is one of the 1,500 that he would supervise.
Q None of this was ever brought to your attention prior to the filing of this lawsuit? Well, at least filed to the memo that Harrison wrote that you never saw?
A That's correct.

Page 203

Q So this was the first you're hearing there was a complaint, Robert Smith against Jeffrey Lilly, was when our lawsuit was filed, is that correct?
A To the best of my recollection, yes.
MR. TURIELLO: Now we'll do 8.
We need to take a two-minute bathroom break.
THE VIDEOGRAPHER: Time is 3:06 o'clock.
(A recess was held.)
THE VIDEOGRAPHER: Time now is 3:14. We are back on the record.
BY MR. TURIELLO:
Q Sorry, Deputy Commissioner, do you have Number 8 in front of you? Policy 304.
A I do.
Q If you can take a look at that. I think it starts on 0246 and ends on 0254. Please review that document. Let me know when you've reviewed it, if you recognize it, or what you recognize it to be?
A This is BPD Policy 304.
Q So this is -- is this a departmental

Page 204

policy? This is not a bureau-specific policy or not part of the handbook or anything; this is an actual policy?
A This is departmental policy from 2017.
Q Do you know whether or not that is still in effect?
A I don't know if this has been updated or not.
Q What is Policy 304 about?
A It's titled Suspension Procedures.
Q Am I correct in assuming this policy outlines the manner in which individuals can be suspended and procedure -- by the procedure that follows?
A This, along with the Law Enforcement Officer Bill of Rights, correct.
Q They work in concert with one another, is that correct?
A Well, they should. It's been changed, which is why the policy needs to be updated, which is why I'm not sure if this one is still in effect,

Page 205

but the law changed July 1st, 2022.
Q Okay. What were the changes that happened in July of 2022, if you recall?
A A lot. Entire statute was removed and a new statute was put in effect.
Q You said that was put into effect of July of 2022?
A July 1st, 2022.
Q Is it correct that in -- until July 1st, this was the policy?
A Well, this policy did not change in July 1st, 2022. The statute changed July 1st, 2022. However, if there were -- if there was a precipitated event that happened before July 1st of 2022, the old statute followed the process until the conclusion of that case.
Q Okay. So any need for this policy to be updated, which may be, as you said, in light of that change, that need didn't arise until at least July 1st of 2022, is that correct, when --
A Essentially July 1st of 2022, there would



MAGNA LEGAL SERVICES

be a need. Whether or not this was updated before that, I would have to look at the policy to see what it says.

Q Of course.

A Generically the process is -- generically would be the same.

Q Okay. So I want to draw your attention to emergency suspensions, which is under the definition section on page 1 of the document, page 246 of the Bates stamp for the record.

Emergency suspensions are defined as the temporary removal of a member's law enforcement authority in connection with an allegation of misconduct or the investigation of an incident that may lead to an allegation of misconduct. And this action is taken when it is believed to be in the best interests of the public and BPD.

So in what situations, practically speaking, I understand what the policy says, but in what situations would an emergency suspension be appropriate?



A Are you talking about with pay or without pay?

Q With pay first.

A So a member's police powers may be suspended if they've committed any violation, any criminal violation, or any misconduct allegation that could lead, if sustained, to a termination.

Q Okay. What about without pay?

A Anybody who is charged with a felony is suspended without pay, or there might be another -- LEOBR, there might be another section for that, but primarily it's if you're charged with a felony.

Q Okay. If you turn to suspension of police powers, which I believe is page 8 of 9 on the document, Appendix A, do you recognize Appendix A?

A I do.

Q What do you recognize that to be?

A That's suspension of police powers Form 154.

Q This is an official form that is used in BPD, is that correct?



A This in concert with 344.

Q So I want to direct your attention to part two of that form, which is about midway down the form, which reads the suspension shall be -- it says check one, with full pay and benefits or without pay and benefits. See that?

A I do.

Q There's a note directly underneath that. Can you read that for me, please?

A A suspension without pay may only occur by the direction of the suspension hearing officer and only at the conclusion of suspension hearing.

Q Okay. So only by the hearing officer, only after that hearing takes place, that seems pretty unambiguous, correct?

A That's what that says.

Q Okay. Who are assigned to be suspension hearing officers in this administrative proceeding?

A It is normally the captain of the Office of Administrative Hearings.

Q That's normally who it is. In May, spring



I'll say of 2022, do you know who that person was?

A Captain Mike Newton.

Q Michael Newton. Where is the Office of -- the office that you mentioned, Office of Administrative -- what was that?

A Hearings.

Q OAH. Where does that fall in BPD's organizational structure?

A It falls under the Public Integrity Bureau.

Q And so you have a captain. You said it was Captain Newton of OAH. Who is Captain Newton's major?

A Right now?

Q Who was his major in May of 2022?

A Jason Callahan.

Q Okay. And was there only one -- is there only one captain of the Office of Administrative Hearings?

A That is correct.

Q So it's always Captain Newton. If he is



MAGNA LEGAL SERVICES

Page 210

the captain, he would be the hearing officer, is that correct?
A If he's working a notification, that's correct.
Q And he reports to Callahan?
A That is correct.
Q And Callahan reports to you?
A That is correct.
Q Okay. What is the purpose of the hearing?
A The purpose of the hearing is for the respondent to come in and explain why they shouldn't be suspended.
Q So people get to present evidence in these hearings, is that correct?
A Not evidence. More of a verbal account. When you say evidence, I would have to ask you what type of evidence you're referring to.
Q Sure. So is it correct that it's an informal hearing, it doesn't have the same sort of evidentiary procedures as like a court hearing, is that fair?

Page 211

A Correct. The department's represented by legal. And then the -- usually the respondent is represented by their attorney, and they come in, and it's -- again, you're going to a neutral person and saying this is the department's case, this is why we suspended the person, this is -- on the defense, this is why they shouldn't be suspended for that, and then the hearing officer makes the determination.
Q Okay. By what standard does the hearing officer make that determination? Is there an evidentiary standard?
A There is no evidentiary standard. It's the best interest of the agency based on the facts that are presented at the hearing.
Q Okay. And so how is the best interest of the agency defined?
A So the law allows people to be suspended in certain situations based on what's best from the agency for protection. For instance, taking somebody's police powers away so they don't have a

Page 212

BPD firearm. They can't go out and kill their spouse with our firearm. Like best interest of the agency.
Or if somebody is going to eventually be terminated, utilizing city resources to pay somebody who's going to be terminated is not a good use of resources, so the law allows for the differentiation of whether or not they get suspended with pay or without pay.
Most people get suspended with pay, which means when we say suspended, their police powers are suspended, they physically still come to work and do administrative function. They have no police powers.
If you get suspended without pay, then you physically do not come to work, and you're entitled under the MOU to get back pay if, in fact, the case against you is either nolle prossed -- back then, nolle prossed or if you're found not guilty.
Q Is it fair to say only in extreme

Page 213

circumstances is -- when someone is likely to be terminated, as you said, do we not -- does the agency suspend someone without pay?
A No. It was the statute which says if you're charged with a felony, you can be suspended without pay. Or if you're -- I have to look at LEOBR, but felony is the biggest one, if you're charged with a felony.
Q Felony allows someone to be suspended without pay, but it's not mandated that if you're charged with the felony, you must be suspended without pay, correct?
A So the statute says may. BPD has, since before I ever got there, has always followed the statute on a felony and suspended without pay. So that's the process we've used. It does say may in the statute, but in all cases people have been suspended for a felony without pay.
Q So every single -- to your knowledge, every single time an officer has been charged with a felony, they have been suspended without pay?



MAGNA LEGAL SERVICES

A That is correct.
Q Do you know how many officers have been suspended without pay --
A No idea.
Q -- under those circumstances since you assumed responsibility of PIB?
A I do not.
Q Would you be able to find that out?
A That would be a manual review of cases. I'm not doing that.
MR. SCHUBERT: I don't want to do it either.
A Yeah, I'm not doing that.
BY MR. TURIELLO:
Q Sure. I suppose what I'm asking is what would the process be like to be able to determine all of the people that have been suspended without pay?
A The process would be knowing that people had a case, going into the case and looking at the paperwork to see if they were suspended without pay.



Q Does BPD keep any records of individuals that have been suspended without pay?
A We keep a record of when they are suspended without pay. But once they've been reinstated or left the agency, there's no account of that. It goes into the file, so it's an individual file count.
Q Okay. So there would need to be a review of all individuals that have been suspended to determine whether it was with or without pay, and then further review of whether they were charged with a felony while without pay, is that correct?
A There would have to be a review of all cases to see if somebody was suspended, and if they were suspended, were they suspended without pay. If they were suspended without pay, was it for a felony.
Q Okay. So all suspensions. Next layer, without pay. Next layer, felony or not?
A Right. 1,500 cases a year, so do the math of that. It's a lot of cases.



Q How many suspensions are there every year?
A But the case doesn't tag suspension. So you have to look at every case to see if it is a suspension.
Q Like 6,000 cases or so. Okay. Who's Philip Motsay?
A He's the -- he was a legal attorney in solicitor's office assigned to BPD.
Q Was he one of the individuals you said the department has representation during these hearings? Is he one of the individuals that represents the department in these hearings?
A That is correct.
Q Is he still with, if you know, is he still with the City Solicitor's Office?
A He is not.
Q He is not.
Okay. I want to mark Number 9.
(Nadeau Deposition Exhibit No. 9 was marked for identification.)



BY MR. TURIELLO:
Q If you could please review Exhibit 9, sir. And after you review it, tell me if you recognize the document. And if so, what you recognize it to be.
A Yes. It is a BPD Form 344 and 154.
Q Okay. So this has -- says at the top, From Lieutenant Daniel Popp, is that correct?
A That is what the form says.
Q That's what the form says. It references my client, Jeffrey Lilly, and his sequence number, date of birth, et cetera, et cetera, is that correct?
A It does not have -- oh, it does have his date of birth. That is correct.
Q Okay. And at the top of this document, this is page one of the document, Daniel Popp's name, assignments, and signature appears, as well as a date of April 27, 2022, is that correct?
A That is correct.
Q Are those fields entered manually, or is



MAGNA LEGAL SERVICES

this a form that's pulled up and I guess are any of these fields autopopulated, do you know?
A What was the last part?
Q Are any of the fields on the form autopopulated?
A The fields are manually entered.
Q Okay. So there's nothing on here that is a computer error inasmuch as it autopopulated a field and then that was wrong, someone physically typed this stuff in?
MR. SCHUBERT: I'll object. You may answer.
A Yeah. Yes, if they pulled the new form out of forms. If they used an old form and just reentered the information on it, that is possible. It could be an error on it. But if they pulled it out of new forms, it would be blank. And just so you know, this bottom section is MPTC form, not BP.
BY MR. TURIELLO:
Q What is MPTC form?
A Maryland Police Training Commission.



Q Okay. So it's possible that there's a mistake, but the mistake is not one from a technology standpoint, this would be user error mistake is what you're saying?
A You are correct.
Q In absence of user error, we can deduce that Daniel Popp wrote this as he intended?
A That's correct.
Q Okay. On page two of the document, there's a signature from my client, Jeffrey Lilly, with a sequence number H642 and date of 4-27-22, correct?
A That is correct.
Q What does that indicate to you?
A That he signed it on 4-27-2022.
Q So of course he had to be presented with it to have signed it, right?
A That's correct.
Q Part one of that document, there's a notation that says suspension hearing scheduled Wednesday, May 4th, 2022, right?



A That is correct.
Q It's April 27, so we are able to deduce the suspension hearing had not yet happened?
A On 4-27, that is correct.
Q And he was suspended without pay on April 27th. My question to you is, why would Daniel Popp make a determination to suspend my client without pay prior to his hearing?
A That would be a question for Daniel Popp.
Q As someone in his chain of command, being confronted with this, do you believe that that was a violation of policy?
MR. SCHUBERT: I'll object. You can answer.
A I do not.
BY MR. TURIELLO:
Q You do not feel like it's a violation of policy?
A That is correct.
Q Why not?
A Well, because this is not a policy. This



is a form.
Q Okay. Well, I'll proffer to you that my client was suspended without pay effective April 27th. So assuming I'm right; I could be wrong and the record will bear that out. If his powers had yet -- if he had yet -- if his hearing had not yet happened, why is it not a violation that he was suspended without pay prior to his hearing?
MR. SCHUBERT: Objection. Form. You can answer.
A Because whenever anybody is suspended with or without pay, their suspending would become aware of the situation, that's when they get suspended. And this form, I see you pointed this out, this is on the form. This is not the process that BP uses.
BY MR. TURIELLO:
Q So the form -- so this is not an official determination that he's suspended without pay, is that your testimony?
A Yeah. This is. This is the form that goes down. This is telling him you're suspended



MAGNA LEGAL SERVICES

without pay. This is the one that goes to BPD to tell MPTC that you're suspended.

Q Okay. So but the department told Jeffrey Lilly you're suspended without pay and you have not had your hearing?

A That is correct.

Q And that is a violation of policy under 344, correct?

MR. SCHUBERT: Objection. Form. You can answer.

A I don't see it in Form 344.

BY MR. TURIELLO:

Q Does it seem to be contrary to the instructions on the form?

A This is a policy. This is a form. I don't see it in the policy. Therefore, it can't be a violation of the policy because it's not in the policy.

Q Okay. So he just didn't follow the instructions on the form, is that it? That's not policy?



A We don't use that instruction, so he did what we do with every other case in every other situation in every other person that is in the same situation.

Q So in every other case in every other situation where someone is accused of a crime, without having a hearing or a chance to discuss the validity of that complaint or having a hearing officer being in a position to evaluate whether or not it is, in fact, the right thing to do to suspend someone without pay, BPD just suspends someone without pay, is that it?

MR. SCHUBERT: Objection. Form. There was a lot in there.

A Actually you mischaracterized what I said.

BY MR. TURIELLO:

Q Please correct me.

A You said in every other case when somebody commits a crime. No, it's a felony. It's not a crime. It's a felony. So under the statute LEOBR, which is publicly available, under LEOBR, it says if



you commit -- charged with a felony, you may be suspended without pay.

Q But may is not may, it's everyone charged with a felony is suspended without pay, correct?

MR. SCHUBERT: Objection.

A Was that a question, or is that a statement?

BY MR. TURIELLO:

Q I'm asking. Is that what the practice of the department is?

A Practice of the department is everybody who is suspended for a felony is suspended without pay.

Q So I have to ask. What's the purpose of the hearing if everyone who is charged with a felony is summarily suspended without pay?

MR. SCHUBERT: Objection. You can answer.

A Great question. So the purpose of the hearing is to be able to come in and produce information. For instance, I was charged with a felony, but it was just dismissed in court this



morning. Can I have my police powers back and my pay? Yes, you may get your police powers back and your pay.

Or, I was charged with a domestic assault and I had a firearm, so they charged me with a felony, but I went to court this morning and the judge threw it out of court. You get your police powers back, you get your pay back.

There are abilities to come in and explain what has happened since the event that brings light to the fact that you shouldn't be suspended.

BY MR. TURIELLO:

Q Couldn't you just review court records for that?

A So you could review the court records, but somebody has to bring that to your attention, because the case, although it's been filed, hasn't been investigated by PIB yet. And again, I'll go back to the 1,500 cases we have. We don't sit and go through the court filings on Maryland Case Search



MAGNA LEGAL SERVICES

on a daily basis to find out what's going on with the case.

If something happens with a case, respondents, normally through their attorney, contact us and say, hey, the case just got dismissed, we have dismissal paperwork, can we get the police powers back. And we review the case -- we review it, we show it to legal, everybody concurs and they get their police powers back .

Q How many people attend these hearings?

A How many people?

Q Yeah. Who's present at these hearings? There's a hearing officer obviously?

A As I said before, legal, the defendant, the respondent, hearing officer, and if they bring their sergeant or lieutenant or whoever.

Q Okay. Are investigators for PIB or command at the suspension hearings?

A So sometimes they're there to present the -- what we know so far to the hearing officer, if that's necessary.



Q So let's just say one person might be there, right? Wouldn't a more efficient process, if the determination is just going to be if there's an active felony, you're going to be suspended, to do a record search, doesn't that take less time than convening a hearing, having people show up, renting a space, taking time? Isn't that a less efficient process?

MR. SCHUBERT: Objection. Form. You can answer if --

A Because, again, you, like a lot of people, focus on one situation. What you have to do is look at the many different situations that happen in the process of people being suspended. So those come in very -- situations with very different information, so they're not always that easy. Sometimes they're harder. Just like when his case was dismissed, he was immediately reinstated. That is the process.

BY MR. TURIELLO:

Q Okay. And if it just so happens that the charges that are levied are completely bogus and



objectively ridiculous, but the legal process takes a year to get -- to run its course, everybody is okay with an officer just not having pay or benefits?

MR. SCHUBERT: Objection. Form. You can answer.

A Just follow the law and the process that we have in place for everybody. We don't go outside the process for anybody.

BY MR. TURIELLO:

Q Do you think in the future that these hearings will be treated as hearings and folks will be able to make a determination based on evidence presented about whether or not being suspended with[sic] pay is actually warranted?

MR. SCHUBERT: Objection. Form. You can answer.

A There's actually no legal requirement to have a hearing. So the answer to your question would be no. Because even the legislature didn't think it was appropriate.



BY MR. TURIELLO:

Q So we're just going to keep going down that path. Legislature has authorized that. Okay. So I want to go back to --

A Is there an error on this form?

MR. SCHUBERT: You're doing great. We'll let Mr. Turiello ask you any questions that he needs to.

BY MR. TURIELLO:

Q Lieutenant Popp, Captain Popp, who was then a lieutenant, testified that -- actually, no. He did not testify to that. Delphine Smith testified that she appeared before court commissioner and filed forgery charges against Jeffrey Lilly after a conversation she had with Daniel Popp, wherein he brought to her attention that this might be a forgery.

My question to you is, if Daniel Popp thought that a crime had been committed, was it not his responsibility to bring that information to the appropriate agency or authority, such as state's



MAGNA LEGAL SERVICES

Page 230

attorney's office?
A I have no idea what Daniel Popp thought.
Q What do you think?
A Well, I don't know what information he had that he allegedly said that. I don't know.
Q I'll proffer that he said that. Do you think it's appropriate that he made contact with complainant instead of reaching out to law enforcement agency like -- or prosecuting agency like the state's attorney's office to investigate whether or not a crime has actually occurred?
MR. CRAIG: Objection. Form.
MR. SCHUBERT: Objection. Form. You can answer.
A I would have to know the facts of what he knew at the time. A forgery can come in many forms. So I would have to know the facts at the time to give you an answer to that.
BY MR. TURIELLO:
Q Okay. All right. That's fine. Who is Ken Thompson?

Page 231

A Ken Thompson is the leading monitor for the consent decree.
Q What are his responsibilities?
A To oversee the monitors for the consent decree.
Q What do the monitors for the consent decree do?
MR. SCHUBERT: I'll object. You can answer.
A We discussed that this morning. They're experts in the law enforcement field to give guidance to the Baltimore Police Department on the proper way to do investigations, write policies, transform the department, et cetera.
BY MR. TURIELLO:
Q How often are members of the monitoring team assigned to oversee an investigation?
MR. SCHUBERT: Objection. You can answer.
A I don't understand the question.
BY MR. TURIELLO:
Q Sure. How often are members of the

Page 232

monitoring team assigned to oversee an investigation in PIB?
A Zero.
Q Well, Police Commissioner Harrison assigned Ken Thompson from the monitoring team to oversee these investigations in January based on this memo.
MR. SCHUBERT: I'll object. You can answer. I think that's a mischaracterization.
A Does it say that?
MR. TURIELLO: Additionally, in the interest of transparency and fairness, Mr. Ken Thompson, a monitoring team member, is assigned to these cases to monitor the investigative process and ensure transparency and fairness throughout the process. Where I did mischaracterize?
MR. SCHUBERT: I don't think it says anything in here that Ken Thompson was specifically assigned to investigate this specific incident.

Page 233

MR. TURIELLO: Additionally, in the interest of transparency and fairness, Mr. Ken Thompson, a monitoring team member, is assigned to these cases to monitor the investigative process and ensure transparency and fairness throughout. The cases are referenced in the subject, 20220347 and 20220156.
Again, where did I mischaracterize?
MR. SCHUBERT: Same objection. You can answer. The objection has been stated.
A I would have to direct you to Commissioner Harrison. I didn't draft the document.
BY MR. TURIELLO:
Q Okay. You didn't write the document. You are aware obviously of the investigative process in PIB. Is it typical for a monitoring team member to be assigned to specific investigations?
MR. SCHUBERT: Objection. Form. Asked and answered.
A I don't believe that's what that says.
MR. TURIELLO: Okay. Okay. What time do


MAGNA LEGAL SERVICES

Page 234

we have?
MR. SCHUBERT: 3:43.
MR. TURIELLO: I have about five minutes of questions. I want to take a five-minute break. We should be on schedule to -- obviously subject to the questions you have.
THE VIDEOGRAPHER: Time now is 3:46. Off the record.
(A recess was held.)
THE VIDEOGRAPHER: Time now is 3:57. We are back on the record.
MR. TURIELLO: I have no further questions for this witness.
MR. SCHUBERT: Okay, I have a couple.
EXAMINATION BY MR. SCHUBERT:
Q Sir, I just want to pivot back to your meeting with Jeff Lilly on February 8th, 2022. You've testified a couple times that you told Jeff that it was, quote, a civil matter and that he should handle it with his attorney, is that fair?
A That is fair.

Page 235

Q What were you attempting to convey to Jeff when you said that?
A Well, I mean, he's a police officer, so he knows the difference between criminal and civil, so he would realize that a dog dispute is a civil process and not a criminal process. It's not like he was walking down the street and somebody snatched the dog. Right? It's a civil process. He would understand that. And by him going to again an attorney, going through the civil, it would be handled civilly, and it wouldn't be criminally.
And the fact that he has called Baltimore County Police to go to the house claiming that they had taken his dogs, that he would know that's a civil process, and that he should go through the civil process and handle it that way. At the same time, let the Blue family go through their grieving process, because they were -- in the time they were planning a funeral.
Q All right. And Exhibit 9, this is the suspension paperwork is what I'll just call it.

Page 236

A Yes.
Q You are aware at some point that Jeffrey Lilly was charged with a felony in Baltimore County?
A I am aware of that.
Q That actually -- I'll proffer the date was April 25th, 2022. Does that sound about right?
A The date of what?
Q The filing of the criminal charge.
A Yes.
Q Okay. And that is what this suspension paperwork was borne out of, is that correct?
A That is correct.
Q And are you aware that at some point Jeffrey Lilly did come off of suspension without pay?
A I am.
Q And what do you recall about that, if anything?
A I recall Major Callahan advising me that they dropped the charges, and he was unsuspending him. And then I received at some point a call from

Page 237

fiscal asking about doing his back pay, if I would authorize it, and I authorized it.
Q You authorized what?
A The back pay.
Q Okay. Do you know what happened?
A I do not.
Q And last, counsel asked you about multiple questions surrounding various events and conversations in the case, correct?
A That's correct.
Q Is it correct to say that you're testifying today based on your present recollection to your -- to the best of your abilities?
A That is correct.
Q And by example, number six was a, I'll call it a letter to Exhibit 6. A letter which you were cc'd on. Is it your testimony that you just don't have a recollection of receiving this in reading it at the time?
A Yeah. It doesn't look familiar to me at all.


MAGNA LEGAL SERVICES

Page 238

Q But it's possible you did receive it; you just can't recall receiving it?
A That is true.
MR. SCHUBERT: Okay. That's all I have.
MR. CRAIG: Nothing.
MR. SCHUBERT: We'll read and sign.
THE VIDEOGRAPHER: Time now is four o'clock. This deposition has concluded.
MR. TURIELLO: Thank you. I'll take a PDF and mini.
MR. SCHUBERT: We want a copy of the full, regular delivery.
(Deposition was concluded at 4:00 p.m.)

Page 239

STATE OF MARYLAND
COUNTY OF CARROLL

I, Laurie Baker, a Notary Public of the State of Maryland, County of Carroll, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been first duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor an employee of counsel, nor related to any of the parties, nor in any way interested in the outcome of the action.

As witness my hand and seal this 1st day of November 2024.

____________________

LAURIE BAKER

My Commission Expires 09-01-26

Page 240

WITNESS CERTIFICATION

I, Brian Nadeau, hereby certify that I have read the foregoing transcript of my deposition taken in the aforementioned case on October 22, 2024.

I further certify that the transcript is a true and correct transcription of the deposition with the addition of the errata sheet, which is hereby made a part of the deposition.

Dated this day of , 2024.

____________________

Brian Nadeau

Page 241

ERRATA AND SIGNATURE SHEET

I, Brian Nadeau, have read the foregoing deposition and verify the same to be stenographically accurate with the exception of the following changes (if any):

PAGE LINE READS SHOULD READ

( ) No corrections

__________ ________________

Date Brian Nadeau



MAGNA LEGAL SERVICES