IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| JEFFREY LILLY, *et al.,* | |
| Plaintiffs, | |
| vs. | C.A. No.: 1:22-cv-02752-BAH |
| BALTIMORE POLICE DEPARTMENT, *et al.,* | |
| Defendants | |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Lakeshia Blue, Delphine Smith and Robert Smith (collectively "Defendants" or "Smith Family" or "Smith Defendants"), in their Motion for Summary Judgment, argue not only the existence of undisputed facts but that the weight of these facts foreclose any plausible entitlement to recovery the Plaintiffs may have in this case. Central to their argument is the *theory* that the Defendants did not and could not have known that a contract existed between the Plaintiffs and James Blue. The evidence in this case demonstrates that the Smith Family absolutely knew an underlying contract existed, they refused to recognize the Plaintiffs' contractual rights, retaliated against the Plaintiffs when they sought legal recourse, and utilized powerful connections to ruin Plaintiff Jeffrey Lilly's career and reputation. *And they sold the dogs.* As detailed below, genuine issues of material fact exist on each of Plaintiffs' claims, rendering summary judgment inappropriate.

## STANDARD OF REVIEW

In their Amended Complaint, Plaintiffs present multiple claims against the Smith Defendants. Count Three of the Amended Complaint (Civil Conspiracy – Tortious Interference

1

with a Contract) alleges that Robert and Delphine Smith "entered into an agreement with one another to pressure and intimidate Plaintiffs Jeffrey Lilly and Raquel Lilly in order to force them to abandon their legal efforts to reclaim their property, thus tortiously interfering with the contract between James Blue and the Plaintiffs." <u>See</u> Amended Complt.  Count Four of the Amended Complaint (Civil Conspiracy – Abuse of Process) alleges another conspiracy by Defendants Robert and Delphine Smith.  Specifically, by filing blatantly false criminal charges against Jeffrey Lilly in Baltimore County, the Plaintiffs allege that Robert and Delphine Smith "entered into an agreement to file false charges that the Plaintiff Jeffrey Lilly had forged a document which the Defendants knew to be a valid contract." <u>Id</u>.

Count Five of the Amended Complaint (Conversion) alleges that the Smith Defendants relocated the litter of puppies without the Plaintiffs' consent and refused to relinquish possession of the puppies to the Plaintiffs.  <u>See</u> Cmplt.  Discovery has established that the Smith Defendants, who all stated they understood the dispute to be a 'civil matter,' ignored the Plaintiffs' efforts to pursue civil remedies, used powerful connections to pressure the Plaintiffs to abandon their claims to the puppies, sold the puppies despite being aware of the Plaintiffs' ownership interest, kept the proceeds of the sale to themselves, and then filed a false internal affairs complaint and a false criminal charge against Plaintiff Jeffrey Lilly.  <u>Id</u>.

Count Six of the Amended Complaint alleges that Robert and Delphine Smith tortiously interfered with the Plaintiffs' contractual rights because they knew of the existence of the contract between James Blue and the Plaintiffs and, notwithstanding the contract, "intentionally, and in bad faith, disrupted, obstructed, and harmed the contractual relationship." <u>Id</u>.

Count Eight of the Amended Complaint alleges that Robert and Delphine Smith each intentionally inflicted emotional distress on the Plaintiffs.  <u>Id</u>.  The undisputed evidence

establishes that both Robert and Delphine Smith, as former high-ranking Baltimore Police Department officials, fully understood the consequences a false allegation of forgery would trigger for Plaintiff Jeffrey Lilly, his career, his family, and his financial stability. Despite this knowledge and with the knowledge that the allegations they were making against Jeffrey Lilly were patently false and unsupported, the Defendants pursued the false allegations. They pursued the false allegations through personal and family connections within BPD's Public Integrity Bureau - the division responsible for discipling officers. In doings so, their actions "were intentional, willful, abusive, with actual malice, and were outrageous and extreme." Id.

Count Ten of the Amended Complaint (Abuse of Process) alleges that "Defendant Delphine Smith initiated criminal legal proceedings against the Plaintiff Jeffrey Lilly when she swore out a charge of forgery which she knew to be false. Id. The Defendant did this with an improper purpose or motive underlying the use of process, namely, to damage the Plaintiff's career and intimidate him into stopping his attempts to enforce a valid contract and retrieve his property." Id. The patently false statements contained in the charges sworn to by Delphine Smith, the timing of when she took out those charges, and her improper communications with the members of PIB investigating the open complaint against Jeffrey Lilly all demonstrate her malicious and improper intent.

Count Eleven of the Amended Complaint alleges that Delphine Smith "made a false and defamatory statement concerning the Plaintiff Jeffrey Lilly when she knowingly falsely accused him of the crime of forgery." Id. Evidence produced in discovery and deposition testimony from Delphine Smith clearly establishes that the sworn statements she submitted to a Court Commissioner were objectively false and misleading, she knew of their falsity when she was making the statements, and she did so with the purpose of injuring Jeffrey Lilly.

Summary judgement is only appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. In the present case, the record evidence establishing the Smith Defendants' concerted actions to harm the Plaintiffs and deprive them of their contractual rights is overwhelming. Accordingly, summary judgment is inappropriate.

## STATEMENT OF FACTS

### A. Background

Plaintiff Raquel Lilly is the niece of Defendants Robert and Delphine Smith and the cousin of Defendant Lakeshia Blue. Robert and Delphine Smith played an integral role in raising Raquel Lilly who grew up with Lakeshia Blue and for extended periods of her life lived with the Smiths. Robert and Delphine Smith met while working for the Baltimore Police Department and both had a long and successful career with BPD. Robert Smith worked twenty-eight (28) years for BPD and retired at the rank of Colonel. Delphine Smith worked for BPD for thirty (30) years and retired at the rank of Lieutenant. At least three of Robert and Delphine Smith's children followed in their parents' footsteps and pursued a career in law enforcement, all working for BPD. Lakeshia Blue began working for BPD on June 16, 1997. Collectively, the Smith Defendants have more than eighty (80) combined years of law enforcement experience with BPD. Raquel Lilly also followed in the footsteps of her aunt and uncle and became a sworn BPD officer, eventually resigning from Internal Affairs as a Detective. By all accounts the

Smith Family was a close-knit police family with Robert and Delphine Smith serving as the patriarch and matriarch, respectively.

While Jeffrey Lilly was working as a Detective with BPD, he and his wife decided to create a side business breeding French Bulldogs.  The idea of the business was born out of tragedy, following the death of several members of Jeffrey Lilly's family who died in a tornado in Alabama.  Determined to make something positive from devastating loss, Jeffrey and Raquel Lilly decided to invest insurance proceeds into their new business venture, Twisted Roots Kennels ("TRK").  By 2021, the Lilly's vision was becoming reality – they had several dogs each carefully selected based on genetic traits and physical attributes, numerous kennels and whelping stations at their home which were custom built at considerable expense, and they were building a social media presence and a rolodex of celebrity and high net worth clientele.  French Bulldog puppies with the characteristics TRK was selectively breeding for routinely sold for $10,000 to $15,000.  Although they were still only hobby breeders, they were actively planning to incorporate their business and expand their breeding activities.

B. <u>Important Events</u>

On October 18, 2020, James Blue, Jeffery Lilly and Raquel Lilly entered into a business partnership.  Through this partnership, the Lilly's agreed to sell a French Bulldog ('Blue's Frenchie' who later became Rain) to James Blue.  As evidence of this transaction on October 18, 2020, James Blue was provided with a Puppy Purchase Agreement, an Official Registration Certificate, and a partially executed Transfer of Ownership document to be completed by James Blue as the purchaser of the dog, collectively <u>Plaintiffs' Exhibit 1</u>.  Underscoring Defendant Lakeshia Blue's knowledge of the business relationship, these documents were emailed to both James Blue and Lakeshia Blue on October 20, 2020.  <u>Plaintiffs' Exhibit 2</u>.

5

The business partnership was not merely to sell a dog to James Blue, but also to breed that dog. This is reflected in multiple ways. First, page three of the Puppy Purchase Agreement explicitly states that the requirement that the puppy be spayed or neutered by the age of six months 'Does NOT Apply to this Buyer." Pl. Ex. 1 at p. 3. Second, page four of the Puppy Purchase Agreement explicitly references, in bold, a second agreement: "*FYI – See Limited Partnership Agreement for James Blue & Twisted Roots Kennels."[1] Id. at p. 4. Third, there is a Limited Partnership Agreement ("LPA") dated October 12, 2020 and DocuSigned by James Blue on October 18, 2020. Plaintiffs' Exhibit 3. The LPA provided for the purchase of one female French Bulldog (Blue's Frenchie later renamed to Rain) and exclusive breeding rights with TRK for a period of two years. The Agreement further provided that the puppies would be sold by TRK and that James Blue was entitled to receive 60% *of the proceeds* from the sales of puppies following TRK receiving the pick of the litter. Id. The very same day that James Blue DocuSigned the Agreement (October 18, 2020), Raquel Lilly emailed him a copy of the executed LPA. Plaintiffs' Exhibit 4.

In the summer of 2021, James Blue and TRK purchased another French Bulldog puppy as a business investment with the intention of breeding the dog. See Plaintiffs' Exhibit 5. The dog (Storm) was purchased for $10,000.00 and the cost was split by James Blue and the Lillys. At her deposition, Defendant Lakeshia Blue testified that she did not approve of her husband spending $5,000.00 on this dog but he explained to her "[he] and Jeff were going to split the cost of Storm and they were going to breed her." Plaintiffs' Exhibit 6, p. 114-115.

---

[1] As will be discussed infra, the Smith Defendants conveniently excluded this page of the Agreement from documentation they provided to BPD and the Baltimore County Court Commissioner. A reasonable jury could conclude that the decision to provide an incomplete document is evidence of their knowledge of the complete document and their intent to conceal or misrepresent the document.

On December 22, 2021, Blue's Frenchie (now known as Rain) gave birth to five puppies. James Blue came up with 'ridiculous' names for them: Kim Kardashian, Kanye, Lottie Dottie, Big Booty Judy, and Bandito.  Id. at 116.  James Blue, Lakeshia Blue, Jeffrey Lilly and Raquel Lilly were in constant communication following the birth of the puppies.  They exchanged photos and Jeffrey Lilly was present at the Blue household daily, teaching James Blue how to care for the puppies.  See Plaintiffs' Exhibit 7, Text messages between Lakeshia Blue and Raquel Lilly; See also Plaintiffs' Exhibit 8, Text messages between Lakeshia Blue and Jeffrey Lilly.

On January 25, 2022, James Blue was tragically murdered.  In the immediate aftermath of this tragedy the Lillys continued to care for the dogs at the Blue household and had multiple conversations with the Smith Family about caring for the puppies going forward.  See eg. Plaintiffs' Exhibit 9, see also, Plaintiffs' Exhibit 10.

By January 27, 2022, the Lillys discovered that the Smiths were reluctant to hand over the puppies to their rightful owners.  At her deposition on October 24, 2024, Defendant Lakeshia Blue explained "The dogs were never going anywhere."  See Pl. Ex. 6, p. 129.

On January 27, 2022, the Lillys arranged to go to the Blue household to pick up the puppies and bring them home.  After making these arrangements, Jeffrey Lilly received a text message from Jadan Blue, the son of Lakeshia and James Blue.  Pl. Ex. 10.  In that message, Jadan stated "Bro don't come at 1…imma call u back at 12:30…just give me some time to work with my family because they aren't being responsive or very understanding of what you and my father had going on but we going to get this done right just gimme some more time to work on them."  Id.  Concerned by the Smith Family's lack of understanding, Jeffrey Lilly texted the

signed Limited Partnership Agreement to Jadan and stated "My stuff is legit bro."  Jadan Blue immediately responded "My man.  I already know."  <u>Id</u>.

 The Smith Family did not allow the Lillys to retrieve the puppies on January 27, 2022. At 7:27 that evening, Jeffrey Lilly sent the signed Limited Partnership Agreement to Defendants Robert Smith and Lakeshia Blue stating, "This is what I sent to Jadan.  So that everyone is on the same page."  See <u>Plaintiffs' Exhibit 11</u>.

 On January 27, 2022, while the Lillys were trying to retrieve the puppies, the Smith Defendants reached an agreement to move all of the puppies to the home of Robert and Delphine Smith.  See <u>Plaintiffs' Exhibit 12</u>, p. 65.

 On January 30, 2022, at 9:16 AM, Raquel Lilly responded to the text message sent by Jeffrey Lilly on January 27th at 7:27 and informed the Smith Family that they would be picking up all of the puppies later that day.  Raquel Lilly further explained "We are not able to be flexible with this decision nor able to allow the puppies to be out of our care and physical oversight any longer.  We're also understanding of the relationship that Keshia and Blue's kids have established with Storm. And even though Storm is owned by our kennel, we don't want to add any additional grief to the kids.  So, Storm can be theirs forever. Which in relation to our business, is a huge loss for us.  But a loss we don't mind taking; in light of the unexpected and devastating circumstances."  See <u>Plaintiffs' Exhibit 13</u>.  Raquel Lilly went on to reference the contract as well as the hope that the matter could be resolved without further escalation or legal process, stating "Though we all know that the contract that was shared between Blue and us plainly describes both parties intentions and scope of business, we want to move forward with what's morally "right" in ourselves.  We believe that this is beyond fair and totally sensitive to

resolving this matter. We ask that you respect our communication of decision; so there is no need for us to have to escalate the matter and seek legal resolve." Id.

When the Plaintiffs were unable to retrieve their property from the Smith household, they contacted the Baltimore County Police Department ("BCPD") and requested that BCPD perform a welfare check on their dogs/property. See Plaintiffs' Exhibit 14. Contrary to the representations made by the Defendants in this underlying motion that Plaintiff Jeffrey Lilly filed a complaint against the Smiths or somehow made false statements, the police report itself demonstrates that the Plaintiffs went to the police regarding a civil dispute and that they were not reporting a crime. With more than eighty (80) years of combined law enforcement experience, the Smith Defendants also understood that Jeffrey Lilly was not the author of the police report.

Despite the fact that the Plaintiffs implored the Smith Defendants to comply with the contract so that there would be no need to seek legal action and despite the fact that the Smiths repeatedly ignored the Plaintiffs' requests – the Smith Defendants were extremely angered by the fact that the police came to their house. At his deposition on October 2, 2024, Robert Smith testified that the police activity at his house was embarrassing and "it just ignited things in my household when it came to this matter....it was a toxic time." See Plaintiffs' Exhibit 15.

Shortly thereafter, an angry Robert Smith messaged his friend and former colleague, Deputy Commissioner Sheree Briscoe asking her to interfere in the matter and speak with Jeffrey Lilly. See Plaintiffs' Exhibit 16.[2] Robert Smith testified further that he contacted Deputy Commissioner Briscoe because he knew Jeffrey Lilly fell under her chain of command and after contacting her he expected "it would be taken care of." Pl. Ex. 15, at p. 162.

---

[2] At their depositions, Robert and Delphine Smith each testified that the document included in Plaintiffs' Exhibit 16 was the text of the text message sent to Deputy Commissioner Briscoe and that they emailed it to themselves on March 13, 2022, before filing a PIB complaint against Jeffrey Lilly.

In response to Retired Colonel Robert Smith's request, both Lt. Colonel Jack Herzog and Deputy Commissioner Sheree Briscoe spoke with Jeffrey Lilly and told him to stop going after his dogs and to leave the Smiths alone. Deeply disturbed by the fact that high ranking BPD officials were interfering in a family matter having nothing to do with her husband's job and intimidating him at the request of her powerful police family, on February 2, 2022, Raquel Lilly contacted PIB and filed a complaint alleging that high-ranking police officials improperly intimidated her husband about a matter having nothing to do with his job. See Plaintiffs' Exhibit 17. The PIB Complaint also named Lakeshia Blue who was then a Lieutenant in PIB.

On February 7, 2022, Raquel Lilly contacted the Baltimore County Police Department requesting a welfare check on the puppies because her family was refusing her access to them. Plaintiffs' Exhibit 18. Defendant Lakeisha Blue complained to her boss, Deputy Commissioner Nadeau, about this incident and asked him for help. Plaintiffs' Exhibit 19, at p. 181.

Between February 2nd and February 8th, Jeffrey Lilly was pulled into multiple meetings with BPD officials, culminating with a February 8, 2022, meeting with Deputy Commissioner Brian Nadeau in which Nadeau instructed Jeffrey Lilly to leave the Smith Family alone and forget about his property before something bad happened to him. At this meeting, Nadeau told Jeffrey Lilly the dispute about his dogs was a civil matter: "And he brought up his dogs. And I said, well, your dogs is a civil issue that you need to take up with an attorney." Id. at p. 179.

Frightened and demoralized from the threatening conversation with Deputy Commissioner Nadeau, the Plaintiffs ceased all communication with the Smith Defendants and halted their personal efforts to retrieve their property. See Pl. Ex. 12, pps. 34-37. At his deposition, Robert Smith could not recall a single interaction occurring after February 7th. Pl. Ex. 15, at p. 164.

10

On February 19, 2022, James Blue was laid to rest.  Shortly thereafter, Jadan Blue returned to school at Virginia Tech.  Lakeisha Blue and the remaining puppies were still living at the home of Robert and Delphine Smith.  Also during this time, colleagues and friends from BPD continuously visited the Smith Family including Deputy Commissioner Nadeau, Captain Lamont Howard, Tony Faulk, Joe Poremski, William Nave, Adam Lattanzi, Sharisse Smith, Brian Frazier, Jerry McLarin and several other colleagues from the Public Integrity Bureau.  See Pl. Ex. 6, at 136-137.

The Lillys were correct to be concerned about their property.  By February 16, 2022, when the puppies were eight weeks old, the Smith Defendants began selling them.  Big Booty Judy was sold for $5,000 when she was eight weeks old.  Id. at p. 121-122.  Kanye went to Virgina Tech with Jadan Blue and was sold for $2,500.  Id. at 117-118.  Bandito was sold for $4,000 at eight weeks old.  Id. at 123.  On March 11, 2022, Lakeshia Blue sold Lottie Dottie to her mother for $5,000.  Id. at 118; Pl. Ex. 12 at 93.  Lakeshia Blue kept Kim Kardashian and renamed her Hailey.  Pl. Ex. 6 at 116-117.  By the end of February, three of the puppies had been sold and only two of them, both of whom were spoken for at this point, remained at the Smith home.

The Smith Family received letters dated March 8, 2022, from lawyers representing Twisted Roots Kennels and seeking the return of the five puppies and one adult French Bulldog (Storm) to their lawful owners.  A copy of the letter sent to Delphine Smith is attached as Plaintiffs' Exhibit 20.  At this time the Smith Defendants could not return the puppies because many had already been sold.  Unable to comply with the legal demand for the return of the puppies and angry with the Plaintiffs for pursuing their contractual rights, Robert and Delphine Smith decided to file a police misconduct complaint against Jeffrey Lilly.  See Pl. Ex. 12, pgs

102-103; see also Pl. Ex. 15 at 167. Jerry McLarin, who worked in PIB and was frequently at the Smith home around this time, made the appointment for Robert and Delphine Smith to file their complaint. See Pl. Ex. 12 at 103.

On March 14, 2022, Robert and Delphine Smith traveled together to the PIB and filed a complaint against Jeffrey Lilly. The Complaint was assigned case number 2022-0347. A copy of PIB's activity log for Robert and Delphine Smith's complaint is attached as Plaintiffs' Exhibit 21. A summary at the top of page 2 of Pl. Ex. 21 recites the timeline provided by Robert Smith and indicates that he submitted "text message information, Agreement documents, signature pages, police reports and all pertinent documentation." Some of the documents contained in this paperwork were produced by BPD in discovery and are attached hereto as Plaintiffs' Exhibit 22. Among the documents the Smiths brought to PIB are the Limited Partnership Agreement with James Blue's signature, James Blue's email receiving the Limited Partnership Agreement the same day that he signed the document, various examples of James Blue's signature, and the Puppy Purchase Agreement without the 4th page of that document. Id.

Detective Anthony Bowling and [then] Lieutenant Daniel Popp conducted a recorded interview of Robert Smith when he came into PIB to file a complaint against Jeffrey Lilly. See Plaintiffs' Exhibit 23, at p. 14. The interview was recorded. Id. at p. 16. After the interview, Detective Anthony Bowling requested to be recused from the investigation based on Robert Smith's statements that he discussed this matter with several top-ranking officials within BPD and that some of those top-ranking officials, including Deputy Commissioner Brian Nadeau, may need to be investigated because the communications were improper. Plaintiffs' Exhibit 24. The recording of this interview has disappeared and despite repeated requests, BPD has been unable to locate it and produce it in discovery.

Lieutenant Popp did not grant Detective Bowling's request for recusal and was instructed to keep the investigation of Robert and Delphine Smith's complaint in-house.  Plaintiffs' Exhibit 25, at p. 203-204.  Robert Smith and Daniel Popp had an established relationship by the time Robert and Delphine Smith filed a complaint against Jeffrey Lilly.  Daniel Popp worked for Robert Smith as a Lieutenant when Smith was the Major of the Northern District.  Despite his own past relationship with Robert Smith and his current relationship with Lakeshia Blue, Lieutenant Popp continued spearheading the investigation of the Smiths' complaint[3] and improperly provided them with updates against the explicit confidentiality mandates governing PIB investigations.  In an email with the subject line 'Robert Smith' from April 22, 2022, Lt. Popp wrote to his Captain, Lamar Howard "Smitty called me, and wanted an update on the investigation.  I told him I was interviewing Lilly on Tuesday at 1000 hrs." Plaintiffs' Exhibit 27. The clearly familiar and friendly reference to Robert Smith as 'Smitty' also contradicts the sworn testimony of both Robert Smith and Lt. Popp about the nature of their relationship. It was improper for Lt. Popp to share this information. Details of investigations in PIB are strictly confidential, and Daniel Popp confirmed this at his deposition. Pl. Ex. 25, at p. 203.

However, Daniel Popp's collusion with Robert and Delphine Smith did not stop with his sharing of confidential information.  With the internal investigation of the Smiths' complaint stalling, Lieutenant Popp instructed Robert and Delphine Smith to go out to Baltimore County and file criminal charges for forgery against Jeffrey Lilly.  Pl. Ex. 112 at 116-117.  Robert and Delphine did just that, traveling together to the Baltimore County Court Commissioner where Delphine Smith swore out felony criminal charges of forgery against Jeffrey Lilly.  Plaintiffs' Exhibit 28.  Later that evening, at 7:42 PM, Delphine Smith emailed the criminal charges she

---

[3] See Plaintiffs' Exhibit 26, April 12, 2022, email from Lieutenant Popp scheduling interview of Jeffery Lilly regarding PIB complaint 0347.

13

took out against Jeffrey Lilly to Lt. Popp. <u>Plaintiffs' Exhibit 29</u>. Lt. Popp promptly forwarded

the criminal charges against Jeffrey Lilly to everyone in his chain of command - Deputy

Commissioner Nadeau, Major Callaghan, and Captain Howard. <u>Id</u>.

  C. <u>Everyone Knew There Was an Agreement</u>

   There is overwhelming evidence to support the conclusion that the Smith Defendants

knew a contract existed between the Lillys and James Blue. To say otherwise is both illogical

and misleading. According to Robert Smith, "*everybody knew there was a business*. And I

knew it was a business, yes." <u>Pl. Ex. 15</u>, at 145. Consideration of what each of the Defendants

knew about James Blue's business relationship with the Lillys and when they knew it supports a

reasonable and inescapable conclusion that, considering the obvious business relationship, the

actions of the Defendants were malicious, outrageous, concerted and illegal.

   •*Robert Smith's Knowledge*

   Robert Smith has testified that he was well aware of the fact that Jeffrey and Raquel Lilly

had a business, that Jeffrey Lilly and James Blue were working together, "and there was going to

be a litter of puppies." <u>Pl. Ex. 15</u>, p. 131-132. In fact, Robert Smith was interested in being a

part of the business. Robert Smith approached Raquel Lilly about purchasing a French Bulldog

from the Lillys well before the contested litter was born. At this time Robert Smith knew there

was a business breeding French Bulldogs, and he knew the Lillys had a partnership with James

Blue. <u>Id</u>. at 141. On November 14, 2021, Robert Smith asked Raquel Lilly about buying a

French Bulldog. <u>Id</u>. at 140. He was initially offered a puppy, but on November 24, 2021,

Raquel Lilly sent him a message indicating "Jeff and I talked last night and we decided not to

take on anymore partnerships this year." <u>Id</u>. The conversations in November of 2021 were

detailed enough for Robert Smith to become familiar with the Lillys' partnership terms (the very

same ones James Blue agreed to) and to form an opinion about them. At his deposition, Robert

Smith testified "but the numbers didn't – I'm a businessman too, and the numbers didn't make

any sense to me…They might have made sense with James Blue, but the numbers just didn't sit

well with me." Id. at 133. James Blue was also a businessman, and Robert Smith was well

aware of this. As a former hobby breeder himself, Robert Smith understood that raising puppies

was hard work and that James Blue was not partnering with the Lillys for fun, "it was a

business." Id. at 139. It is important to note that Robert and Delphine Smith eventually got their

French Bulldog puppy from the Lillys. They just had to wait a few months longer and conspire

with their daughter to make sure the Lillys never received their property.

•*Delphine Smith's Knowledge*

Delphine Smith also knew of the business relationship between the Lillys and James

Blue. She knew of the relationship before James Blue died – her husband testified that

everybody knew, and she has testified that she was aware the Lillys discussed business terms

with her husband and "the money didn't make sense." Pl. Ex. 12 at 86. Delphine Smith knew

that James Blue had never bred dogs before and agreed that "everybody knew that [the Lillys]

were involved in this breeding process." Id., p. 87-88. She also knew the Lillys and the Blues

(both James and Lakeisha) were in constant communication after the puppies were born, that Jeff

Lilly was frequently over at the house, and that the Lillys were going to sell the dogs because

"they had social media." Id. at 88-89. In fact, at her deposition Delphine Smith agreed that

"nobody disputes that there was an agreement between [the Lillys] and [James Blue] about these

puppies." Id. at 90.

In no uncertain terms, Delphine Smith confirmed her knowledge of the business

relationship between James Blue and the Lillys: "Ma'am, well before – that opportunity, if that's

what we want to call it, presented itself, they helped get that dog pregnant, they advised on how to whelp those dogs, they were marketing the litter, they were participating in the process, they had an established network to benefit the parties, right?  They had an established business that everyone was aware of, right?"  Id. at 91-92.  Delphine Smith replied "Yeah, they had a business."  Id. Both Delphine Smith and Lakeshia Blue testified that Delphine Smith had access to James Blue's email following his death, and was the person orchestrating the sale, keeping the records, and otherwise illegally selling the puppies ("My mother kept all the receipts.  She kept everything because, like I said, I wasn't dealing with any of this."  Pl. Ex. 6, at 122).

•*Lakeshia Blue's Knowledge*

Defendant Lakeshia Blue knew of her husbands' business with the Lillys from its inception – in October of 2020.  Lakeshia Blue was present when her husband signed the LPA and she received TRK t-shirts immediately thereafter.  Plaintiffs' Exhibit 30, p. 196-197.  Lakeshia Blue then received an email with the Puppy Purchase Agreement and registration on October 20, 2020.  Pl. Ex. 2.  Lakeshia Blue couldn't believe her husband was spending $8,500 on a puppy and he explained to her that he was going into business with Jeff and that this was a business investment because they would be breeding the dog.  Pl. Ex. 6 at 101-102.  If this wasn't enough, in the Summer of 2021, James Blue reminded her of the business relationship with the Lillys when he spent $5,000 on a second dog.  Lakeshia Blue thought it was ridiculous, but her husband explained he and Jeff were splitting the dog and they were going to breed it.  Id. at 114-115.

Lakeshia Blue also understood that as part of the agreement between her husband and the Lillys, the Lillys would sell the dogs.  "My understanding was that they said that they had like people waiting to purchase French Bulldogs because it was something that people – it was

trending at the time.  And from my understanding Blue paid the breeder's fee, and they were saying we can sell the puppies for you because we have the clientele." <u>Id</u>. at 112.  Lakeshia Blue didn't like her husbands' business plan but even knew that the puppies would be sold for at least $5,000.  "Because my question to Blue is you're going to sell the dogs for $5,000 to who?  Right?  Who's really paying that kind of money for a puppy?  Right?  Besides you got swindled into doing it, but who?  And then he's like Jeff and them said they had the clientele to do it, and they was going to, you know, I guess, advertise the dogs on their social media page and they would get the pick of the litter.  And I said okay." <u>Id</u>. 112-113.  There is overwhelming evidence that Lakeshia Blue knew of the entire agreement but there is indisputable evidence that she knew the Lillys, at a minimum, would be selling the dogs and getting the pick of the litter.  She prevented all of this from happening.

Further evidence that Lakeshia Blue understood the business relationship and was actually working with the Lillys to market the dogs comes from the text messages and photos she sent to them after the puppies were born.  See <u>Pl. Exs. 7 & 8</u>.

D.  <u>Evidence of the Conspiracy</u>

According to the depositions of Lakeshia Blue and Delphine Smith, the conspiracy to deprive the Lillys of their contractual right to sell the puppies began even before James Blue was murdered.  On January 15, 2022, Lakeshia Blue and Delphine Smith allege that Delphine Smith paid James Blue a $2,000 deposit for one of the puppies.  See <u>Pl. Ex. 6</u> at 120.  The evidence establishes the fact that the Smith Defendants all knew of the business relationship between James Blue and the Lillys, they knew that the Lillys were attempting to enforce their contractual rights to the property, and they sold the dogs anyway.  A reasonable juror could conclude that as

early as January 27th when the Lillys first demanded possession of the puppies, the Smith

Defendants already had a motive to interfere with the contract.

    The evidence also establishes that Robert and Delphine Smith wanted to protect their

daughter in the aftermath of her husband's death.  From the moment the Lillys attempted to

retrieve the puppies, Robert Smith inserted himself and called in favors at BPD to silence Jeffrey

Lilly through threats and coercion.  Lakeshia Blue, a high-ranking police officer in command

staff at PIB testified that she knew a complaint was filed against her by the Lillys.  Id. at 134.

She and her parents, both decorated police veterans, fully understood the importance of

confidentiality to the internal affairs investigative process.  Yet Lieutenant Blue didn't bother to

report this obvious policy violation and claimed at her deposition not to even remember who told

her.  We also know that Robert and Delphine Smith had a direct line of communication with

Lieutenant Popp about their complaint against Jeffery Lilly and that Lt. Popp improperly

conveyed to them confidential information (when Jeffrey Lilly was coming in to be interviewed).

    Furthermore, both Lakeshia Blue and Delphine Smith testified to the fact that Delphine

Smith kept the records for the sale of the puppies and took care of all the paperwork (this

obviously also applies to the conversion claim) – activity which they knew was contrary to the

contractual rights being openly claimed by the Lillys, and activity which they concealed from the

Lillys until the Fall of 2024 when they were required to testify under oath at their depositions.

And at his deposition, as evidence of his consciousness of guilt, Robert Smith lied about what

happened to the dogs.  He was asked "whatever happened to the dogs, to the puppies?"  Pl. Ex.

15 at 178. Defendant Smith answered "Well, you have to – I think they were sold.  All of them

were sold, and I had no – no control over the dogs.  *I didn't know who they was sold to.*  I didn't

have any means of any profit from the sale of the dogs, anything like that, but I could tell you

they were sold." Id.  At the end of his deposition, Defendant Smith clarified that he actually bought one of the dogs!  "And I have one thing to add.  Out of the litter of puppies, me and my wife – I overlooked that – we purchased one puppy from my daughter for $5,000." Id. at 205.

In addition to the Smith Defendants' motive to silence the Lillys and their improper communications about this matter with internal affairs investigators, there is also substantial evidence demonstrating that they acted together and discussed each action taken (certainly Robert and Delphine Smith for the charges beyond conversion) at length before taking steps in furtherance thereof.

• The Smith Defendants decided together to move the puppies to the Smith home and prevent the Lillys from accessing them.  Pl. Ex. 12, at 65.[4]

•The documentation Delphine Smith gave to detectives concerning Jeffrey Lilly came from her daughter, Lakeshia Blue.  Id., at 47 ("I gave them what my daughter gave me."). However, once confronted with the fact that the documentation she gave detectives was conspicuously missing the page that references the Limited Partnership Agreement, Delphine Smith backtracked in order to protect her daughter and indicated that she had the paperwork "because I was taking the dogs back and forth to the vet."  Id. at 51.  This statement in and of itself is suspicious because we now know that many of the dogs had already been sold.

•After receiving a letter from attorneys demanding the return of the puppies, Robert Smith "sat down with my wife, and we talked about it" before deciding to file an internal affairs complaint against Jeffrey Lilly.  Pl. Ex. 15, at 167.  Robert Smith, however, was not fully forthcoming with the events surrounding the decision to file a complaint against Jeff Lilly. When he was asked if he spoke to anybody before walking into PIB he clearly stated "No.  No."

---

[4] The referenced statement of Delphine Smith at her deposition initially states that Lakeshia Blue decided to move the puppies, but then indicates that all Smith Defendants discussed the matter and came to an agreement.

Id.  However, Delphine Smith later testified that Jerry McClarin called his captain at PIB and set up an appointment for Robert and Delphine Smith to make their complaint on March 14th.  Pl. Ex. 12, at 114.

•After working with Jerry McClarin to schedule an appointment to file an internal affairs complaint, Robert and Delphine Smith collected documentation together and traveled together to PIB to file the complaint.

•Robert and Delphine Smith spoke to Lieutenant Popp on April 25, 2022, and then traveled together to the Baltimore County Court Commissioner so that Delphine Smith could swear out criminal forgery charges against Jeffrey Lilly.

•As seasoned law enforcement officers intricately familiar with internal affairs complaint procedures from personal and professional experiences, Robert and Delphine Smith were fully aware that an allegation of forgery would destroy Jeffrey Lilly's career as a detective and as an FBI Task Force Officer.

•After filing the patently false criminal charges against Jeffrey Lilly, the Smith Defendants traveled together to District Court in Baltimore County on June 7, 2022, to testify against Jeffrey Lilly.  Pl. Ex. 6 at 134-135.

•Robert and Delphine Smith traveled together to PIB on September 1, 2022, to give taped statements concerning their complaint against Jeffrey Lilly.

E.  Conversion

As discussed and documented supra, the Smith Defendants acted in concert to deny the Lillys access to their property/puppies, to move the puppies to the Smith home despite the Lilly's lawful efforts to retrieve them, to illegally sell and/or keep the puppies, and to conceal evidence of the sale of the puppies from the Plaintiffs.  Furthermore, when the Lillys employed legal

recourse to retrieve their property, the Smith Defendants embarked on a scorched earth policy consisting of an internal affairs complaint and false criminal charges to discredit the Plaintiffs, punish them for pursuing legal recourse, and prevent them from obtaining their rightful property.

Concerning the *sale of the puppies*, Lakeshia Blue testified that she determined the price for each dog but that her mother documented the sales, kept the paperwork and sold the dogs. Furthermore, Robert and Delphine Smith actually bought one of the dogs themselves! This was all done while the Smith Defendants were undeniably aware of the Lilly's contractual claim to the puppies (even if you assume they were challenging the claim). While everyone acknowledged the dispute was a 'civil matter' and 'encouraged' the Lilly's to pursue legal recourse, the Smith Defendants ignored and refused those efforts and instead worked to conceal their past activity and make the Lillys go away.

### F.  Delphine Smith, a Thirty-Year Police Veteran, Swears out False Criminal Charges Against Jeffrey Lilly

On April 25, 2022, in response to the recommendation of PIB Lieutenant Daniel Popp, Robert and Delphine Smith drove to the Baltimore County Court Commissioner where Delphine Smith swore out criminal felony forgery charges against Jeffrey Lilly. Pl. Ex. 28. In the sworn-out charges, made under penalty of perjury, Delphine Smith makes several patently false, misleading and defamatory statements about Jeffrey Lilly. First, she claims that the document was a forgery because she is familiar with the signature of James Blue, and this could not be his signature. At her deposition, Delphine Smith repeated this justification numerous times. This is simply not true. Not only was Delphine Smith fully aware of the surrounding context establishing an obvious business relationship between James Blue and the Lillys (all of which she failed to mention) but the signatures do look alike.

At his deposition, Jeffrey Lilly testified that James Blue quickly scribbled his signature on Raquel Lilly's cell phone on October 18, 2020, when he docusigned the contract. Plaintiffs' Exhibit 31, at p. 325. A comparison of James Blue's DocuSign signature from October 18, 2020, is very similar to the signature of James Blue from July 22, 2021, which Delphine Smith submitted to detectives.

| James Blue's signature from the docusigned LPA (See Plaintiffs' 3): | James Blue's signature from document submitted by Delphine Smith to BPD Detectives (See Plaintiffs' 22 at 15): |
|---|---|
|  |  |

Delphine Smith also swore that Jeffrey Lilly's intent, when sending the signed contract to the Smith Family, was to "defraud us out of my deceased son in laws puppies." Pl. Ex. 28, 2. However, at her deposition Delphine Smith testified that the only time the Lillys clearly communicated their intent was in Raquel Lillys text message (Pl. Ex. 13). This text message provided no indication that the Lillys intended to 'defraud' the Smith Family and Delphine Smith was unable to articulate any contrary intention that was communicated to her. According to the deposition testimony of Raquel Lilly, her intention all along in retrieving the puppies was to provide Lakeshia Blue and her family with meaningful financial support. Pl. Ex. 30, p. 44-45.

Delphine Smith's sworn charges from April 25th next indicate that "Jeffrey Lilly has been harassing my family continuously" and that "my family and I are in fear and feel threat[end] by Jeffrey Lilly's continued actions." Pl. Ex. 28. These statements are both absurd and false. At her deposition, Delphine Smith admitted that the last contact by the Lillys was seventy-seven

(77) days before she falsely claimed continuous harassment.  Pl. Ex. 12, p. 37.  And the idea that

Delphine Smith and her family were in fear of Jeffrey Lilly is also a complete fabrication. Not

only did she later admit that there was no 'continuous harassment' which was previously the

justification for her alleged fear, but she also testified that Jeffrey Lilly has never threatened her

nor was he known to act violently.  Far from resorting to or threatening any form of violence, the

Lillys attempted to seek legal recourse and retained attorneys to help them achieve a peaceful

resolution.  The absurdity of the Smiths' alleged fear is further underscored by Delphine Smith's

deposition testimony where she stated, "we wasn't planning on going to the court commissioner"

until Lt. Popp told them to do so.  Id. at 117.  It would be impossible for a reasonable juror to

conclude that the Smith Family was actually in fear and that their calculated and false criminal

charges were designed to do anything other than inflict pain on the Plaintiffs.  If they weren't

motivated by fear in pursuing internal affairs and criminal charges against Jeffrey Lilly, what

was their motivation?

    Well, Delphine Smith testified that the motivation was "I wanted Jeff to stop the crap."

Id. at 111.  This statement is equally unsupportable by logic and evidence.  By the time the Smith

Defendants pursued internal affairs charges against Jeffrey Lilly, he had already stopped thirty-

five (35) days prior.  By the time the Smith Defendants pursued criminal charges of forgery

against Jeffrey Lilly, he had already stopped seventy-seven (77) days prior.  The only intervening

actions between the last communication from the Lillys to the Smiths and their abusive use of

process was their purchase (of one) and sale of the [other] puppies and the Lillys efforts to utilize

a lawyer to resolve the conflict.  The Smith Defendants were not motivated by the stated reasons

they have provided.  The actions of the Smith Defendants were riddled with false and misleading

statements.  The actions of the Smith Defendants were performed with the knowledge (and

intent) of the devastating career consequences they would cause for Jeffrey Lilly.  The concerted actions were taken by individuals with more than eighty (80) combined years of law enforcement experience.  Without question these actions could be viewed as "atrocious and utterly intolerable" so as to constitute intentional infliction of emotional distress.  Farasat v. Paulikas, 32 F.Supp.2d 244, 247-48 (D.Md. 1997).  These actions were not taken for a legitimate purpose, they were taken with an improper motive and a false pretense in order to inflict maximum pain on the Plaintiffs.

The actions of the Smith Family caused unbearable pain and injury to the Plaintiffs. Jeffrey Lilly was suspended without pay.  He lost his prestigious assignment with the FBI as a Task Force Officer.  He suffered a heart attack.  Pl. Ex. 31, at 368.  Jeffrey Lilly lost his secondary job and dream retirement job with the Baltimore Ravens.  Id. at 250.  The Plaintiffs upstart business to which they had invested so much time and money to get off the ground shuttered.  On April 25, 2023, Raquel Lilly attempted suicide.  Pl. Ex. 30, at 207.  The Plaintiffs' children couldn't go to college because of the financial pain that was a foreseeable (and intended) consequence of the Smith Defendants.  Id. at 69.

## ARGUMENT

### a.    Evidence exists that the Defendants conspired against the Plaintiffs

"Under Maryland law, civil conspiracy is defined as the 'combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff.'" Marshall v. James B. Nutter & Co., 758 F.3d 537, 541 (4th Cir. 2014) (quoting Hoffman v. Stamper, 385 Md. 1, 867 A.2d 276 (2005)). To prevail, a plaintiff must demonstrate both the agreement itself, and the commission

of an overt act in furtherance of the agreement, which caused the plaintiff actual injury. Id.; see also Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc., 340 Md. 176, 665 A.2d 1038 (1995); Blades of Green, Inc. v. Go Green Lawn & Pest, LLC., 598 F. Supp. 3d 348, 357 (D. Md. 2022).

As extensively documented supra, the Smith Defendants took several discrete acts the stated justifications for which are demonstrably false and misleading. Delphine and Robert Smith were side by side, acting in concert at every abusive step of this retaliatory process. A reasonable juror could conclude that the conspiracy began the moment the Smith Defendants decided to keep the dogs and pressure the Lillys to go away. When their efforts to utilize powerful connections and work back channels within BPD to pressure Jeffery Lilly did not work, they decided to apply more pressure by filing an official internal affairs complaint against him. When line detectives at PIB documented their concerns with investigating the Smiths' complaint and created a paper-trial suggesting that the proper investigation of the complaint would implicate top BPD brass, the investigation stalled. Pl. Ex. 12, at 116-117. Undeterred and determined to punish Jeffery Lilly, the Smith Defendants next abused the criminal justice system to take out false charges against Jeffrey Lilly to inflict maximum pain.

**b.    Evidence exists that the Defendants tortiously interfered with the Plaintiffs contractual rights**

Why were the Smith Defendants determined to inflict maximum pain on Jeffrey (and by extension Raquel) Lilly? One reasonable explanation is because they sold the dogs. They were unable to comply with the Lilly's demand, so they attempted to silence the Plaintiffs and coerce them to go away.

In the State of Maryland there are five elements to the long-recognized claim of tortious interference with a contract. Simply put, in order for a plaintiff to survive summary judgment on a claim of tortious interference with a contract, there must be evidence from which a reasonable

juror could conclude: 1) that a contract existed; 2) the Defendant(s) knew of the contract; 3) the Defendant(s) intentionally interfered with the contract; 4) the contract was breached and/or the Plaintiffs did not receive the benefit of the contract; and 5) the Plaintiffs suffered damage from the breach.  havePOWER, LLC v. Gen. Elec. Co., 183 F. Supp. 2d 779 (D. Md. 2002).

The Defendants have conceded the existence of a contract for purposes of this motion. As discussed supra, there is overwhelming evidence from which a reasonable juror could conclude that the Defendants knew of the contract.  There is overwhelming evidence to support the reasonable conclusion that the Defendants interfered with the contract when they moved the dogs, kept the dogs, sold (some of) the dogs, kept the proceeds from the sale of the dogs, and concealed the sale of the dogs from the Plaintiffs all while the Plaintiffs were trying to enforce the contract.  Lastly, the evidence that the Plaintiffs suffered significant, life altering damages in a variety of ways (each of which would independently establish this element of the claim) is overwhelming.

    **c.**    **Evidence exists that the Defendants engaged in an abuse of process**

The tort of "abuse of process in Maryland can apply to either civil or criminal charges." One Thousand Fleet Ltd. P'ship v. Guerriero, 346 Md. 29, 36, 694 A.2d 952, 955 (1997).  In the present case, Plaintiff Jeffrey Lilly was charged with a felony criminal offense, *and* the false criminal charges were a part of the Defendants' strategy to interfere with the Plaintiffs' contractual rights, prevent them from obtaining their contractual property (be it the puppies or the profits therefrom) and to conceal their illegal actions from the Plaintiffs.  To sustain a cause of action for abuse of process, the plaintiff must prove: first, that the defendant willfully used process after it has issued in a manner not contemplated by law, second, that the defendant acted to satisfy an ulterior motive; and third, that damages resulted from the defendant's perverted use

of process. <u>One Thousand Fleet Ltd. P'ship v. Guerriero</u>, 346 Md. 29, 38, 694 A.2d 952, 956 (1997) (internal citations omitted).

Here, the facts of the case and the reasonable inferences drawn therefrom in the light most favorable to the Plaintiffs demonstrate that the Smith Defendants willfully used process (the felony criminal charges) to have Jeffrey Lilly suspended without pay, to have him lose his prestigious assignment as an FBI Task Force Officer, and to pressure and coerce him to cease his efforts to enforce his contractual rights.  The Smith Defendants were successful in using the process for these ulterior motives and, as discussed supra, Plaintiff Jeffrey Lilly suffered considerable damages as a result therefrom.

Delphine Smith testified that they took out charges against Jeffrey Lilly because they wanted him to stop.  But the facts clearly show this was not her actual motive, because the behavior that she claims to have wanted to stop, had in fact stopped seventy-seven days prior.  Rather than engage in the civil process initiated by the Plaintiffs' attorneys' demand letter, the Smith Defendants instead took out criminal charges for a matter that everyone admitted was a civil dispute.

### d.    Evidence exists that the Defendants committed a conversion

The intentional tort of conversion consists of two elements: "a physical act combined with a certain state of mind."  <u>Arkansas Nursing Home Acquisition, LLC v. CFG Cmty. Bank</u>, 460 F. Supp. 3d 621, 646 (D. Md. 2020) (internal citation omitted).  Here, the Smith Defendants committed multiple physical acts of control over the disputed property, all with the state of mind of depriving the Lillys of that property.  Each discrete physical act gives rise to an actionable claim of conversion: moving the dogs to the Smith household; preventing the Lillys from having access to the dogs; selling (three of) the dogs; and keeping (two of) the dogs.

27

The Defendants attempt to argue that a claim of conversion is inapplicable here because money is not generally subject to conversion claims and the Plaintiffs here are only claiming a 40% interest in the proceeds of the sale of the puppies.  However, "an exception exists for discrete, identifiable sums that have been diverted from their proper destination."  Id.  Here, we know exactly what Lakeshia Blue sold the puppies for, and Delphine Smith kept the receipts.  More importantly, the Plaintiffs' contractual rights were not merely for them to receive 40% of the proceeds, it was also for them to have the pick of the litter *and* for them to market and sell the puppies.  The damages suffered by the Plaintiffs stem from their inability to fulfil contracts, the inability to market and advertise the sale of these particular puppies, and the reputational harm the business suffered as a result.  The damages far exceed the loss of 40% of the sale proceeds.

**e.      Evidence exists that the Defendants intentionally inflicted emotional distress on the Plaintiffs**

In order to state a claim for intentional infliction of emotional distress, the Plaintiffs must allege 1) conduct that is "intentional or reckless;" 2) conduct that is "extreme and outrageous;" 3) "a causal connection between the wrongful conduct and the emotional distress;" and 4) emotional distress that is "severe."  Takacs v. Fiore, 473 F.Supp.2d 647, 651-652 (D.Md. 2007).

As discussed supra, the Defendants repeatedly tried to manipulate their power and influence to silence the Plaintiffs and inflict pain on them in order to coerce them to abandon their contractual property.  Each effort made by the Smith Defendants was a further escalation of this plan.  As decorated current and former police officers, with direct ties to the very bureau within BPD tasked with rooting out corruption during a federal consent decree, the Smith Family improperly manipulated their influence to exact a pound of flesh from the Plaintiffs.  They knew what they were doing, they knew their allegations against Jeffrey Lilly were false, and they knew his career would be ruined when they levied false felony charges of perjury against him,

28

regardless of the outcome of that case. They understood the leveling of that charge equated to the ringing of a bell that could not be unrung.  As a result of their intentional, reckless, and malicious conduct, the Lillys lost everything.  They lost their business.  Jeffrey Lilly lost his career.  And both Jeffrey Lilly (heart attack) and Raquel Lilly (suicide attempt) nearly lost their lives and their spouse.

      **f.**      **Evidence exists that Defendant Delphine Smith defamed Jeffrey Lilly**

A defamatory statement is a false statement of fact which is made to a third party and defames the target of that statement.  To state a claim of defamation under Maryland law, a plaintiff must allege (1) that "the defendant made a defamatory statement to a third person," (2) that "the statement was false," (3) that "the defendant was legally at fault for making the statement," and (4) that "the plaintiff suffered harm."  <u>Lindenmuth v. McCreer</u>, 233 Md.App. 343 (Md.Ct.Spec.App. 2017).

Here, Delphine Smith made multiple defamatory statements about Jeffrey Lilly to multiple third parties.  She made the statements to police detectives and most significantly she swore to the statements before a Baltimore County Court Commissioner.  The defamatory statements included false allegations that Jeffrey Lilly forged a document, continually harassed her and her family, and was such a violent and threatening individual that she was in fear of imminent retaliation.  <u>Pl. Ex. 28</u>.  There is no dispute that these statements were all defamatory in nature and that Jeffrey Lilly suffered harm as a result of them.  At her deposition, Delphine Smith admitted that the actions of Jeffrey Lilly stopped and were not continuous (establishing that the statement was false and she was at fault for making it because she knew it was false).  There is no evidence that Jeffery Lilly was known to be dangerous nor that he threatened Delphine Smith.  The Defendants have conceded for purposes of this motion that a valid contract existed (<u>See Defendants Memo</u> at p. 8), which for the purposes of the instant analysis establishes

that the forgery statement made by Delphine Smith was false.  A dispute of material fact exists (although Plaintiffs submit the evidence is overwhelming) as to whether Delphine Smith knew that her statement accusing Jeffrey Lilly of forgery was false.  Based on this, summary judgement is not appropriate on this claim.

## **CONCLUSION**

Summary Judgement for the Defendants is not appropriate because the undisputed material facts establish clear liability for the conduct of the Defendants.  Furthermore, the significant factual disputes that remain, when viewed in the light most favorable to the Plaintiffs, preclude the Defendants' requested relief.

Respectfully submitted,

/s/ Patrick B. Jennings
Patrick B. Jennings (Bar No. 30362)
The Ment Law Group
225 Asylum Street, 15th Floor
Hartford, CT 06103
Pjennings@mentlaw.com