**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | |
|---|---|
| Jeffrey Lilly, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No.: 1:22-cv-02752-BAH |
| BALTIMORE CITY POLICE DEPARTMENT, *et al.* | |
| Defendants. | |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

STATEMENT OF DISPUTED MATERIAL FACTS ......................................................2

STANDARD OF REVIEW ..............................................................................................14

LEGAL ARGUMENT ......................................................................................................14

    **I.**      **Jeffrey Lilly suffered a violation of his substantive due process rights.** ...............15

    *A. Jeffrey Lilly has a valid property interest* ........................................................16

    *B. BPD's conduct shocks the conscious.* ...............................................................17

    *C. Post-deprivation remedies are not applicable* ................................................17

    **II.**    **Evidence exists that BPD, through the actions of Nadeau, caused the deprivation of Jeffrey Lilly's constitutional rights.** ................................................................20

    **III.**   **Nadeau's status as a "final policymaker" imputes liability on BPD** ....................22

    **IV.**   **BPD's actions were taken under color of state law** ..............................................23

    **V.**    **The Plaintiff concedes that BPD as a municipality is not liable for punitive damages.** ...............................................................................................................24

CONCLUSION ..................................................................................................................24

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
NORTHERN DIVISION

JEFFREY LILLY, *et al.,*

      Plaintiffs,

  vs.

BALTIMORE POLICE DEPARTMENT, *et al.,*

  Defendants

C.A. No.: 1:22-cv-02752-BAH

## PLAINTIFF'S RESPONSE TO DEFENDANT BALTIMORE POLICE DEPARTMENT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION:

This case is not before the Court to resolve a simple contractual dispute between family members. The Defendant's description of this case as an uncomplicated dispute wherein the Plaintiff seeks accountability from the Defendant for actions and decisions that are unrelated to his harm is misleading and indicative of an inability or unwillingness to place facts in the context of reality.

The reality is that a simple family dispute was transformed into a shocking assault on the rights and lives of the Plaintiffs. High-ranking officials of the Baltimore Police Department ("BPD") inappropriately interfered in a private family matter, and when the Plaintiffs made a complaint against those officials, pursuant to their right under Maryland Law, BPD retaliated. The retaliation came at the direction of the Deputy Commissioner of the Public Integrity Bureau ("PIB"), Brian Nadeau, a final policymaker of BPD, and in the form of a sham, weaponized, internal affairs investigation.

Under Nadeau's direction, PIB buried the complaint filed by the Plaintiffs, and cooked up a sham investigation against Jeffrey Lilly that left his career in ruin. Jeffrey Lilly was punished because his wife made a complaint against a Deputy Commissioner, because Brian Nadeau favored the people that Mr. Lilly had a dispute with, and, ultimately, because Brian Nadeau had the power to do so. The Plaintiffs will present the facts below through a more realistic lens; one that recognizes that the truth of fully determinate propositions depends on the context in which they occur.

## STATEMENT OF DISPUTED MATERIAL FACTS:

### Relevant Contextual Background

The Baltimore Police Department has been under a federal Consent Decree since April 7, 2017. Ex. 1, October 26, 2021, Consent Decree Hearing Transcript, Plaintiffs' 1824 – 1954 at 3:22 – 4:2. A key component of the Consent Decree was the reformation of internal investigations conducted by the Public Integrity Bureau, "PIB." Id. at 6:8 – 15. Brian Nadeau's leadership of the PIB and his role in leading the bureau's reform has been recognized by the Court overseeing the consent decree. Id. at 106:20 – 107:3, 110:11 – 111:21.

Brian Nadeau, as the Deputy Commissioner of PIB, is designated as the final decisionmaker authorized to make findings in PIB investigations. Ex. 2, PIB Investigative and Training Manual, BPD 400 – 402. He determines whether a case qualifies for transfer because of a conflict of interest. Ex. 3, PIB Investigative and Training Manual, BPD 383 – 384. Deputy Commissioner Nadeau holds himself out as the final decision maker in all cases. Ex. 4, Affidavit of Major Sephanie Lansey. Deputy Commissioner Nadeau has authority over the Office of Administrative Hearings and has threatened hearing officers that do not make findings in administrative hearings consistent with the findings of PIB. Ex. 5, January 1, 2021, Letter to

Trial Board Members, Plaintiffs' 2922. He micromanages investigations undertaken by PIB, going so far as to install a live video feed from PIB's interview room to his office. Ex. 4. He personally monitors investigations that are of interest to him. Id.

Brian Nadeau utilizes his relationships with other members of PIB to maintain visibility on cases. Id. Specifically, he and Daniel Popp have a close personal relationship, and Popp regularly consults with Nadeau on cases. Id.

### Chronology of Events.

Since 2019, Jeffrey and Raquel Lilly have sold dogs as hobby breeders and have not formed or registered any organization or entity with the Pennsylvania Secretary of State. Ex. 6, 134:11 – 21. Jeffrey Lilly started the project with personal funds obtained from insurance settlements he received in the wake of a family tragedy, after members of his family perished in a tornado. Ex. 6, 136:14 – 137:11. The Lillys do not maintain a separate bank account for their breeding efforts, and all money is received through Jeffrey Lilly's personal accounts. Ex. 7, 276:3 – 6, 281:21 – 282:5, 352:1 – 6.

On October 18, 2020, Jeffrey and Raquel Lilly and James Blue executed a contract whereby James Blue agreed to invest $8,500.00 through the purchase of one female French bulldog. Ex. 8, Contract between Jeffrey and Raquel Lilly and James Blue with DocuSign Certificate of Completion, Plaintiff's 6–7. Jeffrey Lilly and Raquel Lilly met James Blue and Lekeshia Blue in Hunt Valley, Maryland. Ex. 6, 192:17–193:14. There, James Blue signed the contract via DocuSign on Raquel Lilly's iPhone. Ex. 8. The contract provided that James Blue would keep 60% of the proceeds from any litter produced and the Lillys would keep 40%. Id. The Lillys were also entitled to the pick of the litter. Id. The contract also provided Jeffrey and

Raquel Lilly with exclusive rights for the marketing and sale of the litter produced. Id. Raquel Lilly drafted the contract without an attorney. Ex. 6, 147:7–17.

Later that day, Raquel Lilly emailed James Blue a copy of the executed contract. Ex. 9, Email to James Blue, Plaintiff's 8–9. James Blue did not want Lekeshia Blue to know about the contract. Ex. 6, 197:5–8; Ex. 7, 324:15–325:20. Nevertheless, Raquel Lilly specifically referenced the contract in paperwork that she sent to Lekeshia Blue on October 20, 2020. Ex. 10, Plaintiff's 0100-0103; Ex. 11, Plaintiff's 0028-0029.

On December 22, 2021, a litter was produced pursuant to the contract the Lillys had with Mr. Blue. Ex. 12, L. Blue Answers to Ints. Answer Nos. 1 and 2. Shortly thereafter, Jeffrey Lilly received deposits for the sale of two puppies and had interest from another buyer. Ex. 6, 79:13–21. Until January 25, 2022, the agreement between James Blue and the Lillys was openly carried out without any question of its legitimacy from the Smith and Blue family. Ex. 13. 87:19 – 90:4.

On January 25, 2022, James Blue was murdered. Ex. 6, 158:1 – 3. On January 27, 2022, the Lillys communicated with Jadan Blue to schedule the return of their litter of puppies from Lekeshia Blue's house. Ex. 14, Plaintiffs' 0013 – 0015. To further demonstrate their exclusive rights to the litter, Jeffrey Lilly sent the contract to Jadan Blue. Id. The Smith family then moved the location of the dogs from the Blue residence to the Smith residence without the Lillys' consent. Ex. 6, 153:14 – 154:7.

On January 30, 2022, Raquel Lilly sent a text message to the Smith family to arrange for the return of the dogs. Ex. 7, 66:14 – 67:6. The Lillys were unable to fulfill their obligations to buyers because the Smith Family refused to return the dogs. Ex. 6, 77:14 – 78:3.

On January 31, 2022, Robert Smith spoke to Deputy Commissioner Briscoe and asked her to intervene in the family dispute. Ex. 15, Text Message from Robert Smith to Briscoe, BPD

133–134. Deputy Commissioner Briscoe was Jeffrey Lilly's highest-ranking commander in his chain of command. Ex. 16, 66:11 – 69:3. Deputy Commissioner Briscoe then called Lieutenant Colonel Herzog to ask for Jeffrey Lilly's phone number. Id. 95:12–14. After hearing about the conflict, Herzog asked if he could call Jeffrey Lilly instead because they had a rapport from working together in the Western District. Id. 96:6–14.

On January 31, 2022, Herzog telephoned Jeffrey Lilly and asked Jeffrey Lilly if he would leave the Blue and Smith families alone. Ex. 7, 69:16–70:5. Jeffrey Lilly explained his side of the story and communicated that he "wasn't really trying to hear what [Herzog] was trying to say." Id. 72:12–19. When Herzog realized that Jeffrey Lilly was not going to budge, Herzog tried to de-escalate the situation by asking Jeffrey Lilly to "do [him] a favor, at least till after the funeral." Id. 72:2–8; 73:1–6. Jeffrey Lilly perceived Herzog's request as an order because Herzog was ranking officer in his chain of command. Id. 71:10–15.

On February 2, 2022, a colleague told Jeffrey Lilly that he heard from another person that the FBI and PIB were investigating Jeffrey Lilly, at the behest of the Smiths, for breeding dogs while working for BPD. Ex. 17, J. Lilly's Answers to Ints. Answer Nos. 1 and 4; Ex. 7, 89:19–90:12. Jeffrey Lilly called Herzog to convey his concerns that the dispute had traveled to the FBI. Id., 93:4–21.

On February 2, 2022, Raquel Lilly submitted a complaint to PIB. Exhibit 18, PIB Complaint filed by Raquel Lilly, BPD 26–27. Raquel Lilly lodged a complaint with PIB against Briscoe, Herzog, and Lekeshia Blue for their actions. Id. Raquel Lilly concluded her complaint by stating that supporting documentation must be requested through her attorney, and to contact her through the attorney. Id.

After Raquel Lilly's complaint was submitted, Nadeau approached Director of EODS, Olufemi Akanni and told Akanni about the conflict between Jeffrey Lilly and the Smith family. Ex. 19, Statement of Olufemi Akanni, 00:02:18 – 00:04:40. At the request of Nadeau, Akanni then scheduled a meeting with Jeffrey Lilly. Id. Jeffrey Lilly did not want the meeting to take place at PIB because the issue involved a member of PIB and her family. Id.

On February 3, 2022, Briscoe telephoned Jeffrey Lilly. Ex. 7, 96:10–13. Briscoe apologized to Jeffrey Lilly and indicated that she understood how Herzog's telephone call could have been viewed as intimidating. Id., 96:17–97:12. Her statements mirrored the content of Raquel Lilly's complaint, though Briscoe testified that she was never made aware of the complaint against her. Ex. 18; Ex. 16, 111:19 – 114:6.

On February 4, 2024, Jeffrey Lilly met with Akanni and Sgt. Glen Jackson at BPD Headquarters. Ex. 19, 00:02:18 – 00:04:40. At the meeting, Jeffrey Lilly informed Akanni and Jackson about the conflict with the Smith family. Id. at 00:05:00 – 00:08:30. He stated that the Smith family was trying to intimidate him through Briscoe and Herzog, and he voiced his concern that the FBI was monitoring him because he was attempting to retrieve his property. Id. Lilly warned Akanni that he feared he would continue to be retaliated against by BPD if he tried to retrieve his property. Id. at 00:13:10 – 00:13:42. Akanni then briefed Deputy Commissioner Nadeau on the meeting he had with Jeffrey Lilly. Id. at 00:13:42 – 00:14:47. Nadeau indicated to Akanni that he had already consulted with BPD legal counsel about the conflict. Id.

On February 7, 2022, Deputy Commissioner Nadeau advised Akanni that the Lillys had requested Baltimore County Police to conduct a welfare check on their dogs and then ordered Akanni to arrange a meeting between Deputy Commissioner Nadeau and Jeffrey Lilly. Id. at 00:15:39 – 00:18:13.

On February 8, 2022, Jeffrey Lilly met with Akanni and Nadeau at BPD Headquarters. Ex. 20, 176:12–178:15. At the meeting, Nadeau asked Jeffrey Lilly why he continued to call the police over a civil matter. Ex. 17, Answer No. 12. Nadeau said that if Jeffrey Lilly continued to call Baltimore County Police for a civil dispute, it would be possible for Baltimore County to charge him. Id. Nadeau told him that he did not want Jeffrey Lilly to embarrass the BPD by calling the police over a civil matter, and that Jeffrey Lilly would be laughed out of court. Id. Jeffrey Lilly felt intimidated during that meeting and immediately had another conversation with Akanni wherein he warned that he was going to be retaliated against. Ex. 19 at 00:32:35 – 00:35:17. Akanni did not take that statement as a "complaint" and did nothing to investigate those concerns. Id.

On March 8, 2022, attorneys for the Lillys sent a demand letter to the Blue and Smith family for the return of their property. Ex. 21, Demand Letter, BPD 83–85.

On March 10, 2022, Lekeshia Blue, Robert Smith, and Delphine Smith received the demand letter. Ex. 22, 130:13–15, Ex. 13, 98:13–99:3. A PIB employee, Jerry McClarin, was present at the time. Ex. 13, 114:6–9. McClarin then contacted PIB Captain Lamar Howard and scheduled a time for Robert and Delphine Smith to file a complaint against Jeffrey Lilly. Id., 104:14–20.

On March 14, 2022, Robert and Delphine Smith arrived in-person at PIB and made a complaint against Jeffrey Lilly for harassment. Ex. 23, IAPro Summary 2022-0347, BPD 212–218. Other than the official communications from the Lillys' attorneys there had been no communications between the Lillys and the Smith family since January 28, 2022. Ex. 13, 36:7 – 37:13, 69:2 - 9. The last time the Police were called to conduct a welfare check was February 7,

2022. Id. Despite this, Delphine Smith categorized Jeffrey Lilly's "harassment" as "continuous." Ex. 23.

Detective Anthony Bowling and Lieutenant Daniel Popp conducted the intake of Robert Smith's complaint. Ex. 24, 13:15 – 16:6; Ex. 23. Before retiring, Robert Smith was one of Daniel Popp's commanders, and Popp refers to Mr. Smith by his nickname, "Smitty." Ex. 25, 108:16 – 22; Ex. 26, Email from Popp to Howard, BPD 1097. Bowling testified that he recorded that interview, and his normal procedure was to upload the recording to IAPro. Ex. 24, 16:2 – 17:7. The recording no longer exists. Ex. 27, Email with Defense Counsel. All interviews conducted at PIB must be recorded and uploaded to IAPro. Ex. 28, PIB Investigative and Training Manual, BPD 384 – 386.

On March 24, 2022, Lieutenant Daniel Popp emailed Captain Lamar Howard, indicating that he believed the case should be moved "out of the building" because the case could result in charging Briscoe, Nadeau, and Akanni with failing to follow PIB policies. Ex. 26, Email from Popp to Howard, BPD 1097. Popp was ordered to investigate the case despite the conflict of interest. Ex. 25, 126:3 – 20.

On March 28, 2022, BPD served Jeffrey Lilly notification of the complaint lodged against him. Ex. 29, Notice of Internal Investigation, BPD 59. Conversely, as stated above, Deputy Commissioner Briscoe was never served with a Notice of Internal Investigation, because Director Akanni was ordered not to investigate Raquel Lilly's complaint. Ex. 16, 111:19 – 114:6, Ex. 19 at 00:51:40 – 52:10.

On March 29, 2022, Bowling drafted a memorandum requesting recusal due to the obvious conflict of interest. Ex. 30, Bowling Memorandum, BPD 69–70. Bowling detailed that in order to properly conduct the investigation, he would have to ask accusatory questions of

Nadeau and Briscoe and potentially charge them for neglect of duty. Id. Bowling cited the PIB Investigative and Training Manual's provisions that mandated BPD's recusal. Id.; Ex. 3. After drafting the memorandum, Anthony Bowling emailed a copy to his entire chain of command, read receipt, because he wanted them to know that he knew what they were doing. Ex. 31, Bowling Emails to Commanders; Ex. 24, 37:16 – 40:13. The case still was not transferred.

On April 4 and 14, 2022, FOP attorney Mike Davey emailed Nadeau to request that an outside agency investigate the complaint against Jeffrey Lilly. Ex. 32, Email from Davey to Nadeau and Nadeau to Callaghan, BPD 1110–1111. Nadeau did not respond to Davey and instead forwarded the email to Callaghan. Id. When Davey emailed a second time, Nadeau emailed Callaghan again and stated: "I have no oversight of this case, so I am forwarding to you. I don't know who the case is assigned to." Ex. 33, Emails among Davey, Nadeau, and Callaghan, BPD 1126–1129.

Despite his conversation with BPD Legal in February, his conversations with Akanni regarding Raquel Lilly's complaint, Anthony Bowling's recusal memorandum naming him for potential policy violations, his close friend, Daniel Popp's, involvement in the case, and the email traffic between him and Mike Davey, Nadeau testified that he neither had knowledge of or involvement in either Raquel Lilly's or Robert Smith's complaints. Ex. 20, 175:10 – 18; 194:4 – 199:18.

On April 22, 2024, Robert Smith called PIB to check the status of his complaint. Ex. 34, Email from Popp to Howard, BPD 1130. Popp informed Robert Smith of the date and time of Jeffrey Lilly's upcoming interview on April 26, 2024. Id. Popp never documented the call in IAPro or took it on a recorded line in violation of PIB policy. Ex. 35, PIB Investigative and Training Manual, BPD 346 – 347; Ex. 23. During the call, Popp told Robert and Delphine Smith

to go to Baltimore County and swear out criminal charges for forgery. Ex. 13, 109:11 – 110:3, 116:17 – 117:13. Prior to that conversation, the Smiths had no intention of filing criminal charges. Id.

On April 25, 2022, Robert Smith and Delphine Smith went to the Baltimore County Court Commissioner to file forgery charges against Jeffrey Lilly. Ex. 13, 12:14–13:20. Later that evening, Delphine Smith emailed them directly to Daniel Popp, who immediately replied and assured her that he'd make sure they were served. Ex. 36, Criminal Charges, BPD 86 - 91; Ex. 37, Email from D. Smith to D. Popp, BPD 1137. It was well known that a felony charge against Jeffrey Lilly would result in suspension without pay, and that it would disqualify him from his assignment as an FBI Task Force Officer. Ex. 25, 165:18 – 24; Ex. 20, 213:19 - 214:1, Ex. 38, 170:8 – 14. Commissioner Michael Harrison testified that it was never appropriate for an officer to make that kind of recommendation to a complainant. Ex. 38, 172:12 – 21. The Commissioner's sentiment is mirrored by the PIB Manual which states that investigators must consult with the relevant prosecuting agency if they uncover evidence that a crime may have been committed. Ex. 39, PIB Investigative and Training Manual, BPD 332.

On April 27, 2022, Jeffrey Lilly was served with a criminal summons and suspended without pay. Ex. 40, Suspension of Jeffrey Lilly, BPD 71–72. BPD scheduled a suspension hearing in May. Id. The suspension form indicates that no suspension without pay can occur prior to a hearing. Id.

On May 5, 2022, Jeffrey Lilly appeared for his suspension hearing and presented evidence of the valid contract. Ex. 7, 179:15 – 180:2. Prior to the hearing, officers were instructed to tape record the hearing and upload the recording to IAPro. Ex. 41, Email – Suspension Hearing 5/5/2022, BPD 1193-1194. At the last minute, Lisa Riha was advised that

Daniel Popp would "do the suspension hearing." Id. Jeffrey Lilly's unpaid suspension was upheld at the hearing, despite the evidence he presented. Ex. 6, 97:5 – 98:4. Brian Nadeau had a history of intimidating hearing officers to ensure that they made findings consistent with PIB's desired outcome. Ex. 4; Ex. 5. The recording of the hearing does not exist. Ex. 27.

On June 9, 2022, the State of Maryland dismissed the felony forgery charges against Jeffrey Lilly. Ex. 7, 180:6–8. The prosecutor noted that the alleged acts did not fall under the statute charged and that Jeffrey Lilly produced an abundance of evidence of a valid contract. Ex. 42, Email from J. Riger, BPD 102.

On August 12, 2022, counsel for Plaintiffs served a Notice of Legal Representation and Intent to File Suit on the BPD. Ex. 43, Plaintiffs' Claim Notice, BPD 241–242. That same day, PIB Detective Michael Payne sent Robert Smith notification that BPD had opened its investigation for the complaint he lodged against Jeffrey Lilly 151 days earlier. Ex. 44, PIB Notification to Robert Smith, BPD 73. Other than recommending that the Smiths file criminal charges that ultimately resulted in Jeffrey Lilly being suspended without pay, BPD took no investigative steps in Robert Smith's complaint until after receiving notice of a pending lawsuit. Id.; Ex. 23. The inaction of PIB ran contrary to the fact that PIB had reduced the time to complete internal investigations to 136 days. Ex. 20, 45:17 – 46:7.

On September 13, 2022, the Plaintiffs filed this lawsuit. Ex. 38, 122:22 – 123:7. That same day, PIB Detective Jahlik Mathis noted the first attempt to contact Raquel Lilly to discuss her complaint. Ex. 45, 2022-0156 Summary, BPD 233 – 238. Raquel Lilly did not receive the email because Twisted Roots Kennels email account was no longer operational. Ex. 6, 74:14–15. Mathis never noted an attempt to contact Raquel Lilly through her attorney despite her complaint's explicit instructions. Ex. 45.

On October 13, 2022, 213 days after BPD knew of the conflict of interest, Major Jason Callaghan directed a subordinate to contact the Office of the Inspector General to ask if they would conduct the investigations. Ex. 38, 102:21 – 103:21; Ex. 46, Emails Between Callaghan and Roeser, BPD 1446–1450. The delay is unexplainable as there was a standing Memorandum of Understanding between the Office of the Inspector General ("OIG") and BPD wherein OIG would take all cases that involved complaints against command staff like Briscoe and Nadeau. Ex. 38, 94:13 – 95:19. The OIG declined. Ex. 47, 90:7–91:1.

On December 15, 2022, Baltimore County Police agreed to handle the investigations and assigned the matter to Captain Longo. Ex. 48, 13:3–14:3. Immediately upon reviewing the case files, Captain Longo identified nine witnesses that needed to be interviewed, including Deputy Commissioner Nadeau. Id. at 22:16 – 24:14; Ex. 49, Letter from Captain Trivett, Plaintiff's 998. Captain Longo testified that the BPD's conflict of interest was obvious. Ex. 48, 52:16 – 53:5.

On December 21, 2022, Captain Longo interviewed Director Akanni, and additional witnesses were identified. Ex. 49. Baltimore County declined to continue the investigations due to time constraints. Id.; Ex 48, 53:11 – 54:5.

On January 3, 2023, Commissioner Harrison assigned both complaints to Director Akanni of EODS. Ex. 50, Harrison Memorandum, BPD 155–154. Harrison expected a full and thorough investigation to be completed. Ex. 38, 160:11 – 15, 174:19 – 175:21, 180:8 – 181:5. He took the extraordinary step of assigning the head DOJ Monitor, Ken Thompson, to oversee the cases because he wanted the Court overseeing the Consent Decree to see that the BPD was ensuring that these cases were investigated properly. Id. at 161:11 – 163:1.

On January 4, 2023, BPD received the investigative files back from Baltimore County. Ex. 51, Return Receipt for Investigations, Plaintiff's 1015. Despite the orders of Commissioner

Harrison to complete a full and thorough investigation, Director Akanni ordered his detectives not to interview witnesses and to close the cases. Ex. 50; Ex. 38, 160:11 – 15, 174:19 – 175:21, 180:8 – 181:5; Ex. 23 at BPD 217; Ex. 45, at BPD 236. Deputy Commissioner Nadeau was one of the witnesses that Baltimore County identified for an interview. Ex. 48, 22:16 – 24:14. The detectives noted their files that Akanni's orders were not the ordinary investigative process. Ex. 23 at BPD 217; Ex. 45, at BPD 236. Akanni's orders were a direct violation of PIB's investigative policies. Ex. 52, PIB Investigative and Training Manual, Compelled Statements from Respondents; Ex. 53, PIB Investigative and Training Manual, Identifying and Interviewing Witnesses; Ex. 54, PIB Investigative and Training Manual, Investigations with Uncooperative Complainants.

The case filed against Jeffrey Lilly was 'not sustained' a designation that is short of exoneration. Ex. 23; Ex. 55; Policy 308, in relevant part, BPD 255 – 256. The case filed by Raquel Lilly against command staff members was 'unfounded', a finding that amounts to being exonerated. Ex. 45; Ex. 55. When confronted with Raquel Lilly's complaint concluding as "unfounded" Commissioner Harrison acknowledged that there was no basis for that finding. Ex. 38, 175:23 – 176:9.

After disobeying Commissioner Harrison's direct orders, and violating multiple PIB investigative policies, all while the DOJ Monitor for the Consent Decree was watching, Director Akanni was promoted to Chief of the Public Integrity Bureau. Ex. 52; Ex. 53; Ex. 54; Ex. 38, 160:11 – 15, 161:11 – 163:1, 174:19 – 175:21, 180:8 – 181:5. He now works directly under Deputy Commissioner Nadeau. Ex. 20, 63:3 – 19.

Jeffrey Lilly had a heart attack due to the stress he experienced because of BPD's actions. Ex. 6, 69:7 – 21; 203:19 – 205:3. His wife attempted suicide on the anniversary of his criminal

charges being filed. Id. The family nearly lost their home, and their children needed to return home from college because of the financial stress they endured because of BPD's actions. Id.

## STANDARD OF REVIEW:

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson,* 477 U.S. at 250.

The moving party bears the burden of showing that there is no genuine issue of material fact. *See* Fed.R.Civ.P. 56(c). When ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the non-moving party. *See Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 437 (4th Cir.1998).

## LEGAL ARGUMENT:

A municipality can be held liable for constitutional harms stemming from a policy or custom instituted by "official actions" of municipal officials who "have the responsibility and authority to implement final municipal policy with respect to a particular course of action." *Riddick v. Sch. Bd. of the City of Portsmouth*, 238 F.3d 518, 522-23 (4th Cir. 2000). *See also* 42 U.S.C § 1983.

Contrary to the Defendant's assertion in its motion, Deputy Commissioner Nadeau's actions were anything but limited. Evidence exists that Nadeau was a central participant in this dispute from the outset, and that he gave orders to Director Akanni, Major Callaghan, and

Lieutenant Popp along the way that resulted in substantial harm to Jeffrey Lilly. Nadeau's actions in this case are consistent with the record evidence that he consistently micromanaged PIB investigations that were of interest to him or BPD.

The actions carried out by individuals under Nadeau's chain of command were both shocking and arbitrary, as they violated PIB investigative policies that were implemented pursuant to the Consent Decree, directly contradicted the orders of Commissioner Harrison, and undermined efforts to reform BPD. Plainly, ensuring that neither Raquel Lilly's complaint (2022-0156) nor Robert Smith's complaint (2022-0347) were properly investigated served Brian Nadeau's personal and professional interests and ran contrary to the public interest of reforming BPD. Thus, the Court should deny the Defendant's instant motion.

**I. Jeffrey Lilly suffered a violation of his substantive due process rights.**

That either common law or state law supplies an alternative remedy when life, liberty or property are taken does not invalidate the Plaintiff's claim. As then-Judge Gorsuch wrote for the panel in *Browder v. City of Albuquerque*, 787 F.3d. 1076 (2015), "[S]ome things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing. Indeed, it would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt." *Id.* at 1083 - 1084

The evidence in this case shows that BPD violated Jeffrey Lilly's substantive due process rights. When properly analyzed, the evidence shows that Jeffrey Lilly (1) had a specific liberty or property interest; (2) that BPD, through the actions of Nadeau, deprived him of this liberty or

property interest; and (3) that BPD's action, through Nadeau, falls, so far beyond the outer limits of legitimate government action that *no process* could cure the deficiency. *CMDS Residential, LLC v. Mayor & City Council of Baltimore,* 714 F. Supp. 3d 583, 620 (D. Md. 2024).

*A. Jeffrey Lilly has a valid property interest.*

Defendant asserts that Jeffrey Lilly has not suffered a due process violation because he has no personal right to enforce either the contract he made with James Blue or the subsequent agreements he made with prospective buyers. In support of this assertion, the Defendant points to Pennsylvania law and attempts to establish a fictional business entity that would preclude the Plaintiff from seeking redress against BPD. In its motion, the Defendant conveniently omits key elements for determining a "partnership" under Pennsylvania law, namely:

> "**(c) Rules for determining formation of partnership.--**In determining whether a partnership is formed, the following rules apply:
>
> (1) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property or part ownership <u>does not by itself establish a partnership</u>, even if the co-owners share profits made by the use of the property.
>
> (2) The sharing of gross returns <u>does not by itself establish a partnership</u>, even if the persons sharing them have a joint or common right or interest in property from which the returns are derived."

Pa. Stat. and Cons. Stat. Ann. § 8422 (emphasis added).

The evidence in this case is that Jeffrey and Raquel Lilly breed dogs as a hobby. Jeffrey Lilly began the effort by using personal funds obtained through insurance payments, issued to him personally, as a result of the tragic death of his family members after a tornado. All funds used and received in these efforts were paid from and deposited to Jeffrey Lilly's personal bank account. The couple has never registered a "Partnership" or any other formal entity with the Pennsylvania Secretary of State, nor have they filed taxes as a separate entity. Neither Jeffrey nor

Raquel has taken a salary from their efforts, and they alone bore the financial burden resulting from the inability to retrieve their property. Accordingly, Jeffrey Lilly, not a fictional business entity, suffered a deprivation of rights.

*B. BPD's conduct shocks the conscious.*

To establish a substantive due process violation, the Plaintiff must show that BPD's behavior was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, (1998)). The "shocks the conscience" standard applies to the Plaintiff's § 1983 claim of a violation of substantive due process based on BPD's misconduct. *See Temkin v. Frederick Cty. Commissioners*, 945 F.2d 716, 722 (4th Cir. 1991). As a threshold matter this Court must determine what level of culpability is required for BPD's actions to be considered "conscience shocking." *See Dean for & on behalf of Harness v. McKinney*, 976 F.3d 407, 414 (4th Cit. 2020) (citing *Lewis*, 523 U.S. at 850).

There are two standards of culpability that a Court can use to determine "conscious shocking" behavior. *See Dean* at 414 – 415. The higher standard, applied in circumstances in which action is taken by a municipal actor in response to an emergency, is the "intent to harm" standard. *Id.* The lessor standard, which is applied in circumstances where a municipal actor has time to make unhurried judgments in a non-emergency situation, is the "deliberate indifference" standard. *Id.* Here, the Court should apply the "deliberate indifference" standard because the actions of BPD, through Nadeau, were not in response to a dangerous emergency, but rather occurred over many months with both the time to deliberate and the resources to aid in that deliberation.

"[L]iability for deliberate indifference ... rests upon the luxury ... of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. <u>When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking.</u>" Id. (citing *Lewis*, 523 U.S. at 853) (emphasis added). For the purposes of this argument, the Plaintiff's position is that, at very least, had the investigations of 2022-0156 and 2022-0347 been transferred to an outside agency and properly investigated, the Smith family would not have felt empowered to keep the dogs, and Jeffrey Lilly would not have been suspended without pay, lost his assignment as an FBI Task Force Officer or suffered the stress and pain that followed.

Raquel Lilly filed 2022-0156 on February 2, 2022. Her complaint plainly indicated that PIB had a conflict of interest in investigating her complaint. Robert Smith's complaint that followed more than a month later cemented the conflict of interest. Seventy-nine (79) days passed between the date that Raquel Lilly filed her complaint and the date that Daniel Popp directed the Smiths to file criminal charges against Jeffrey Lilly that ultimately sealed his fate. Evidence exists that during those seventy-nine days, Deputy Commissioner Nadeau 1) had conversations with Olufemi Akanni about investigating 2022-0156; 2) consulted with BPD legal about the conflict of interest; 3) met with Jeffrey Lilly about the dispute, 4)was named as a witness in both 2022-0156 and 2022-0347 by Anthony Bowling; 5) was identified for potential policy violations attendant to his involvement in the case; 6) ensured that his close friend, Daniel Popp, kept the investigation; 7) received direct communication from Mike Davey requesting a transfer; and 8) forwarded those requests to Major Callaghan. At each of the intervals above, Deputy Commissioner Nadeau was aware of the conflict of interest that mandated recusal and

had the sole authority to recuse BPD pursuant to the PIB Investigative and Training Manual. His numerous and protracted failures during those initial seventy-nine days are truly shocking.

But the evidence of Deputy Commissioner Nadeau's shocking actions doesn't stop on April 22, 2022. Evidence exists that Nadeau improperly influenced the investigations all the way through their "completion" and subsequently rewarded the people that helped him achieve his goal of violating Jeffrey Lilly's rights. This conclusion is logically inferred by the fact that Director Akanni disobeyed the orders of Commissioner Michael Harrison on January 3, 2023, when he arbitrarily closed both investigations, and then was promoted to a higher position under Deputy Commissioner Nadeau's command. Similarly, Daniel Popp was promoted to Captain under Deputy Commissioner Nadeau's command. Lekeshia Blue was promoted to Captain under Deputy Commissioner Nadeau's command. Major Callaghan was also promoted to the rank of Lieutenant Colonel. There is sufficient evidence for a jury to conclude that the actions of these key players came at the direction of Nadeau because they were subsequently promoted to higher positions under Nadeau's command. Simply put, there is sufficient evidence to support a *quid pro quo* wherein Nadeau rewarded officers that acted in support of Nadeau's personal and professional interests. Stephanie Lansey's personal experience and observations of Nadeau's management of PIB, as detailed in her affidavit, further supports this conclusion.

*C. Post-deprivation remedies are not applicable.*

The post-deprivation remedies available to Jeffrey Lilly were inadequate and ineffective in this case. The continuous retaliatory actions of BPD and Nadeau directly impeded Lilly's ability to seek redress through these remedies, leaving him without a meaningful opportunity to enforce his substantive due process rights.

The Defendant's argument on this point is premised on its flawed conclusion that Brian Nadeau's interference was fully consummated by the meeting on February 8, 2022. *See* ECF No. 68, citing *CMDS Residential LLC v. Mayor and City Council of Baltimore*, 714 F. Supp 3d. 583 (U.S. Dist. for Md. 2024). The evidence in this case indicates continued arbitrary and wrongful actions by BPD. In *Zinermon v. Burch*, 494 U.S. 113 (1990), the Supreme Court limited the application of the doctrine to procedural due process claims for which the state provides an adequate post-deprivation remedy. There, the Court explained, "the Due Process clause contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Id.* at 125, (citing *Daniels v. Williams*, 474 U.S. 327 at 331). In such cases, "[a] plaintiff ... may invoke § 1983 regardless of any state-tort remedy that might be available to compensate him for the deprivation of these rights." *Zinermon*, 494 U.S. at 125. Thus, "[t]he fact that the alleged wrongdoing also violated state law and could support a tort claim is not sufficient to invoke the *Parratt* doctrine." *Armstrong v. Daily*, 786 F.3d 529, 539 (7th Cir. 2015) (citing *Zinermon*, 494 U.S. at 128).

BPD's argument fails because the availability and adequacy of a post-deprivation state remedy is irrelevant to the analysis for a substantive due process claim. According to *Zinermon*, the availability of a state law remedy for BPD's egregious conduct does not impact the plaintiff's § 1983 suit. *Id.* at 125. Thus, the Court should disregard the Defendant's argument on this point.

## II. Evidence exists that BPD, through the actions of Nadeau, caused the deprivation of Jeffrey Lilly's constitutional rights.

The Defendant's argument regarding the causal relationship between Jeffrey Lilly's harm and Deputy Commissioner Nadeau's actions again relies on the false assertion that Nadeau's

actions were limited to a single meeting on February 8, 2022. For the reasons stated *supra*, that assertion ignores critical facts and the context in which those facts occurred.

Key to this analysis is the Smith family's deep, long-standing ties to BPD generally and PIB specifically. As the Defendant correctly points out, Lieutenant (now Captain) Lekeshia Blue is assigned to PIB under Nadeau's command. ECF No. 68. Delphine Smith formerly worked as a lieutenant in Internal Affairs, which is now PIB. *Id.* Retired Lieutenant Colonel Robert Smith was a high-ranking BPD official and had previously supervised the investigator that was assigned to 2022-0347, Lieutenant (now Captain) Daniel Popp. *Id.* The record evidence clearly establishes that the relationship between the Smith family and Brian Nadeau's PIB resulted in, at the very least, an obvious conflict of interest that precluded a fair and thorough investigation of the complaints at issue. Had thorough investigations been conducted, the Smith's complaint would have been exposed as fraudulent, and Brian Nadeau would have been charged with neglect of duty for his improper interference.

More importantly, the facts establish that the timing of Robert and Delphine Smith's complaint against Jeffrey Lilly supports the conclusion that the purpose of the complaint was to impede the Plaintiff's attempts to enforce his contracts and reclaim his property. The evidence reveals that their complaint against Jeffrey Lilly was made immediately after the Lilly's attempt to reclaim their property through legal process; that it was done with the assistance of Jerry McLarin (a PIB employee); and that the purpose of the complaint was to interfere with his ability to enforce the contracts at issue, a purpose that PIB was happy to support. Further, Delphine Smith admitted that prior to Lieutenant Popp's direction to take out criminal charges against Jeffrey Lilly, neither she nor Robert Smith had considered filing criminal charges of forgery.

These facts present a question that only a jury can answer, namely had BPD not entertained the Smith family's complaint, and acted to retaliate against Jeffrey Lilly by suspending him without pay (which was only possible because of the decision to keep the investigation rather than transfer it) would Jeffrey Lilly have been able to reclaim his property and enforce his contract? A jury could reasonably determine that BPD's conduct, through Nadeau's actions, was the moving force behind the inability of Jeffrey Lilly to enforce his contracts. *See City of Oklahoma v. Tuttle* 471 U.S. 808 at 823 (1985).

The Smith family was unlawfully withholding Jeffrey Lilly's property and interfering with his right to enforce contracts. They sought assistance from BPD and Brian Nadeau, in the form of a false complaint and a sham investigation, so that they could continue their unlawful possession. BPD happily obliged and violated its own policies and procedures that govern officer discipline and investigative due diligence. Put another way, BPD held a gun to Jeffrey Lilly while the Smith family escaped with his property. Based on the record evidence placed in its appropriate context, a jury could easily determine that the act of holding that gun was the moving force behind the harm Mr. Lilly suffered. Thus, the Defendant's motion must fail on this issue.

### III. Nadeau's status as a "final policymaker" imputes liability on BPD.

Liability against municipalities may be based upon a single incident and the requirements of "policy" and "custom" do not necessitate proof of a long-standing practice. *See Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). Liability attaches where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials <u>responsible for establishing final policy with respect to the subject matter in question.</u> *Id.* at 483 (emphasis added.)

Here, the facts establish that Brian Nadeau is, unquestionably, a "final policymaker" as it pertains to the investigations undertaken by PIB. Nadeau's authority to enact and execute the policy of PIB has been recognized by the Court overseeing the Consent Decree. Per the PIB Investigative and Training Manual, he is the final arbiter of investigative findings, and he alone can determine when a case should be transferred due to a conflict of interest. Deputy Commissioner Nadeau holds himself out as the final decisionmaker in PIB and has taken extraordinary steps to retain visibility and control of ongoing investigations. These facts mirror the facts of *Monistere v. City of Memphis*, 115 Fed. Appx. 845 (2004), where a sergeant was delegated final policymaking authority as to conduct of investigations of officers accused of stealing money from suspect during traffic stop. *See Monistere* at 852. *See also Mandel v. Doe* 888 F.2d 783 (1989), (finding that a physician's assistant at a prison was a policymaker with respect to medical affairs at the prison.)

**IV. BPD's actions were taken under the color of state law.**

BPD's actions went beyond the scope of a typical employer-employee relationship and were taken under the color of state law. Both Raquel Lilly's complaint and Robert Smith's complaint were citizen complaints of misconduct, filed pursuant the Md Code, Public Safety § 3-103. Those complaints are regulated by state law, which specifically provides that:

> A law enforcement agency shall complete a thorough investigation upon receipt of a complaint of alleged police officer misconduct, which is not eligible for mediation, as prescribed pursuant to Public Safety Article, §§ 3-102 and 3-103, Annotated Code of Maryland.

Md. Code Regs. 12.04.09.06 (emphasis added.)  A "law enforcement agency" is defined as:

> (d)(1) "Law enforcement agency" means a governmental police force, sheriff's office, or security force or law enforcement organization of the State, a county, or a municipal

corporation that by statute, ordinance, or common law is authorized to enforce the general criminal laws of the State.

Md Code, Public Safety § 3-201. Thus, and again, the Defendant's argument on this point disregards the appropriate context through which the facts must be analyzed.

Had BPD removed Jeffrey Lilly from his position with the FBI because of performance concerns, or relative to a performance review, perhaps the Defendant's argument would have merit. That is not what happened here. The actions of BPD were taken pursuant to their authority to investigate claims of police misconduct that are prescribed under state law. BPD's failure to conduct any meaningful investigations directly violates the Maryland Legislature's requirement that they thoroughly investigate police misconduct. Additionally, BPD violated provisions of the PIB Investigative Manual that were drafted and implemented in accordance with the federal mandate to reform the agency pursuant to the Consent Decree. Further, BPD recommended that the Smiths take out criminal charges against Jeffrey Lilly. That direction, made by Lieutenant Daniel Popp, while on duty and clothed in the power of a law enforcement officer, provides for recovery under § 1983.

### V. The Plaintiff concedes that BPD as a municipality is not liable for punitive damages.

The Plaintiff concedes that Jeffrey Lilly cannot recover punitive damages against BPD in Count I of this suit.

### CONCLUSION:

The record evidence is sufficient for a jury to find that Jeffrey Lilly suffered a substantive due process violation at the hands of BPD. A reasonable jury could find that Brian Nadeau's actions were consistent with those of a final policymaker and that BPD is liable for the damage

the Plaintiff sustained. Given the facts in dispute, and in recognition of the context in which those facts occurred, the Court should deny the Defendant's motion for summary judgment and set this case for trial.

Dated: February 18, 2025

Respectfully submitted

THE PLAINTIFFS,

By /s/_____
Michael Turiello, Esq. (#30383)
Skeen Law Offices
252 E. High Street
Charlottesville, VA 22902
mturiello@skeenlaw.com

Patrick Jennings, Esq. (#30362)
Jeffrey L. Ment, Esq. (*Pro Hac Vice*)
Ment Law Group
225 Asylum Street – 15th Floor
Hartford, CT 06103
pjennings@mentlaw.com
jment@mentlaw.com