## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JEFFREY LILLY ET AL.,                      *

     Plaintiffs,                          *

v.                                          *

                                        Civil No. 22-2752-BAH

BALTIMORE CITY POLICE                      *
DEPARTMENT ET AL.,
                                            *
     Defendants.
                                            *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

    Jeffrey Lilly, Raquel Lilly, and Twisted Roots Kennels (collectively "Plaintiffs") brought

suit against the Baltimore Police Department ("BPD"), Lekeshia Blue, Robert Smith, and Delphine

Smith alleging violations of Plaintiffs' substantive due process rights under 42 U.S.C. § 1983

through BPD Deputy Commissioner Brian Nadeau's alleged malicious abuse of the Public

Integrity Bureau's ("PIB") investigative and disciplinary process (Count I), and through BPD's

policy and practice of mishandling investigations conducted by the PIB (Count II), as well as state

law claims of civil conspiracy for tortious interference with a contract (Count III), civil conspiracy

for abuse of process (Count IV), conversion (Count V), tortious interference with a contract (Count

VI and Count VII), intentional infliction of emotional distress (Count VIII), abuse of process

(Count IX and Count X), defamation (Count XI), recovery of unpaid wages (Count XII), unlawful

retaliation against a police officer (Count XIII), and indemnification (XIV).[1]  ECF 24 (amended

---

[1] Judge Bennett previously granted Defendants' motion to dismiss Count II, Count III (as to
Nadeau and unknown employees, but not the Smiths), Count IV (as to Blue, but not the Smiths),
Count VII, Count VIII (as to Nadeau and Blue, but not the Smiths), and Count XII.  ECF 34.
Plaintiffs voluntarily withdrew Count IX, Count XIII, and Count XIV in their response to

complaint). Pending before the Court is Defendants Lekeshia Blue, Delphine Smith, and Robert Smith's Motion for Summary Judgment (the "Motion.").[2] ECF 67. Plaintiffs filed an opposition, ECF 74, and Defendants filed a reply, ECF 82. All filings include memoranda of law and exhibits.[3] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Defendants' Motion is **GRANTED** in part and **DENIED** in part.

## I.    BACKGROUND

### A.    Factual Background

Jeffrey Lilly and his wife, Raquel Lilly (collectively "the Lillys") are current or former BPD employees who operated a side business breeding French and English bulldogs, which they called Twisted Roots Kennels ("TRK"). ECF 74, at 5. In October 2020, the Lillys agreed to sell a French Bulldog (a female later named Raine) to James Blue, who is Raquel Lilly's cousin. ECF 74-4, at 2. On October 18, 2020, James Blue was provided with a Limited Partnership Agreement ("LPA"), an Official Registration Certificate, and a partially executed Transfer of Ownership document to be completed by James Blue as the purchaser of the dog. *Id.* Pursuant to the LPA, James Blue agreed to invest $8,500.00 through the purchase of one female French bulldog and gained exclusive breeding rights with TRK for two years. ECF 74-6 (Limited Partnership Agreement), at 2–3. The contract provided that James Blue would keep 60% of the proceeds from total litter sales and the Lillys would keep 40% of the sales. *Id.* at 2. The contract also entitled the

---

Defendants' Motion to Dismiss. *Id.* at 40. Thus, Judge Bennett also dismissed those claims with prejudice.

[2] BPD has filed a separate motion for summary judgment, ECF 68, which is addressed in a separate opinion.

[3] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

Lillys to the pick of the litter. *Id.* James Blue signed the contract via DocuSign on Raquel Lilly's phone on October 18, 2020. *Id.* at 3. Later that day, Raquel Lilly emailed James Blue a copy of the executed contract. ECF 74-5 (email from Raquel Lilly), at 2–3.

In the summer of 2021, James Blue and TRK purchased another French bulldog puppy, Storm, as a business investment with the intention of breeding the dog. ECF 74-8, at 2. At her deposition, Lekeshia Blue testified that she did not approve of her husband spending $5,000.00 on this dog but her husband explained that "[he] and Jeff [Lilly] were going to split the cost of [the bulldog] and [] they were going to breed [the bulldog]." ECF 74-9 (Lekeshia Blue Dep.), at 31, 114:13–115:8. On December 22, 2021, a litter was produced by bulldog Raine. ECF 74-10, at 3. The litter was physically kept at James and Lekeshia Blue's house. ECF 74-10; ECF 74-11.

On January 25, 2022, James Blue was tragically murdered. ECF 74-15 (Delphine Smith Dep.), at 18, 65:13–15. In the immediate aftermath of this tragedy, the Lillys continued to care for the now four-month-old puppies at the Blue household. ECF 74-12, at 2; ECF 74-13, at 2. However, the Lillys wanted the pick of the litter that they believed they were entitled to under the terms of the contract. ECF 74-7, at 2. On January 27, 2022, Jeffrey Lilly received a text message from Jadan Blue, the son of Lekeshia and James Blue. ECF 74-13, at 3. In that message, Jadan stated, "Bro don't come at 1 . . . imma call u back at 12:30 . . . just give me some time to work with my family because they aren't being responsive or very understanding of what you and my father had going on but we going to get this done right just gimme some more time to work on them." *Id.* Jeffrey Lilly responded by sending a copy of the LPA and stated: "My stuff is legit bro." *Id.* at 4–5. Jadan Blue responded "My man. I already know." *Id.* at 5. That evening, Jeffrey Lilly sent the signed LPA to Defendants Robert Smith and Lekeshia Blue stating, "This is what I sent Jadan. So that everyone is on the same page." ECF 74-14, at 2.

3

On January 27, 2022, while the Lillys were trying to retrieve the puppies, Lekeshia Blue reached an agreement with her mother and stepfather, Robert and Delphine Smith, to move all of the puppies to Robert and Delphine's home. ECF 74-15, at 18, 65:7–12. On January 30, 2022, Raquel Lilly informed the Smith Family by text message that the Lillys would be picking up all of the puppies later that day but leaving Storm. ECF 74-16, at 2–3. After Lekeshia Blue and the Smiths prevented the Lillys from retrieving the puppies from the Smith household, the Lillys contacted the Baltimore County Police Department ("BCPD") and requested that BCPD perform a welfare check on the dogs. ECF 74-17 (Police Report), at 4. Robert Smith testified that the Lillys' behavior "ignited things in [his] household when it came to this matter . . . my son hadn't been buried yet . . . it was a toxic time." ECF 74-18 (Robert Smith Dep.), at 41, 157:18–23. Shortly thereafter, Robert Smith messaged his friend and former colleague Deputy BPD Commissioner Sheree Briscoe and asked her to speak with Jeffrey Lilly. *Id.* at 42, 160:9–23. Robert Smith further testified that he contacted Deputy Commissioner Briscoe because he knew Jeffrey Lilly fell under her chain of command, *id.*, and he expected that the family issue "would be taken care of," *id.* at 43, 162:13–18.

Briscoe called Lieutenant Jack Herzog, who then called Jeffrey Lilly on February 1, 2022. ECF 74-20, at 2. Herzog told Jeffrey Lilly to wait to handle the matter until after James Blue's funeral services. *Id.* Raquel Lilly then contacted PIB and filed a complaint alleging that high-ranking police officials "conspire[d]" with Lekeshia Blue and Robert Smith to "influence others by instruction and [use] threatening/intimidating tactics" that "affect[] [Jeffrey Lilly's] job as a police officer." *Id.* at 2–3. Specifically, Raquel Lilly alleged that Robert Smith and Lekeshia Blue "used their assumed power and authority to further extend real power and authority through communication with the Deputy Commissioner to advise, illegal, unreasonable, non-professional,

and intimidating tactics/actions [] that have nothing to do with the performance, responsibility or matters involving [her] husband's occupation and duties." *Id.* at 3.

On February 7, 2022, Raquel Lilly contacted the BCPD to request another welfare check on the puppies. ECF 74-21, at 3–4. Delphine Smith testified that communication with the Lillys and the Lillys' "harassment" of the family ceased on February 7, 2022 after Raquel Lilly asked for the welfare check. ECF 74-15, at 11, 37:2–13. Robert Smith also testified that he did not recall any other interactions with the Lillys after the police came to the Smiths' house on February 7, 2022. ECF 74-18, at 43, 164:7–17.

On February 8, 2022, Jeffrey Lilly attended a meeting with Deputy Commissioner Brian Nadeau in which Nadeau instructed Jeffrey Lilly that "[his] dogs [are] a civil issue that [he] need[s] to take up with an attorney." ECF 74-22 (Brian Nadeau Dep.), at 47, 179:9–11. Nadeau also testified that he told Jeffrey Lilly: "Baltimore County has also told you to settle the matter, like you don't want to get this escalated, you don't want to have any problems, just follow the advice of your attorney." *Id.* at 47, 181:9–13.

By the end of February or the beginning of March, when the puppies were approximately eight weeks old, the Smiths and Lekeshia Blue began selling them. *See* ECF 74-9, at 32–33, 121:12–122:8 ("Big Booty Judy" was sold for $5,000 when she was eight weeks old); *id.* at 33, 123:6–13 ("Bandito" was sold for $4,000 at eight weeks old); *id.* at 32, 118:1–7 ("Kanye" went to Virginia Tech where Jadan Blue was a student, and was later sold for $2,500); *id.* at 32, 118:14–120:1 ("Lottie Dottie" was sold to Delphine Smith for $5,000). Lekeshia Blue kept "Kim Kardashian," or "Kim K.," and renamed her Hailey. *Id.* at 31, 116:21–117:1.

The Smith family received demand letters, dated March 8, 2022, from attorneys representing TRK, seeking the return of the five puppies and the now adult French bulldog named

Storm. ECF 74-23, at 2–4. However, the puppies had already been sold at this point. Shortly thereafter, Robert and Delphine Smith filed a misconduct complaint against Jeffrey Lilly. ECF 74-15, at 28, 103:2–19. Jerry McLarin, who worked in PIB and was frequently at the Smith home around this time, made the appointment for Robert and Delphine Smith to file their complaint. *Id.*

On March 14, 2022, Robert and Delphine Smith traveled together to the PIB and filed a complaint against Jeffrey Lilly. ECF 74-24, at 2–3. The Smiths brought the following documents to the meeting: the LPA with James Blue's signature, the email James Blue received which contained the signed LPA, various examples of James Blue's signature, and the Puppy Purchase Agreement without the fourth page of that document. ECF 74-25, at 2–20.

Detective Anthony Bowling and Lieutenant Daniel Popp conducted an interview of Robert Smith when he came in to PIB to file a complaint against Jeffrey Lilly. ECF 74-26 (Anthony Bowling Dep.), at 6, 14:2–16. The interview was recorded. *Id.* at 6, 16:2–6. After the interview, Detective Bowling requested to be recused from the investigation based on Robert Smith's statements that he discussed this matter with several top-ranking officials within BPD and that some of those top-ranking officials, including Deputy Commissioner Nadeau, may need to be investigated because such communication may have been improper and in violation of internal policies. ECF 74-27 (Bowling Recusal Report), at 2–3. The recording of the interview has disappeared and despite repeated requests, BPD has been unable to locate it and produce it in discovery. ECF 74, at 12.

Lieutenant Popp did not grant Detective Bowling's request for recusal and was instructed to keep the investigation of Robert and Delphine Smith's complaint in-house. ECF 74-28 (Daniel Popp Dep.), at 53, 203:21–204:25. In an email with the subject line 'Robert Smith' from April 22, 2022, Lieutenant Popp wrote to his Captain, Lamar Howard, with the following update: "Smitty

called me, and wanted an update on the investigation. I told him I was interviewing Lilly on Tuesday at 1000 hrs, but I was trying to farm the investigation out." ECF 74-30, at 2. Lieutenant Popp confirmed at his deposition that details of investigations in PIB are strictly confidential. ECF 74-28, at 53, 203:3–5.

On April 25, 2022, Robert and Delphine Smith swore out felony criminal charges of forgery against Jeffrey Lilly because they believed James Blue's signature had been forged on the LPA documents. ECF 74-31, at 2–6. Lieutenant Popp had previously instructed Robert and Delphine Smith to go to a state District Court Commissioner about the alleged contract forgery because "that's what [he] would do." ECF 74-15, at 31, 117:5–16. Later that evening, Delphine Smith emailed the criminal charges she took out against Jeffrey Lilly to Lieutenant Popp. ECF 74-32, at 1. Delphine Smith wrote: "Lt. Popp, Attached is the Charging document from Baltimore County Court Commissioner for Jeffrey Lilly to be added to our Internal Investigation Complaint. Please let us know if you need anything else." *Id.* Lieutenant Popp then forwarded the criminal charges against Jeffrey Lilly to everyone in his chain of command, which included Deputy Commissioner Nadeau, Major Callaghan, and Captain Howard. *Id.*

## B.    Procedural History

On September 13, 2022, Plaintiffs initiated the instant lawsuit in the Circuit Court for Baltimore City against Defendants. ECF 2. On October 26, 2022, Defendants removed this action pursuant to this Court's federal question and diversity jurisdiction. ECF 1.

On November 21, 2022, the BPD Defendants[4] filed a Motion to Dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF 12. On January 31, 2023, Plaintiffs Jeffrey and Raquel Lilly filed their First Amended Complaint against Defendants, adding

---

[4] The BPD Defendants include BPD, Nadeau, unknown employees of BPD, and Lekeshia Blue.

Plaintiff Twisted Roots Kennels, bringing fourteen claims against the various Defendants. ECF 24. Also on January 31, 2023, Defendants Robert Smith and Delphine Smith answered Plaintiffs' First Amended Complaint. ECF 21; ECF 22. On February 14, 2023, the BPD Defendants filed an updated Motion to Dismiss Plaintiffs' First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF 25. Plaintiffs responded in opposition, ECF 26, and the BPD Defendants replied, ECF 33.

On September 25, 2023, Judge Bennett granted in part and denied in part the Motion to Dismiss. ECF 35. The claims that survived the Motion to Dismiss are: the 42 U.S.C. § 1983 claim set forth in Count 1 against Defendant BPD; the civil conspiracy claims for tortious interference with a contract and abuse of process set forth in Counts 3 and 4 against Defendants Robert Smith and Delphine Smith; the conversion claim set forth in Count 5 against Defendants Lekeshia Blue, Robert Smith, and Delphine Smith; the tortious interference with a contract claim set forth in Count 6 against Defendants Robert Smith and Delphine Smith; the intentional infliction of emotional distress claim set forth in Count 8 against Defendants Robert Smith and Delphine Smith; the abuse of process claim set forth in Count 10 against Defendant Delphine Smith; and the defamation claim set forth in Count 11 against Defendant Delphine Smith.

On October 18, 2023, the case was reassigned to the undersigned. On January 16, 2025, Lekeshia Blue and the Smiths filed a Motion for Summary Judgment. ECF 67. On January 17, 2025, BPD also filed a Motion for Summary Judgment. ECF 68. Plaintiffs opposed both Motions, ECF 74; ECF 75, and Defendants replied, ECF 82 (Blue and Smiths' reply); ECF 86 (BPD reply).

## II.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether

the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002). At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens*

9

*Football Club, Inc.,* 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774,

778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving

party as well as conclusory allegations or denials, without more, are insufficient to withstand a

summary judgment motion." *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Tom v.*

*Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.    ANALYSIS

Defendants move for summary judgment on all remaining Counts in the Amended

Complaint. As explained in more detail below, the Court finds that Defendants are entitled to

summary judgment on Plaintiffs' claims for abuse of process (Count X), civil conspiracy for abuse

of process (Count IV), intentional infliction of emotional distress (Count VIII), and defamation

(Count XI). Genuine disputes of material fact preclude summary judgment on Plaintiffs' claims

for tortious interference with a contract (Count VI), civil conspiracy for tortious interference with

a contract (Count III), and conversion (Count V). Accordingly, Defendants' motion for summary

judgment is granted in part and denied in part.[5]

---

[5] The Court notes that some portions of Defendants' Motion for Summary Judgment read like a
Motion to Dismiss. Indeed, it appears that, at times, Defendants substituted the motion to dismiss
standard for the summary judgment standard. *See, e.g.,* ECF 67, at 10 ("Plaintiffs' conclusion of
a conspiracy is purely speculative and fails to state when the alleged conspiracy was formed, and
also to present any facts tending to show that such agreement was ever collectively reached.");
ECF 67, at 17 ("The allegations in Count 8 fall far short of stating a claim for IIED under Maryland
law."). While BPD, Lekeshia Blue, and Brian Nadeau filed a motion to dismiss before Judge
Bennett, the Smiths did not previously challenge the sufficiency of the Amended Complaint.
Therefore, to the extent the Smiths attempt to belatedly argue that Plaintiffs failed to state a claim
under certain counts in the Amended Complaint, the Court rejects such arguments as inappropriate
at this stage of the litigation. The Court evaluates the Motion for Summary Judgment in
accordance with the aforementioned standards set forth under Rule 56.

A.    Tortious Interference with a Contract (Count VI) and Civil Conspiracy for Tortious Interference with a Contract (Count III)

Plaintiffs brought Counts VI and III against Robert and Delphine Smith for tortious interference with a contract and civil conspiracy for tortious interference with a contract. ECF 24, at 27–28. In Maryland, a claim for civil conspiracy requires proof of the following elements: 1) a confederation of two or more persons by agreement or understanding; 2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and 3) actual legal damage resulting to the plaintiff. *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 284 (Md. 2007). Civil conspiracy is not an independent cause of action under Maryland law. *Hejirika v. Md. Div. of Corr.*, 264 F. Supp. 2d 341, 346–47 (D. Md. 2003). Rather, a "defendant's liability for civil conspiracy depends entirely on its liability for a substantive tort." *Id.* To prevail on a claim for tortious interference with contract, the plaintiff must show "(1) the existence of a contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional interference with that contract; (4) hindrance to the performance of the contract; and (5) resulting damages to the plaintiff." *Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*, 705 F. Supp. 3d 510, 517 (D. Md. 2023).

Here, Defendants argue that they "were never privy to the terms of the parties' agreement" and thus "there was no way for Defendants to confirm the agreement or its terms." ECF 67, at 8. Plaintiffs respond that "[t]here is overwhelming evidence to support the reasonable conclusion that the Defendants interfered with the contract when they moved the dogs, kept the dogs, sold (some of) the dogs, kept the proceeds from the sale of the dogs, and concealed the sale of the dogs from the Plaintiffs all while the Plaintiffs were trying to enforce the contract." ECF 74, at 26.

For the purposes of this Motion, Defendants have conceded that a contract existed. ECF 67, at 8. However, material fact disputes remain over whether Defendants *knew* in January,

11

February, and March 2022 that the contract was valid and nonetheless intentionally interfered with the contract. Specifically, the parties dispute whether the Smiths had a good faith basis to believe that James Blue's signature on the LPA was forged. According to Lekeshia Blue's affidavit, "[t]he signature did not appear to be that of James Blue, because it did not look anything like his signature and it was missing his middle initial and the 3rd or "III" to the ending, which he always used to distinguish himself from his father's signature." ECF 67-9 (Lekeshia Blue Aff.), at 3 ¶ 19; *see also* ECF 67-15, at 2–8 (prior examples of James Blue's signature). Similarly, Delphine Smith affirmed that she "knew that James Blue always signed his name as James E. Blue, III to distinguish himself from his father; and that he had recently signed a financial loan agreement via DocuSign with his true full name," and that the "alleged contract did not include any authentication, and it only consisted of a single page, with no accompanying authentication page or other supporting documentation associated with DocuSign." ECF 67-8, at 3 ¶¶ 18, 19. Plaintiffs, on the other hand, argue that there is ample evidence in the record from which a reasonable juror could infer the Smiths' knowledge of a valid contract, including Robert and Delphine Smith's deposition testimony confirming that they knew there was a business, ECF 74-18, at 38, 145:22–23; ECF 74-15, at 25, 91:20–92:8, Lekeshia Blue's presence when James Blue signed the contract, ECF 74-33, at 51, 197:5–8, and Robert Smith and Lekeshia Blue's receipt of the LPA from Jeffrey Lilly via text after James Blue died, ECF 74-14, at 2. Ultimately, whether the Defendants have spoken truthfully about their skepticism of the validity of the signature on the contract is a credibility determination that the Court simply may not make. *See Anderson*, 477 U.S. at 255. Thus, the case will proceed to trial on the tortious interference with a contract claim for the jury to determine whether Defendants knowingly interfered with a contract.

The Supreme Court of Maryland[6] has "consistently held that 'conspiracy is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff.'" *Alleco Inc. v. Harry & Jeannette Weinberg Found., Inc.*, 665 A.2d 1038, 1045 (Md. 1995) (quoting *Alexander v. Evander*, 650 A.2d 260, 265 n.8 (Md. 1994)). Thus, Plaintiffs' civil conspiracy claim may be viable if Plaintiffs prevail on their tortious interference with a contract claim, as that could provide the underlying injury. *See Hoffman v. Stamper*, 867 A.2d 276, 290 (Md. 2005) ("The tort actually lies in the act causing the harm; the agreement to commit that act is not actionable on its own but rather is in the nature of an aggravating factor."). Because there are genuine issues of material fact on the tortious interference with contract claim, the question of whether there was a mutual agreement between the Smiths to accomplish the allegedly wrongful conduct must also be resolved at trial because the conspiracy claim hinges on whether there was underlying "tortious injury." *Alleco Inc.*, 665 A.2d at 1045.

Defendants argue that "Plaintiffs are unable to present any evidence that the Defendants came to a mutual understanding to accomplish an unlawful plan." ECF 67, at 9. However, there is a genuine dispute over the level of the Smiths' involvement in preventing the Lillys from accessing the dogs, and the Court cannot conclude on this record that there is an absence of evidence giving rise to an agreement to conspire. There is evidence that the Smiths agreed to move the dogs from Lekeshia Blue's house to their house, ECF 74-15, at 18, 65:7–12, Delphine Smith handled the sale of most of the dogs and "kept all the receipts," ECF 74-9, at 33, 122:1–4, and Robert Smith made a call to a former co-worker at the BPD asking the co-worker to get Jeffrey Lilly to stop seeking the return of the dogs, at least until after the funeral of James Blue, ECF 74-

---

[6] On November 8, 2022, the voters of Maryland ratified an amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

18, at 42, 160:9–23. Whether these facts indicate ill-timed independent wrongdoing by two actors, or the product of a conspiracy, is for a jury to decide. *See Anderson*, 477 U.S. at 255 (determining which version of events is more persuasive is a function for the jury, not the Court). Because a reasonable juror could conclude that the Smiths acted in concert to knowingly interfere with a contract, summary judgment is inappropriate on Counts VI and III.

**B.      Abuse of Process (Count X) and Civil Conspiracy for Abuse of Process (Count IV)**

Count X, abuse of process, is brought against Delphine Smith. ECF 24, at 33. Count IV, civil conspiracy for abuse of process, was initially brought against the Smiths and Lekeshia Blue, but Judge Bennett dismissed the claim against Lekeshia Blue with prejudice. ECF 34, at 32. To sustain a cause of action for abuse of process, the plaintiff must prove: first, that the defendant willfully used process after it has issued in a manner not contemplated by law; second, that the defendant acted to satisfy an ulterior motive; and third, that damages resulted from the defendant's perverted use of process. *One Thousand Fleet Ltd. Pshp. v. Guerriero*, 694 A.2d 952, 956 (Md. 1997); *Berman v. Karvounis*, 518 A.2d 726, 727 (Md. 1987). Additionally, Maryland law requires a plaintiff to allege an unlawful arrest or seizure of property to support the damages element of an abuse of process claim. *See One Thousand Fleet*, 694 A.2d at 960. The "mere issuance of process itself . . . is not actionable, even if it is done with 'ulterior motive' or 'bad intention.'" *Campbell v. Lake Hallowell Homeowners Ass'n*, 852 A.2d 1029, 1044 (Md. App. 2004). "[T]here is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Palmer Ford, Inc. v. Wood*, 471 A.2d 297, 311 (Md. 1984) (quoting W. Prosser, Handbook of the Law of Torts 846–47 (4th ed. 1971)).

The parties dispute whether the Smiths swore out criminal forgery charges against Jeffrey Lilly based on a good faith belief that the contract was not validly signed by James Blue. ECF 67,

at 19. However, even assuming the Smiths did not actually believe the document was forged, and further assuming that the Smiths swore out criminal charges with bad intentions or an ulterior motive, there is no evidence in the record that Jeffrey Lilly suffered an unlawful arrest or seizure of property to support the damages element of an abuse of process claim. Plaintiffs argue that "the facts of the case and the reasonable inferences drawn therefrom in the light most favorable to the Plaintiffs demonstrate that the Smith Defendants willfully used process (the felony criminal charges) to have Jeffrey Lilly suspended without pay, to have him lose his prestigious assignment as an FBI Task Force Officer, and to pressure and coerce him to cease his efforts to enforce his contractual rights." ECF 74, at 27. But none of these harms constitute an arrest or a seizure of property, as required by Maryland law. *See One Thousand Fleet*, 694 A.2d at 960 ("A cause of action for civil abuse of process in Maryland requires that the plaintiff establish that an arrest of the person or a seizure of property of the plaintiff resulted from the abuse of process." (citation omitted)). In fact, Plaintiffs do not even address the arrest or property seizure requirement in discussing damages. Rather, they simply claim that Jeffrey Lilly "suffered considerable damages," ECF 74, at 27, without addressing Defendants' argument that Plaintiffs have failed to establish that the "final [damages] component of this cause of action is [] met." ECF 67, at 12. Because there is no genuine dispute in the record that Jeffrey Lilly was neither arrested nor had his property seized because of the felony charges levied against him by the Smiths, summary judgment is appropriate on Count X. Additionally, because civil conspiracy is not a stand-alone claim, summary judgment must be awarded on Count IV, too, since it is based on the underlying abuse of process claim.

### C.    Conversion (Count V)

Count V is brought against Robert and Delphine Smith and Lekeshia Blue. Under Maryland law, "[c]onversion is an intentional tort, consisting of two elements, a physical act

combined with a certain state of mind." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 841

A.2d 828, 835 (Md. 2004). "The physical act can be summarized as 'any distinct act of ownership

or dominion exerted by one person over the personal property of another in denial of his right or

inconsistent with it.'" *Id.* (citations omitted). The requisite intent is "an intent to exercise a

dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." *Keys*

*v. Chrysler Credit Corp.*, 494 A.2d 200, 208 (Md. 1985). "The defendant may have the requisite

intent even though he or she acted in good faith and lacked any consciousness of wrongdoing, as

long as there was an intent to exert control over the property." *Darcars*, 841 A.2d at 836. "The

general rule is that monies are intangible and, therefore, not subject to a claim for conversion."

*Allied Inv. Corp. v. Jasen*, 731 A.2d 957 (Md. 1999) (citations omitted). "An exception exists,

however, when a plaintiff can allege that the defendant converted specific segregated or

identifiable funds." *Id.* (citations omitted).

Defendants argue that "[i]t is well settled that monies are intangible and, therefore, cannot

be subject to a claim for conversion." ECF 67, at 15. Plaintiffs respond that their "contractual

rights were not merely for them to receive 40% of the proceeds, it was also for them to have the

pick of the litter and for them to market and sell the puppies." ECF 74, at 28. Courts applying

Maryland law have distinguished between claims seeking return of actual, identifiable money, and

those seeking a specific amount of money. *See, e.g., G&D Furniture Holdings, Inc. v. SunTrust*

*Bank*, Civ. No. TDC-16-2020, 2016 WL 7441607, at *7 (D. Md. Dec. 22, 2016) (dismissing

conversion claim where the plaintiff "asserted the intentional withdrawal of, and failure to return,

a specific dollar amount," but not "that the allegedly converted funds were segregated, identifiable,

or kept separate in any way"); *Durm v. Am. Honda Fin. Corp.*, Civ. No. WDQ-13-0223, 2013 WL

6490309, at *6 (D. Md. Dec. 9, 2013) ("The complaint does not seek the return of the exact funds

[plaintiff] paid to [defendant], but instead seeks damages . . . [plaintiff] basically alleges that . . . [defendant] owes him a specific amount of money."). In short, where the defendant "commingles [the funds] with other monies . . . the money 'loses its specific identity and may no longer be the subject of a conversion action.'" *Gibbons v. Bank of Am. Corp.*, Civ. No. JFM-08-3511, 2012 WL 94569, at *9 (D. Md. Jan. 11, 2012) (quoting *Simmons v. Lennon*, 773 A.2d 1064, 1075 (Md. App. 2001)); *see also John B. Parsons Home, LLC v. John B. Parsons Found.*, 90 A.3d 534, 547 (Md. App. 2014) ("[W]hen funds are co-mingled, the monies lose their 'separateness' and, therefore, are not subject to a claim of conversion.").

Here, there is no evidence that the allegedly converted funds (the proceeds from the puppy sales) were maintained in a segregated account or otherwise were not comingled with the Defendants' accounts. Plaintiffs merely contend that they "know exactly what L[e]keshia Blue sold the puppies for, and Delphine Smith kept the receipts." ECF 74, at 28. But this is insufficient to show "that the allegedly converted funds were segregated, identifiable, or kept separate in any way." *See G&D Furniture Holdings*, 2016 WL 7441607, at *7; *see also Nash v. Montgomery Cnty., Md.*, Civ. No. GJH-20-1138, 2021 WL 1222874, at *8 (D. Md. Mar. 31, 2021) (dismissing conversion claim where the plaintiff failed to allege "any facts suggesting that these funds have been held in a segregated account or otherwise held apart"). Ultimately, with respect to the 40% of the litter sale proceeds, the Court finds that Plaintiffs "do[] not seek the return of the exact funds" from the litter sale, rather they seek damages and allege that Defendants "owe[] [them] a specific amount of money." *Durm*, 2013 WL 6490309, at *6. This is not the proper subject of a conversion claim. Thus, to the extent part of Plaintiffs' conversion claim is based on their alleged entitlement to 40% of the proceeds of the litter sale, Defendants are entitled to summary judgment on that theory of recovery because the money at issue does not fall under the exception to the rule.

However, Plaintiffs' conversion claim does not appear to rest solely on the allocation of proceeds under the contract. Plaintiffs also aver that "the Smith Defendants committed multiple physical acts of control over the disputed property, all with the state of mind of depriving the Lillys of that property." ECF 74, at 27. According to Plaintiffs, "[e]ach discrete physical act gives rise to an actionable claim of conversion: moving the dogs to the Smith household; preventing the Lillys from having access to the dogs; selling (three of) the dogs; and keeping (two of) the dogs." *Id.* Defendants maintain that "puppies were moved by [] Defendant Blue who was lawfully in possession of the puppies; that the mother of the puppies, Raine, belonged to the decedent James Blue and his wife and children, and . . . that the puppies of Raine were to stay with their mother until they were at least 8 weeks." ECF 67, at 13. While Defendants state in a conclusory fashion that Lekeshia Blue "was within her legal right to take her dog Raine and the puppies," and "there was no basis, legal or contractual[,] to prevent the move," ECF 67, at 14, Plaintiffs contend that they were entitled "to have the pick of the litter and for them to market and sell the puppies." ECF 74, at 28.

There remains a genuine dispute of fact over whether the litter, or some portion of the litter, was the property of Plaintiffs. There is also a genuine dispute of fact over who was legally entitled to sell the puppies. There is record evidence showing that the Lillys were entitled to the pick of the litter, ECF 74-6, at 2, and that the Smiths and Lekeshia Blue withheld all five puppies, ECF 74-17, at 4. While the contract explicitly laid out the allocation of litter sale proceeds, there is ambiguity in the contract as to who was entitled to be in physical possession of the puppies and as to who was to conduct the litter sale. *See* ECF 74-6, at 2. Accordingly, there is a genuine dispute of fact over whether the litter (or at least one puppy in the litter) was the property of Plaintiffs. A reasonable juror could find that the litter was the personal property of Plaintiffs and thus

Defendants' actions of retaining the puppies (or at least one puppy) in their exclusive control, and eventually selling the puppies, constituted an exercise of control which was inconsistent with Plaintiffs' rights. Therefore, summary judgment is not warranted under Count V. To be clear, at trial, the conversion claim will not rest on the return of the 40% sale proceeds because that money is not the proper subject of a conversion claim. However, Defendants' alleged movement of the puppies without Plaintiffs' consent and Defendants' alleged subsequent restriction of Plaintiffs' access to the puppies is the proper subject of the conversion claim. The Court leaves to the jury the task of weighing the evidence to determine whether the litter (or some portion of the litter) constituted Plaintiffs' personal property, given the ambiguity in the contract terms and competing claims regarding who was entitled to physical possession of the puppies after they were born.

### D.    Intentional Infliction of Emotional Distress (Count VIII)

Count VIII remains only as to the Smiths because Judge Bennett dismissed the claim against Lekeshia Blue and Nadeau. ECF 34, at 38. The question remaining, in essence, is whether filing forgery charges and keeping the Lillys from accessing the puppies they intended to sell constitutes "extreme and outrageous conduct." *Batson v. Shiflett*, 602 A.2d 1191, 1216 (Md. 1992). Defendants argue that the behavior "does not rise to the level of extreme or outrageous conduct required to support an [Intentional Infliction of Emotional Distress ("IIED")] claim under Maryland law." ECF 67, at 18. The Court agrees.

In Maryland, the elements of an IIED claim are: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; [and] (4) The emotional distress must be severe." *Lasater v. Guttmann*, 5 A.3d 79 (Md. App. 2010). In order to satisfy the element of extreme and outrageous conduct, the conduct "must be 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

19

society.'" *Batson*, 602 A.2d at 1216 (quoting *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)). In other words, the emotional distress complained of must be so severe that "no reasonable man could be expected to endure it." *Harris*, 380 A.2d 611. "To be actionable, the conduct relied upon 'must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Id.* at 248 (quoting *Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1064 (Md. App. 1986)).

Even drawing all reasonable inferences in favor of Plaintiffs, no reasonable juror could find the underlying conduct "extreme and outrageous." *Batson*, 602 A.2d at 1216. As noted, the "extreme and outrageous" standard is quite high. *See generally Bagwell v. Peninsula Reg'l Med. Ctr.*, 665 A.2d 297, 319 (Md. App. 1995) (explaining that the tort of IIED is "rigorous, and difficult to satisfy"). Plaintiffs maintain that the Smiths caused severe emotional distress by "repeatedly [trying] to manipulate their power and influence to silence the Plaintiffs and inflict pain on them in order to coerce them to abandon their contractual property." ECF 74, at 28. Further, Plaintiffs argue that Defendants "knew [Jeffrey Lilly's] career would be ruined when they levied false felony charges of perjury against him." ECF 74, at 28. As a result of the Smiths' conduct, Plaintiffs argue that they "lost their business[,] Jeffrey Lilly lost his career[,] [a]nd both Jeffrey Lilly (heart attack) and Raquel Lilly (suicide attempt) nearly lost their lives and their spouse." ECF 74, at 29. While the Court acknowledges that this was a painful time for Plaintiffs, the conduct by Robert and Delphine Smith does not exceed "all possible bounds of decency." *Batson*, 602 A.2d at 1216. Accordingly, summary judgment is warranted on Count VIII.

### E.    Defamation (Count XI)

Count XI is brought against Delphine Smith. ECF 24, at 34. The Maryland Court of Appeals has explained that extrinsic statements that give rise to an out-of-court defamation claim "occur commonly in three categories: (1) statements made with the direct purpose or effect of

producing a judicial or quasi-judicial proceeding, *e.g.*, a police brutality complaint, (2) statements 'prepared for possible use in connection with a pending judicial proceeding,' but which remain unfiled at the time of the alleged injury, and (3) statements that are not designed necessarily to produce a proceeding or cause one to be 'filed,' but which are connected contextually to a pending or ongoing proceeding." *Norman v. Borison*, 17 A.3d 697, 710–11 (Md. 2011) (quoting *Adams v. Peck*, 415 A.2d 292, 294 (Md. 1980)). As the Supreme Court of Maryland has explained, absolute privilege is extended in many situations falling into one of these categories in order to "encourage the free divulgence of information in pursuit of justice," and "because '[t]he evaluation and investigation of facts and opinions for the purpose of determining what, if anything, is to be raised or used in pending litigation is as integral a part of the search for truth . . . as is the presentation of such facts and opinions during the course of the trial . . . '" *Id.* at 711 (quoting *Adams*, 415 A.2d at 295); *see also Offen v. Brenner*, 935 A.2d 719, 726 (Md. 2007) ("[T]he basis for extending absolute immunity [is] to prevent unduly hindering important speech, and to ensure that otherwise actionable conduct thus is protected where the accused acts in furtherance of a recognized socially important interest." (internal quotation marks and citation omitted)).

When evaluating a defamation claim for statements made with the direct purpose or effect of producing a judicial or quasi-judicial proceeding, the Court considers "whether the proceeding, which results from the statement, serves an important public interest and possesses adequate procedural safeguards." *Norman*, 17 A.3d at 711. In *Norman*, the Supreme Court of Maryland reviewed the relevant case law and explained that:

> [I]n *Miner v. Novotny*, 498 A.2d 269, 273–75 (Md. 1985), and *Imperial v. Drapeau*, 716 A.2d 244, 250–51 (Md. 1998), we held that absolute privilege protected citizens who filed complaints with governmental entities against a deputy sheriff and an emergency medical technician, respectively. The possible harm stemming from these defamatory complaints was "outweighed by the public's interest in encouraging the filing and investigation of valid complaints."

*Id.* Delphine Smith argues that her actions "were based on a reasonable belief that the purported contract was forged." ECF 67, at 21. Further, she maintains that because the "alleged defamatory statements were made as part of a report to [the] Court Commission and [the] State's Attorney regarding a potential forgery," the statements are protected by absolute privilege. *Id.* According to Plaintiffs, "[t]he defamatory statements included false allegations that Jeffrey Lilly forged a document, continually harassed her and her family, and was such a violent and threatening individual that she was in fear of imminent retaliation." ECF 74, at 29 (citing ECF 74-31, at 2–6).[7]

Plaintiffs do not address Delphine Smith's argument that she is entitled to absolute privilege. Plaintiffs' failure to substantively respond to the affirmative defense constitutes abandonment. *See Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (explaining that plaintiff's failure to address an argument raised in defendant's opening brief constitutes abandonment of the challenged claim). However, even if Plaintiffs had not abandoned the defamation claim, Delphine Smith is nonetheless entitled to absolute privilege for the allegedly defamatory statements she made to the District Court Commissioner when swearing out criminal charges against Jeffrey Lilly.

The proceeding that resulted from Delphine Smith's statement—a criminal investigation into forgery—serves an important public interest, namely preventing fraudulent behavior. *See Miner*, 498 A.2d at 274–75 (explaining that absolute privilege applies to a citizen's police brutality complaint because "[c]itizen complaints of such abuses, and the administrative disciplinary

---

[7] The only record evidence Plaintiffs cite in the defamation section of their response in opposition to the Motion is Exhibit 28, which is the application for statement of charges. ECF 74, at 29. Therefore, the Court interprets the scope of the defamation claim to include only the statements Delphine Smith made while filing the application for criminal charges.

procedure which has been developed to investigate these complaints, serve a public function of vital importance by providing a mechanism through which abuses may be reported to the proper authorities, and the abusers held accountable"). Further, the process utilized by Delphine Smith possesses adequate procedural safeguards to minimize the occurrence of defamatory statements. *See id.* at 274 (finding adequate procedural safeguards where, *inter alia*, no complaint may be investigated unless the complaint is duly sworn to, a person who knowingly makes a false complaint is subject to criminal liability, a record of the interrogation must be kept, the hearing phase is adversarial in nature, and each party has the right to cross-examine witnesses and submit rebuttal evidence); *cf. McDermott v. Hughley*, 561 A.2d 1038, 1045 (Md. 1989) (finding insufficient procedural safeguards in an administrative investigation where "[t]here was no legally cognizable tribunal administering the proceeding; there was no public hearing adversary in nature; no compellable witnesses were sworn or cross-examined; no reviewable opinion or analysis was generated; and, most significantly, [defendant] did not have the opportunity to present his side of the story").

Here, the document titled, "Notice to Applicant for a Charging Document," which is provided to persons filling out an Application for Statement of Charges, states "You are filing the application under oath. Criminal Law Article § 9-503, of the Annotated Code of Maryland makes it a crime to knowingly make a false statement in order to have charges brought or an official investigation started."[8] The form also indicates: "You must appear at the trial as a witness. Unless

---

[8] The Court takes judicial notice of the Notice to Applicant for a Charging Document because it is referenced in the Application for Statement of Charges document and provides publicly available information about the procedural safeguards associated with the criminal complaint process. *See Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 503 (D. Md. 2019) ("Pursuant to Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts if they are not subject to reasonable dispute, in that they are (1) generally known within the territorial jurisdiction of the trial court or

you are excused by the State's Attorney, failure to appear on the date set by the court could result in your arrest for failure to obey a court order." This provides an avenue to attempt to ensure the availability of the complainant for cross-examination if the case proceeds, and the criminal proceedings, if instituted, are adversarial in nature. Thus, the Court finds that the procedural safeguards built into the criminal complaint process are adequate. *See Miner*, 498 A.2d at 269. Because public policy encourages communication of possible fraudulent behavior to law enforcement authorities and the Baltimore County criminal complaint process implements procedural safeguards to help protect the integrity of the process, the Court finds that Delphine Smith is entitled to absolute privilege for her allegedly defamatory statements and she cannot be held civilly liable for statements she made during the criminal complaint process.

## IV.  **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment, ECF 67, is granted in part and denied in part. Defendants are entitled to summary judgment on Plaintiffs' claims for abuse of process (Count X), civil conspiracy for abuse of process (Count IV), intentional infliction of emotional distress (Count VIII), and defamation (Count XI). Genuine disputes of material fact preclude summary judgment on Plaintiffs' claims for tortious interference with a contract (Count VI), civil conspiracy for tortious interference with a contract (Count III), and conversion (Count V).

A separate implementing Order will issue.

Dated: June 17, 2025

/s/
Brendan A. Hurson
United States District Judge

---

(2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." (internal quotation marks omitted)).