**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

JEFFREY LILLY ET AL.,        \*

    Plaintiffs,          \*

v.                        \*

BALTIMORE CITY POLICE      \*
DEPARTMENT ET AL.,
                         \*

    Defendants.          \*

Civil No. 22-2752-BAH

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>MEMORANDUM OPINION</u>

Jeffrey Lilly ("Lilly"), Raquel Lilly, and Twisted Roots Kennels brought suit against the Baltimore Police Department ("BPD"), Brian Nadeau, Lekeshia Blue, Robert Smith, and Delphine Smith alleging the violation of Plaintiffs' substantive due process rights under 42 U.S.C. § 1983 through Brian Nadeau's alleged malicious abuse of the Public Integrity Bureau's investigative and disciplinary process (Count I), as well as state law claims of civil conspiracy for tortious interference with a contract (Count III), civil conspiracy for abuse of process (Count IV), conversion (Count V), tortious interference with a contract (Count VI), intentional infliction of emotional distress (Count VIII), abuse of process (Count X), and defamation (Count XI).[1] ECF 24 (amended complaint).

In short, this case presents an unfortunate dispute between family members over the ownership of a litter of puppies. That dispute eventually spilled into the workplace of several of the family members, the BPD, and came to involve several other BPD officials, including

---

[1] Judge Bennett previously granted Defendants' motion to dismiss the remaining Counts. ECF 34.

Nadeau. Pending before the Court is BPD's Motion for Summary Judgment (the "Motion"). ECF 68. Plaintiff Jeffrey Lilly[2] filed an opposition, ECF 75, and BPD filed a reply, ECF 86. All filings include memoranda of law and exhibits.[3] BPD also filed a motion to strike two exhibits in Plaintiff's response in opposition to the Motion. ECF 85. Plaintiff filed an opposition to the motion to strike, ECF 87, and BPD filed a reply, ECF 89. The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, BPD's Motion for Summary Judgment is **GRANTED**. Additionally, BPD's Motion to Strike is **GRANTED** in part and **DENIED** in part.[4,]

## I.    BACKGROUND

Plaintiff Jeffrey Lilly is a Detective with BPD. Since 2019, Mr. Lilly, along with his wife, Raquel Lilly (collectively, "the Lillys") have operated a side business breeding French and English bulldogs, which they named Twisted Roots Kennels. ECF 75-8 (Raquel Lilly Dep.), at 36, 134:11–21. On October 18, 2020, the Lillys executed a contract with James Blue (Raquel Lilly's cousin) whereby James Blue agreed to invest $8,500.00 in the Lilly's dog-breeding business through the purchase of one female French Bulldog. ECF 75-10 (Limited Partnership Agreement), at 2–3. The Lillys met James Blue and James's wife, Lekeshia Blue, in person and James Blue signed the contract via DocuSign using Raquel Lilly's phone. ECF 75-8, at 50,

---

[2] Count I, which is the only surviving claim against BPD, was brought by Plaintiff Jeffrey Lilly "against Defendant Baltimore Police Department for the actions of its agent Deputy Commissioner Nadeau[.]" ECF 24, at 25 ¶ 131. Because this Count was brought only on behalf of Jeffrey Lilly, the Court will refer to Jeffrey Lilly as "Plaintiff" and will reference BPD as "Defendant."

[3] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

[4] A separate motion for summary judgment filed by Defendants Lekeshia Blue, Robert Smith, and Delphine Smith, ECF 67, will be decided in a separate opinion. Thus, for the purposes of this Memorandum Opinion, "Defendant" references BPD.

192:1–193:14; ECF 75-10, at 3.  According to Raquel Lilly, Lekeshia Blue was present, but Raquel "[doesn't know] if [Lekeshia Blue] saw her husband sign [the contact]," and "[James Blue] didn't want [Lekeshia] involved in that agreement[.]"  ECF 75-8, at 51, 197:3–8.  The contract provided that James Blue would keep 60% of the proceeds from any litter produced using the female French Bulldog he purchased and the Lillys would keep 40%. ECF 75-10, at 2. The agreement also entitled the Lillys to the pick of the litter.  *Id.*  Raquel Lilly drafted the contract without an attorney.  ECF 75-8, at 39, 147:3–11.  Later that day, Raquel Lilly emailed James Blue a copy of the executed contract.  ECF 75-11 (email from Raquel Lilly to James Blue), at 2.

On December 22, 2021, a litter was produced pursuant to the contract the Lillys had with James Blue.[5]  ECF 75-14 (Lekeshia Blue Answers to Interrogatories), at 2–3. Shortly thereafter, Jeffrey Lilly received deposits for the sale of two puppies and had interest from another buyer. ECF 75-8, at 22, 79:13–21.

On January 25, 2022, James Blue was tragically murdered.  *Id.* at 42, 158:1–3.  On January 27, 2022, the Lillys communicated with Jadan Blue (the son of James and Lekeshia Blue) to schedule the return of the litter of puppies from Lekeshia Blue's house.  ECF 75-16 (text messages between Jadan Blue and Jeffrey Lilly), at 2–4.  After some back and forth messaging with Jadan Blue, Jeffrey Lilly sent the contract to Jadan Blue noting that "his stuff is legit," meaning his partnership with James Blue was legitimate.  *Id.* at 4.  Though Jadan Blue responded

---

[5] BPD provides a helpful chart with the names of the puppies but incorrectly identifies their birthdates as December 22, 2022. *See* ECF 68-1, at 5 (noting that five puppies named Bandito, Big Booty Judy, Kanye, Kim K., and Lottie Dottie were born on December 22, 2022).  It appears uncontested that the puppies were born on December 22, 2021. *See* ECF 75-5, at 5 (citing 75-14, at 3); ECF 68-1, at 7 (citing ECF 68-17, at 2 (Lekeshia Blue's Answers to Interrogatories)).

with a short phrase seemingly supporting Jeffrey Lilly's assertion, *id.*, Jadan Blue's mother testified at her deposition that she was unhappy with Jeffrey Lilly's attempts to secure the dogs:

> [Jeffrey Lilly] was trying to get [Jadan Blue] to get him to give him the dogs, which I found ridiculous because why are you talking to my son the day after my husband was murdered . . . So this is a traumatizing event for everyone involved, especially my son who heard his father being murdered, and you're trying to get him to give you dogs. Like what is your mindset at this point? So insensitive to the situation. It's beyond ridiculous. My son is a child. My son does not speak for me . . .

ECF 68-9 (Lekeshia Blue Dep.), at 34–35, 129:12–130:5.

On January 27, 2022, Jeffrey Lilly spoke with Jadan Blue on the phone, at which time Jadan Blue informed him that his mother, Lekeshia Blue, and grandparents, Robert and Delphine Smith, had discussed the matter and decided not to allow the Lillys to retrieve their puppies. ECF 68-5 (Raquel Lilly Dep.), at 40, 153:3–13. Jadan further stated that his mother, Lekeshia Blue, had decided to "keep the puppies permanently." *Id.* Part of Lekeshia Blue's rationale was that her children had been taking care of the puppies every night with their father before he passed away. ECF 68-16 (Delphine Smith Dep.), at 18, 64:20–65:6. Lekeshia Blue did not want to take the puppies from her children after their father's murder, and believed the puppies could provide therapy to her children. *Id.* Lekeshia Blue, Delphine Smith, and Robert Smith then moved the dogs from the Blue residence to the Smith residence without the Lillys' consent. ECF 75-8, at 40–41, 153:14–154:7.

On January 30, 2022, Raquel Lilly again sent a text message to Robert Smith and Lekeshia Blue to arrange for the return of the dogs. ECF 75-9 (Jeffrey Lilly Dep.), at 19, 66:14–67:6; ECF 68-24 (text message from Raquel Lilly), at 3. The Lillys were unable to fulfill their obligations to buyers because the Smith family refused to return the dogs. ECF 75-8, at 21–22, 77:14–78:3. Jeffrey Lilly and Raquel Lilly went to a state District Court Commissioner, but the

Lillys ultimately decided against filing criminal charges. ECF 68-8 (Jeffrey Lilly Dep.), at 34–35, 129:4–130:9. Instead, they went to the Baltimore County Police Department and reported the theft of the dogs. *Id.* at 34, 129:3–12; ECF 68-25 (Baltimore County Police Report), at 2.[6] The Baltimore County Police were dispatched to Robert and Delphine Smith's home. ECF 68-15 (Robert Smith Dep.), at 40, 150:3–153:11. The Baltimore County Police left without taking any action, having deemed the matter a civil issue. *Id.* at 153:6–11. Officer Wright "advised [Jeffrey] Lilly of the court process to further help his case." ECF 68-25, at 2.

On January 31, 2022, Robert Smith spoke to Deputy Commissioner Briscoe and asked her to intervene in the family dispute. ECF 75-17 (email from Robert Smith to Briscoe), at 2–3. Deputy Commissioner Briscoe was Jeffrey Lilly's highest-ranking commander in his chain of command but had "very little contact" with Jeffrey Lilly. ECF 75-18 (Briscoe Dep.), at 19, 66:11–69:3. Deputy Commissioner Briscoe then called Lieutenant Colonel Herzog to ask for Jeffrey Lilly's phone number. *Id.* at 26, 95:12–14. After hearing about the conflict, Herzog asked if he could call Jeffrey Lilly instead because they had a rapport from working together in the Western District. *Id.* 96:6–23.

On January 31, 2022, Herzog telephoned Jeffrey Lilly and, in Jeffrey Lilly's recollection, asked if Jeffrey Lilly would leave the Blue and Smith families alone and stated something along the lines of "just do me a favor, at least [un]til after the funeral." [7] ECF 75-9, at 19–20, 69:16–73:6. Jeffrey Lilly testified that he "didn't take [the request] as a favor," because he was "under

---

[6] The narrative portion of the police report reflects that Jeffrey Lilly "reported an ongoing civil dispute" to police on January 30, 2021. ECF 68-25, at 2, 5. The reference to 2021 appears to be an error as the remainder of the document references the call from Lilly occurring on Sunday, January 30, 2022. *Id.* at 2.

[7] Jeffrey Lilly also testified that he had "a long conversation" with Herzog and said "how can you all tell me to stop, because it has nothing to do with my job? So [Herzog] said yes, well do me a favor, just leave them alone until after the funeral." ECF 75-9, at 27, 101:12–19.

[Herzog's] command, so [Herzog] had [an] impact on [Jeffrey Lilly]." *Id.* at 20, 71:10–15. Jeffrey Lilly "took it as [Herzog] telling [Jeffrey Lilly] to stop pursuing . . . [Lilly's] property." *Id.* 73:1–6.

On February 2, 2022, a colleague told Jeffrey Lilly that he heard from another person that the Federal Bureau of Investigation ("FBI") and BPD's Public Integrity Bureau ("PIB") were investigating Jeffrey Lilly, at the behest of the Smiths, for breeding dogs while working for BPD. ECF 75-19 (Jeffrey Lilly's Answers to Interrogatories), at 12. Jeffrey Lilly called Herzog to convey his concern that the dispute had made its way to the FBI. *Id.*

On February 2, 2022, Raquel Lilly submitted a complaint to PIB against Briscoe, Herzog, Robert Smith, and Lekeshia Blue. ECF 75-20 (PIB Complaint filed by Raquel Lilly), at 2–3. The complaint alleged that Lekeshia Blue and Robert Smith "willingly used their assumed power and authority to further extend real power and authority through communication with the Deputy Commissioner to advise, illegal, unreasonable, non-professional, and intimidating tactics/actions[] that have nothing to do with the performance, responsibility or matters involving [Jeffrey Lilly's] occupation and duties." *Id.* at 3. Raquel Lilly concluded her complaint by stating that supporting documentation must be requested through her attorney. *Id.*

BPD's Equal Opportunity and Diversity Section ("EODS") was assigned to investigate Raquel Lilly's complaint. ECF 68-4 (Daniel Popp Dep.), at 48, 184:16–185:6. On February 2, 2022, Jeffrey Lilly emailed Director Akanni to discuss, "a civil matter involving retired LTC, Baltimore Police, and a current member assigned to [PIB]." ECF 68-28 (emails between Jeffrey Lilly and Akanni), at 2. On February 3, 2022, Briscoe telephoned Jeffrey Lilly. ECF 75-9, at 26–27, 96:10–98:10. Briscoe apologized to Jeffrey Lilly and indicated that she understood how Herzog's telephone call could have been viewed as intimidating. *Id.*

On February 4, 2022, Jeffrey Lilly met with Akanni and Sergeant Glen Jackson at BPD Headquarters. Exhibit 19[8] (audio recording of Akanni statement), 00:02:18–00:04:40. At the meeting, Jeffrey Lilly informed Akanni and Jackson about the conflict with the Smith family. *Id.* at 00:05:00–00:08:30. Jeffrey Lilly also stated that the Smith family was trying to intimidate him through Briscoe and Herzog, and he voiced his concern that the FBI was monitoring him. *Id.* Jeffrey Lilly warned Akanni that he feared he would continue to be retaliated against by BPD if he tried to retrieve his property. *Id.* at 00:13:10–00:13:42. Akanni then briefed Nadeau, Deputy Commissioner of PIB, on the meeting he had with Jeffrey Lilly. *Id.* at 00:13:42–00:14:47. Nadeau indicated to Akanni that he had already consulted with BPD legal counsel about the issue and they were "both on the same page that this is not a BPD issue, BPD should not be involved in the dog issue in any way, shape, or form." *Id.*

Around this time, Lekeshia Blue contacted Nadeau and asked him to prohibit Jeffrey Lilly from attending James Blue's funeral, a request that Nadeau declined because it was "a civil matter we're not going to get involved in[.]" ECF 68-7 (Brian Nadeau Dep.), at 43, 165:4–16. During their conversation, Lekeshia Blue informed Nadeau that Robert Smith had contacted Briscoe. *Id.* at 165:11–13. Akanni, who was in Nadeau's office during this conversation, then talked to Nadeau about his meeting with Jeffrey Lilly. *Id.* at 46, 177:6–13. Nadeau said that he knew Jeffrey Lilly from their time serving on an FBI task force together and asked Akanni to "see if [Jeffrey Lilly would] have a meeting with [Nadeau and Akanni]" so that they could "calm this all down before it gets out of control." *Id.* 177:14–178:1. Nadeau noted that Jeffrey Lilly "would know [about the grieving process] because [Lilly] went through a tragedy himself." *Id.* 177:15–18. Nadeau did not speak with anyone else about the situation involving Jeffrey Lilly.

---

[8] No ECF number is assigned to Exhibit 19 because it was submitted to the Court as a physical exhibit. The physical exhibit is a CD with the audio recording of Akanni's statement.

*Id.* at 48, 183:6–21 (testimony by Nadeau that he did not speak with Robert Smith about this complaint); ECF 68-31 (Lekeshia Blue Answers to Interrogatories), at 3 (Q: "Who in PIB of BPD leadership have you communicated with about Complaint 2022-0156? A: "I have not communicated with anyone in command about this complaint."); ECF 68-32 (Delphine Smith Answers to Interrogatories), at 3 (explaining that Delphine Smith spoke to Detective Bowling, Lieutenant Popp, Officer Wright, Jerry McLarin, Major Natalie Preston, Lieutenant Sonia Young, and Detective Doyle between January 2022 and the date of the interrogatory, but not Nadeau); ECF 68-33 (Robert Smith Answers to Interrogatories), at 3 (explaining that Robert Smith spoke to Detective Bowling, Lieutenant Popp, Detective Doyle, and Briscoe between January 2022 and the date of the interrogatory, but not Nadeau).

On February 7, 2022, Raquel Lilly called the Baltimore County Police to ask authorities to conduct another wellness check on the litter of puppies. ECF 68-34 (Call for Service Report), at 2–3; ECF 68-5, at 41, 157:5–21. Robert Smith informed the officers who arrived that police had previously been to the residence on January 30, 2022 and deemed the issue regarding the puppies to be a civil dispute. ECF 68-15, at 41, 154:6–16. Robert Smith recalled that the responding officers said that they would "tag the communication in our dispatch system where they won't dispatch another person" for the same issue. *Id.* 154:17–23. Also on February 7, 2022, Jeffrey Lilly posted a picture on social media with a message stating: "MF's act like I didn't have connections! To the gravel with this shit! ON MY MAMA!" ECF 68-35 (Jeffrey Lilly Social Media Post), at 2.

On the evening of February 7, 2022, Akanni contacted Jeffrey Lilly to schedule a meeting with Nadeau.[9] ECF 68-8, at 30, 111:7–16. On February 8, 2022, Jeffrey Lilly met with Akanni and Nadeau at BPD Headquarters. *Id.* 111:18–112:8. At the meeting, Jeffrey Lilly recalled Nadeau asking him why he continued to call the police over a civil matter. ECF 68-6 (Jeffrey Lilly Answers to Interrogatories), at 18. According to Jeffrey Lilly, Nadeau noted that he "d[id]n't know and [did not] want to know the story, and told Lilly that he "[did not] want [Jeffrey Lilly] to embarrass the Baltimore Police Department with Baltimore County and get [himself] in trouble" by continuing to call the police to the Smiths' house. *Id.* at 18–19. Nadeau also indicated that he did not want Baltimore County "going after" Jeffrey Lilly for "sending the police to those peoples' house." *Id.* at 19. Nadeau also purportedly told Jeffrey Lilly that "[n]o judge is going to hear this," and "[s]ome judge is going to laugh you out of court," especially given "the timing of it all." *Id.* at 18. Jeffrey Lilly testified at his deposition that Nadeau never told Lilly that he could not file a civil lawsuit. ECF 68-8, at 33, 122:2–9. However, Akanni reported that he and Jeffrey Lilly had a conversation after the meeting and Jeffrey Lilly stated that he "doesn't trust the Department . . . and [believed that] the people in power . . . [were] trying to intimidate [him]." Ex. 19 at 00:32:35–00:33:38.

On March 8, 2022, attorneys for Twisted Roots Kennels sent a demand letter to the Blue and Smith family seeking the return of their property, "[s]pecifically . . . five French Bulldog puppies and one adult French Bulldog named Storm." ECF 75-22 (Demand Letter), at 2–4. On

---

[9] According to Plaintiff, Nadeau, as the Deputy Commissioner of PIB, is designated as the final decisionmaker authorized to make findings in PIB investigations. ECF 75-4, at 3–4. According to the PIB Investigative and Training Manual, "the Deputy Commissioner of PIB must evaluate the conflict and make a recommendation to include a justification of whether or not it can be handled by any investigative group in PIB." ECF 75-5, at 2. "If the Deputy Commissioner of PIB determines that no one at PIB can investigate the matter without an actual or apparent conflict of interest, the Deputy Commissioner of PIB shall refer the case to an outside investigative agency or the Office of the Inspector General." *Id.*

March 10, 2022, Lekeshia Blue, Robert Smith, and Delphine Smith received the demand letter. ECF 75-23, at 35, 130:13–15; ECF 75-15, at 27, 98:13–99:3. A PIB employee, Jerry McClarin, was present at the time. ECF 75-15, at 31, 114:6–9. McClarin then contacted PIB Captain Lamar Howard and scheduled a time for Robert and Delphine Smith to "come in" and file their own PIB complaint against Jeffrey Lilly. *Id.* at 28, 104:14–20.

On March 14, 2022, Robert and Delphine Smith arrived in-person at PIB and made a complaint against Jeffrey Lilly alleging harassment and claiming that Jeffrey Lilly "provid[ed] false documentation." ECF 75-24 (IAPro Summary 2022-0347), at 3. Detective Anthony Bowling and Lieutenant Daniel Popp conducted the intake of Robert Smith's complaint. ECF 75-25 (Bowling Dep.), at 5–6, 13:15–16:6; ECF 75-24. Before Daniel Popp's retirement, Robert Smith was one of Popp's commanders, and Popp refers to Smith by his nickname, "Smitty." ECF 75-26, at 29, 108:16–22; ECF 75-27, at 2. Bowling testified that he recorded that interview, and his normal procedure was to upload the recording to IAPro. ECF 75-25, at 6, 16:2–17:7. However, the recording could not be located. ECF 75-28 (email with defendant's counsel), at 2.

On March 24, 2022, Popp emailed Captain Lamar Howard, indicating that he believed the case should be moved "out of the building" because the case could "possibly involve" Briscoe, Nadeau, and Akanni, who "may have fail[ed] to report an incident of harassment on the part of Det[ective] Lilly." ECF 75-27, at 2. Despite Popp's concerns related to the BPD performing an investigation, Howard ordered Popp to investigate the complaint lodged against Lilly. ECF 75-26, at 34, 126:3–20. On March 28, 2022, BPD served on Jeffrey Lilly notification of the complaint lodged against him. ECF 75-30 (Notice of Internal Investigation), at 2.

On March 29, 2022, Bowling drafted a memorandum requesting recusal due to a conflict of interest. ECF 75-24 (Bowling Memorandum), at 3–4. Bowling noted in his memorandum that in order to properly conduct the investigation, he would have to ask accusatory questions of Nadeau and Briscoe and potentially charge them with misconduct. *Id.* Specifically, Bowling stated:

> It is this Detective's understanding that once an officer of this department is made aware of alleged crime committed by an officer of this agency, the information pertaining to the allegation must be authored in a Blue Team Report and submitted to the Public Integrity Bureau for investigation. It is my contention that for this reason, Deputy Commissioner Nadeau may be in violation of these policies and therefore will need to be questioned/Interviewed as an accused in order to ask questions related to his conversations with Mr. Smith, and Mr. Lilly, and accusatory questions to address why the information pertaining to the allegations presented to him by Mr. Smith against a Police Officer of this agency was not authored in a Blue Team Report.

*Id.* at 4. Bowling cited the PIB Investigative and Training Manual's provisions that mandated BPD's recusal. *Id.*; ECF 75-5 (PIB Training Manual).

After drafting the memorandum, Bowling emailed a copy of his memorandum regarding recusal to his entire chain of command with a read receipt. ECF 75-32 (Bowling email). On April 4 and 14, 2022, attorney Mike Davey emailed Nadeau to request that an outside agency investigate the complaint against Jeffrey Lilly. ECF 75-33 (email from Davey to Nadeau), at 2. Nadeau did not respond to Davey and instead forwarded the email to Callaghan. *Id.* at 3 (forwarded email from Nadeau to Callaghan). When Davey emailed a second time, Nadeau emailed Callaghan again and stated: "I have no oversight of this case, so I am forwarding to you. I don't know who the case is assigned to." ECF 75-34 (email from Nadeau to Callaghan), at 2. Nadeau testified that he neither had knowledge of nor involvement in either Raquel Lilly's or Robert Smith's complaints. ECF 75-21, at 46, 175:10–18, at 51–52, 194:4–199:18 (testimony by Nadeau that he "had no part of this investigation," and Major Callaghan and Director Akanni

11

"oversaw" the case). Callaghan responded in an email to Davey stating: "The Deputy Commissioner has recused himself from this matter and I will be handling any further decisions regarding this case. We plan to conduct an interview with Detective Lilly in order to hear his version of events. Based on the current status of the case, it is necessary that he be provided the option of representation." ECF 75-34 (email from Callaghan to Davey), at 4.

On April 22, 2024, Robert Smith, with Delphine Smith listening nearby, called PIB to check on the status of his complaint. ECF 75-35 (email from Popp to Howard noting call from "Smitty"), at 2. Popp informed Robert Smith of the date and time of Jeffrey Lilly's upcoming interview with Popp on April 26, 2024. *Id.* According to Plaintiff, "Popp never documented the call [with Robert Smith] in IAPro or took it on a recorded line," which Plaintiff alleges was a violation of PIB policy. ECF 75, at 10 (first citing ECF 75-36, at 2–3, then citing ECF 75-24). During the call, Popp allegedly told Robert Smith to go to Baltimore County and swear out criminal charges for forgery. ECF 75-15, at 31, 116:17–117:13. Prior to that conversation, the Smiths "[weren't] planning on going to the court commissioner." *Id.* Commissioner Harrison testified that it was never appropriate for an officer to make recommendations for criminal charges. ECF 75-39, at 45, 172:12–21.

On April 25, 2022, Robert Smith and Delphine Smith went to a District Court Commissioner in Baltimore County to file forgery charges against Jeffrey Lilly. ECF 75-15, at 5, 12:14–13:20. The forgery charges were based on Delphine Smith's contention that the signature on the Limited Partnership Agreement did not match James Blue's DocuSign signature, and Delphine Smith's belief that Raquel Lilly had a propensity to forge documents. ECF 68-16 (Delphine Smith Dep.), at 21–22, 77:2–7, 78:6–79:1. Later that evening, Delphine Smith emailed the charging document, ECF 75-37, directly to Popp with a message that said,

"Attached is the Charging document from Baltimore County Court Commissioner for Jeffrey Lilly to be added to our Internal Investigation Complaint." ECF 75-38 (email from Delphine Smith to Popp), at 2. Popp replied: "Thank you for sending me this document. I will add it to the case folder, and ensure that he is served with the paperwork." *Id.*

On April 27, 2022, Jeffrey Lilly was served with a criminal summons and was suspended by BPD without pay. ECF 75-41 (suspension of Jeffrey Lilly), at 2–3. The form indicated that the BPD scheduled a suspension hearing for May 4, 2022. *Id.* at 3. The suspension form indicates that no suspension without pay can occur prior to a hearing. *Id.*

Jeffrey Lilly appeared for his suspension hearing and presented evidence of the valid contract. ECF 75-9, at 47, 179:15–180:2. Prior to the hearing, officers were instructed to tape record the hearing and upload the recording to IAPro. ECF 75-24 (email regarding suspension hearing), at 3. At the last minute, Lisa Riha, a detective in PIB, was advised that Daniel Popp would "do the suspension hearing." *Id.* at 2. Jeffrey Lilly's unpaid suspension was upheld at the hearing. ECF 75-8, at 26–27, 97:5–98:4. The recording of the hearing could not be located. ECF 75-28, at 2.

According to Plaintiff, "[i]t was well known that a felony charge against Jeffrey Lilly would result in suspension without pay, and that it would disqualify him from his assignment as an FBI Task Force Officer." ECF 75, at 11 (citing ECF 75-26, at 43, 165:18–24; ECF 75-21, at 55, 213:19–214:1; ECF 75-39, at 45, 170:8–14). Raquel Lilly also testified that Jeffrey Lilly had a heart attack after "BPD stepped in and started disciplining [Jeffrey Lilly]", ECF 75-8, at 19, 69:7–21, she attempted suicide on the anniversary of Jeffrey Lilly's criminal charges being filed, *id.* at 53, 203:19–205:3, and the Lillys' youngest son "couldn't go to college because [the Lillys] [had] to pay attorneys" to litigate this case, *id.* at 19, 69:14–21.

13

On June 9, 2022, the State of Maryland dismissed the forgery charges against Jeffrey Lilly. ECF 75-9, at 47, 180:6–8. The prosecutor noted that the alleged acts did not fall under the statute charged and further observed that there was "no way" the State could prove the charges beyond a reasonable doubt. ECF 75-43 (email from state's attorney's office), at 2.

On August 12, 2022, counsel for Plaintiffs served a Notice of Legal Representation and Intent to File Suit on the BPD. ECF 75-44 (notice of intent to file suit), at 2. That same day, PIB Detective Michael Payne sent Robert Smith notification that BPD had opened its investigation into the complaint he lodged against Jeffrey Lilly 151 days earlier. ECF 75-45 (PIB Notification to Robert Smith), at 2. When he was asked to give an estimate on how long it takes to "investigate a case from start to finish," Nadeau testified that "generically" cases usually took 136 days to investigate. ECF 75-21, at 13–14, 45:17–46:7.

On September 13, 2022, the Plaintiffs filed this lawsuit. That same day, PIB Detective Jahlik Mathis noted the first attempt, made by email, to contact Raquel Lilly to discuss her complaint. ECF 75-46, at 5–6. Raquel Lilly did not receive the email, however, because the Twisted Roots Kennels email account was no longer operational. ECF 75-8, at 21, 74:2–15.

On October 13, 2022, Major Callaghan directed Lieutenant Kevin Roeser to contact the Office of the Inspector General ("OIG") to ask if they would conduct the PIB investigations. ECF 75-47 (email from Callaghan), at 2. The OIG declined to take the case. ECF 75-48 (Callaghan Dep.), at 25, 90:7–91:1.

On December 15, 2022, Baltimore County Police agreed to handle the investigations and assigned the matter to Captain Longo. ECF 75-49 (Longo Dep.), at 5–6, 13:3–14:3. Upon reviewing the case files, Captain Longo identified nine witnesses that needed to be interviewed, including Deputy Commissioner Nadeau. *Id.* at 8, 22:16–24:14; ECF 75-50 (letter from Captain

Trivett), at 1. Captain Longo testified that he thought the BPD conflict of interest was "obvious" because of "the way these complaints were coming, calls being made by retired colonels to deputy commissioners to get them involved." ECF 75-49, at 15, 52:16–53:5. On December 21, 2022, Captain Longo interviewed Director Akanni, and "multiple additional" witnesses were identified. ECF 75-50 (letter from Captain Trivett). Baltimore County subsequently declined to continue the investigations due to perceived time constraints. *Id.*; ECF 75-49, at 15–16, 53:11–54:5.

On January 3, 2023, Commissioner Harrison assigned both complaints to Director Akanni of EODS. ECF 75-51 (Harrison Memorandum), at 2. Harrison also assigned a member of the Consent Decree Monitoring Team, Kenneth Thompson, to oversee the cases.[10] ECF 75-39, at 42–43, 161:11–163:1.

On January 4, 2023, BPD received the investigative files back from Baltimore County. ECF 75-52, at 2. According to a case noted entered by Detective Doyle, she was "[a]dvised by Director Akanni to not interview Captain Blue and Respondent Lily," and was "[a]dvised to determine findings based on evidence." ECF 75-24, at 7. On January 6, 2023, Detective Doyle noted that she was "[a]dvised by Director Akanni to not send out close-out letters to Complainant and Respondent." *Id.* Detective Doyle noted that these orders did not represent the "usual investigative process." *Id.* Similarly, Detective Mathis entered a case note on January 6, 2023, stating:

> Be advised, on Jan 04, 2023 I was advised by Director Akanni in his office to not interview any of the Respondents on the case because the Complainant, Raquel

---

[10] The BPD has been under a federal Consent Decree since April 7, 2017. ECF 75-3 (Oct. 26, 2021 Consent Decree Hearing Transcript), at 3–4, 3:22–4:2. A "key area of reform" in the Consent Decree is "reforming the public integrity function within the department [of] internal affairs." *Id.* at 6, 6:8–15. Mr. Thompson was assigned as Lead Monitor of the Consent Decree. ECF 75-39, at 42–43, 161:11–163:1.

Lilly, was not cooperating and refused to return my calls or emails. I was
instructed to then write a Progress Note detailing due to. us needing more
information from the Complainant, this case will be giv[en] a finding of
'unfounded' and closed out per Director Akanni. Be advised Sergeant Glen
Jackson was present during this meeting.

ECF 75-46, at 5. According to Plaintiff, "Akanni's orders were a direct violation of PIB's

investigative policies." ECF 75, at 14 (citing ECF 75-53 (PIB Investigative and Training

Manual, Compelled Statements from Respondents); ECF 75-54 (PIB Investigative and Training

Manual, Identifying and Interviewing Witnesses); ECF 75-55 (PIB Investigative and Training

Manual, Investigations with Uncooperative Complainants)).

The case filed against Jeffrey Lilly was "not sustained," which is a determination given

when "the investigation is unable to determine, by a Preponderance of the Evidence, whether the

alleged misconduct occurred." ECF 75-24, at 8; ECF 75-56, at 3. The case filed by Raquel Lilly

against command staff members was "unfounded," which is a determination given when "the

investigation determines, by Clear and Convincing Evidence that the alleged misconduct did not

occur or did not involve the employee under investigation." ECF 75-46, at 6; ECF 75-56, at 3.

Commissioner Harrison acknowledged that he saw no basis for the "unfounded" finding in

Raquel Lilly's complaint. ECF 75-39, at 46, 175:23–176:9. Director Akanni was subsequently

promoted to Chief of the Public Integrity Bureau. ECF 68-4, at 28, 105:6–20. He now works

directly under Deputy Commissioner Nadeau. *Id.*

## II.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted

"if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether

the evidence presents a sufficient disagreement to require submission to a [trier of fact] or

whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th

Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.   ANALYSIS

### A.   Motion to Strike

#### 1.   Failure to Disclose Witnesses

Invoking Federal Rules of Civil Procedure 16(f), 26(e), and 37(c), Defendant BPD moves to strike two exhibits submitted by Plaintiff as part of his response in opposition to the motion for summary judgment. *See* ECF 85. First, BPD moves to strike the affidavit of Stephanie Lansey, ECF 75-6 on the ground that Lansey was never identified in Plaintiff's Rule 26(a)(1) disclosures or identified in Plaintiff's response to any discovery requests, interrogatories, or document requests. ECF 85, at 1. Second, BPD moves to strike the letter from Brian Nadeau, dated January 1, 2021, ECF 75-7, because it was not produced by Plaintiff until February 11, 2025, which was months after the deadline for Rule 26(e)(1) disclosures and after the close of fact discovery. ECF 85, at 1. The disclosure of the Nadeau letter also came after the BPD had already filed its motion for summary judgement. *Id.* at 2.

Additionally, in the opposition to the motion to strike, Plaintiff contends that Detective Rivera, who allegedly worked under Nadeau, authored a "memorandum to document an order from Brian Nadeau to stop investigating a PIB complaint that alleged discrimination consistent with the '45% Rule.'" ECF 87, at 2. According to Plaintiff's opposition, the 45% Rule "requires detectives in PIB to sustain allegations against accused officers if the detectives are '45% sure' that the allegation made against an accused officer is true," thereby "shift[ing] the burden of

proof to a standard below a preponderance of the evidence [and] violating BPD's policy." *Id.*
Plaintiff insists that Rivera should have been "identified as [an] individual[] that made
complaints" against Nadeau in Defendant's Answers to Interrogatories. *Id.* at 3. Defendant
responds that "the Court should disregard this entire line of argument" related to Rivera because
"Plaintiff cites numerous alleged facts in his opposition that are simply not in the record." ECF
89, at 7.

Rule 26(a) requires a party to voluntarily disclose to other parties "the name and, if
known, the address and telephone number of each individual likely to have discoverable
information—along with the subjects of that information—that the disclosing party may use to
support its claims or defenses . . . ." Fed. R. Civ. P. 26(a)(1)(A)(i). The basic purpose of Rule
26(a) "is to allow the parties to adequately prepare their cases for trial and to avoid unfair
surprise." *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014). Rule 26
further requires a party to "supplement" any disclosure made under Rule 26(a) "if the party
learns that in some material respect the disclosure or response is incomplete or incorrect, and if
the additional or corrective information has not otherwise been made known to the other parties
during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1).

It is undisputed that Plaintiff failed to disclose or to supplement his discovery responses
to reveal Lansey as a witness prior to appending her affidavit to the opposition to summary
judgment. *See* ECF 87, at 6. Because of Plaintiff's failure to disclose Lansey as a witness,
Defendant was never given the opportunity to depose her. Moreover, Plaintiff has not shown
that the failure to disclose or supplement was substantially justified or harmless. *See* Fed. R.
Civ. P. 37(c) (automatic exclusion for failure to disclose or supplement unless failure was

substantially justified or harmless).  Therefore, for the reasons explained below, the Court grants

the motion to strike Lansey's affidavit.

Plaintiff argues that "BPD submitted its 26(a)(1) disclosures on March 18, 2024," and

"[n]either Lansey nor Rivera were identified in those disclosures as individuals that may have

discoverable information." ECF 87, at 3.  BPD responds that "Plaintiff misunderstands the scope

of those disclosures" because, BPD contends, "[u]nder Rule 26(a)(1)(A)(i)-(ii), a party is

required to disclose only the witnesses and documents it *may use to support its own* claims or

defenses." ECF 89, at 5 (emphasis in original).  Because BPD had no intention of relying on

Stephanie Lansey, Carlos Rivera, or Brian Nadeau's January 1, 2021, letter to support its

defenses in this case, it contends it was under no obligation to disclose their identities. *Id.* at 5

(citing *In re Fort Totten Metrorail Cases Arising Out of the Events of June 22, 2009*, 279 F.R.D.

18, 22–23 (D.D.C. 2011)).

Plaintiff also maintains that *he* was "surprised by the existence of Stephanie Lansey," not

BPD, since Defendant was "specifically asked" to "identify any complaints against Brian

Nadeau, to identify the complainant, and to summarize the substance of the complaint." ECF 87,

at 6.  Plaintiff alleges that in response, BPD "referenced a single page printout of Brian Nadeau's

IAPro summary," which did not include Lansey's "complaint." *Id.*[11]  Defendant responds that

"Lansey describes expressing 'concerns' to Commissioner Harrison and requested a transfer

from her assignment," but "she did not characterize her statements as a 'complaint,' nor did she

ask for any formal action to be taken against Nadeau, in the face of being asked what she

'wanted to do' about the situation." ECF 89, at 6.  Defendant also points out that "BPD objected

---

[11] Lansey's affidavit includes numerous issues related to her interactions with Nadeau and Popp. ECF 75-6, at 2–4.  It closes with reference to Lansey "reporting" Nadeau to Commissioner Harrison, which is likely the "complaint" referenced by Plaintiff in his response to the motion to strike. ECF 87, at 6.

20

to Interrogatory Number 15 based on the vague and confusing terminology Plaintiff used," and specifically objected "to the terms 'discipline,' 'complaints,' 'investigations,' and 'complainant' as insufficiently defined to allow a meaningful response." *Id.* at 7.

If Plaintiff was dissatisfied with BPD's response to the interrogatory or believed further supplementation was warranted, the rules required Plaintiff to address that concern at an earlier stage of the process. *See Info-Hold, Inc. v. Sound Merch., Inc.*, 538, F.3d 448, 458 (6th Cir. 2008) (once a party properly objects to an interrogatory under Rule 33(b) the burden shifts to the requesting party to clarify its discovery or seek relief from the court). The Court will not countenance an attempt to raise a discovery dispute long after the time for doing so has passed and cannot condone Plaintiff's untimely disclosure of Lansey. For the same reasons, the Court also declines to consider Plaintiff's assertions about Defendant's alleged failure to disclose a complaint made by Detective Rivera. An argument that Defendant provided an insufficient response to an interrogatory is not properly raised in a response in opposition to a motion to strike.

### 2.    Sanctions Under Rule 37 for the Failure to Disclose Lansey

Defendant styles the motion as a "motion to strike." However, Rule 37(c)(1) authorizes the sanction of "not allow[ing]" a party to "use" evidence supplied by an undisclosed witness. *See White v. City of Greensboro*, 532 F. Supp. 3d 277, 299 (M.D.N.C. 2021) (analyzing remedy under Rule 37(c)(1) on a motion to exclude); *Wall Recycling, LLC v. 3TEK Global, LLC*, 588 F. Supp. 3d 647, 658 n.10 (M.D.N.C. 2022) ("Technically, the court does not strike declarations, as motions to strike are directed to pleadings." (citing Fed. R. Civ. P. 12(f))). Accordingly, the court's remedy, if granted, would be to disregard the evidence at issue when ruling on Defendant's motion for summary judgment.

21

"If a party fails to [timely] provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The court has "broad discretion" to determine whether an untimely disclosure is substantially justified or harmless. *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596–97 (4th Cir. 2003). The five *Southern States* factors guide the exercise of that discretion: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Id.* at 597. The first four factors of this test "relate primarily to the harmlessness exception, while the last factor, addressing the party's explanation for its nondisclosure, relates 'mainly to the substantial justification exception." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 190 (4th Cir. 2017). The non-disclosing party bears the burden of establishing these factors. *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014).

As to the first factor, Plaintiff undoubtedly surprised BPD with Lansey's affidavit. Plaintiff contends, in essence, that Defendant could not have been surprised by Lansey's affidavit because Nadeau, and BPD by extension, knew of Lansey's complaint to Harrison and thus should not be allowed to "hide evidence that is damaging to its case and then feign surprise and prejudice." ECF 87, at 6. But this argument "misunderstands the nature of 'surprise' in this context, which comes not from learning the declarants' identities, but from learning that the opposing party intends to use those declarants in support of its version of the facts." *Intercollegiate Women's Lacrosse Coaches Ass'n (IWLCA) v. Corrigan Sports Enters., Inc.*, 694

22

F. Supp. 3d 625, 652 (M.D.N.C. 2023). While Plaintiff goes on to criticize BPD's alleged conduct during the discovery process, none of these accusations cure the fact that BPD was not aware that Plaintiff intended to rely on Lansey (or her affidavit) as part of the case.

The second factor—the ability of the non-disclosing party to cure the surprise—also favors BPD. By producing Lansey's affidavit in the response to Defendant's motion for summary judgment, Plaintiff ensured that Defendant "had little, if any, ability to impeach the declarants." *IWLCA*, 694 F. Supp. 3d at 653. To cure the surprise at this stage, the court would have to re-open discovery to allow for depositions and order a second round of summary judgment briefing, "thereby delaying resolution of this case and increasing the cost of litigation to both parties and wasting this court's judicial resources." *Pontones v. San Jose Rest. Inc.*, No. 18-cv-219, 2020 WL 6438395, at *2 (E.D.N.C. Nov. 2, 2020). The failure to disclose left BPD with little in the way of recourse or impeachment. *See Baemmert v. Credit One Bank, N.A.*, 271 F. Supp. 3d 1043, 1051 (W.D. Wis. 2017) (declining to consider declaration submitted at summary judgment from a previously undisclosed witness because its "untimely disclosure deprived [the plaintiff] of the opportunity to impeach this evidence before summary judgment"); *see also Revak v. Miller*, No. 18-cv-206, 2021 WL 2188674, at *5 (E.D.N.C. May 28, 2021) (striking affidavits of three witnesses whose disclosure came after discovery had closed and defendants had moved for summary judgment, explaining that plaintiff could not now "depose [them] to assess their credibility or uncover any gaps or weaknesses in their affidavits").

The third *Southern States* factor—whether "allowing the evidence would disrupt the trial," 318 F.3d at 597—does not weigh against Plaintiff as no trial has been scheduled. However, "courts need not find that every *Southern States* factor weighs against the non-disclosing party if exclusion is otherwise warranted." *Martin v. Norfolk S. Ry. Co.*, No. 16-cv-

1191, 2018 WL 6840128, at *4 n.4 (M.D.N.C. Dec. 31, 2018) (citing *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 330 & n.6 (4th Cir. 2011)), *aff'd*, 787 F. App'x 162 (4th Cir. 2019).

As to the fourth factor—importance of the evidence—Plaintiff concedes that Lansey is "crucially important to the Plaintiff's case." ECF 87, at 7. It is well-established that "[t]he more important the evidence, the less a plaintiff is justified for failure to disclose it and the more the opposing party would be prejudiced if the evidence were allowed." *IWLCA*, 694 F. Supp. 3d at 653 (citing *Finch v. BASF Catalysts LLC*, No. 16-cv-1077, 2018 WL 2770140, at *3 (M.D.N.C. June 8, 2018)).

The fifth factor is the non-disclosing party's explanation for its failure to disclose the evidence. To explain the failure, Plaintiff's counsel admits that he "thought that he had made the disclosure prior to appending." ECF 87, at 6. Plaintiff then goes on to argue that "[e]very litigator will admit that preparing a motion for summary judgment or an opposition is a monumental undertaking," and while Plaintiff's counsel was preparing the opposition, he received "two unsolicited, startling, phone calls that revealed facts" important to Plaintiff's case. *Id.* at 7. Plaintiff states: "[i]t was chaotic, and counsel believed that [] Lansey was disclosed[.]" *Id.*

The finite duration of the discovery process serves an important role in making sure that both parties can prepare their cases and defenses according to what has been produced and represented by the opposing party during discovery. While the Court appreciates that this case contains voluminous records and is sympathetic to Plaintiff's counsel's predicament, the Court is not persuaded that simply overlooking the disclosure of a purportedly "crucially important" witness due to "chaos" or "error" is a sufficient explanation for the failure to disclose given the unfair surprise and prejudice that resulted.

Considering all five factors, the Court concludes that they weigh in Defendant's favor. *See Southern States*, 318 F.3d at 597. While Defendant's motion is styled as a motion to strike, the sanction provided under Rule 37 is disallowance from "use." Fed. R. Civ. P. 37(c)(1). Accordingly, the Court grants Defendant's motion insofar as it will not consider Lansey's affidavit in its determination of Defendant's motion for summary judgment.

As it relates to the identity of Detective Rivera, the substance of his knowledge, and the January 1, 2021, letter from Brian Nadeau, Plaintiff argues that Rule 37(e) is inapplicable because "Plaintiff's disclosures on February 11, 2025, were timely." ECF 87, at 5. According to Plaintiff, the fact that the disclosure "occurred after the close of the discovery period is irrelevant, as the information was learned mere days earlier." *Id.* Defendant avers that "Plaintiff provides no justification or reasoning (other than blaming the BPD) as to why he could not have identified Stephanie Lansey, Carlos Rivera, or located the January 1, 2021 letter [from Nadeau] before filing his complaint or during the discovery period had he acted with diligence." ECF 89, at 4.

As an initial matter, Plaintiff generally fails to support the position that he is exempt from Rule 37 as long as "new information [is] disclosed when it is learned, and that the duty to supplement or correct extends beyond the discovery period and continues through trial."[12] ECF 87, at 5 n.4. Rather, judges have ordered exclusion in similar cases where the disclosure was not made until after discovery closed and the failure to disclose was not substantially justified. *See, e.g., Hoyle*, 650 F.3d at 326–328 (affirming district court's exclusion of testimony disclosed after discovery closed and defendant filed a motion for summary judgment); *Contech Stormwater*

---

[12] Plaintiff candidly caveats that this is the way "counsel for Plaintiff has always understood the spirit of the rule, and the practice of this Court," but Plaintiff does not cite any cases to support this argument. ECF 87, at 5 n.4.

*Sols. v. Baysaver Techs., Inc.*, 534 F. Supp. 2d 616, 625 (D. Md. 2008) (excluding disclosures made after close of discovery and, in some cases, after filing of motion for summary judgment).

Here, the disclosure of the Brian Nadeau letter came nine weeks after fact discovery closed and three weeks after BPD had already filed its motion for summary judgment. ECF 85, at 1–2. The letter at issue was addressed to "Trial Board Sworn Members," and written by Nadeau. ECF 75-7, at 2. The letter asked members to "take copious notes about the decision making process during the trial board," and indicated that if the members reach a finding that "disagrees with the finding during the investigative process in PIB, [a] meeting will be set within 14 days . . . to go over that decision, in order to educate [PIB's] detectives and to make the process more effective." *Id.* While Plaintiff does not explicitly address the significance of the letter in the briefing, it appears from the opposition to summary judgment that Plaintiff intends to use this evidence to support his argument that "Brian Nadeau had a history of intimidating hearing officers to ensure that they made findings consistent with PIB's desired outcome." ECF 75, at 12 (citing ECF 75-6; ECF 75-7).

The extent to which Nadeau controls and influences the PIB decision-making process has been at issue in this litigation since inception. Thus, the Court gives some weight to Defendant's argument that Plaintiff's prior lack of knowledge of the letter "is an admission of his failure to diligently investigate and develop the factual basis for his claims as required by Rule 26." ECF 89, at 4. In short, where "[t]he importance of the issue . . . is patently obvious . . . [plaintiff] should have known that he needed to collect evidence supporting his claims from the moment he filed this case." *Edwards v. McElliotts Trucking, LLC*, 268 F. Supp. 3d 867, 884 (S.D. W. Va. 2017). However, the "primacy of the issue," *see id.*, cuts the other way, too. Defendant cannot claim a great degree of prejudice or surprise about a letter written by Nadeau – a former

Defendant in the case and a witness who has already been deposed – about the procedures he implemented in PIB. *See* ECF 68-7 (Nadeau Dep. Transcript). To the extent Defendant was surprised, the surprise can be cured as Defendant already has access to Nadeau's extensive deposition testimony and answers to interrogatories. Additionally, no trial date has been set so the untimely disclosure would not disrupt the trial. While the Court is not wholly satisfied with Plaintiff's explanation for the failure to timely disclose the letter, the content of the letter is not centrally important. Therefore, the Court finds Plaintiff's failure to timely disclose Nadeau's letter harmless. As such, Defendant's motion to strike is denied as to the Nadeau letter.

Finally, Plaintiff includes various assertions about Detective Rivera in the response in opposition to the motion to strike, but Plaintiff fails to include any citations to the record. ECF 87, at 2. According to Defendant, "Plaintiff failed to attach any affidavit, supplemental interrogatory response, or use any other evidence from Rivera in his opposition to BPD's motion for summary judgment." ECF 89, at 7. Therefore, Defendant maintains that "there is no basis for the Court to credit Plaintiff's assertions about Rivera, let alone consider them as support for any argument that BPD failed to disclose a 'complaint' made by Rivera against Brian Nadeau" during the discovery process. *Id.* The Court agrees, and in any event, as the Court already noted, the current posture of this case is an inappropriate forum for Plaintiff to raise miscellaneous concerns over Defendant's alleged discovery conduct. Further, "litigants are not excused from their obligations under the rules of procedure merely because an opponent has failed to comply with his obligations." *Hoyle*, 650 F.3d at 330.

In sum, in deciding the motion for summary judgment, the Court will consider the letter from Nadeau, but the Court will not consider Lansey's affidavit, or any assertions related to Detective Rivera.

### 3.    Plaintiff's Request for Sanctions

Plaintiff also includes in his opposition to the motion to strike a separate argument that BPD failed to comply with its discovery obligations and thus must be sanctioned under Rule 26(g)(3). As a threshold matter, this request is procedurally improper under Federal Rule of Civil Procedure 7. *See* Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion."). Additionally, Plaintiff has failed to comply with the requirements of Rule 37, the Court's Local Rules, and the Court's stated procedures for resolving discovery disputes. *See* Fed. R. Civ. P. 37(a)(3)(B)(iii); Local Rule 104.8(a); ECF 45 (discovery dispute procedures). As Defendant points out, "Plaintiff cites no authority permitting him to request discovery sanctions for the first time in a response brief, without filing a proper motion or otherwise adhering to the appropriate procedural mechanisms." ECF 89, at 11–12. A response in opposition to a motion to strike is certainly not the appropriate forum for this challenge, especially given that this Court has repeatedly emphasized the importance of adhering to the Court's informal discovery dispute procedures. *See* ECF 45 (order outlining informal discovery dispute procedure); ECF 66 (letter order addressing discovery dispute and reiterating procedures). The Court thus rejects Plaintiff's request for sanctions and declines to further analyze the alleged discovery disputes given the posture of the case.

For the reasons stated above, the motion to strike will be granted in part and denied in part. In deciding the pending motion for summary judgment, the Court will consider the letter from Brian Nadeau dated January 1, 2021. However, the Court will not consider Lansey's affidavit.[13]

---

[13] Significantly, however, even if the motion to strike was denied and the Court could consider Lansey's affidavit, the result would be the same. More specifically, and as explained *infra*, if the exhibit was not stricken and the evidence proffered was accepted as undisputed, Plaintiff still

**B.** **Motion for Summary Judgment**

1.    Nadeau's Conduct Does Not Shock the Conscience

42 U.S.C. § 1983 provides "a method for vindicating federal rights." *Albright v. Oliver*,

510 U.S. 266, 271 (1994) (quotation omitted).  It allows suits against any "person" acting under

color of state law who subjects the claimant to "the deprivation of any rights, privileges, or

immunities secured by the Constitution."  42 U.S.C. § 1983.  The Due Process Clause of the

Fourteenth Amendment prohibits "any State [from] depriv[ing] any person of life, liberty, or

property, without due process of law." U.S. Const. amend. XIV § 1.  "[T]he Due Process Clause

contains a substantive component that bars certain arbitrary, wrongful government actions . . ."

and an alleged violation thereof is actionable under § 1983. *Zinermon v. Burch*, 494 U.S. 113,

125 (1990); *see also Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) (noting that "[t]he touchstone

of due process is protection of the individual against arbitrary action of government").

"Together with § 1983, then, there is some risk of the [Due Process] Clause supplanting

state tort law in almost any suit alleging that a local official has caused harm." *Waybright v.*

*Frederick Cnty., Md.*, 528 F.3d 199, 204 (4th Cir. 2008).  Thus, the Supreme Court has made

clear that "the Due Process Clause of the Fourteenth Amendment . . . does not transform every

tort committed by a state actor into a constitutional violation." *DeShaney v. Winnebago Cnty.*

*Dep't of Social Servs.*, 489 U.S. 189, 202 (1989); *see also Cnty. of Sacramento v. Lewis*, 523

U.S. 833, 848 (1998) ("[T]he due process guarantee does not entail a body of constitutional law

imposing liability whenever someone cloaked with state authority causes harm."); *Collins v. City*

*of Harker Heights*, 503 U.S. 115, 128–29 (1992) ("[W]e have previously rejected claims that the

Due Process Clause should be interpreted to impose federal duties that are analogous to those

---

fails to show that the conduct at issue "shocks the conscience" for the purposes of a § 1983

claim.

traditionally imposed by state tort law."). In short, "applying the Clause to the ordinary run of governmental neglect, inaction, and bad policy would diminish it." *Waybright*, 528 F.3d at 204. The Supreme Court has "repeatedly emphasized that only the most egregious official conduct can be said to be arbitrary in the constitutional sense[.]" *Lewis*, 523 U.S. at 846. And the Court has likewise noted that it has "always been reluctant to expand the concept of substantive due process," and in evaluating such claims, courts must utilize "judicial self-restraint" and "the utmost care" when courts are "asked to break new ground." *Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 125 (1992).

With these principles in mind, the Supreme Court has, for half a century now, marked out executive conduct wrong enough to register on a due process scale as conduct that "shocks the conscience," and nothing less. *Cnty. of Sacramento*, 523 U.S. at 846 (citing *Rochin v. California*, 342 U.S. 165, 172 (1952)). "Where a claim sounds both in state tort law and substantive due process, state tort law is the rule and due process the distinct exception. In other words, the Supreme Court has established a strong presumption that § 1983 due process claims which overlap state tort law should be rejected and the case, if diversity is lacking, sent to state court." *Waybright*, 528 F.3d at 205. The presumption is rebuttable, but it can only be overcome by "showing governmental conduct so 'arbitrary' and 'egregious' that it 'shocks the conscience,' usually because a state actor intended harm without justification." *Id.* (citing *Cnty. of Sacramento*, 523 U.S. at 845–46).

"The Supreme Court in *Lewis* described a 'culpability spectrum' along which behavior may support a substantive due process claim." *Dean for and on behalf of Harkness v. McKinney*, 976 F.3d 407, 414 (4th Cir. 2020) (quoting *Lewis*, 523 U.S. at 848–49). Negligent misconduct does not shock the conscience and "is categorically beneath the threshold of constitutional due

process." *Lewis*, 523 U.S. at 849 (citing *e.g.*, *Daniels v. Williams*, 474 U.S. 327, 328 (1986)).
"[C]onduct intended to injure in some way unjustifiable by any government interest" lies at the
other end of the culpability spectrum and is "most likely to rise to the conscience-shocking
level." *Id.* at 849 (citing *Daniels*, 474 U.S. at 331). This intent-to-harm standard applies "when
unforeseen circumstances demand an officer's instant judgment, [such that] even precipitate
recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the
large concerns of the governors and the governed.'" *Id.* at 853 (quoting *Daniels*, 474 U.S. 332).

In the middle of the spectrum lies conduct that is deliberately indifferent, "'an
intermediate level of culpability' that can, if proven, also establish a due process violation."
*Dean*, 976 F.3d at 415 (quoting *Lewis*, 523 U.S. at 848–49). "Deliberate indifference that shocks
in one environment may not be so patently egregious in another, and our concern with preserving
the constitutional proportions of substantive due process demands an exact analysis of
circumstances before any abuse of power is condemned as conscience shocking." *Lewis*, 523
U.S. 850. "[U]nlike the intent-to-harm standard, th[e deliberate indifference] standard 'is
sensibly employed only when actual deliberation is practical.'" *Dean*, 976 F.3d at 415 (citing
*Lewis*, 523 U.S. at 851). "Certainly, time to 'reflect on [one's] actions' is a factor in determining
whether deliberate indifference is the appropriate standard." *Id.* (quoting *Browder v. City of
Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015) (Gorsuch, J.)). Both parties agree that the
deliberate indifference standard should guide the Court's analysis here. ECF 68-1, at 23; ECF
75, at 18.

At the motion to dismiss stage, Judge Bennett construed Count I as a substantive due
process claim against BPD involving the deprivation of Jeffrey Lilly's right to enforce an
existing contract and to contract with prospective buyers. ECF 34, at 21. In denying the motion

to dismiss Count I, Judge Bennett noted that "neither party addressed whether the alleged conduct 'shocks the conscience' in their submissions to the Court, and this Court is mindful that ultimately considerably more will be necessary to establish liability under § 1983." ECF 34, at 22–23. Indeed, the shocks-the-conscience standard is a high bar. *Cf. Rochin,* 342 U.S. at 165 (finding that officers forcibly pumping suspect's stomach for morphine capsules "shock[ed] the conscience"). "The behavior complained of must be egregious and outrageous." *Hernandez v. Ridley,* 734 F.3d 1254, 1261 (10th Cir. 2013) (citing *Breithaupt v. Abram,* 352 U.S. 432, 435 (1957)).

Plaintiff's § 1983 due process claim overlaps with state tort law; there is thus a presumption against it. *Waybright,* 528 F.3d at 205 (noting the "concern for the authority of state governments over areas traditionally assigned to state law—and with that, disquiet at the potentially staggering practical consequences of empowering federal judges to oversee everything from pillows left on prison stairs . . . to sewer maintenance . . . with the inflexible instrument of constitutional law."). Plaintiff argues, against a presumption to the contrary, that this case presents one of those special circumstances in which BPD's conduct shocks the conscience to such an extent that a federal action lies. ECF 75, at 19. In other words, Plaintiff claims that BPD, through the actions of Nadeau, acted deliberately indifferent to his right to enforce a contract and to contract with buyers by failing to properly and timely complete internal investigations of Raquel Lilly and the Smiths' complaints. *Id.* Plaintiff can prevail on this claim brought pursuant to the Due Process Clause only if he can show that the actions of Nadeau "shock[] the conscience." *Cnty. of Sacramento,* 523 U.S. at 846.

Defendant argues that "[n]either BPD's failure to transfer the PIB investigations sooner nor Nadeau's actions come close to approaching 'conscience shocking' behavior, and Jeffrey

Lilly does not provide a single case to support his threadbare claim that it does." ECF 86, at 13.

After carefully reviewing the record, the Court agrees that BPD's handling of the complaints and

investigation fail to establish deliberate indifference. Plaintiff contends that "[f]or the purposes

of this argument, Plaintiff's position is that, at very least, had the investigations of 2022-0156

and 2022-0347 been transferred to an outside agency and properly investigated, the Smith family

would not have felt empowered to keep the dogs, and Jeffrey Lilly would not have been

suspended without pay, lost his assignment as an FBI Task Force Officer or suffered the stress

and pain that followed." ECF 75, at 19. But failing to promptly transfer the investigations to an

outside agency due to an alleged conflict of interest does not shock the conscience. *See, e.g.,*

*Blain v. Twp. of Radnor,* 167 F. App'x 330, 333 (3d Cir. 2006) (finding that township's alleged

frivolous or non-meritorious appeal of zoning decision, threat to condemn some land for walking

paths, conflict of interest, and improper denial of subdivision plan was not conscience-shocking,

so as to constitute a violation of landowner's substantive due process rights). Plaintiff argues

that:

> Deputy Commissioner Nadeau 1) had conversations with Olufemi Akanni about
> investigating 2022-0156; 2) consulted with BPD legal about the conflict of
> interest; 3) met with Jeffrey Lilly about the dispute, 4) was named as a witness in
> both 2022-0156 and 2022-0347 by Anthony Bowling; 5) was identified for
> potential policy violations attendant to his involvement in the case; 6) ensured that
> his close friend, Daniel Popp, kept the investigation; 7) received direct
> communication from Mike Davey requesting a transfer; and 8) forwarded those
> requests to Major Callaghan. At each of the intervals above, Deputy
> Commissioner Nadeau was aware of the conflict of interest that mandated recusal
> and had the sole authority to recuse BPD pursuant to the PIB Investigative and
> Training Manual.

ECF 75, at 19–20. At worst, this conduct reveals a potentially dysfunctional and arguably

inappropriate investigative process, at least as it relates to the complaints at issue. However,

courts have repeatedly held that such administrative and investigatory failures, even when faulty

or obviously in need of improvement, do not automatically generate a substantive due process

33

claim for those aggrieved by the insufficient process. *See Scheeler v. City of St. Cloud, Minn.*, 402 F.3d 826, 832 (8th Cir. 2005) ("Certainly, the [] report may have confirmed the [plaintiffs'] view that the police could have handled the investigation more professionally, but it provides no independent basis for a civil rights claim against the defendants."); *Heward v. Bd. of Educ. of Anne Arundel Cnty.*, No. 23-cv-00195-ELH, 2023 WL 6381498, at *53 (D. Md. Sept. 29, 2023) (finding that a school imposing a "procedurally defective and unjustified two-day suspension" is not conscience-shocking behavior); *Kissinger-Stankevitz v. Town of Tappahannock*, 750 F. Supp. 3d 590, 621 (E.D. Va. 2024) ("[W]hile turning off a body camera may be contrary to policy, doing so in the manner alleged here is not so 'outrageous' as to violate the constitution on a shock-the-conscience theory."). Given the specific factual circumstances of this case, Plaintiff cannot maintain his substantive due process claim under Count I.

The Court acknowledges that Plaintiff argues that Nadeau's involvement did not end at the February 2022 meeting, and that "Nadeau improperly influenced the investigations all the way through their 'completion'" and "rewarded the people that helped him achieve his goal of violating Jeffrey Lilly's rights." ECF 75, at 20. According to Plaintiff, "[t]his conclusion is logically inferred" by Akanni's allegedly arbitrary closing of the investigations and subsequent promotion to a higher position under Deputy Commissioner Nadeau's command, Popp and Lekeshia Blue's promotion to Captain under Deputy Commissioner Nadeau's command, and Major Callaghan's promotion to the rank of Lieutenant Colonel. *Id.* However, there is no record evidence from which a reasonable juror could conclude that Nadeau was involved in Akanni's decision to not interview witnesses and close the cases. To the contrary, the undisputed evidence shows that on April 4 and 14, 2022, when attorney Mike Davey emailed Nadeau to request that an outside agency investigate the complaint against Jeffrey Lilly, Nadeau did not respond to

Davey and instead forwarded the email to Callaghan. ECF 75-33, at 3. When Davey emailed a second time, Nadeau emailed Callaghan again and stated: "I have no oversight of this case, so I am forwarding to you. I don't know who the case is assigned to." ECF 75-34, at 2. Thus, Plaintiff has failed to produce a genuine dispute of fact over Nadeau's involvement past February 8, 2022, as there is no record evidence that he was involved in the process in any meaningful way after that point. In fact, Nadeau specifically denied any involvement in handling either of the complaints in his deposition testimony. ECF 75-21, at 46, 175:10–18; at 51–52, 194:4–199:18. Further, there is no evidence that Nadeau was involved in Popp's decision to advise Smith to file charges. Plaintiff's allegations to the contrary are merely speculative and insufficient to defeat summary judgment. *See Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (explaining that a party "cannot create a genuine [dispute] through mere speculation or the building of one inference upon another"). While Plaintiff points to arguably unprofessional behavior by various members of the BPD, none of that evidence points to Nadeau. In the absence of specific evidence linking Nadeau to Popp or Akanni's actions, the only conduct that can be attributed to Nadeau is his own.

In any event, even assuming there was a *quid pro quo* arrangement in this case, the alleged conduct—promoting certain people in exchange for hindering a BPD investigation into a private familial dispute—is not so arbitrary as to shock the conscience, at least under these circumstances. *See Evans v. Chalmers*, 703 F.3d 636, 646 n.2 (4th Cir. 2012) ("Due Process Clause does not constitute a catch-all provision that provides a remedy whenever a state actor causes harm."); *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957) (reiterating that conduct that "'shocked the conscience' and was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency" would violate substantive due process); *Heward*, 2023

WL 6381498, at *53 ("The cases in [the substantive due process] realm 'typically feature quite extreme governmental wrongdoing.'" (citations omitted)). In short, a messy familial dispute that spilled into the workplace does not give rise to a substantive due process claim.

Additionally, in Bowling's memorandum requesting recusal, he noted that in order to properly conduct the investigation, he would have to ask "accusatory questions" of Nadeau and Briscoe and potentially charge them with "Neglect of Duty, Conduct Unbecoming a Police Officer/Employee and Misconduct." ECF 75-24, at 3–4. But even assuming Nadeau violated the PIB Investigative and Training Manual procedures, ECF 75-5, at 2, and could have been charged for failing to immediately transfer the matter to an outside agency, this does not rise to the level of conscience-shocking behavior. *See Estate of Morgan v. Mayor and City Council of Hampton, Va.*, 936 F. Supp. 343, 348 (E.D. Va. 1996) ("[E]ven though it is alleged that the City failed to effectively follow certain policies and procedures and to implement plans or allocate resources in the manner Plaintiffs desired for their protection, such a failure is not sufficient to meet the 'shocks the conscience' standard necessary to establish a due process violation."). It is also worth noting that the record reflects that BPD eventually *did* attempt to transfer both complaints to an outside agency. *See* ECF 75-47, at 2 (email from Major Callaghan on October 13, 2022 directing a subordinate to contact the Office of the Inspector General to ask if they would conduct the investigations). After the OIG declined to take the case, ECF 75-48, at 25, 90:7–91:1, Baltimore County Police agreed to handle the investigations and assigned the matter to Captain Longo. ECF 75-49, at 5–6, 13:3–14:3. After conducting a partial investigation, Baltimore County declined to continue the investigation due to time constraints. ECF 75-50; ECF 75-49, at 15–16, 53:11–54:5. Therefore, even assuming, as Plaintiff suggests, that BPD should have recused itself sooner in accordance with the PIB Investigative and Training

Manual's provisions, the mere delay in recusal is insufficient to give rise to a substantive due

process claim. *See Waybright*, 528 F.3d at 205 ("The shocks-the-conscience test turns on degree

of fault.").

The Supreme Court has made clear that the "due process guarantee does not entail a body

of constitutional law imposing liability whenever someone cloaked with state authority causes

harm." *Lewis*, 523 U.S. at 848. Indeed, the Fourth Circuit has clarified that "[s]ubstantive due

process exists as the 'last line of defense' against such official abuses of power that are so

arbitrary as to shock the conscience of the court." *Washington v. Housing Auth. of the City of

Columbia*, 58 F.4th 170, 182 (4th Cir. 2023) (citing *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir.

1980)). In keeping with the Court's modest role, the Court leaves resolution of Nadeau's alleged

conduct to ordinary tort litigation.[14] *See Christensen v. Cnty. of Boone, IL*, 483 F.3d 454, 464

(7th Cir. 2007) ("*Lewis* calls for judicial modesty in implementing a federal program of

constitutional torts that lie outside any specific clause of the Constitution."). The Court finds

---

[14] The Court agrees with Plaintiff that the mere availability of a state law remedy does not
directly impact the availability of Plaintiff's § 1983 suit. *See Dean*, 976 F.3d at 421 (explaining
that "the availability and adequacy of a post-deprivation state remedy is irrelevant to the analysis
for a substantive due process claim"). The Court thus declines to hold that the mere availability
of state law remedies bars the federal claim as a matter of law. However, the Court analyzes
Plaintiff's claim consistent with the rebuttable presumption set forth in *Waybright*. *See* 528 F.3d
at 205 ("[T]he Supreme Court has established a strong presumption that § 1983 due process
claims which overlap [with] state tort law should be rejected and the case, if diversity is lacking,
sent to state court."); *see also Collins*, 503 U.S. at 128 (explaining that Section 1983 should not
"be interpreted to impose federal duties that are analogous to those traditionally imposed by state
tort law"). Accordingly, the Court finds that while the presumption is rebuttable, Plaintiff failed
to show "governmental conduct so 'arbitrary' and 'egregious' that it 'shocks the conscience.'"
*Id.* (citing *Cnty. of Sacramento*, 523 U.S. at 845–46); *see also Slaughter v. Mayor and City
Council of Balt.*, 682 F.3d 317, 323 (4th Cir. 2012) ("[T]o treat the Fire Department's conduct as
a substantive due process violation would be to constitutionalize a state tort claim, which must
only be done in the rarest of cases."). As such, Plaintiff's § 1983 claim fails not because there
are state law remedies available to remedy the harm, but because the circumstances present here
do not justify expanding the narrow bounds of substantive due process claims to
"constitutionalize a state tort claim." *Slaughter*, 682 F.3d at 323.

that the evidence in this case does not rise to the level of arbitrary state action that shocks the conscience. Therefore, the Court grants summary judgment with respect to the § 1983 claim against BPD.

> 2.    No Reasonable Juror Could Find that Nadeau Caused the Alleged Constitutional Violation

Even if Nadeau's conduct did shock the conscience, and even assuming *arguendo* that Jeffrey Lilly has a valid property interest[15], Plaintiff's § 1983 claim would still fail because the record evidence does not support a finding that Nadeau *caused* the alleged constitutional violation. Plaintiff contends that "[t]hese facts present a question that only a jury can answer, namely had BPD not entertained the Smith family's complaint, and acted to retaliate against Jeffrey Lilly by suspending him without pay (which was only possible because of the decision to keep the investigation rather than transfer it) would Jeffrey Lilly have been able to reclaim his property and enforce his contract?" ECF 75, at 23. According to Plaintiff, "[a] jury could reasonably determine that BPD's conduct, through Nadeau's actions, was the moving force behind the inability of Jeffrey Lilly to enforce his contracts." *Id.* (citing *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985)). The Court disagrees.

There are three necessary elements for *Monell* liability. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). First, the plaintiff must show a constitutional harm that stems from the acts of a municipal employee "taken in furtherance of some municipal

---

[15] To succeed on a substantive due process claim, a plaintiff must prove "(1) that they had property or a property interest; (2) that the state deprived them of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that *no process* could cure the deficiency." *CMDS Residential, LLC v. Mayor and City Council of Balt.*, 714 F. Supp. 3d 583, 620 (D. Md. 2024) (emphasis in original) (citation omitted). Defendant argues that Jeffrey Lilly is not a party to the Limited Partnership Agreement in his personal capacity and therefore does not have a property interest in the puppies. ECF 68-1, at 22–23. However, even assuming Jeffrey Lilly does have a property interest, Plaintiff's claim fails on the causation prong for the reasons noted above.

'policy or custom.'" *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (quoting *Monell*, 436 U.S. at 694); *see also Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987).. As interpreted by the Fourth Circuit, a "policy or custom" can exist in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."[16] *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)). Further, the plaintiff must put forth facts showing that the policy's creation is fairly attributable to the municipality. *Spell*, 824 F.2d at 1389. Finally, the plaintiff must show an affirmative causal link between the "policy or custom," and the particular injury suffered by the plaintiff. *Id.* "[A] single act by a municipality may give rise to civil liability if it is shown that the officials of the municipality responsible for establishing the challenged policy made a calculated choice to follow the course of action deemed unconstitutional." *Pachaly v. City of Lynchburg*, 897 F.2d 723, 726 (4th Cir. 1990). To avoid imposing *respondeat superior* liability on municipalities, a plaintiff must do more than identify something that the municipality "could have done" to prevent the alleged injury. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 392 (1989); *Tuttle*, 471 U.S. at 823.

Count I alleges a municipal liability claim against BPD resulting from Nadeau's decision as a person with final policymaking authority. ECF 24, at 25–26. Plaintiff maintains that BPD "violated its own policies and procedures that govern officer discipline and investigative due

---

[16] At the motion to dismiss stage, Judge Bennett dismissed Count II against BPD and held that "Plaintiffs' allegations are insufficient at the pleading stage to allege the existence of a policy or custom of mishandling investigations, the extent of which is widespread or flagrant enough for a condonation claim." ECF 34, at 29 (citations omitted).

diligence," and figuratively speaking, "BPD held a gun to Jeffrey Lilly while the Smith family escaped with his property." ECF 75, at 23. However, there is no evidence in the record to support the sweeping accusation that failures on the part of BPD resulted in the loss of the puppies. Rather, the record evidence shows that BPD's failure to immediately transfer Robert Smith's complaint bears no causal connection to Jeffrey Lilly's inability to contract with prospective buyers or to enforce the Limited Partnership Agreement.

Even assuming that Nadeau made the decision to not transfer the complaint and further assuming that he is a person with final policymaking authority, there is no evidence that this decision caused the harm alleged by Jeffrey Lilly. While Plaintiff argues that BPD's failure to immediately transfer Smith's complaint caused the Lillys to lose the right to enforce the contract, the undisputed record evidence shows that at the time Robert Smith made his complaint, Lekeshia Blue had *already sold* the puppies that she did not intend to keep. *See* ECF 68-17, at 2 (indicating that three puppies were sold or transferred by March 11, 2022). Thus, the Court finds that Jeffrey Lilly was not deprived of his ability to contract with prospective buyers because of a decision made by Nadeau. Rather, Jeffrey Lilly was deprived of his ability to contract with prospective buyers because the Smith family did not return, and eventually sold or gifted the puppies. No reasonable juror could find otherwise on this record. Plaintiff's argument that Nadeau's alleged interference emboldened the Smiths and Lekeshia Blue to keep the puppies finds no genuine support in the record. Rather, the undisputed evidence shows that Lekeshia Blue never intended to give the litter of puppies to the Lillys after James Blue died, regardless of BPD's involvement.[17] *See* ECF 68-9, at 34, 129:5–8 (testimony by Lekeshia Blue that "[t]he

---

[17] The record evidence shows that when an attorney emailed Nadeau about the case in April 2022, Nadeau forwarded the email to Callaghan and stated: "I have no oversight of this case, so I am forwarding to you. I don't know who the case is assigned to." ECF 75-34, at 2. When

dogs were never going anywhere."); *see also* ECF 68-5, at 40, 153:3–13; ECF 68-16, at 18, 64:20–65:6.

Additionally, to the extent Plaintiff argues that the February 8, 2022 meeting between Jeffrey Lilly, Akanni, and Nadeau at BPD Headquarters establishes causation, *see* ECF 68-8, at 30, 111:18–112:8, the Court finds this argument unpersuasive because there is no evidence that in the absence of this meeting taking place, Jeffrey Lilly would have been able to reclaim the property. At the meeting, Nadeau purportedly asked Jeffrey Lilly about why he continued to call the police over what Nadeau (and the Baltimore County Police) perceived to be a civil matter. ECF 68-6, at 18. Nadeau said that he "[did not] want [Jeffrey Lilly] to embarrass the Baltimore Police Department with Baltimore County and get [himself] in trouble" by continuing to call police to the Smiths' house. *Id.* at 18–19. Nadeau also indicated that he did not want Baltimore County "going after" Jeffrey Lilly for "sending the police to those peoples' house." *Id.* at 19. Nadeau also told Jeffrey Lilly that "[n]o judge is going to hear this," and "[s]ome judge is going to laugh you out of court," especially given the timing of it all. *Id.* at 18. Jeffrey Lilly alleges that he felt intimidated during that meeting and immediately had another conversation with Akanni wherein he expressed his concern that he would be retaliated against if he tried to get the dogs back. Ex. 19 at 00:32:35–00:35:17. However, by this point, Jadan Blue had already

---

Callaghan responded to the attorney, he indicated that: "The Deputy Commissioner has recused himself from this matter and I will be handling any further decisions regarding this case." ECF 75-34, at 4. Further, Nadeau testified that he neither had knowledge of or involvement in either Raquel Lilly's or Robert Smith's complaints. ECF 75-21, at 46, 175:10–18; at 51–52, 194:4–199:18 (testimony by Nadeau that he "had no part of this investigation," and Major Callaghan and Director Akanni "oversaw" the case). Plaintiff responds by pointing generally to the promotions of certain staff members and the eventual "arbitrary" closing of the cases, but even considering these facts, Plaintiff fails to produce anything more than speculation as to a causal link between these actions and Nadeau's decisions with respect to the investigation into Jeffrey Lilly. In short, Plaintiff has failed to create a genuine dispute of fact over whether Nadeau's conduct specifically caused the alleged harm.

communicated to the Lillys that his mother intended to "keep the puppies permanently." ECF 68-5, at 40, 153:3–13. In fact, by the time Jeffrey Lilly met with Nadeau, the Lillys had already filed a police report against Lekeshia Blue for failing to return the puppies. ECF 68-8, at 34, 129:3–12 (reflecting that police were called by the Lillys on January 30, 2022); ECF 68-25, at 2 (noting police report filed on January 30, 2022); ECF 68-9, at 35, 132:4–9. Thus, the Court agrees with Defendant that "Jeffrey Lilly's contractual harm—caused by the breach of the Limited Partnership Agreement—occurred well before Robert Smith filed his complaint or any other BPD involvement in the matter," including the meeting with Nadeau. ECF 86, at 6.

Moreover, Plaintiff complains that "Popp informed Robert Smith of the date and time of Jeffrey Lilly's upcoming interview on April 26, 2024," ECF 75-35, at 2, without documenting the call in IAPro or taking it on a recorded line, in violation of PIB policy. ECF 75-36, at 2–3; ECF 75-24. During the call, Popp purportedly told the Smiths to swear out an application for charges alleging forgery on the part of Jeffrey Lilly. ECF 75-15, at 31, 116:17–117:13. However, there is no record evidence connecting Nadeau to this call or to Popp's general conduct throughout the investigation. Thus, for the purposes of *Monell* liability, Popp's conduct cannot be interpreted as a decision made by a person with final policymaking authority. While Plaintiff supports his federal claim with scattershot allegations targeting multiple employees, including Popp and Akanni, this Court already clarified that, "Judge Bennett limited the *Monell* claim to one based 'on a single, deliberate decision regarding a single instance of conduct' by [Nadeau], namely the investigation into [Jeffrey] Lilly." ECF 66 at 3. Thus, the Court declines to consider evidence that falls outside the scope of the *Monell* claim, as doing so would expand BPD's liability under a theory of *respondeat superior*, which is clearly barred. *See City of*

*Canton*, 489 U.S. at 385 ("*Respondeat superior* or vicarious liability will not attach under §
1983.").

Additionally, the claim cannot survive based solely on Plaintiff's claim that he was
deprived of the right to enforce the contract because, as Defendant points out, Jeffrey Lilly has
"hired attorneys, sent demand letters, and took multiple enforcement actions throughout this case
that eventually culminated in a lawsuit to enforce his contractual rights." ECF 86, at 7. Thus,
because the undisputed facts show that Nadeau's decision to not immediately transfer the
complaints to an outside agency did not cause Jeffrey Lilly's harm, the Court grants summary
judgment in favor of BPD.[18]

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF 68, is
granted.

A separate implementing Order will issue.

Dated: <u>June 17, 2025</u>                                                      <u>          /s/          </u>
                                                                        Brendan A. Hurson
                                                                        United States District Judge

---

[18] Because the Court found that Nadeau's conduct did not shock the conscience, and in the
alternative, that Nadeau did not cause the alleged constitutional violation, the Court declines to
reach Defendant's remaining arguments that BPD is entitled to summary judgment because
Jeffrey Lilly does not have a valid property interest in the puppies, Nadeau was not a final
policymaker, and BPD's actions were not taken under color of state law for the purposes of
Section 1983. ECF 68-1.